**Highland Capital Management, L.P.**
**Schedule of Investments**
**(in millions)**
**Current Case**

| Investment | Estimated Value | Remaining Loan Balances | Mark Date |
|---|---|---|---|
| *Remaining Assets* | | | |
| Crusader Deferred Incentive Fees | $ 22.1 | | Estimate as of 4/30/09 |
| Highland Capital Management Europe Limited | 12.2 | | 5/31/2009 |
| Conversus Capital Equity | 9.8 | | 6/22/2009 |
| Highland CLO Value Fund, L.P. | 5.0 | | 4/30/2009 |
| American Banknote Corp | 3.7 | | 5/29/2009 |
| HySky Communications, LLC | - | | 5/29/2009 |
| Terrestar Corporation (Motient) | 0.2 | | 4/30/2009 |
| Highland Special Situations Fund | 2.5 | | 5/31/2009 |
| Highland Healthcare Fund | 1.9 | | 6/22/2009 |
| Solstice Neurosciences | 2.4 | | 5/29/2009 |
| Restoration Capital Partners | 1.6 | | Estimate as of 3/31/09 - includes 4/3 sub |
| Highland Crusader Fund, L.P. | 1.7 | | Estimate as of 4/30/09 |
| Highland Credit Strategies Fund RIC | 3.3 | | 6/22/2009 |
| Angiotech Pharmaceuticals, Inc. | 6.4 | | 6/22/2009 |
| Highland Distressed Opportunities, Inc. | - | | Merged with HCF |
| HE Capital LLC | 1.3 | | 4/30/2009 |
| Cornerstone Healthcare Group | 1.1 | | 5/29/2009 |
| Highland Financial Corporation | 0.3 | | Estimate as of 5/29/09 |
| Rockwall CDO | 1.4 | | 4/30/2009 |
| Highland Real Estate Fund 2002-A, L.P. | 0.2 | | Estimate as of 5/29/09 |
| Highland Long/Short Equity Fund | 2.0 | | 6/22/2009 |
| Highland Select Equity Fund, L.P. | 0.1 | | Estimate as of 4/30/09 |
| HP CDO | 0.04 | | 4/30/2009 |
| Total | $ 79.3 | | |
| | | | |
| *REIT Assets* | | | |
| NBREC Highland Village, L.P. | $ 2.5 | | 5/29/2009 |
| HCREA Trimarchi of North Dallas, L.P. | - | | 5/29/2009 |
| HE Capital KR, LLC | - | | 5/29/2009 |
| Total REIT Assets | $ 2.5 | | |
| | | | |
| *New Assets* | | | |
| Highland Real Estate Fund 2002-A, L.P. | $ 3.0 | | Estimate as of 5/29/09 |
| Restoration Capital Partners | 2.0 | | Estimate as of 3/31/09 - includes 4/3 sub |
| Total New Assets | $ 5.0 | | |
| | | | |
| Total Remaining Assets | $ 86.8 | | |
| | | | |
| *Awarded Deferred Compensation Securities* | | | |
| Restoration Capital Partners | $ 7.0 | | Estimate as of 3/31/09 - includes 4/3 sub |
| Highland Real Estate Fund 2002-A, L.P. | 6.4 | | Estimate as of 5/29/09 |
| Total Deferred Compensation Assets | $ 13.3 | | |
| | | | |
| *Vested Assets Reserved For Terminated Employees* | | | |
| Highland Real Estate Fund 2002-A, L.P. | $ 0.8 | | Estimate as of 5/29/09 |
| Highland Credit Strategies Fund RIC | 0.6 | | 6/22/2009 |
| Total Vested Assets Reserved for Terminated Employees | $ 1.4 | | |
| | | | |
| *Assets for Future Compensation* | | | |
| HE Sugar Land Project, LLC | $ 2.0 | | 5/29/2009 - revised estimate |
| Highland CLO Value Fund, L.P. | 2.8 | | 4/30/2009 |
| Pamco CLO B1 | 2.8 | | 4/30/2009 |
| Pamco CLO B2 | 2.7 | | 4/30/2009 |
| HE Mezz KR, LLC | 0.4 | | 5/29/2009 |
| Highland Real Estate Fund 2002-A, L.P. | 1.6 | | Estimate as of 5/29/09 |
| Restoration Capital Partners | 2.2 | | Estimate as of 3/31/09 - includes 4/3 sub |
| Total Assets for Future Compensation | $ 14.5 | | |
| | | | |
| Total Assets for Compensation | $ 29.3 | | |
| | | | |
| *Assets to Repay Governance RE* | | | |
| Highland CLO Value Fund, L.P. | $ 2.1 | | 4/30/2009 |
| | | | |
| *Assets to Repay Loan to Services* | | | |
| Pamco CLO B1 | $ 1.8 | | 4/30/2009 |
| Pamco CLO B2 | 1.8 | | 4/30/2009 |
| HCREA Nolen Drive, L.P. | 1.3 | | 5/29/2009 |
| HCREA Lockhill Retail, L.P. | 1.5 | | 5/29/2009 |
| Total | $ 6.4 | $ 8.8 | |
| | | | |
| *Assets to Repay Jim/Mark* | | | |
| Restoration Capital Partners | $ 7.8 | - | Estimate as of 3/31/09 - includes 4/3 sub |
| | | | |
| Total Assets to Repay Loans | $ 14.1 | $ 8.8 | |

EXHIBIT 1

exhibitsticker.com

App. 0001

FILED
3/17/2022 3:54 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

**CAUSE NO. 12-04005**

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § § | |
| v. | § § | |
| PATRICK DAUGHERTY, | § § § | |
| Defendant and Counter-Plaintiff, | § § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| SIERRA VERDE, LLC, HIGHLAND EMPLOYEE RETENTION ASSETS LLC, JAMES DONDERO, PATRICK BOYCE, AND WILLIAM L. BRITAIN, | § § § § § § | |
| Third-Party Defendants. | § | 68th JUDICIAL DISTRICT |

## AGREED MOTION TO PARTIALLY VACATE
## THE FINAL JUDGMENT DATED JULY 14, 2014

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Highland Capital Management, L.P. ("Highland") and Defendant Patrick Daugherty ("Daugherty" and together with Highland, the "Parties") file this *Agreed Motion to Partially Vacate the Final Judgment Dated July 14, 2014* (the "Motion") and respectfully show the following:

1. On July 14, 2014, this Court entered a *Final Judgment* (the "Judgment") that, among other things, granted Highland's motion for injunctive relief against Daugherty.

2. The Judgment was amended on March 23 and June 23, 2017.

3. On October 16, 2019, Highland filed a petition under chapter 11 in the United States Bankruptcy Court for the District of Delaware ("Highland's Bankruptcy Case"). On October 24,

AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 1 OF 5
4883-8008-2966.1

EXHIBIT

2

App. 0002

2019, as a result of the commencement of Highland's Bankruptcy Case, the Supreme Court of Texas issued an order abating a related case that Daugherty had brought in that court, Case No. 19-0758.   Highland's Bankruptcy Case was subsequently transferred to the United States Bankruptcy Court for the Northern District of Texas.

4.      Daugherty asserted certain claims against Highland in Highland's Bankruptcy Case. The Parties have fully and finally resolved their disputes pursuant to a settlement agreement (the "Settlement Agreement") reached in the Highland Bankruptcy Case pursuant to which, among other things, (a) all of Daugherty's known and unknown claims against each of the Highland Released Parties (as those terms are defined in the Settlement Agreement) are resolved, and (b) this Motion seeking the *vacatur* of certain provisions of the Judgment specifically set forth below is being filed.

5.      Highland and Daugherty hereby agree and stipulate that the Court has plenary power to issue an order granting this Motion because the Court retained authority to enforce the permanent injunction rendered in the Judgment, and that changed circumstances have now arisen such that the Court should dissolve the permanent injunction.  Highland and Daugherty further agree and stipulate that this Motion shall be treated as an agreement of the Parties pursuant to Texas Rule of Civil Procedure 11 and is fully enforceable. *See Coale v. Scott*, 331 S.W.3d 829, 831-32 (Tex. App.—Amarillo 2011, no pet.) ("Irrespective of whether a trial court lost its plenary jurisdiction over its judgment, the trial court's authority to approve a Rule 11 agreement does not depend on whether it has such jurisdiction.").

6.      Highland and Daugherty agree that the following portions of the Judgment shall be vacated pursuant to their settlement in the Highland Bankruptcy Case:

AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 2 OF 5
4883-8008-2966.1

App. 0003

a.  The second full paragraph on Page 2 of the Judgment, which begins "The Court, after considering the jury's findings regarding Daugherty's breaches of contract and breaches of fiduciary duty . . .";

b.  The permanent injunction rendered against Daugherty in the third full paragraph on Page 2 of the Judgment, which begins "It is therefore further ORDERED that Daugherty be and hereby is commanded to cease and desist from . . .";

c.  The fourth and fifth full paragraphs on Page 2 of the Judgment awarding Highland a monetary judgment against Daugherty for reasonable and necessary attorney's fees, as well as post-judgment interest on that award[1]; and

d.  The jury's answers to Questions 1, 2, 5, 6, 9 and 12 in the Verdict, which was attached as Exhibit 1 to the Judgment.

7.  Highland and Daugherty further agree that, as a result of the vacation of the permanent injunction in the Judgment, Highland hereby withdraws any pending motions to show cause or motions for contempt against Daugherty that allege Daugherty violated or is violating the permanent injunction.  Highland also agrees not to seek to enforce the permanent injunction in any manner in the future.

---

[1] Daugherty previously satisfied the monetary judgment awarded to Highland, and Highland filed a release of the monetary judgment.  Although Highland and Daugherty have agreed to vacate the monetary judgment awarded to Highland, Daugherty waives and relinquishes any right or claim to recover any amount previously paid in satisfaction of the Judgment and Highland shall not be required to reimburse Daugherty for his prior satisfaction of the monetary judgment.  To the extent Daugherty is entitled to indemnification for any liabilities, losses, and damages allegedly incurred by him for actions taken in connection with Highland's business, including the liabilities Daugherty allegedly incurred in connection with this action and the Judgment, such indemnification claims have been fully and finally satisfied and resolved under the Settlement Agreement.

App. 0004

8.     Concurrent with the filing of this Motion, Daugherty will file a motion to dismiss his as-yet unfiled petition for review pending before the Supreme Court of Texas under Case No. 19-0758.

9.     Highland and Daugherty further agree that any portions of the Judgment that are not specifically vacated pursuant to this Motion shall remain in full force and effect.

WHEREFORE, Highland and Daugherty pray that the Court grant this Motion in its entirety, and for all further relief, at law or in equity, the Court deems necessary.

Respectfully submitted,

GRAY REED

By: ___/s/ Andrew K. York_____
   ANDREW K. YORK
   State Bar No. 24051554
   Email: dyork@grayreed.com

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332

**ATTORNEYS FOR PATRICK DAUGHERTY**

-and-

**HAYWARD PLLC**

/s/ Zachery Z. Annable_____
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Suite 106
Dallas, Texas 75231
Telephone:  (972) 755-7100
Facsimile:  (972) 755-7110

**COUNSEL FOR
HIGHLAND CAPITAL MANAGEMENT, L.P.**

App. 0005

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been transmitted by electronic transmission to all counsel of record on March 17, 2022, as follows:

Zachery Z. Annable
HAYWARD LLP
10501 N. Central Expy, Suite 106
Dallas, Texas 75231
ZAnnable@HaywardFirm.com

Marc D. Katz
Crystal J. Woods
DLA PIPER LLP (US)
1717 Main St., Suite 3700
Dallas, Texas 75201
marc.katz@dlapiper.com
crystal.woods@dlapiper.com

Attorneys for Highland Capital
Management, L.P.

Michael K. Hurst
Jonathan Childers
LYNN PINKER COX HURST, LLP
2100 Ross Ave., Suite 2700
Dallas, Texas 75201
mhurst@lynnllp.com
sbrown@ lynnllp.com
jchilders@ lynnllp.com

Attorneys for Third-Party Defendants HERA,
Patrick Boyce, and William Britain

/s/ Andrew K. York
ANDREW K. YORK

App. 0006

FILED
DALLAS COUNTY
9/19/2014 5:16:31 PM
GARY FITZSIMMONS
DISTRICT CLERK

CAUSE NO. 12-04005

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| PATRICK DAUGHERTY, | § § | |
| Defendant and Counter-Plaintiff, | § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| SIERRA VERDE, LLC, HIGHLAND EMPLOYEE RETENTION ASSETS LLC, JAMES DONDERO, PATRICK BOYCE, AND WILLIAM L. BRITAIN, | § § § § § | |
| Third-Party Defendants. | § § | 68th JUDICIAL DISTRICT |

## THIRD-PARTY DEFENDANT HIGHLAND EMPLOYEE RETENTION ASSETS LLC'S NOTICE OF CASH DEPOSIT IN LIEU OF SUPERSEDEAS BOND AND AFFIDAVIT ESTABLISHING NET WORTH

WHEREAS, Defendant and Counter-Plaintiff obtained a judgment in the above captioned matter against Third-Party Defendant Highland Employee Retention Assets LLC ("HERA"), signed by the Court on July 14, 2014 (the "Judgment"); and

WHEREAS, Third-Party Defendant HERA attaches and files the Affidavit Establishing Net Worth of Highland Employee Retention Assets LLC, which presents detailed evidence regarding HERA's negative net worth of ($2,447.709) based on HERA's balance sheet, as permitted by Rule 24.2(c) of the Texas Rules of Appellate Procedure. **Exhibit A.** This constitutes prima facie evidence of its net worth for purposes of its obligation to provide a bond, deposit, or security under Rule 24.2(a)(1) of the Texas Rules of Appellate Procedure; therefore,

NOTICE OF CASH DEPOSIT IN LIEU OF SUPERSEDEAS BOND                                    PAGE 1

EXHIBIT

3

App. 0007

Pursuant to Texas Rules of Appellate Procedure 24.2, HERA hereby gives notice that it has deposited the cash sum of $1.00 with the District Clerk of Dallas County, Texas, conditioned that HERA shall prosecute its appeal with effect, and in case the final judgment of the last of the Court of Appeals, Supreme Court of Texas, or Supreme Court of the United States to dispose of the appeal shall be against Defendant, shall pay up to the aggregate liability of One Dollar ($1.00) if Defendant does not perfect an appeal or if the appeal is dismissed and Defendant does not perform the trial court's judgment; or Defendant does not perform an adverse judgment final on appeal. **Exhibit B.**

Respectfully submitted,

**GRUBER HURST JOHANSEN HAIL SHANK LLP**

By:_ */s/ John Franklin Guild*_____

    Michael K. Hurst
     State Bar No. 10316310
     mhurst@ghjhlaw.com
    A. Shonn Brown
     State Bar No. 24007164
     sbrown@ghjhlaw.com
    Jonathan R. Childers
     State Bar No. 24050411
     jchilders@ghjhlaw.com
    John Franklin Guild
     State Bar. No. 24041022
     jguild@ghjhlaw.com
    1445 Ross Avenue, Suite 2500
    Dallas, Texas 75202
    Telephone: (214) 855-6800
    Facsimile: (214) 855-6808

**ATTORNEYS FOR THIRD-PARTY DEFENDANTS HIGHLAND EMPLOYEE RETENTION ASSETS LLC, PATRICK BOYCE, AND WILLIAM L. BRITAIN**

**NOTICE OF CASH DEPOSIT IN LIEU OF SUPERSEDEAS BOND**                                      **PAGE 2**

App. 0008

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 19th day of September, 2014, a true and correct copy of the foregoing document was served on the following counsel of record as follows:

<u>**Via CMRRR & Email**</u>
James W. Ribman
Ruth Ann Daniels
William B. Chaney
Drew York
Rachel M. Crockett
GRAY REED & MCGRAW, P.C.
1601 Elm Street, Suite 4600
Dallas, TX 75201
(214) 954-4135

Charles T. Frazier, Jr.
ALEXANDER DUBOSE JEFFERSON & TOWNSEND LLP
4925 Greenville Avenue, Suite 510
Dallas, Texas 75206
(214) 369-2358

<u>**Via CMRRR & Email**</u>
Marc D. Katz
Isabel A. Crosby
William J. Moore
Jason R. Regas
ANDREWS KURTH LLP
1717 Main Street, Suite 3700
Dallas, TX 75201
(214) 659-4400

*/s/ John Franklin Guild*
John Franklin Guild

**NOTICE OF CASH DEPOSIT IN LIEU OF SUPERSEDEAS BOND**                    **PAGE 3**

App. 0009

CAUSE NO. 12-04005

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| PATRICK DAUGHERTY, | § § | |
| Defendant and Counter-Plaintiff, | § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| SIERRA VERDE, LLC, HIGHLAND EMPLOYEE RETENTION ASSETS LLC, JAMES DONDERO, PATRICK BOYCE, AND WILLIAM L. BRITAIN, | § § § § § | |
| Third-Party Defendants. | § § | 68th JUDICIAL DISTRICT |

## AFFIDAVIT ESTABLISHING NET WORTH OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC

| | |
|---|---|
| STATE OF TEXAS | § § § |
| COUNTY OF DALLAS | § |

On this day, David Klos appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said:

1. "My name is David Klos. I am over 21 years of age, of sound mind, capable of making this affidavit, and I have personal knowledge of the facts stated in this affidavit as the Senior Manager of Finance for Highland Capital and oversee accounting relating to the assets and liabilities of Highland Employee Retention Assets LLC, and the facts stated are true and correct.

2. Highland Employee Retention Assets LLC has a negative current net worth of ($2,447,709) as of August 31, 2014 (the "Net Worth Calculation"). Attached as

Exhibit A

App. 0010

Exhibit 1 to this affidavit is a true and correct copy of the unaudited balance sheet for Highland Employee Retention Assets LLC as of August 31, 2014. The statements and representations contained within the statements are true and correct as of the date of the statements.

3. Highland Employee Retention Assets LLC owns the following real property: None.

4. Highland Employee Retention Assets LLC owns the following interests in personal property: None.

5. Highland Employee Retention Assets LLC has cash on hand in the amount of $0 as of August 31, 2014.

6. Highland Employee Retention Assets LLC has the following amount of funds on deposit that it may withdraw: $0.

7. Highland Employee Retention Assets LLC has the following assets, other than those described above:

- Investment in HE Sugar Land Project LLC: $107,362. This is the only asset currently listed on the Balance Sheet of Highland Employee Retention Assets LLC.

- A contingent interest in assets held in escrow pursuant to an Escrow Agreement, a true and correct copy of which is attached hereto as Exhibit 2 (the "Deposit Assets"). The Deposit Assets are not presently controlled by or available to Highland Employee Retention Assets LLC. Per the Escrow Agreement, if a final, non-appealable judgment against Highland Employee Retention Assets LLC is reached, Abrams & Bayliss, LLP, as Escrow Agent, will transfer the Deposit Assets to Highland Employee Retention Assets LLC. As such, for bookkeeping purposes, the Deposit Assets are contingent assets, whose ultimate value should not be recorded on the balance sheet or included in the Net Worth Calculation until such time as a final, non-appealable judgment against Highland Employee Retention Assets LLC is reached.

8. Highland Employee Retention Assets LLC has the following debts and other liabilities:

- Highland Employee Retention Assets LLC is liable to Highland Capital Management, L.P. for legal expenses funded on its behalf in the total amount of $7,459,568. Only $2,555,071 of that amount is included on the Balance Sheet or the Net Worth Calculation because $4,904,497 of that liability have been written off by Highland Capital Management, L.P. as of December 31, 2013 assuming a lack of collectability from Highland Employee Retention Assets LLC. It should be noted, however, that

App. 0011

Highland Employee Retention Assets LLC remains liable to Highland Capital Management, L.P. for the entire $7,459,568, such that any future liquidity achieved at Highland Employee Retention Assets LLC would become fully due and payable to Highland Capital Management, L.P. up to $7,459,568.

- On July 14, 2014, a court entered a final judgment against Highland Employee Retention Assets LLC for $2,600,000 plus interest (the "Judgment Debt"). For bookkeeping purposes, the Judgment Debt is a contingent liability due to the inherent uncertain outcome of a final, non-appealable judgment, and will remain so until such time as a final, non-appealable judgment is reached. Accordingly, the Judgment Debt is not recorded on the balance sheet or included in the Net Worth Calculation.

Signature of Affiant

### Certification of Oath or Affirmation

On this date, I administered the above oath or affirmation from the person named above. I am a Notary Public and am authorized to administer an oath or affirmation pursuant to Texas Government Code. If I have a seal of office that I am required by law to affix to documents when administering an oath or affirmation, then I have included an original impression of may official seal below.



DEANNE SCHRECK
Notary Public State of Texas
My Commission Expires
December 22, 2015

Signature of Person Administering Oath or Affirmation

9/19/14

Date

App. 0012

# EXHIBIT 1

## FINANCIAL STATEMENTS

`

**Highland Employee Retention Assets, LLC ("HERA")**
**Balance Sheet (unaudited)**
**as of August 31, 2014**

**Assets**

| | | |
|---|---|---|
| Cash | $ | - |
| Investment in HE Sugar Land Project LLC | | 107,362 |
| Other assets [2] | | - |
| **Total Assets** | **$** | **107,362** |

**Liabilities and equity**
  **Liabilities**

| | | |
|---|---|---|
| Due To HCMLP [1] | $ | 2,555,071 |
| Other liabilities [2] | | - |
| **Equity** | | (2,447,709) |
| **Total liabilities and equity** | **$** | **107,362** |

(1) Amount represents expenses incurred by HERA during calendar year 2014 only, which have been paid by Highland Capital Management, L.P. ("HCMLP") on HERA's behalf. Note that during calendar year 2012 and calendar year 2013, an additional $4,904,497 of expenses were incurred by HERA, but paid by HCMLP on HERA's behalf. For bookkeeping purposes these 2012 and 2013 amounts have been written off by HCMLP, assuming a lack of collectability from HERA and accordingly HERA has also written off these obligations to HCMLP
It should be noted, however, that HERA remains liable to HCMLP for the entire **$7,459,568** ($2,555,071 per the balance sheet above, plus $4,904,497 written off), such that any future liquidity achieved at HERA would become fully due and payable to HCMLP up to $7,459,568. Additionally, any future expenses funded by HCMLP on HERA's behalf would further increase the amount owed to HCMLP

(2) • On July 14, 2014, a court entered a final judgment against HERA, which is currently subject to appeal. The amount specified to compensate Daugherty for these damages was $2,600,000 plus interest. Per the Escrow Agreement dated December 13, 2013 between HCMLP and Abrams & Bayliss, LLP, if a final, non-appealable judgment against HERA is reached, Abrams & Bayliss, LLP as Escrow Agent, will transfer the HERA Deposit Assets to HERA. As such, for bookkeeping purposes, the Deposit Assets as well as the damage award of $2,600,000 plus interest are contingent assets and liabilities, due to the inherent uncertain outcome of a final, non-appealable judgment. Accordingly, neither the asset or liability is recorded on the balance sheet. In the event of a final, non-appealable judgment against HERA the Deposit Assets would be recognized by HERA as an asset as would the $2,600,000 liability to Daugherty (or different amount in the event that the final, non-appealable judgment were to differ from the original jury finding).

App. 0014

**EXHIBIT 2**

**ESCROW AGREEMENT**

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT is entered into December 13, 2013, by and between Highland Capital Management, L.P. ("Depositor"), and Abrams & Bayliss, LLP, as escrow agent (the "Escrow Agent").

WHEREAS, from time to time, pursuant to certain transactions, Depositor receives and holds certain funds; and

WHEREAS, Depositor is desirous of appointing the Escrow Agent as its agent to hold these funds subject to the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.      **Appointment.** Depositor hereby appoints Escrow Agent as its escrow agent for the purposes set forth herein, and Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.      **Deposit Assets.** Depositor agrees to deposit with Escrow Agent the assets as set forth in Schedule 1 (the "Deposit Assets"). Escrow Agent shall hold the Deposit Assets as set forth in this Escrow Agreement. Escrow Agent shall not have any liability for any loss sustained as a result of any increase or decrease of value of any Deposit Assets or for the failure of an Authorized Representative of Depositor to give Escrow Agent instructions regarding any Deposit Asset. All interest or other income earned under this Agreement shall be accumulated and become part of the Deposit Assets. Depositor hereby represents to Escrow Agent that Depositor shall file all necessary tax documentation in relation to the Deposit Assets and no other tax reporting of any kind is required given the underlying transaction giving rise to this Agreement.

3.      **Disposition and Termination.**

(a) The Escrow Agent shall deliver the Deposit Assets upon, and pursuant to, the written instructions of Depositor in compliance with Section 3(b). Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of the Deposit Assets, must be in writing or set forth in a Portable Document Format ("PDF"), executed by Depositor as evidenced by the signatures of the person or persons signing this Agreement or one of its designated persons as set forth in Schedule 2 (each an "Authorized Representative"), and delivered to Escrow Agent only by confirmed facsimile or attached to an email on a Business Day only at the fax number or email address set forth in Section 8 below. No instruction for or related to the transfer or distribution of the Deposit Assets shall be deemed delivered and effective unless Escrow Agent actually shall have received it on a Business Day by facsimile or as a PDF attached to an email only at the fax number or email address set forth in Section 8 and as evidenced by a confirmed transmittal to Depositor's transmitting fax number or email address and Escrow Agent has been able to satisfy any applicable security procedures as may be required hereunder. Escrow Agent shall not be liable to Depositor or other person for refraining from acting upon any instruction for or related to the transfer or distribution of the Deposit Assets if delivered to any other fax number or email address, including but not limited to a valid email address of any employee of Escrow Agent. Depositor acknowledges that Escrow Agent is authorized to use the following funds transfer instructions to disburse any Deposit Assets due to Depositor, respectively, without a verifying call-back, as set forth in Section 3(b) below:

Depositor: Bank name:    Compass Bank
                         Account Name: Highland Capital Management, L.P. (Master Operating Account)
                         Routing# 113010547
                         Account# 0025876342

{A&B-00276659-2}



1

PLAINTIFFS 0799691

App. 0016

(b) Escrow Agent shall only transfer Deposit Assets under the following circumstances:

   i.   In the event Escrow Agent is provided a final, non-appealable judgment against Highland Employee Retention Assets, LLC ("HERA") by Patrick Daugherty, his successors, or assigns ("Daugherty") in the case *Highland Capital Management, L.P. and Cornerstone Healthcare Group Holding, Inc. v. Patrick Daugherty v. Sierra Verde, LLC, et al.*, Cause No. 12-04005 in the 68th Judicial District of Dallas County, Texas ("Daugherty Action"), Escrow Agent shall, within 10 Business Days, transfer to HERA Deposit Assets equivalent to the amount of such judgment, or if the judgment against HERA exceeds the amount of Deposit Assets, Escrow Agent shall transfer to HERA all Deposit Assets, including accumulated income, held by Escrow Agent.

   ii.   In the event Escrow Agent is provided a final, non-appealable order dismissing Daugherty's claims against HERA in the Daugherty Action, Escrow Agent shall, within 10 Business Days, transfer all Deposit Assets, including accumulated income, to Depositor.

All transfers made in this Section 3(b) shall be made subject to Sections 6 and 7 herein.

   (c) As used in this Section 3, "Business Day" shall mean any day other than a Saturday, Sunday or any Federal holiday. Upon delivery of the Deposit Assets by Escrow Agent, this Agreement shall terminate, subject to the provisions of Sections 6 and 7 herein.

4.   **Escrow Agent.** Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature. No other duties shall be implied, and under no circumstances shall the Escrow Agent be deemed a fiduciary of Depositor for the purposes of this Agreement. Escrow Agent has no knowledge of, nor any requirement to comply with, the terms and conditions of any other agreement, instrument or document other than this Agreement. Escrow Agent may conclusively rely upon any written notice, document, instruction or request delivered by Depositor believed by it to be genuine and to have been signed by an Authorized Representative without inquiry and without requiring substantiating evidence of any kind. Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it pursuant to, or in relation to this Agreement, except for willful misconduct causing direct loss to Depositor. Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents. Escrow Agent shall have no duty to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. Anything in this Agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

5.   **Resignation; Succession.** Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving ten (10) days advance written notice specifying a date when such resignation shall take effect. Escrow Agent shall deliver the Deposit Assets to any appointed successor escrow agent, or to the Depositor, at which time Escrow Agent's obligations under this Agreement shall cease and terminate. Any entity into which Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business may be transferred, shall be the Escrow Agent under this Agreement without further act.

6.   **Compensation.** Depositor agrees to pay Escrow Agent upon execution of this Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder as agreed by Escrow Agent and Depositor.

7.   **Indemnification and Reimbursement.** Depositor agrees to indemnify, defend, hold harmless, pay or reimburse Escrow Agent and its affiliates and their respective successors, assigns, directors, partners, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, costs or expenses (including, without limitation, attorney's fees, expert fees and expenses and out-of-pocket expenses) (collectively "Losses"), arising out of or in connection with (a) Escrow Agent's performance of this Agreement, except to the extent that such Losses are determined by a court of competent jurisdiction through a final, non-appealable order to have been caused by the willful misconduct of

{A&B-00276659-2}

2

PLAINTIFFS 0799692

App. 0017

such Indemnitee; and (b) Escrow Agent's following any instructions or directions from Depositor received in accordance with this Agreement. Depositor shall pay all expenses (including attorney's fees) incurred by such Indemnitee as they are incurred in advance of the dispute's final disposition. The foregoing indemnification includes, but is not limited to, disputes between Depositor and Escrow Agent arising out of or in connection with this Agreement. Depositor hereby grants Escrow Agent a lien on, right of set-off against and security interest in the Deposit Assets for the payment of any claim for indemnification, fees, expenses and amounts due to Escrow Agent or an Indemnitee. In furtherance of the foregoing, Escrow Agent is expressly authorized and directed, but shall not be obligated, to charge against and withdraw from the Deposit Assets for its own account or for the account of an Indemnitee any amounts due to Escrow Agent or to an Indemnitee under Section 6 or 7. The obligations set forth in this Section 7 shall survive the resignation, replacement or removal of Escrow Agent or the termination of this Agreement.

8.     **Notices.** All communications hereunder shall be in writing or set forth in a PDF attached to an email, and all instructions from Depositor to the Escrow Agent shall be executed by an Authorized Representative, and shall be delivered in accordance with the terms of this Agreement by facsimile, email or overnight courier only to the appropriate fax number, email address, or notice address set forth for each party as follows:

| | |
|---|---|
| If to Depositor: | Highland Capital Management, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, Texas, 75201<br>Attention: General Counsel<br>Tel No.: (972) 628-4100<br>Fax No.: (972) 628-4147<br>Email: sellington@hcmlp.com |
| If to Escrow Agent: | Abrams & Bayliss, LLP<br>20 Montchanin Road, Suite 200<br>Wilmington, Delaware 19807<br>Attention: Jean Chaney<br>Tel No.: (302) 388-2457<br>Fax No.: (302) 261-0293<br>Email: chaney@AbramsBayliss.com |

9.     **Compliance with Court Orders.** Escrow Agent shall provide Depositor with prompt written notice in the event that any of the Deposit Assets shall be attached, garnished, levied upon, or otherwise be subject to any court order, or the delivery thereof shall be stayed or enjoined by an order of a court. Escrow Agent hereby is expressly authorized, in its sole discretion, to obey and comply with all such orders so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that Escrow Agent obeys or complies with any such order it shall not be liable to Depositor hereto or to any other person by reason of such compliance notwithstanding such order be subsequently reversed, modified, annulled, set aside or vacated.

10.     **Miscellaneous.** The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing signed by the Escrow Agent and Depositor. Neither this Agreement nor any right or interest hereunder may be assigned by Depositor without the prior consent of Escrow Agent. This Agreement shall be governed by and construed under the laws of the State Delaware. Depositor and Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consent to service of process by mail or in any other manner permitted by applicable law and consents to the exclusive jurisdiction of the courts located in the State of Delaware. To the extent that in any jurisdiction either Party may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, such Party shall not claim, and hereby irrevocably waives, such immunity. Escrow Agent and Depositor further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement. No party to this Agreement is liable to any other party for losses due to, or if it is unable to

{A&B-00276659-2}     3

PLAINTIFFS 0799693

perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or instruction, as applicable. All signatures of the parties to this Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Depositor represents warrants and covenants that each document, notice, instruction or request provided by Depositor to Escrow Agent shall comply with applicable laws and regulations. Except as expressly provided in Section 7 above, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than Escrow Agent and Depositor any legal or equitable right, remedy, interest or claim under or in respect of the Deposit Assets or this Agreement. The parties agree that irreparable harm would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which they are entitled at law or in equity. This Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred from the terms of this Agreement or any other agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective on the date set forth above:

HIGHLAND CAPITAL MANAGEMENT, L.P.
As Depositor

By: _____
Name: James Dondero
Title: President of Strand Advisors, Inc., as general partner

ABRAMS & BAYLISS, LLP.
As Escrow Agent

By: _____
Name: Kevin G. Abrams
Title: Managing Partner

PLAINTIFFS 0799694

App. 0019

## SCHEDULE 1

The following shall be the Deposit Assets:

| Asset | Amount |
| --- | --- |
| Cash (USD) | $ 1,210,502.03 |
| Highland Restoration Capital Partners, L.P. limited partner interest (USD as of 9/30/2013) | $ 1,820,050.49 |
| Cash equivalent of NexPoint Credit Strategies Deposit Assets (such amount to be updated at the end of each calendar month) | 1088.42 shares |

(A&B-00276659-2)                                    5

PLAINTIFFS 0799695

App. 0020

**SCHEDULE 2**

**Telephone Numbers and Authorized Signatures for**
**Person(s) Designated to Give Joint Instructions and Confirm Deposit Assets Transfer Instructions**

For Depositor:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
| 1.  Scott Ellington | (972) 419-2584 | |

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email,  must include the signature of the Authorized Representative authorizing said funds transfer on behalf of each Party.

**PLAINTIFFS 0799696**

App. 0021

# OFFICIAL RECEIPT
## DALLAS COUNTY OFFICIAL RECEIPT GARY FITZSIMMONS, DISTRICT CLERK

Payor
HIGHLAND EMPLOYEE RETENTION ASSETS LLC
BE SERVED THROUGH ITS REGISTERED AGENT
THE CORPORATION TRUST COMPANY CORPORATION
TRUST CENTER
1209 ORANGE ST
WILMINGTON, DE 19801

Receipt No.
**55189-2014-DCLK**

Transaction Date
09/19/2014

| Description | Amount Paid |
|---|---|

On Behalf Of  HIGHLAND EMPLOYEE RETENTION ASSETS LLC
    DC-12-04005
    HIGHLAND CAPITAL MANAGEMENT LPet al vs. PATRICK DAUGHERTYet al
    Bond Account

| | |
|---|---|
| CASH BOND DEPOSIT (CIVIL) | 1.00 |
| **SUBTOTAL** | **1.00** |

**PAYMENT TOTAL**  | **1.00** |

| | |
|---|---|
| CASH Tendered | 1.00 |
| Total Tendered | 1.00 |
| Change | 0.00 |

| 09/19/2014 | Cashier | Audit |
|---|---|---|
| 03:16 PM | Station DC126 | 57579793 |

## OFFICIAL RECEIPT

Exhibit B

App. 0022

HIGHLAND CAPITAL MANAGEMENT VS. PATRICK DAUGHERTY          1
LETTERS ROGATORY MOTION - 09-22-14

**REPORTER'S RECORD**
**VOLUME 33 OF 41 VOLUMES**
**CAUSE NO. 05-14-01215-CV**
**TRIAL COURT CAUSE NUMBER 12-04005-C**

| | | |
|---|---|---|
| **HIGHLAND CAPITAL** | § | **IN THE DISTRICT COURT** |
| **MANAGEMENT, L.P., AND** | § | |
| **CORNERSTONE HEALTHCARE** | § | |
| **GROUP HOLDING, INC.,** | § | |
| Plaintiffs and Counter-Defendants, | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **PATRICK DAUGHERTY,** | § | |
| Defendant and Counter-Plaintiff, | § | **68TH JUDICIAL DISTRICT** |
| | § | |
| **VS.** | § | |
| | § | |
| **SIERRA VERDE, LLC, HIGHLAND** | § | |
| **EMPLOYEE RENTENTION ASSETS LLC,** | § | |
| **JAMES DONDERO, PATRICK BOYCE** | § | |
| **AND WILLIAM L. BRITAIN,** | § | |
| Third-Party Defendants. | § | **OF DALLAS COUNTY, TEXAS** |

_____

**LETTERS ROGATORY MOTION**

_____

ON THE **22nd DAY OF SEPTEMBER, 2014,** the following proceedings came on to be heard outside the presence of the jury, in the above-entitled and numbered cause; and the following proceedings were had before the HONORABLE MARTIN HOFFMAN, Judge of the 68th Judicial District Court in Dallas, Dallas County, Texas:

Proceedings reported by Computerized Stenotype Machine.

ANTIONETTE REAGOR, OFFICIAL COURT REPORTER
68TH JUDICIAL DISTRICT COURT - 600 Commerce Street
Dallas, Texas  75202
(214) 653-7158

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

EXHIBIT

4

HIGHLAND CAPITAL MANAGEMENT VS. PATRICK DAUGHERTY            11
LETTERS ROGATORY MOTION - 09-22-14

THE COURT: I just had a question. I'm trying to -- 24.2(c)2 says the creditor may conduct reasonable discovery concerning the judgment of debtor's net worth. I'm just looking at the rule. I'm not looking at any cases right now.

Is there case law that says you have to file a contest before the discovery occurs? Maybe there is. I just don't know.

MR. CHANEY: I am not sure of that, Your Honor, but out of an abundance of caution, I, as I said, I intend to be filing that. The chances that I'm not going to are very remote.

THE COURT: Let me just tell you my general view on this, which is, I'm inclined to allow pretty broad discovery on this issue; you know, reasonable, obviously. I'm not going to allow everything in the world, but given kind of the lead up to this and the judgment, I'm inclined to allow, you know, a fairly robust discovery. I find it curious that HERA now is claiming to have a zero value, given kind of the history of this, or negative value.

MR. HURST: Respectfully, Your Honor, everything that's in the sworn financial statement has been provided to the other side and it's been provided to the Court, also came up during trial; that is the exact same assets, approximately the exact same value with the loan

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0024

that Highland made on the attorney's fees to HERA for the purposes of litigation.  All those things came out during trial.  There's nothing new.  There's nothing all of a sudden that there's a judgment against HERA that the financial statements changed.  It is the exact same position that took place at trial.  We've given more net worth than would even be required under, for instance, net worth discovery and the allegation of punitive damages by virtue of the affidavit that we provided.  They're not going to find anything by doing a net worth request that's any different from what we've filed in our supersedeas bond.  That is the net worth.

THE COURT:  The main question I have at this point is just is it premature?  I don't know if it is.  I don't see anything in the rule that indicates it is premature, but I'm not familiar with it.

Do you have case law, Mr. Guild, that indicates that it's required to file the contest first and then --

MR. GUILD:  No, Your Honor.  I have not seen case law one way or the other on that topic.

MR. FRASER:  Your Honor, I have researched this and written on it.  The cases say simply that when a judgment debtor files a bond or cash deposit based upon net worth as opposed to the amount required by statute or by the rule, the judgment creditor is permitted to take

App. 0025

HIGHLAND CAPITAL MANAGEMENT VS. PATRICK DAUGHERTY          13
LETTERS ROGATORY MOTION - 09-22-14

depositions discovery.  It doesn't say it's a condition to contest before.  The discovery, of course, is broad, but the issue is the --

THE COURT:  That really makes more sense to me that you would -- I mean, because how -- why would you need to contest it if you don't know that there's a reason to contest it?

MR. HURST:  Procedurally it's interesting because, obviously, the supersedeas bond is supposed to suspend inadequate discovery in the attempts to execute on the judgment.  I agree with Charlie that you can do net worth discovery.  It seems like it would make sense that it would be subsequent to a contest of net worth.  All I'm saying, Your Honor, is they're getting the exact same thing that we've already put in the bond anyway.

THE COURT:  What in particular are you opposing?  Can I see a copy of the Letters Rogatory?

MR. CHANEY:  Let me get that for you.

MR. HURST:  Do you have a copy of our -- here's their motion.

MR. CHANEY:  Your Honor, may I approach?

THE COURT:  Sure.

MR. CHANEY:  Out of our notebook, this is a duplex, double-sided, copy.  You need to turn there.

THE COURT:  Okay.  Remind me what Abrams &

FILED
DALLAS COUNTY
12/8/2016 9:52:12 AM
FELICIA PITRE
DISTRICT CLERK

Marissa Pittman

DC-16-15669

CAUSE NO. _____

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § § § | IN THE DISTRICT COURT OF |
| Plaintiff/Garnishor | § § § | |
| v. | § § § | DALLAS COUNTY, TEXAS |
| HIGHLAND EMPLOYEE RETENTION ASSETS, LLC | § § § | |
| Garnishee. | § | 68th JUDICIAL DISTRICT |

### PLAINTIFF HIGHLAND CAPITAL MANAGEMENT, L.P.'S APPLICATION FOR WRIT OF GARNISHMENT

Pursuant to Texas Rule of Civil Procedure 658 and Texas Civil Practice and Remedies Code § 63.001 *et seq.*, Plaintiff Highland Capital Management, L.P. ("Highland" or "Garnishor") applies to this Court for an order directing issuance of a writ of garnishment against Garnishee Highland Employee Retention Assets, LLC ("HERA" or "Garnishee"), and would respectfully show the Court as follows:

### I.    PARTIES

1.    Garnishor Highland Capital Management, L.P. is a Delaware limited partnership with its principal place of business located at 300 Crescent Ct #700, Dallas, TX 75201. It can be served through its counsel of record in this matter.

2.    Defendant Patrick Daugherty ("Mr. Daugherty" or "Judgment-Debtor"), is an individual residing in Texas who can be served at his home address of 3621 Cornell Avenue, Dallas, Texas 75205 pursuant to Texas Rule of Civil Procedure 663a.

**PLAINTIFF HIGHLAND CAPITAL MANAGEMENT, L.P.'S APPLICATION
FOR WRIT OF GARNISHMENT—Page 1**
DAL:948780.1

EXHIBIT
5

3.      Garnishee Highland Employee Retention Assets, LLC is a Delaware limited liability company and may be served with process through its registered agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## II.      BACKGROUND

4.      On July 14, 2014, Highland obtained a personal judgment against Mr. Daugherty in Cause No. DC-12-04005, *Highland Capital Management, L.P., et. al v. Patrick Daugherty*, in the 68th Judicial District Court in Dallas County, Texas (the "Final Judgment"). A copy of the Final Judgment is attached as **Exhibit A** and incorporated by reference. The Final Judgment awards Highland, as the judgment creditor, recovery of $2,800,000 plus post-judgment interest at the rate of 5% per annum, which through the filing of this application amounts to a total of approximately $3,129,095.89. The amount to be garnished should include all interest incurred through the date the Final Judgment is satisfied.

5.      The Final Judgment is in all things final, valid, and subsisting, and it is wholly unsatisfied. All appeals have concluded and the Dallas Court of Appeals has issued its mandate to the trial court.

## III.      REQUEST FOR WRIT OF GARNISHMENT

6.      Highland requests the issuance of a Writ of Garnishment based on the Final Judgment.

7.      Highland has reason to believe that Garnishee is indebted to Judgment-Debtor. Indeed, Garnishee is itself a judgment debtor to Mr. Daugherty under the Final Judgment in the amount of $2.6 million plus prejudgment and post-judgment interest. A copy of the Final Judgment is attached as **Exhibit A** and incorporated by reference evidencing the debt that HERA owes to Mr. Daugherty.

**PLAINTIFF HIGHLAND CAPITAL MANAGEMENT, L.P.'S APPLICATION**
**FOR WRIT OF GARNISHMENT—Page 2**
DAL:948780.1

App. 0028

8.      Highland seeks to garnish all monies, sums, or debts which Garnishee may owe to Judgment-Debtor, up to and including the amount of the Final Judgment, plus interest, and any attorneys' fees said garnishment may require.

9.      Within Highland's knowledge, Mr. Daugherty does not have property within this State subject to execution which is sufficient to satisfy the above-described Judgment.

10.     The Garnishment is not sought to injure Mr. Daugherty or Garnishee, but rather to allow Highland to collect on Mr. Daugherty's debt under the Final Judgment.

11.     This application is supported by the affidavit of Scott Ellington, a person having knowledge of the relevant facts. Mr. Ellington's affidavit is attached as **Exhibit B** and incorporated by reference.

## IV.      PRAYER

12.     WHEREFORE, Highland requests that the Writ of Garnishment be issued, and that Highland have judgment against Garnishee to satisfy the Final Judgment as provided by law, together with all costs of court, and such other relief to which Highland may be justly entitled.

**PLAINTIFF HIGHLAND CAPITAL MANAGEMENT, L.P.'S APPLICATION
FOR WRIT OF GARNISHMENT—Page 3**
DAL:948780.1

App. 0029

Respectfully submitted,

*/s/ Marc D. Katz*_____
Marc D. Katz
State Bar No. 00791002
marckatz@andrewskurth.com
Isabel A. Crosby
State Bar No. 24050266
isabelcrosby@andrewskurth.com
**ANDREWS KURTH KENYON LLP**
1717 Main Street, Suite 3700
Dallas, Texas  75201
Telephone: (214) 659-4400
Facsimile:  (214) 659-4401

**PLAINTIFF HIGHLAND CAPITAL MANAGEMENT, L.P.'S APPLICATION
FOR WRIT OF GARNISHMENT—Page 4**
DAL:948780.1

App. 0030

# EXHIBIT A

481 C

CC190

CAUSE NO. 12-04005

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiffs, | § § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| PATRICK DAUGHERTY, | § § | |
| Defendant and Counter-Plaintiff, | § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| SIERRA VERDE, LLC, HIGHLAND EMPLOYEE RETENTION ASSETS LLC, JAMES DONDERO, PATRICK BOYCE, AND WILLIAM L. BRITAIN, | § § § § § | |
| Third-Party Defendants. | § § § | 68th JUDICIAL DISTRICT |

## FINAL JUDGMENT

On January 14, 2014, this case was called to trial. Plaintiff/Counter-Defendant Highland Capital Management, L.P. ("Highland"), and Third-Party Defendants Sierra Verde, LLC and James Dondero ("Dondero") appeared themselves and/or through their attorneys of record and announced ready for trial. Defendant/Counter-Plaintiff/Third-Party Plaintiff Patrick Daugherty ("Daugherty") appeared himself and through his attorneys of record and announced ready for trial. Highland Employee Retention Assets LLC ("HERA"), Patrick Boyce, and William L. Britain appeared themselves and/or through their attorneys of record and announced ready for trial.

After a jury was impaneled and sworn, it heard evidence and arguments of counsel. In response to the jury charge, the jury made findings that the Court received, filed, and entered of record. The questions submitted to the jury and the jury's findings are attached as Exhibit 1 hereto and incorporated by reference.

**FINAL JUDGMENT - Page 1**
DAL:894638.4

6

App. 0032

The Court renders this Final Judgment under the jury verdict and the evidence heard at trial, as well as having considered any and all post-verdict motions and briefing submitted to the Court and arguments of counsel.

The Court, after considering the jury's findings regarding Daugherty's breaches of contract and breaches of fiduciary duty owed to Highland, and after hearing evidence and considering the nature of the harm suffered by Highland as a result, finds and concludes that Highland is entitled to relief hereinafter given.

It is therefore further ORDERED that Daugherty be and hereby is commanded to cease and desist from retaining, using, disclosing, publishing or disseminating Highland's (or its affiliates') confidential, proprietary, and/or privileged information, including but not limited to information concerning Highland's customers, clients, marketing, business and operational methods, contracts, financial data, technical data, e-mail, pricing, management methods, finances, strategies, systems, research, plans, reports, recommendations and conclusions, tear sheets, industry comparative analysis, Collateralized Loan Obligation (CLO) and other structured products, and names, arrangements with, or other information relating to Highland's (or its affiliates') customers, clients, suppliers, financiers, owners, and business prospects. Notwithstanding the foregoing, Daugherty may use or disclose the information described in this paragraph only as (i) required by law; or (ii) directed and authorized in writing by Highland

The Court further ORDERS that Highland have and recover from Daugherty $2,800,000 for reasonable and necessary attorneys' fees rendered through trial.

It is further ORDERED that the total amount of the judgment here rendered for Highland against Daugherty will bear interest at the rate of 5% per annum from the date this judgment is signed until paid.

FINAL JUDGMENT - Page 2
DAL:894638.4

7

App. 0033

Furthermore, the Court, after considering the jury's findings regarding HERA's breach of the implied covenant of good faith and fair dealing, finds and concludes that Daugherty is entitled to relief hereinafter given.

It is therefore further ORDERED that Daugherty have and recover $2,600,000 from HERA, ~~representing the full value of Daugherty's interest in HERA as determined by the jury.~~

It is further ORDERED that Daugherty shall no longer have any ownership or other interest in HERA or any proceeds or accounts arising from Daugherty's prior interest in HERA that were not distributed to Daugherty prior to the entry of this judgment, Daugherty having been awarded the full value of that interest in HERA as determined by the jury.

It is further ORDERED that total amount of the actual damages rendered against HERA herein will bear prejudgment interest at the rate of 5% simple interest from May 22, 2012, until the day before this judgment is signed.

It is further ORDERED that the total amount of the judgment here rendered against HERA will bear interest at the rate of 5% per annum, compounded annually, from the date this judgment is signed until paid.

Furthermore, the Court, after considering the jury's findings regarding the claims for breach of fiduciary duty asserted against Patrick Boyce and William L. Britain by Third-PartyCounter -Plaintiff Patrick Daugherty, suing individually and/or suing derivatively on behalf of Highland Employee Retention Assets LLC, finds that Boyce and Britain are entitled to a take-nothing judgment as to all claims asserted against them.

It is therefore further ORDERED that Third-Party Counter-Plaintiff Patrick Daugherty, suing individually and/or derivatively on behalf of Highland Employee Retention Assets LLC,

**FINAL JUDGMENT - Page 3**
DAL:894638.4

8

shall take nothing on the claims for breach of fiduciary duty against Patrick Boyce and William L. Britain.

This judgment disposes of all claims asserted against Patrick Boyce and William L. Britain in the above-captioned cause. All other relief that Daugherty seeks pertaining to Boyce and Britain not expressly granted in this judgment is denied.

It is further ORDERED that all Parties shall bear their own respective costs of Court.

All writs and processes for the enforcement and collection of the judgment may issue as necessary.

All relief requested and not expressly granted is denied. This judgment disposes of all parties and claims and is appealable.

**FINAL JUDGMENT - Page 4**
DAL.894638.4

9

App. 0035

SIGNED on ___July 14___, 2014.


_____

The Honorable Martin Hoffman

FINAL JUDGMENT - Page 5
DAL:894638.4

10

# EXHIBIT B

11

<u>**AFFIDAVIT OF SCOTT ELLINGTON**</u>

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF DALLAS** | § |

**BEFORE ME,** the undersigned authority, personally appeared Scott Ellington, who after being duly sworn, stated on his oath as follows: ·

1.      "My name is Scott Ellington. I am over the age of twenty-one years and of sound mind. I have never been convicted of a felony or any crime of moral turpitude. I am fully competent to testify to the matters set forth in this Affidavit. All the matters contained in this Affidavit are true and correct and based upon my personal knowledge.

2.      I am the General Counsel at Highland Capital Management, L.P. ("Highland"). In that capacity, I have overseen the litigation against Patrick Daugherty related to his employment at Highland. I have exercised this role for a number of years. It is through my oversight of that litigation and through my work as General Counsel at Highland that I gained personal knowledge of the facts set forth in this affidavit.

3.      On July 14, 2014, Highland obtained a personal judgment against Mr. Daugherty in Case No. DC-12-04005, *Highland Capital Management. L.P., et. al v. Patrick Daugherty*, in the 68th Judicial District Court in Dallas County, Texas (the "Final Judgment"). The Final Judgment awards Highland, as the judgment creditor, recovery of $2,800,000 plus post-judgment interest at the rate of 5% per annum, which through the filing of this application amounts to $3,129,095.89.

4.      In the Final Judgment, Highland Employee Retention Assets, LLC ("HERA") is itself a judgment debtor to Mr. Daugherty under the Final Judgment in the amount of

12

App. 0038

$2,600,000.00 plus prejudgment and post-judgment interest. The Final Judgment is valid and subsisting.

5.    Within Highland's knowledge, Defendant Patrick Daugherty does not possess property in Texas subject to execution sufficient to satisfy the Final Judgment.

*[Remainder of page left intentionally blank.]*

13

**FURTHER AFFIANT SAYETH NOT.**

Scott Ellington
General Counsel
Highland Capital Management, L.P.

**SWORN TO AND SUBSCRIBED** before me on the 23ʳᵈ day of

November , 2016.

Notary Public in and for the State of Texas

[*Seal*]

SARAH ASHLEY BELL
Notary ID # 130183004
My Commission Expires
April 8, 2019

Printed Name: Sarah Bell

My commission expires: April 8 , 2019

14

App. 0040

EFiled: Feb 15 2019 04:00PM EST
Transaction ID 62975131
Case No. 2017-0488-MTZ

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,

    Plaintiff,

    v.

HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND EMPLOYEE RETENTION ASSETS LLC, HIGHLAND ERA MANAGEMENT LLC, and JAMES DONDERO,

    Defendants,

    and

HIGHLAND EMPLOYEE RETENTION ASSETS LLC,

    Nominal Defendant.

C.A. No. 2017-0488-MTZ

## SECOND AMENDED VERIFIED COMPLAINT

### YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE COURT OF CHANCERY OF THE STATE OF DELAWARE

If you are not authorized by Court Order to view or retrieve this document, read no further than this page. You should contact the following person:

Thomas A. Uebler (#5074)
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401, Wilmington, DE 19808
(302) 468-5960
*Attorneys for Patrick Daugherty*

**A public version of this document will be filed on or before February 22, 2019.**

**EXHIBIT**

**6**

App. 0041

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PATRICK DAUGHERTY,<br><br>Plaintiff,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND EMPLOYEE RETENTION ASSETS LLC, HIGHLAND ERA MANAGEMENT LLC, and JAMES DONDERO,<br><br>Defendants,<br><br>and<br><br>HIGHLAND EMPLOYEE RETENTION ASSETS LLC,<br><br>Nominal Defendant. | C.A. No. 2017-0488-MTZ |

### SECOND AMENDED VERIFIED COMPLAINT

Patrick Daugherty brings this action against Highland Capital

Management, L.P., a Delaware limited partnership ("Highland Capital"),

Highland Employee Retention Assets LLC, a Delaware limited liability

company ("Highland Employee Retention Assets" or "HERA"), Highland

ERA Management LLC ("Highland ERA Management"), and James

Dondero to collect a judgment entered in Daugherty's favor in Texas against

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0042

Highland Employee Retention Assets; to return assets fraudulently transferred from Highland Employee Retention Assets; for dissolution of Highland Employee Retention Assets and distribution of its assets; for breach of fiduciary duty against Highland ERA Management and Dondero in connection with self-dealing transactions involving Highland Employee Retention Assets; for aiding and abetting breach of fiduciary duty against Highland Capital in connection with those self-dealing transactions; for breach of the implied covenant of good faith and fair dealing against Highland ERA Management and Dondero; for indemnification and fees on fees against Highland Capital under its partnership agreement; for unjust enrichment against Highland Capital; and for promissory estoppel against Highland Capital.

### Introduction

1.      On December 1, 2016, the Court of Appeals for the Fifth District of Texas at Dallas issued a Mandate in the lawsuit captioned *Highland Capital Management, L.P. v. Daugherty*, 12-04005, District Court of Dallas County, Texas, 68th Judicial District (Dallas) (the "Texas Action"), concluding over four years of litigation between Highland Capital, Highland Employee Retention Assets, and Daugherty.  The appellate court affirmed the final judgment of the trial court.

2

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

2.     The final judgment of the trial court included the following provisions, with the judge's handwritten markup:

Furthermore, the Court, after considering the jury's findings regarding HERA's breach of the implied covenant of good faith and fair dealing, finds and concludes that Daugherty is entitled to relief hereinafter given.

It is therefore further ORDERED that Daugherty have and recover $2,600,000 from HERA, ~~representing the full value of Daugherty's interest in HERA as determined by the jury.~~

It is further ORDERED that Daugherty shall no longer have any ownership or other interest in HERA or any proceeds or accounts arising from Daugherty's prior interest in HERA that were not distributed to Daugherty prior to the entry of this judgment, Daugherty having been awarded the full value of that interest in HERA as determined by the jury.

It is further ORDERED that total amount of the actual damages rendered against HERA herein will bear prejudgment interest at the rate of 5% simple interest from May 22, 2012, until the day before this judgment is signed.

It is further ORDERED that the total amount of the judgment here rendered against HERA will bear interest at the rate of 5% per annum, compounded annually, from the date this judgment is signed until paid.

3.     Under the final judgment, Daugherty was awarded $2.6 million in damages against Highland Employee Retention Assets, plus pre- and post-judgment interest, as compensation for the diminution of value of Daugherty's units as a result of Highland Employee Retention Assets' breach of the implied covenant of good faith and fair dealing.

3

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0044

4.    The Texas court rejected the notion that the damages award extinguished Daugherty's interest in Highland Employee Retention Assets, striking that language from the form of judgment proposed by Highland Employee Retention Assets.

5.    Highland Employee Retention Assets has failed to satisfy Daugherty's judgment.  During 2013 and 2014, after the Texas Action commenced, Dondero, Highland ERA Management, and Highland Capital caused Highland Employee Retention Assets to fraudulently or otherwise wrongfully transfer its assets to Highland Capital, which purportedly left Highland Employee Retention Assets insolvent.

6.    In this action, Daugherty seeks to have Highland Employee Retention Assets, Highland Capital, Dondero, and Highland ERA Management satisfy his Texas judgment and return fraudulently transferred assets to Highland Employee Retention Assets.

7.    Further, because Highland Employee Retention Assets can no longer fulfill its original limited purpose, which was the retention of Highland Capital employees, it should be dissolved.  Once its fraudulently or wrongfully transferred assets are returned, those assets should be distributed to Daugherty as the sole remaining member.

4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

8.    Daugherty also brings claims on behalf of himself and Highland Employee Retention Assets against Highland ERA Management, Dondero, and Highland Capital for self-dealing transactions that Highland ERA Management and Dondero caused Highland Employee Retention Assets to enter into for the benefit of Highland Capital.

9.    Finally, Daugherty seeks indemnification from Highland Capital for his defense costs, including attorneys' fees, in the Texas Action to the extent that such costs were incurred in defending claims against him "by reason of any act performed or omitted to be performed in the name of or on behalf of [Highland Capital], or in connection with [Highland Capital's] business." He also seeks fees on fees in prosecuting this action.

**The Parties**

10.    Daugherty resides in Dallas, Texas. Daugherty was a partner and senior executive of Highland Capital and certain of its affiliates from 1998 until 2011, when Daugherty resigned.

11.    Defendant Highland Capital is a Delaware limited partnership with its principal place of business at 300 Crescent Court #700, Dallas, Texas 75201. Highland Capital was co-founded by defendant Dondero and non-party Mark Okada and is controlled by them, their affiliates, and various trusts for their benefit and the benefit of their immediate families. Dondero

5

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

is Highland Capital's president. Highland Capital is an SEC-registered investment adviser that claims to have approximately $14.9 billion of assets under management.

12. Defendant and nominal defendant Highland Employee Retention Assets is a Delaware limited liability company that was formed on June 23, 2009.

13. Defendant Highland ERA Management, a Delaware limited liability company, was formed on February 1, 2013. Dondero was and is the president and the sole member of Highland ERA Management. As demonstrated below, it is a mere instrumentality and Dondero's alter ego. Dondero is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

**Daugherty's Interest in Highland Employee Retention Assets**

14. Highland Capital performed poorly during the 2008-2009 financial crisis. Late in 2008, Highland Capital was viewed as a firm likely to default. It had very little cash and available assets for incentive-compensation purposes. Accordingly, Highland Employee Retention Assets was created by Highland Capital to curb employee resignations by offering

6

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

employees a replacement of their previously received deferred compensation that was awarded on February 27, 2009.

15.    Highland Employee Retention Assets was intended to be an independent (from Highland Capital) standalone entity to retain, reward, and incentivize Highland Capital's employees (excluding Dondero and Okada) by granting them equity-like awards in certain funds, and then distributing the proceeds of those interests to the employees in their capacity as unit holders of Highland Employee Retention Assets.

16.    When Highland Employee Retention Assets was formed, Highland Capital "represent[ed], warrant[ed] and covenant[ed]" that the three purposes for which Highland Employee Retention Assets was created were and would remain "limited solely to":

    a.    "directly owning and holding assets to be contributed by [Highland Capital] and to distribute the proceeds of such assets from time to time to certain employees of [Highland Capital] in order to create a retention incentive for such employees (the 'Retention Assets')";

    b.    "distribute the proceeds of the Retention Assets in accordance with the terms of the Series A Preferred Units of [Highland Employee Retention Assets]"; and

7

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

c.    "transacting any and all lawful business for which a limited liability company may be organized under Delaware law that is incident, necessary and appropriate to accomplish the foregoing."

17.    Under the Limited Liability Company Agreement of Highland Employee Retention Assets LLC dated October 26, 2009, the purpose of Highland Employee Retention Assets

> shall be to receive and hold assets to be contributed by [Highland Capital] and to distribute the proceeds of such assets from time to time to certain employees of [Highland Capital] (or of affiliates of [Highland Capital], as applicable) as the Board may from time to time determine in order to create a retention initiative for such employees and to engage in such other lawful purposes and activities in connection with the foregoing.

Ex. A, § 2.1.

18.    Daugherty became a member of Highland Employee Retention Assets on October 26, 2009, subject to a vesting schedule requiring Daugherty to remain employed at Highland Capital through May 15, 2011.

19.    Under his award agreement, Daugherty was initially awarded 1,571.86 Series A Preferred Units and was the largest holder in Highland Employee Retention Assets.

20.    Daugherty's ownership percentage increased as other employees resigned from Highland Capital prior to vesting.  Daugherty

8

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

remains a member of Highland Employee Retention Assets and holds 1,909.69 vested Series A Preferred Units.

**Highland Employee Retention Assets' Mistreatment of Daugherty**

21.    Daugherty resigned from Highland Capital on September 28, 2011.  At the time of his resignation, Daugherty was a director of Highland Employee Retention Assets.

22.    On February 16, 2012, all the directors of Highland Employee Retention Assets except Daugherty removed Daugherty as a director.  *See* Ex. B.  Immediately thereafter, the newly composed board executed a Second Amended and Restated Agreement (drafted by Thomas Surgent, Highland Capital's assistant general counsel and chief compliance officer) (the "2012 Amendment").  *See* Ex. C.

23.    On March 6, 2012, Brian Collins, Highland Capital's director of human resources, distributed the 2012 Amendment to all unit holders of Highland Employee Retention Assets.

24.    The 2012 Amendment added a new Article 12, which included dispute-resolution and confidentiality provisions:

a.    If any member of Highland Employee Retention Assets, including a holder of Series A Preferred Units (i.e., Daugherty), "commences litigation" or "otherwise initiates any dispute or makes any claim ... related

9

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0050

to [Highland Employee Retention Assets]" against Highland Employee Retention Assets, any of its directors, officers, or agents, or any Highland Employee Retention Assets member, *including Highland Capital*, or that does or could adversely impact the assets held by Highland Employee Retention Assets, "then with the consent of 75% of the Board, all pending and future distributions to" that litigating member "shall be immediately suspended and held in escrow by [Highland Employee Retention Assets] until the final, non-appealable resolution of the Dispute."

b.    If the litigating member does not prevail, the full costs of the litigation, including attorneys' fees, are deducted from the escrow account and the balance will be distributed to the litigating member. However, even if the litigating member prevails, the Board has sole discretion to withhold the escrowed funds to cover any diminution in value to Highland Employee Retention Assets "resulting from or in connection with" the litigation, as determined by the Board in its sole discretion. Any withheld funds are to be reallocated to the other Preferred Unit holders on a pro-rata basis.

### The Texas Action and Dondero's Takeover of Highland Employee Retention Assets

25.    In 2012, after Daugherty participated in a Highland Capital-sanctioned exit interview with concerned investors and after Daugherty

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0051

testified under court order in another legal matter involving Dondero, Highland Capital commenced the Texas Action against Daugherty. The Texas Action was filed just seven weeks after the 2012 Amendment.

26. Daugherty responded in the Texas Action with counterclaims against Highland Capital for breach of contract and defamation and third-party claims against Highland Employee Retention Assets and others. Daugherty alleged breach of contract and breach of the covenant of good faith and fair dealing against Highland Employee Retention Assets and Highland Capital based on the 2012 Amendment.

27. During the Texas Action, Dondero sought to gain control of Highland Employee Retention Assets by buying its units held by current and former employees of Highland Capital.

28. On December 26, 2012, Dondero schemed with Ted Dameris, then a board member of Highland Employee Retention Assets and an employee of Highland Capital and a current board member of Highland Capital affiliate NexBank Capital, Inc., and employee of Highland Capital, to "offer everyone except 1 a buyout offer at 100% cash and 40% discount on" non-cash assets of Highland Employee Retention Assets.

29. On January 18, 2013, and January 31, 2013, Highland Capital presented an offer to all Highland Employee Retention Assets unit holders—

11

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

except Daugherty—to purchase their units for 100 percent of the value of their cash interests and 60 percent of the value of their non-cash interests.

30. On January 17, 2013, and January 18, 2013, the board of Highland Employee Retention Assets collaborated with Dondero to transfer the powers of the board to Highland ERA Management. At the time, Highland ERA Management was not validly formed under Delaware law.

31. On January 19, 2013, the board members of Highland Employee Retention Assets resigned after each received a buyout offer from Highland Capital, and Highland ERA Management (i.e., Dondero) became the sole manager of Highland Employee Retention Assets. At the time, Highland ERA Management was not validly formed under Delaware law.

32. Highland Capital's director of human resources, Brian Collins, and Surgent peddled Highland Capital's offer to buy out the unit holders of Highland Employee Retention Assets—except Daugherty—through an Offer to Purchase dated January 31, 2013. The Offer to Purchase expired on February 15, 2013.

33. On February 1, 2013, the date that Highland ERA Management was formed under Delaware law, Dondero executed the Third Amended and Restated Agreement of Highland Employee Retention Assets (again drafted

12

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

by Surgent), which stripped virtually all the rights of Highland Employee Retention Assets unit holders.  It eliminated:

a.    the purposes for which Highland Employee Retention Assets was created;

b.    the requirement of Highland Employee Retention Assets to make cash distributions to unit holders to cover pass-through tax obligations attributable to Highland Employee Retention Assets; and

c.    members' rights to indemnification.  *See* Ex. D.

34.    Also on February 1, 2013, Dondero executed an Expense Allocation Agreement on behalf of Highland Capital and Highland Employee Retention Assets under which the parties reallocated 93.4 percent of Highland Capital's purported legal expenses related to the Texas Action to Highland Employee Retention Assets.  *See* Ex. E.

35.    Highland Capital supposedly incurred $1,142,284 in legal expenses in the Texas Action as of December 31, 2012, compared to $154,029 incurred by Highland Employee Retention Assets over the same time period.

36.    On February 7, 2013, Highland Capital, at the direction of Dondero, offered Daugherty $0 for his interest in Highland Employee Retention Assets.  Highland Capital claimed that "the costs, expenses, and

13

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

diminution of the assets" exceeded Daugherty's value in Highland Employee Retention Assets.

37.    All Highland Employee Retention Assets unit holders except Daugherty purportedly sold their units to Highland Capital. Upon information and belief, however, Highland Capital used Highland Employee Retention Assets' funds, not solely its own funds, to purchase the units.

38.    On April 30, 2013, Dondero executed an Assignment Agreement on behalf of Highland Capital and Highland Employee Retention Assets, declaring that Highland Capital held the "sole economic interest in [Highland Employee Retention Assets]" following the consummation of the transactions pursuant to the Offer to Purchase. *See* Ex. F.

39.    The Assignment Agreement further resolved that "[Highland Capital] and [Highland Employee Retention Assets] have each determined that it is in their respective best interest" to transfer substantially all the assets of Highland Employee Retention Assets as "in-kind distribution[s]" to Highland Capital (then valued at approximately $9,700,000). *See id.*

40.    Dondero, through Highland ERA Management, was and is in full control of Highland Employee Retention Assets and its assets. It was fitting, therefore, in the Texas Action when Dondero described himself as

14

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"the man behind the curtain solving financial puzzles." Dondero also refers to himself as "the wizard."

41. In December 2013, approximately one month before trial in the Texas Action, Highland Capital placed Daugherty's Highland Employee Retention Assets interests, valued at the time at approximately $3.1 million, into escrow, with the law firm Abrams & Bayliss LLP as escrow agent (the "Escrow"). *See* Ex. G. One year earlier, Abrams & Bayliss had represented Highland Employee Retention Assets in responding to a books and records demand by Daugherty relating to the Texas Action.

42. Under the Escrow, if Daugherty prevailed in the Texas Action, escrowed funds in the amount of the judgment—or the entire amount if the judgment exceeded the balance—were to be transferred to Highland Employee Retention Assets and then to Daugherty.

43. During the Texas Action on January 23, 2014, Dondero testified as follows regarding the Escrow:

> Q. Okay. So -- so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and [Highland Employee Retention Assets], **what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?**
> A. **They go to him.**
> Q. I'm sorry?
> A. They go **to him** via to [Highland Employee Retention Assets] and then **to him**. (Emphasis added.)

15

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0056

44. Dondero also confirmed that Highland Capital's buyout of the unit holders in January and February 2013 extinguished the original limited purpose of Highland Employee Retention Assets:

> Q. So -- why did the escrow agreement not get signed until December of 2013?
> A. My recollection is as follows: After [Highland Employee Retention Asset] went from being an employee retention program with 30-odd participants clamoring for their money but it all mucked up in litigation, Highland [Capital] wrote a check for $10 million to give those people, in all fairness, liquidity and what they deserved for staying around at Highland [Capital]. Once Highland [Capital] bought out all their units, there were only two unit holders, Highland [Capital] and Pat Daugherty, and **there was no retention purpose left in the vehicle**. (Emphasis added.)

45. After a three-week trial in the Texas Action, the jury found that Highland Employee Retention Assets breached the implied covenant of good faith and fair dealing by adopting Section 12.1 in the 2012 Amendment. The jury awarded Daugherty damages of $2.6 million plus interest. *See* Ex. H. The jury also found that Dondero and Highland Capital defamed Daugherty with malice. *See id.*

46. The jury also found that Daugherty breached contractual and fiduciary duties by retaining Highland Capital information after his Highland Capital employment, but awarded zero damages. Highland Capital would, however, recover its attorneys' fees in the amount of $2.8 million plus interest. All parties appealed.

16

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

47.   In September 2014, Highland Employee Retention Assets represented to the Texas court as follows regarding the Escrow:

> A contingent interest in assets held in escrow pursuant to an Escrow Agreement, a true and correct copy of which is attached hereto as Exhibit 2 (the "Deposit Assets"). The Deposit Assets are not presently controlled by or available to [Highland Employee Retention Assets]. **Per the Escrow Agreement, if a final, non-appealable judgment against [Highland Employee Retention Assets] is reached, Abrams & Bayliss, LLP, as Escrow Agent, will transfer the Deposit Assets to [Highland Employee Retention Assets].**

Ex. I, Aff. ¶ 7 (emphasis added).

48.   Highland Employee Retention Assets also filed an Affidavit with the Texas court disclosing that it was insolvent. Highland Employee Retention Assets further disclosed that it is liable to Highland Capital for legal expenses funded on its behalf in the total amount of $7,459,568 and that only $2,555,071 was included in the net worth computation because Highland Capital had written off $4,904,497 of the liability as of December 31, 2013, because of "lack of collectability."

**The Disappearing Escrow Assets**

49.   The appeal of the Texas Action lasted almost three years. On December 1, 2016, the appellate court affirmed the trial court judgment. Thus, Daugherty owed Highland Capital $2.8 million (plus interest) in

17

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0058

attorneys' fees and Highland Employee Retention Assets owed Daugherty $2.6 million (plus interest) in damages.

50.    On December 2, 2016, Highland Capital filed a request for Writ of Execution, which was granted that same day.

51.    Also on December 2, 2016—unknown to Daugherty—Abrams & Bayliss, which has served and currently serves as counsel for Highland Capital and its affiliates, resigned as escrow agent of the Escrow.

52.    On December 5, 2016—unknown to Daugherty—Abrams & Bayliss delivered over $3.1 million in Escrow assets to Highland Capital.  It took only three days for Abrams & Bayliss to transfer to Highland Capital the same assets that took almost eight months for Highland Capital to transfer to the Escrow.

53.    Also on December 5, 2016, the day Highland Capital secretly received the Escrow funds, Highland Capital filed a judgment lien on Daugherty's home.  The judgment lien on Daugherty's home remains in place as of this filing.

54.    On December 8, 2016, the Mandate of the appellate court was filed with the trial court in the Texas Action.

55.    Also on December 8, 2016, Highland Capital requested a Writ of Garnishment in the Texas Action to seize Highland Employee Retention

18

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Assets' assets owed to Daugherty under the judgment based on an affidavit of Scott Ellington, Highland Capital's general counsel and chief legal officer, that Daugherty had no other way to pay Highland Capital's attorneys' fees.

56.    Also on December 8, 2016, the constable returned the first Writ of Execution unexercised as Daugherty was in New York on business through December 9, 2016.

57.    On December 9, 2016, four days after Abrams & Bayliss returned the Escrow assets to Highland Capital, Highland Capital requested and was granted a second Writ of Execution.

58.    Also on December 9, 2016, Highland Capital filed an Application for Turnover specifically directing that Daugherty's interest in NexBank Capital, Inc., and Trussway Holdings, Inc., be turned over to Highland Capital.  Both NexBank and Trussway are entities controlled by Dondero, Okada, and Highland Capital, and both are the subject of related actions pending in this court.  *See Hoyd v. Trussway Holdings, LLC*, Del. Ch., C.A. No. 2017-0260-SG; *Daugherty v. NexBank Capital, Inc.*, Del. Ch., C.A. No. 2017-0382-SG.

59.    On December 14, 2016, nine days after Highland Capital secretly obtained the Escrow funds, Daugherty wired approximately $3.2

19

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

million in cash to Highland Capital in satisfaction of its award of attorneys' fees in the Texas Action.

60.   On February 16, 2017, following a request from Daugherty to Abrams & Bayliss regarding the Escrow, given that Highland Employee Retention Assets had not satisfied Daugherty's judgment, Abrams & Bayliss unveiled the earlier events and transfers by which Highland Capital received the Escrow assets held for Daugherty:

> By letter dated December 2, 2016, Abrams & Bayliss notified Highland that it was resigning as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement. By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.

> On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately. On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016 instructions. Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.

Ex. J.

61.   That is, at the same time Highland Capital placed a judgment lien on Daugherty's family home and was sending a constable to Daugherty's doorstep to seize his assets, Highland Capital and its agents

20

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

were secretly diverting Highland Employee Retention Assets' funds reserved for Daugherty to Highland Capital.

62.    The Abrams & Bayliss letter, tellingly, copied Highland Capital's general counsel and chief legal officer, Ellington, and its assistant general counsel, Isaac Leventon, as well as its attorney, Mark Katz, but not Highland Employee Retention Assets' attorney.

63.    Efforts to collect Daugherty's judgment have failed, as Highland Employee Retention Assets claims to be insolvent.  Through this action, Daugherty hopes to undo the transfer of assets in the Escrow and any other fraudulent transfers from Highland Employee Retention Assets so that Daugherty can collect his judgment and restore full value to his continuing interest in Highland Employee Retention Assets.

### Daugherty's Indemnification Rights

64.    Section 4.1(h) of the Second Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 31, 2004 (the "Highland Partnership Agreement"), states:

> Indemnification.  The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively, the "*GP Party*"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys'

21

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however*, the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct.

Ex. K, § 4.1(h).

65.    The General Partner under the Highland Partnership Agreement is Strand Advisors, Inc., a Delaware corporation ("Strand").

66.    From 2004, if not earlier, until he resigned from Highland Capital in 2011, Daugherty was an officer and agent of Strand. Daugherty, therefore, is a GP Party for purposes of the Highland Partnership Agreement.

67.    Some of the untrue and unproven allegations made against Daugherty by Highland Capital in the Texas action included:

a.    "Daugherty's tenure at Highland had been characterized by extreme behavior, and his performance and ability to function in his job diminished over the years. Daugherty became increasingly unmanageable, erratic, and insubordinate, as well as hostile and belligerent to peers and subordinates at Highland. Recently, Daugherty admitted to Highland that two strokes he suffered years earlier had left him with dead spots in his brain that impacted his mental competence and conduct." Ex. L, ¶ 8.

b.    "During his last year of employment, a number of employees made complaints regarding Daugherty's actions. Management

22

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0063

discussed these complaints with Daugherty, but his behavior persisted. Specifically, these complaints centered on Daugherty's abusive tirades. Daugherty frequently dehumanized employees, publicly berating them .... A number of these employees subsequently resigned from Highland or requested to be reassigned to departments in which they would not have to interact with Daugherty. Further, when complaints were brought to Daugherty's attention, he refused to acknowledge any problems with what he had done and said that he had a right to insult any man or woman at Highland in any way he saw fit, regardless of the purpose or content." *Id.*, ¶ 9.

   c. "Daugherty's work effort and performance also significantly declined over the last year of his employment as he devoted less time to his duties and spent large amounts of time out of the office tending to non-business matters." *Id.*, ¶ 10.

  68. Highland Capital asserted in the Texas Action that the conduct described in the above-referenced allegations "violated [Daugherty's] common law duties to Highland, as well as several agreements between him and Highland." *Id.*, ¶ 12. Highland Capital further asserted that Daugherty "breached a number of common law obligations related to his employment relationship." *Id.*, ¶ 21.

23

THIS DOCUMENT IS A CONFIDENTIAL FILING.<br>ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

69. Highland Capital asserted claims for declaratory judgment, breach of Daugherty's employment agreement, breach of a buy-sell agreement, breach of fiduciary duties, misappropriation of trade secrets, tortious interference, defamation, a request for attorneys' fees, and a request for a permanent injunction.

70. Many of the allegations against Daugherty—particularly the allegations concerning Daugherty's performance on behalf of Highland Capital—formed the basis for multiple claims, including both contractual and fiduciary-duty claims. Allegations regarding Daugherty's acts on behalf of Highland Capital, which trigger Daugherty's indemnification rights, pervaded Highland Capital's claims in the Texas Action.

71. Daugherty was liable for breach of contract and breach of fiduciary duties based on the retention of confidential information *post-employment*, for which zero damages were awarded. He was not liable for, and successfully defended, all claims and allegations concerning his performance on behalf of Highland Capital. In fact, on the eve of trial, Highland Capital "non-suited" its allegations concerning Daugherty's performance on behalf of Highland Capital. *See* Ex. M.

24

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

72.    Daugherty incurred substantial attorneys' fees and costs in defending the baseless and unproven allegations regarding his performance on behalf of Highland Capital and is entitled to indemnification.

**Count One**
**(Fraudulent Transfer)**
**(Against All Defendants)**

73.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

74.    One of the reasons that Highland Employee Retention Assets has failed to satisfy Daugherty's judgment in the Texas Action is that the defendants secretly caused the Escrow assets—reserved for a judgment in Daugherty's favor—to revert back to Highland Capital.  Now Highland Employee Retention Assets claims to be insolvent.

75.    Highland Capital and Dondero, through Highland ERA Management, exercise total control over Highland Employee Retention Assets and treat its funds as their own, which is routine for Dondero.

76.    As an example, Josh Terry, a former Highland Capital employee, recently asserted in a lawsuit:

> Okada, the co-founder of Highland, stated on February 10, 2016, "Dude are you aware Jim [Dondero] hasn't paid any taxes in the past year? And he took out a loan from NexBank to pay them but then he got caught up in one of the leverage situations he did with American [Airlines] and a couple of other stocks and he doesn't have the money until March 31 to

25

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0066

actually do this. So he's put a lien on his assets…but if some clerk there decides to put the lien on, it would be a PR nightmare. I was just in his office yelling at him, 'I approved the loan at the bank so you could pay your taxes but you never paid your taxes.'"

77.    In this case, Dondero was not using money from his bank to pay his personal taxes, but was instead siphoning money from one of his subsidiaries. Highland ERA Management is nothing more than a mere instrumentality or alter ego of Dondero. All acts of Highland ERA Management advantaged Dondero and disadvantaged Daugherty.

78.    Delaware has a potent fraudulent transfer statute enabling creditors, such as Daugherty, to challenge actions by parent companies siphoning assets from subsidiaries.

79.    The transfer of Highland Employee Retention Assets' funds reserved for Daugherty in the Escrow to Highland Capital, achieved through the resignation of Abrams & Bayliss, constitutes a fraudulent transfer under Delaware law. It also contradicts sworn representations of the defendants and their agents in the Texas Action regarding the Escrow.

80.    Highland Capital and Dondero should be required to return to Highland Employee Retention Assets all assets fraudulently or otherwise wrongfully transferred to Highland Capital by or on behalf of Highland Employee Retention Assets.

26

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0067

81.     Given Highland Employee Retention Assets' failure to satisfy its judgment, and apparent lack of funds to do so, Daugherty is entitled to collect his judgment from Highland Capital and Dondero.

**Count Two**
**(Dissolution of Highland Employee Retention Assets)**
**(Against All Defendants)**

82.     Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

83.     In the Texas Action, Daugherty was awarded damages that resulted from Highland Employee Retention Assets' breach of the implied covenant of good faith and fair dealing, which were measured by the devaluation of Daugherty's units at the time of the breach.

84.     The trial judge in the Texas Action struck from the final order the concept that Daugherty was fully compensated for his units and those units were extinguished.  To the contrary, Daugherty retains his interest in Highland Employee Retention Assets.

85.     Daugherty is the sole remaining unit holder of Highland Employee Retention Assets.  The purported purchases of units by Highland Capital in January and February 2013, using the funds of Highland Employee Retention Assets, were invalid transfers.

27

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0068

86. Because Highland Employee Retention Assets can no longer fulfill its original limited purpose, the retention of Highland Capital employees, Highland Employee Retention Assets should be dissolved.

87. Section 18-802 of the LLC Act provides for dissolution when "it is not reasonably practicable to carry on the business in conformity with the limited liability company agreement." That standard is met here. There are no more unit holder-employees eligible for deferred compensation.

88. To the extent Dondero purported to change the purpose of Highland Employee Retention Assets in February 2013, that amendment should be invalided and ignored because it was self-dealing and a breach of fiduciary duty or the implied covenant of good faith and fair dealing. The purported amendment was inconsistent with the fundamental agreement of the parties when Highland Employee Retention Assets was established.

89. Judicial dissolution of Highland Employee Retention Assets is appropriate. The funds transferred from Highland Employee Retention Assets must be returned and then distributed to Daugherty as the sole remaining member.

28

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**Count Three**
**(Breach of Fiduciary Duties)**
**(Against Highland ERA Management and Dondero)**

90.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

91.    As a fiduciary, Highland ERA Management owed fiduciary duties to Highland Employee Retention Assets and its members.  Fiduciary duties were not expressly disclaimed in Highland Employee Retention Assets' operating agreement.

92.    Highland ERA Management is nothing more than a mere instrumentality or alter ego of Dondero.  Thus, Dondero is bound by the same duties and liable for the same acts as his alter ego.

93.    The adoption by Highland ERA Management, on the date of its formation, and Dondero of the Third Amended and Restated Agreement of Highland Employee Retention Assets was self-dealing and constituted a breach of fiduciary duties.

94.    The execution of the Expense Allocation Agreement by Highland ERA Management, on the date of its formation, and Dondero, under which the parties reallocated 93.4 percent of Highland Capital's purported legal expenses related to the Texas Action to Highland Employee Retention Assets, was self-dealing and a breach of fiduciary duties.

29

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

95.    The execution by Highland ERA Management and Dondero of the April 30, 2013 Assignment Agreement, declaring that Highland Capital held the "sole economic interest in [Highland Employee Retention Assets]" and transferring substantially all of the remaining non-cash assets of Highland Employee Retention Assets to Highland Capital (valued at approximately $9,700,000 at the time), was self-dealing and a breach of fiduciary duties.

96.    To the extent this claim is considered a derivative claim, Daugherty may bring such claim on behalf of Highland Employee Retention Assets.  A member of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed.

97.    Efforts to cause the manager, Highland ERA Management (or its alter ego, Dondero), to bring this claim are not likely to succeed because Highland Capital and its affiliates, including Highland ERA Management, have a direct and material conflict of interest in the transactions that are challenged.  That is, the funds wrongfully transferred from Highland Employee Retention Assets went to Highland Capital and Dondero.

30

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

98.     Daugherty has standing to bring a derivative claim because he is currently a member of Highland Employee Retention Assets and was a member of Highland Employee Retention Assets at the time of the transactions of which he complains.

99.     Given Highland Employee Retention Assets' and Highland Capital's arguments in the Texas Action that Daugherty's interest in Highland Employee Retention Assets was extinguished, it was not until the Texas Action became final and non-appealable in December 2016 that it was clear Daugherty remained a member of Highland Employee Retention Assets and had standing to pursue this claim.

**Count Four**
**(Aiding and Abetting Breach of Fiduciary Duties)**
**(Against Highland Capital)**

100.     Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

101.     The drafting of the Third Amended and Restated Agreement of Highland Employee Retention Assets by Highland Capital and its agents constituted aiding and abetting breach of fiduciary duties.

102.     The receipt by Highland Capital of the assets of Highland Employee Retention Assets pursuant to the April 30, 2013 Assignment Agreement constituted aiding and abetting fiduciary duties.

31

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

103. A fiduciary relationship existed between Highland ERA Management and its alter ego, Dondero, and Highland Employee Retention Assets; there was a breach of fiduciary duties, as described above; and there was knowing participation in that breach by Highland Capital and its agents.

104. To the extent this claim is considered a derivative claim, Daugherty may bring such claim on behalf of Highland Employee Retention Assets. A member of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed.

105. Efforts to cause the manager, Highland ERA Management (or its alter ego, Dondero), to bring this claim are not likely to succeed because Highland Capital and its affiliates, including Highland ERA Management, have a direct and material conflict of interest in the transactions that are challenged. That is, the funds wrongfully transferred from Highland Employee Retention Assets went to Highland Capital and Dondero.

106. Daugherty has standing to bring a derivative claim because he is currently a member of Highland Employee Retention Assets and was a

32

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

member of Highland Employee Retention Assets at the time of the transactions of which he complains.

107.    Given Highland Employee Retention Assets' and Highland Capital's arguments in the Texas Action that Daugherty's interest in Highland Employee Retention Assets was extinguished, it was not until the Texas Action became final and non-appealable in December 2016 that it was clear Daugherty remained a member of Highland Employee Retention Assets and had standing to pursue this claim.

**Count Five**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**(Against Highland ERA Management and Dondero)**

108.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

109.    Under Delaware law, a duty of good faith and fair dealing is implied in every contract, including LLC agreements.  The implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct that has the effect of preventing the other party to the contract from receiving the fruits of the bargain.

110.    The implied covenant of good faith and fair dealing required Highland ERA Management and Dondero to refrain from arbitrary or

33

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

unreasonable conduct that benefited themselves at the expense of Highland Employee Retention Assets and its unit holders.

111.    The adoption by Highland ERA Management, on the date of its formation, and Dondero of the Third Amended and Restated Agreement of Highland Employee Retention Assets was a breach of the implied covenant of good faith and fair dealing.

112.    The execution of the Expense Allocation Agreement by Highland ERA Management, on the date of its formation, and Dondero, under which they reallocated 93.4 percent of Highland Capital's purported legal expenses related to the Texas Action to Highland Employee Retention Assets, was a breach of the implied covenant of good faith and fair dealing.

113.    The execution by Highland ERA Management and Dondero of the April 30, 2013 Assignment Agreement, declaring that Highland Capital held the "sole economic interest in [Highland Employee Retention Assets]" and transferring substantially all of the remaining non-cash assets of Highland Employee Retention Assets to Highland Capital (valued at approximately $9,700,000 at the time), was a breach of the implied covenant of good faith and fair dealing.

34

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**Count Six**
**(Indemnification for Texas Action)**
**(Against Highland Capital)**

114. Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

115. As an officer and agent of Strand, Daugherty is indemnified

against all liabilities, losses, and damages incurred by [him] by reason of any act performed or omitted to be performed in the name of or on behalf of [Highland Capital], or in connection with [Highland Capital's] business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however*, [Highland Capital] shall have no obligation to indemnify and hold harmless [Daughterty] for any action or inaction that constitutes gross negligence or willful or wanton misconduct.

Ex. K, § 4.1(h).

116. Daugherty successfully defended all claims and allegations against him in the Texas Action that were based on his employment performance on behalf of Highland Capital.  Indeed, those allegations and claims were "non-suited" on the eve of trial.  Daugherty's only liability related to post-employment retention of information, for which zero damages were awarded.

35

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

117. Daugherty incurred substantial attorneys' fees in defending the baseless and unproven allegations regarding his performance as a Highland Capital employee. He is entitled to be indemnified for those fees.

**Count Seven**
**(Fees on Fees)**
**(Against Highland Capital)**

118. Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

119. Daugherty is entitled to fees on fees in prosecuting his indemnification rights against Highland Capital in this action. Such a right is not specifically excluded from the Highland Partnership Agreement.

**Count Eight**
**(Unjust Enrichment)**
**(Against Highland Capital)**

120. Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

121. One of the reasons that Highland Employee Retention Assets has failed to satisfy Daugherty's judgment in the Texas Action is that the defendants secretly caused the Escrow assets—reserved for a judgment in Daugherty's favor—to revert back to Highland Capital. Now Highland Employee Retention Assets claims to be insolvent.

36

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

122.    The transfer of Highland Employee Retention Assets' funds reserved for Daugherty in the Escrow to Highland Capital, in contravention of sworn representations of the defendants and their agents regarding the Escrow in the Texas Action, unjustly enriched Highland Capital.

123.    Unjust enrichment is the unjust retention of a benefit to the loss of another.  An unjust-enrichment claim includes five elements: (a) an enrichment, (b) an impoverishment, (c) a relation between the enrichment and impoverishment, (d) the absence of justification, and (e) the absence of a remedy provided by law.

124.    By collecting the funds reserved for Daugherty in the Escrow, after the sworn representation of defendants and their agents and after Daugherty's judgment in the Texas Action became final and non-appealable, Highland Capital was enriched to Daugherty's detriment without justification, and Daugherty lacks an adequate remedy at law.

125.    To remedy the unjust enrichment of Highland Capital, Daugherty is entitled to damages and other equitable relief, including, but not limited to, a constructive trust.

37

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0078

## Count Nine
## (Promissory Estoppel)
## (Against Highland Capital)

126.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

127.    The elements of promissory estoppel are: (1) a promise was made; (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (3) the promisee reasonably relied on the promise and took action to his detriment; and (4) such promise is binding because injustice can be avoided only by enforcement of the promise.

128.    Under the Escrow, if Daugherty prevailed in the Texas Action, escrowed funds in the amount of the judgment—or the entire amount if the judgment exceeded the balance—were to be transferred to Highland Employee Retention Assets and then to Daugherty.

129.    On January 23, 2014, Dondero, on behalf of Highland Capital, testified under oath at trial in the Texas Action before the judge and jury:

> Q.    Okay.  So -- so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and [Highland Employee Retention Assets], **what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?**
> A.    **They go to him.**
> Q.    I'm sorry?

38

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

A.    They go **to him** via to [Highland Employee Retention Assets] and then **to him**.  (Emphasis added.)

130.    In September 2014, David Klos, the Senior Manager of Finance for Highland Capital who claimed to "oversee accounting relating to the assets and liabilities of Highland Employee Retention Assets," represented to the Texas court as follows regarding the Escrow:

> A contingent interest in assets held in escrow pursuant to an Escrow Agreement, a true and correct copy of which is attached hereto as Exhibit 2 (the "Deposit Assets").  The Deposit Assets are not presently controlled by or available to [Highland Employee Retention Assets].  **Per the Escrow Agreement, if a final, non-appealable judgment against [Highland Employee Retention Assets] is reached, Abrams & Bayliss, LLP, as Escrow Agent, will transfer the Deposit Assets to [Highland Employee Retention Assets].**

Ex. I, Aff. ¶ 7 (emphasis added).

131.    When making these promises, it was the reasonable expectation of Highland Capital and its agents, including, but not limited to, Dondero and Klos, to induce action or forbearance on the part of Daugherty.

132.    Daugherty reasonably relied to his detriment on the promises of Highland Capital and its agents regarding the Escrow.  Relying on the promises of Highland Capital and its agents that a judgment in his favor in the Texas Action would be paid from the Escrow, Daugherty did not, for example, seek to invalidate the Escrow during the Texas Action.  Highland Capital asserted in this action, for example, "[Daugherty] was aware of the

39

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

terms and provisions of the Escrow Agreement approximately 3 years prior to the [December 2016] transfer in question and never made any objections, including during the Texas Action."

133.   In further reliance on the promises of Highland Capital and its agents, on December 14, 2016, nine days after Highland Capital secretly obtained the Escrow funds, Daugherty wired approximately $3.2 million in cash to Highland Capital in satisfaction of its award of attorneys' fees in the Texas Action.

134.   Instead of using the Escrow assets to satisfy Daugherty's judgment in the Texas Action as promised, Highland Capital breached its promises in December 2016, after Daugherty's judgment became final and non-appealable, by seizing the Escrow assets.

135.   On October 26, 2018, Highland Capital asserted the following positions in this action, which are inconsistent with its promises:

a.   "The Escrow Agreement only involved two parties, *and thus did not establish an escrow relationship*";

b.   "the Escrow Agreement was intended to allow Highland to segregate the Deposit Assets in case there was an adverse judgment entered in Daugherty's favor *that Highland was found to be liable for, in whole or in part*" (emphasis added); and

40

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

c.    "Highland Capital deposited the funds in the Escrow *in case Highland Capital was found to be partially or entirely liable* for any judgment entered against HERA in Plaintiff's favor" (emphasis added).

136.    When Highland Capital promised Daugherty, the Texas judge, and the Texas jury that Daugherty's judgment in the Texas Action would be paid from the Escrow, it did not condition that promise on Highland Capital being directly liable to Daugherty under the judgment or take the position that the Escrow was not an escrow.

137.    The promises of Highland Capital and its agents to pay Daugherty's judgment in the Texas Action from the Escrow are binding and enforceable by Daugherty because injustice can be avoided only by enforcement of the promises.

138.    Daugherty is entitled to damages and other equitable relief, including, but not limited to, a constructive trust.

WHEREFORE, Daugherty respectfully requests that the Court:

a.    enter judgment in favor of Daugherty and against Highland Capital, Highland Employee Retention Assets, Highland ERA Management, and Dondero;

41

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

b.      order Highland Capital, Highland Employee Retention Assets, Highland ERA Management, and Dondero to satisfy the judgment against Highland Employee Retention Assets and in the Texas Action;

c.      order Highland Capital and Dondero to return to Highland Employee Retention Assets all of the assets that Highland Capital fraudulently or otherwise wrongfully caused to be transferred from Highland Employee Retention Assets to Highland Capital or Dondero;

d.      declare that Daugherty remains a member of Highland Employee Retention Assets;

e.      declare that Daugherty is the sole member of Highland Employee Retention Assets;

f.      dissolve Highland Employee Retention Assets and distribute its assets to Daugherty;

g.      declare that Highland ERA Management and Dondero breached their fiduciary duties owed to Highland Employee Retention Assets and its unit holders;

h.      declare that Highland Capital aided and abetted Highland ERA Management and Dondero's breach of fiduciary duties;

i.      declare that Highland ERA Management and Dondero breached the implied covenant of good faith and fair dealing;

42

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

App. 0083

j.    award Daugherty indemnification for costs, including attorneys' fees, incurred in defending the Texas Action;

k.    award Daugherty fees on fees in prosecuting this action;

l.    hold Highland Capital liable for unjust enrichment and award damages or impose a constructive trust;

m.    hold Highland Capital liable for promissory estoppel and award damages or impose a constructive trust;

n.    award Daugherty pre- and post-judgment interest;

o.    award Daugherty his reasonable costs and expenses incurred in connection with this action, including reasonable attorneys' fees; and

p.    grant such other relief that is just and proper.

/s/ Thomas A. Uebler
Thomas A. Uebler (#5074)
Kerry M. Porter (#6067)
McCollom D'Emilio Smith
 Uebler LLC
Little Falls Centre Two
2751 Centerville Road, Suite 401
Wilmington, DE 19808
(302) 468-5960

Attorneys for Patrick Daugherty

Dated: February 15, 2019

43

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

EFiled: May 15 2020 04:46PM EDT
Transaction ID 65640162
Case No. 2019-0956-MTZ

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,

    Plaintiff,

    v.

JAMES DONDERO, HIGHLAND
ERA MANAGEMENT LLC,
HIGHLAND EMPLOYEE
RETENTION ASSETS LLC,
HUNTON ANDREWS KURTH LLP,
MARC KATZ, MICHAEL HURST,
SCOTT ELLINGTON, THOMAS
SURGENT AND ISAAC
LEVENTON,

    Defendants,

    and

HIGHLAND EMPLOYEE
RETENTION ASSETS LLC,

    Nominal Defendant.

C.A. No. 2019-0956-MTZ

### VERIFIED AMENDED COMPLAINT

Patrick Daugherty brings this action against James Dondero, Highland

Employee Retention Assets LLC ("HERA"), Highland ERA Management

LLC ("HERA Management"), Hunton Andrews Kurth LLP ("Andrews

Kurth"), former Andrews Kurth attorney Marc Katz, former Gruber Hurst

Johansen Hail Shank LLP attorney Michael Hurst, and internal Highland

**EXHIBIT**

**7**

App. 0085

Capital Management L.P. ("Highland") attorneys Scott Ellington, Thomas Surgent, and Isaac Leventon (collectively, "Defendants") and HERA as nominal defendant to recover for Defendants' wrongdoing, some of which was revealed only during the course of related litigation in this Court, *Daugherty v. Highland Capital Management, L.P.*, C.A. No. 2017-0488-MTZ (the "Delaware Related Action"), which is stayed because of Highland's bankruptcy.

### Introduction

1.      On December 1, 2016, the Court of Appeals for the Fifth District of Texas at Dallas issued a mandate in the lawsuit captioned *Highland Capital Management, L.P. v. Daugherty*, 12-04005, District Court of Dallas County, Texas, 68th Judicial District (Dallas) (the "Texas Action"), concluding over four years of litigation between Highland, HERA, and Daugherty.  The appellate court affirmed the final judgment of the trial court.

2.      Under the final judgment, Daugherty was awarded $2.6 million in damages against HERA, plus pre- and post-judgment interest, as compensation for the diminution of value of Daugherty's HERA units based on HERA's breach of the implied covenant of good faith and fair dealing.

3.      HERA has failed to satisfy Daugherty's judgment.  During 2013 and 2014, after the Texas Action commenced, Dondero, HERA, HERA

2

Management, Highland, Katz, Hurst, Ellington, Surgent, and Leventon engaged in fraud, a conspiracy to defraud Daugherty, and civil conspiracy with the goal of defrauding Daugherty and never paying him the compensation he had earned. The wrongdoing and willful misconduct was consummated after the Texas appellate court issued its mandate on December 1, 2016.

4.    At that point, Defendants raided assets that they fraudulently told the Texas judge and jury and Daugherty that they had set aside in escrow in Delaware to satisfy his claims. The fraudulent statements that the assets had been set aside for Daugherty's benefit in escrow in Delaware during the Texas Action and were not in the control of Highland were made to preclude Daugherty from bringing his claims related to such assets against Highland itself, among other fraudulent purposes.

5.    What Defendants and Highland intended, however, was a classic bait-and-switch fraud. The scheme was to lie to the Texas judge and jury and Daugherty by telling them the assets were set aside for Daugherty in escrow in Delaware. If the assets could be said to belong to any Highland affiliate, it would be HERA, not Highland itself, because HERA would receive the assets if Daugherty prevailed, they said. This was the bait. Daugherty took the bait and the Texas judge and jury took it too. Both

3

App. 0087

Daugherty and the Texas judge and jury directed their attention to HERA

instead of Highland to make Daugherty whole for what had been done to his

HERA interests.

6.    After the appellate mandate was entered, Defendants and

Highland executed the switch.  Dondero, through Ellington, Surgent,

Leventon, and Katz, on whom he relied, pulled the assets out of the escrow

in Delaware, declared that HERA had no ownership over the assets related to

Daugherty's HERA interest that had been held in escrow in Delaware, and

declared that HERA had no ability to cover its separate $2.6 million

judgment in Daugherty's favor.

7.    In this action, Daugherty seeks recovery for Defendants'

fraudulent scheme and willful misconduct from the parties who were

implicated as set forth below during the prosecution of the Delaware Related

Action.[1]

---

[1] Trial in the Delaware Related Action was scheduled for October 14-
16, 2019.  The Court conducted the first two days of trial, but Highland
declared bankruptcy on the morning of the third day.  The Delaware Related
Action is currently stayed and Daugherty currently is not able to bring the
causes of action set forth in this complaint against Highland outside of the
bankruptcy proceedings.  The transcript of the trial proceedings is
incorporated herein by reference.

4

App. 0088

**The Parties and Related Persons**

8.      Daugherty resides in Dallas, Texas.  Daugherty was a partner and senior executive of Highland and certain of its affiliates from 1998 until 2011, when Daugherty resigned.

9.      Non-party Highland is a Delaware limited partnership with its principal place of business at 300 Crescent Court #700, Dallas, Texas 75201. Highland was co-founded by and is controlled by defendant Dondero and non-party Mark Okada, their affiliates, and various trusts for their benefit and the benefit of their immediate families.  Okada announced his departure from Highland on September 30, 2019, four days after Highland retained bankruptcy counsel.  Highland declared bankruptcy on October 16, 2019.

10.      Defendant Dondero is Highland's co-founder and president.  He is also the president of HERA Management, the ostensible manager of HERA.  Dondero is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

11.      Defendant HERA is a Delaware limited liability company that was formed on June 23, 2009.

12.      Defendant HERA Management is a Delaware limited liability company that was formed on February 1, 2013.  Dondero's testimony in the

5

App. 0089

Delaware Related Action demonstrates that HERA and HERA Management have been mere instrumentalities and Dondero's alter egos since 2013.

13.     Andrews Kurth was a law firm based in Houston, Texas, prior to its merger with Hunton & Williams LLP in April 2018.[2]  Defendant Hunton Andrews Kurth LLP is the successor to Andrews Kurth LLP and, because the events at issue pre-date the merger, is referred to herein as "Andrews Kurth."  Andrews Kurth is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

14.     Defendant Katz is an attorney who represents Highland and was a partner of Andrews Kurth LLP from July 2009 to February 2018.  In February 2018, Katz joined the firm DLA Piper.  Katz is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

15.     Defendant Hurst is an attorney who represents Highland and nominally represented HERA in the Texas Action.  Until February 2016, Hurst was a partner of Gruber Hurst Johansen Hail Shank LLP, which was a law firm in Dallas, Texas, prior to its dissolution in April 2018.  Hurst is now a partner of Lynn Pinker Hurst & Schwegmann LLP, a law firm in Dallas, Texas.  Hurst is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

---

[2] In certain locations, Andrews Kurth also operated under the name Andrews Kurth Kenyon after hiring all attorneys of the firm Kenyon & Kenyon LLP in August 2016.

App. 0090

16.     Defendant Ellington is an in-house attorney at Highland. Ellington is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

17.     Defendant Surgent is an in-house attorney at Highland.  Surgent is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

18.     Defendant Leventon is an in-house attorney at Highland. Leventon is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

**Daugherty's Interest in HERA**

19.     Highland performed poorly during the 2008-2009 financial crisis.  Late in 2008, Highland was viewed as a firm likely to default.  It had very little cash and available assets for incentive-compensation purposes. Accordingly, HERA was created by Highland to curb employee resignations by offering employees a replacement of their previously received deferred compensation that was awarded on February 27, 2009.

20.     HERA was intended to be an independent (from Highland) standalone entity to retain, reward, and incentivize Highland's employees (excluding Dondero and Okada) by granting them equity-like awards in certain funds, and then distributing the proceeds of those interests to the employees in their capacity as unit holders of HERA.

21.     Under the Limited Liability Company Agreement of Highland Employee Retention Assets LLC dated October 26, 2009, the purpose of

7

HERA "shall be to receive and hold assets to be contributed by [Highland] and to distribute the proceeds of such assets from time to time to certain employees of [Highland] (or of affiliates of [Highland], as applicable) as the Board may from time to time determine in order to create a retention initiative for such employees and to engage in such other lawful purposes and activities in connection with the foregoing."

22.    Daugherty became a member of HERA on October 26, 2009, subject to a vesting schedule requiring Daugherty to remain employed at Highland through May 15, 2011.

23.    Daugherty was initially awarded 1,571.86 Series A Preferred Units and was the largest holder in HERA.

24.    Daugherty's ownership percentage increased as other employees resigned from Highland prior to vesting.  Daugherty remains a member of HERA and holds 1,909.69 vested Series A Preferred Units, representing a 19.0969% ownership share of HERA's original number of units, but if Highland's acts are invalidated, Daugherty is the sole remaining valid unit holder of HERA.

8

**The 2012 Amendment and Section 12.1**

25.    Daugherty resigned from Highland on September 28, 2011.  At the time of his resignation, Daugherty was a director of HERA.

26.    On February 16, 2012, all the directors of HERA except Daugherty removed Daugherty as a director. Immediately thereafter, the newly composed board executed a Second Amended and Restated Agreement (drafted by Surgent, Highland's assistant general counsel and chief compliance officer) (the "2012 Amendment").

27.    The 2012 Amendment added a new Article 12, which included dispute-resolution and confidentiality provisions:

a.    Under Section 12.1, if any member of HERA, including a holder of Series A Preferred Units (i.e., Daugherty), "commences litigation" or "otherwise initiates any dispute or makes any claim ... related to HERA" against HERA, any of its directors, officers, or agents, or any HERA member, *including Highland*, or that does or could adversely impact the assets held by HERA, "then with the consent of 75% of the Board, all pending and future distributions to" that litigating member "shall be immediately suspended and held in escrow by HERA until the final, non-appealable resolution of the Dispute."

9

App. 0093

b.      If the litigating member does not prevail, the full costs of the litigation, including attorneys' fees, are deducted from the escrow account and the balance will be distributed to the litigating member. However, even if the litigating member prevails, the Board has sole discretion to withhold the escrowed funds to cover any diminution in value to HERA "resulting from or in connection with" the litigation, as determined by the Board in its sole discretion. Any withheld funds are to be reallocated to the other Preferred Unit holders on a pro-rata basis.

28.      Section 12.1 represented Defendants' first attempt to take Daugherty's compensation through fiat. The evolution of Defendants' positions with respect to Section 12.1 over time has been remarkable. The only continuous thread is that Defendants' positions have changed to whatever they believed to be most convenient at the moment, without regard to coherence with previous positions taken.

**The Texas Action and Dondero's Takeover of HERA**

29.      In 2012, after Daugherty participated in a Highland-sanctioned exit interview with concerned investors and after Daugherty testified under court order in Dondero's divorce proceeding, Highland commenced the Texas Action against Daugherty. The Texas Action was filed just seven weeks after the 2012 Amendment.

10

App. 0094

30.    Daugherty responded in the Texas Action with counterclaims against Highland for breach of contract and defamation and third-party claims against HERA and others.  Daugherty alleged breach of contract and breach of the covenant of good faith and fair dealing against HERA and Highland based on the 2012 Amendment.

31.    During the Texas Action, Dondero sought to gain control of HERA by buying its units held by current and former employees of Highland and isolating Daugherty to punish him.  This was one of the first steps in the conspiracy to defraud Daugherty and Dondero relied on Ellington, Surgent, and Leventon, who were "coordinating a plethora of external legal counsel," which, on information and belief, included Andrews Kurth, Katz, and Hurst.

32.    On December 26, 2012, Dondero schemed with Ted Dameris, then a board member of HERA and an employee of Highland, to "offer everyone except 1 a buyout offer at 100% cash and 40% discount on" non-cash assets of HERA.  Daugherty was offered nothing for his interest, the value of which Highland claimed was exceeded by the "costs, expenses and diminution of the assets."  In fact, Daugherty's value was set at $0 arbitrarily and in bad faith.  The "costs, expenses and diminution of the assets" tracked Section 12.1 of the 2012 Amendment, but Defendants stated more than a

11

App. 0095

dozen times in the Texas Action that Section 12.1 was never employed. They presented that position to argue that there could be no damage to Daugherty since the provision had never been employed.

33.    Hurst argued in closing arguments to the Texas jury that Daugherty's claim of divestment of his interest through operation of Section 12.1 made no sense: "Divesting by Section 12.1, how can there be breach of contract for divesting by Section 12.1 when he still has his interest, all of it[?]" The jury accepted that argument and did not find a breach of contract for divesting by operation of Section 12.1. Defendants would later claim that Highland was entitled to all of Daugherty's interest, but they kept this position secret during the Texas Action.

34.    In January 2013 Highland offered to all HERA unit holders— except Daugherty—to purchase their rights in the units for 100 percent of the value of their cash interests and 60 percent of the value of their non-cash interests in exchange for releases against Dondero and Highland. All offerees accepted the buyout offer. Dondero relied on the legal advice of Highland's in-house and external counsel who are Defendants in this action to carry out this part of the fraud, which was necessary to isolate Daugherty to set up the scheme presented in the Texas Action.

12

App. 0096

35.    Next, in January 2013 the HERA board collaborated with Dondero (who relied on the legal advice of Highland's in-house and external counsel who are Defendants in this action to carry out this part of the fraud) to transfer the management powers of HERA to HERA Management.  This part of the scheme was necessary to give Dondero the appearance of legal authority to act on behalf of HERA to carry out the scheme presented in the Texas Action.  At the time, HERA Management was not validly formed under Delaware law.

36.    On January 19, 2013, the HERA board members resigned after each received a buyout offer from Highland, and HERA Management purported to become the sole manager of HERA.  At the time, HERA Management was not validly formed under Delaware law.

37.    With Daugherty isolated as the only remaining equity holder of HERA, Defendants orchestrated a targeted effort to deprive him of the compensation he had earned in the form of HERA units.

38.    Through a series of transactions in early 2013, HERA Management (controlled by Dondero) emptied HERA (controlled by Dondero) of all its underlying assets and transferred those assets to Highland (controlled by Dondero), which Dondero testified was done in reliance on the legal advice provided by Highland's in-house and external counsel who

13

are Defendants in this action to carry out this part of the fraud. The advice provided was to engage in a series of transactions designed for the purpose of defrauding Daugherty of his assets. Dondero requested the advice for the purpose of defrauding Daugherty, the advice was provided by the team of in-house and external counsel who are Defendants in this action because they knew that fraudulent purpose to be Dondero's actual purpose,[3] and the advice was relied on to carry out the bait-and-switch fraud through the series of transactions described herein.

39.    On February 1, 2013, the date that HERA Management was formed under Delaware law, Dondero purportedly executed the Third Amended and Restated Agreement of HERA (the "Third Amended and Restated HERA LLC Agreement") (again drafted by Surgent) as part of his reliance on the legal advice provided by his team of in-house and external counsel working together in concert, which stripped virtually all the rights of HERA unit holders.  It eliminated:

a.    the purposes for which HERA was created;

b.    the requirement of HERA to make cash distributions to unit holders to cover pass-through tax obligations attributable to HERA; and

---

[3] Daugherty has not named counsel as defendants who may not have known that the purpose of the request for legal advice was fraudulent.

14

c.      members' rights to indemnification.

40.    The Third Amended and Restated HERA LLC Agreement no longer included a Section 12.1. The Third Amended and Restated HERA LLC Agreement included a dispute-resolution provision at Section 11.1, but it had been changed materially from the prior agreement. The 2012 Amendment provided a mechanism whereby a member's interest could be placed "in escrow" (what the agreement called the "Dispute Escrow"). The Dispute Escrow would be paid out to the prevailing party at the conclusion of the dispute subject to a determination by HERA's board that the value of assets held by the Company had been diminished by the dispute. The 2012 Amendment expressly provides that costs **cannot** be offset against a prevailing party.

41.    The Third Amended and Restated HERA LLC Agreement provided no such mechanism. Instead, Section 11.1 provided an even more arbitrary process. It eliminated the concept of a Dispute Escrow altogether. Nothing would be placed in escrow, there was no recognition that a member who prevailed would be entitled to the interest, and Highland could cancel out all value attributable to the member's interest by fiat and impose costs as an "offset" against value even if the member prevailed. A comparison of the two provisions is set forth below.

15

App. 0099

Section ~~12.1~~ 11.1 → Dispute Resolution. In the event any Member or holder of units of the Company, including, without limitation, Series A Preferred Units (any such member or holder, a *"Disputing Party"*), is party to or commences litigation ~~or, solely with respect to persons who have not executed a separation agreement in favor of the Initial Member unless such action constitutes a breach of such separation agreement,~~ or otherwise is party to or initiates or has initiated any dispute or makes or has made any claim, or takes or has taken any action that results in, has resulted in or could be expected to result in any third party making a claim, in each case involving or related to the Company, the Manager, the Initial member, or any of their respective members, officers, directors, agents, representatives, partners, employees, advised funds or accounts equity holders (collectively, *"Relevant Parties"*) or the management or operation ~~thereof or~~ of any such entities or any of the assets held thereby (each, a *"Dispute"*) ~~(i) against the Company, any Member thereof, any officer or director or other agent or representative or equity holder thereof (each, a "Company Party"), or (ii)~~ or that in any way does or could adversely impact any of the assets held by any of the ~~Company~~Relevant Parties, then ~~with~~ in sole discretion of the ~~consent of 75% of the Board~~Manager, all pending and future distributions to the Disputing Party shall be immediately suspended ~~and held in escrow by the Company (the "Dispute Escrow")~~ until the Manager determines the total of the ~~final~~full losses, ~~non-appealable resolution of the Dispute, it being understood that the expiration of any applicable statute of limitations~~ costs and expenses (including ~~any applicable tolling periods with respect thereto) shall constitute such a resolution (any such resolution, a "Dispute Resolution Date"). The full balance of the Dispute Escrow shall be distributed to the Disputing Party promptly following the Dispute Resolution Date, net of the sum of (A) the full~~ costs and expenses ~~incurred by any Company Party in connection with such competent jurisdiction has ruled in favor of Disputing Party in a final non-appealable judgment~~of legal counsel) of the Relevant Parties, ~~and (B)~~ plus any diminution in value ~~to the~~ of any Relevant Party's assets ~~held by the Company resulting from or~~ (including, without limitation, good will) incurred in connection with ~~such Dispute, as determined by the Board in~~ each Dispute or a Member's disclosure of matters and information regarding any Relevant Party or its assets (except as required by law or directed and authorized in writing by the applicable Relevant Party) in each case as determined by the Manager in its sole discretion (such aggregate losses, costs and expenses, the *"Damages"*). Once the Manager determines the Damages, it may in its sole discretion offset 100% of such Damages against the Capital Account of the Disputing Party and any and all amounts that would otherwise be payable or distributable by the Company to the Disputing Party. Any amount deducted from a Disputing Party's distribution pursuant to the preceding sentence shall be reallocated ~~pro rata to~~ as determined by the ~~other Series A Preferred Unit Holders based on their respective holdings of Series A Preferred Units~~Manager in its sole discretion, including without limitation, to any holder(s) of Common Units of the Company.¶

42.   In the Delaware Related Action, Leventon testified that Section 12.1, which was not in effect in December 2013 when Daugherty's assets were placed in escrow, discussed below, was an "important part of [his] understanding of why" the escrow was set up in December 2013.  At the

16

time, Section 11.1, which provided for no escrow mechanism, was in effect. Leventon also testified that it was the "same language," "identical" in Section 11.1 and Section 12.1, but that was false as indicated above.

43.    Defendants have asserted whatever position with respect to Section 12.1 or Section 11.1 and their effect on Daugherty's right to his compensation that has been most convenient in the moment. Their sole focus has been on depriving Daugherty of his compensation (and later the Texas judgment with respect to such compensation) through their fraud with no regard for determining whether their actions were legal.

44.    Also on February 1, 2013, Dondero executed an Expense Allocation Agreement on behalf of Highland and HERA drafted by Leventon under which the parties reallocated 93.4 percent of Highland's purported legal expenses related to the Texas Action to HERA. Leventon and Dondero made and approved the calculation in bad faith. The expenses had no substantive connection to the purpose for which such expenses were incurred. Dondero testified in the Texas Action that the calculation was made by comparing the "claims against Highland [] for $199,000 of the LTIP, and the claims against HERA [] for somewhere between 2.5 and 3. 199,000, over 3 million is approximately 6 or 7 percent." Daugherty would later learn that

17

App. 0101

in fact the expenses attributed to HERA were incurred for the direct benefit of Highland and Dondero and in no way benefited HERA.

45.     Highland supposedly incurred $1,142,284 in legal expenses in the Texas Action as of December 31, 2012, compared to $154,029 incurred by HERA over the same time period.  Over the course of the dispute with Daugherty, Defendants continued to allocate Highland expenses fraudulently to HERA in a manner designed to harm Daugherty (the "Imposed Liabilities").  As of December 31, 2018, the total Imposed Liabilities Defendants had imposed were $9,617,989.32, which were in addition to the amounts HERA had already paid.  This allocation was part of Defendants' fraud and was used to improperly and fraudulently funnel assets and benefits to Dondero, Andrews Kurth, Katz, and Hurst.  Andrews Kurth, Katz and Hurst knew that the services they had rendered were for the benefit of Dondero and Highland, but were improperly being paid by HERA directly or attributed to HERA in order to defraud Daugherty of such value.

46.     All fees and expenses incurred by Highland for its counsel and other expenses related to the Texas Action were funneled through the Expense Allocation Agreement.  The largest portion of those expenses were related to services provided by Andrews Kurth and Katz who knowingly participated in the fraudulent scheme.

18

47. On April 30, 2013, Dondero, relying on the legal advice provided by Highland's in-house and external counsel who are Defendants in this action to carry out this part of the fraud, executed an Assignment Agreement on behalf of Highland and HERA (the "2013 Assignment Agreement"), declaring that Highland held the "sole economic interest in HERA" following the HERA unit-holder buyouts.

48. The 2013 Assignment Agreement further resolved that "[Highland] and HERA have each determined that it is in their respective best interest" to transfer substantially all the assets of HERA as "in-kind distribution[s]" to Highland (then valued at approximately $9,700,000) to try to keep them from Daugherty as the sole rightful equity holder in HERA.

49. This was the state of affairs one month before the Texas trial.

### Defendants Create the Sham Escrow

50. Although Defendants committed fraud and told a different story at the Texas trial, Dondero, through HERA Management, was and is in full control of HERA and its assets. It was fitting, therefore, in the Texas Action when Dondero described himself as "the man behind the curtain solving financial puzzles."

51. As the Texas trial approached, Defendants conducted a mock trial. After that exercise, in December 2013, approximately one month

19

before trial in the Texas Action, Dondero, Leventon, Andrews Kurth, Katz, and Hurst formed an escrow for Daugherty's HERA assets (the "Escrow") so they could sell to the jury that they had not simply stolen Daugherty's HERA assets. The notion that Defendants did nothing nefarious with Daugherty's assets and merely set them aside would become a theme of Defendants in the Texas trial and was used to insulate Highland and Dondero from being directly liable for the theft through knowing and willful misrepresentations.

52.    Daugherty's HERA interests, valued at the time at approximately $3.1 million, were put in the Escrow with the Delaware law firm Abrams & Bayliss LLP ("Abrams & Bayliss") as escrow agent. Defendants chose Abrams & Bayliss because they expected Abrams & Bayliss to do whatever Defendants requested. Abrams & Bayliss was a firm that Highland used frequently when any Delaware law issues came up.

53.    Leventon sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day.

54.    The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Action provided that if Daugherty prevailed in the Texas Action, escrowed assets in the amount of the judgment "shall" be transferred to HERA. The provision states in full:

> In the event Escrow Agent is provided a final, non-appealable judgment against Highland Employee

20

> Retention Assets, LLC ("HERA") by Patrick
> Daugherty, his successors, or assigns
> ("Daugherty") in the case *Highland Capital
> Management, L.P. and Cornerstone Healthcare
> Group Holding, Inc. v. Patrick Daugherty v. Sierra
> Verde, LLC, et al.*, Cause No. 12-04005 in the 68th
> Judicial District of Dallas County, Texas
> ("Daugherty Action"), Escrow Agent shall, within
> 10 Business Days, transfer to HERA Deposit
> Assets equivalent to the amount of such judgment,
> or if the judgment against HERA exceeds the
> amount of Deposit Assets, Escrow Agent shall
> transfer to HERA all Deposit Assets, including
> accumulated income, held by Escrow Agent.

The substantive design of the Escrow roughly tracked Section 12.1 of the

2012 Amendment.

55.    Katz and Hurst both specifically signed off on the operative

§ 3(b)(i) of the Escrow Agreement.

56.    The Deposit Assets were (1) $1,210,502.03 in cash; (2) a

limited partner interest in RCP with an asset value of $1,820,050.49 as of

September 30, 2013; and (3) 1088.42 shares of NexPoint Credit Strategies.

57.    Three days after executing the Escrow Agreement, Highland

wanted to "slip sheet the Schedule 1 assets" in the Escrow Agreement.

Abrams & Bayliss simply swapped the pages as requested without following

the amendment procedures of the Escrow Agreement.

58.    The version of Schedule 1 that would be presented to

Daugherty and the Texas judge and jury was:

21

App. 0105

**SCHEDULE 1**

The following shall be the Deposit Assets:

| Asset | Amount |
|---|---|
| Cash (USD) | $ 1,210,502.03 |
| Highland Restoration Capital Partners, L.P. limited partner interest (USD as of 9/30/2013) | $ 1,820,050.49 |
| Cash equivalent of NexPoint Credit Strategies Deposit Assets (such amount to be updated at the end of each calendar month) | 1088.42 shares |

## The Texas Trial

59.     With the appearance of an escrow in place, Defendants falsely presented themselves and Highland in the Texas trial not as thieves, but rather protectors of Daugherty's interest who would respect Daugherty's rights and the judicial process.  That is the story they spun in the Texas trial.

60.     Dondero testified under oath during the Texas trial as follows:

Q.     We heard from -- from opposing counsel the other day about this -- well, there was money -- the interests were escrowed, if you will, the HERA interests of Mr. Daugherty.  Is that a true statement?
A.     Yes.
…
Q.     Okay.  And [Daugherty's counsel], one of my very learned opposing counsel, they actually said – or showed an escrow agreement in the courthouse.  Did you see that?
A.     Yes.
…
Q.     So why -- why did the escrow agreement not get signed until December of 2013?
A.     My recollection is as follows: …
So sometime in the April period, the assets were transferred to Highland, okay, post the -- the

22

App. 0106

> end of the year buyout.  Pat Daugherty's assets were always segregated at Highland Capital.  But to formalize the segregation, they were moved into an escrow.
>
> It took a while to get the escrow set up because they were moving illiquid assets that have all kinds of transfer delays and issues.  And it took until December to formally set up the escrow for the assets that were proportionate to Pat's share that were segregated at Highland.

61.     While Dondero testified that "moving illiquid assets" resulted in "transfer delays," that was just another falsehood that was convenient to tell at the time.

62.     During the Texas Action on January 23, 2014, Dondero also testified as follows during his prepared testimony with Hurst:

> Q.     Okay.  So -- so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and HERA, **what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?**
> A.     **They go to him**.
> Q.     I'm sorry?
> A.     They go **to him** via to HERA and then **to him**.  (Emphasis added.)

63.     Dondero also testified that "Pat's share of all the assets including the cash is in escrow" and that the Escrow was "to protect Pat Daugherty" and that "[t]here's been nothing deducted or removed from Pat's account."  In closing argument, Hurst summed up Defendants' fraudulent

23

pitch to the jury: "[I]f Pat Daugherty happens to prevail in his lawsuit against … HERA you heard Jim Dondero testify, he gets his interest, which is currently escrowed in the third-party escrow account, all of it."

64.    Defendants were adamant during the Texas Action that the procedure provided in Section 12.1 of the 2012 Amendment was never implemented.  This was a calculated strategy to mislead Daugherty and the Texas court carried out with the knowledge and cooperation of each of the defendants. Some examples include:

a.    Hurst argued on summary judgment that "nothing happened with Mr. Daugherty's units" under Section 12.1 because "[t]he board has to vote to suspend escrow distributions. That never happened."

b.    Hurst further represented to the jury in the Texas Action that "[e]ven though you're going to hear a lot of testimony about Section 12.1, you're going to see what the section says, it was never used. … [T]he board never voted to use Section 12.1."

c.    Hurst also said, "[t]he board never took any action on Section 12.1."

d.    Hurst questioned Surgent, Highland in-house counsel and chief compliance officer, in prepared testimony, "[w]hen was Section 12.1 ever used by the HERA board? A. Never. Q. Never? A. Never.");

24

App. 0108

e.    Surgent confirmed on cross-examination that Section 12.1 was never implemented.

65.    In the Delaware Related Action, Defendants told the Court precisely the opposite and justified their actions against Daugherty by invoking Section 12.1.

**Daugherty's Judgment Against HERA**

66.    After a three-week trial in the Texas Action, the jury found that HERA breached the implied covenant of good faith and fair dealing by adopting Section 12.1 in the 2012 Amendment. The jury awarded Daugherty damages of $2.6 million plus interest.

67.    The final judgment confirmed Daugherty's entitlement to damages and his HERA interest, which Defendants had promised they were protecting through the Escrow. The Texas judge's markup of the final order is below.

25

App. 0109

Furthermore, the Court, after considering the jury's findings regarding HERA's breach of the implied covenant of good faith and fair dealing, finds and concludes that Daugherty is entitled to relief hereinafter given.

It is therefore further ORDERED that Daugherty have and recover $2,600,000 from HERA, ~~representing the full value of Daugherty's interest in HERA as determined by the jury.~~

It is further ORDERED that Daugherty shall no longer have any ownership or other interest in HERA or any proceeds or accounts arising from Daugherty's prior interest in HERA that were not distributed to Daugherty prior to the entry of this judgment, Daugherty having been awarded the full value of that interest in HERA as determined by the jury.

It is further ORDERED that total amount of the actual damages rendered against HERA herein will bear prejudgment interest at the rate of 5% simple interest from May 22, 2012, until the day before this judgment is signed.

It is further ORDERED that the total amount of the judgment here rendered against HERA will bear interest at the rate of 5% per annum, compounded annually, from the date this judgment is signed until paid.

68.    The jury also found that Dondero and Highland defamed Daugherty with malice and that Daugherty breached contractual and fiduciary duties by retaining Highland information after his Highland employment, but awarded zero damages.  Highland was awarded attorneys' fees in the amount of $2.8 million plus interest.  All parties appealed.

26

**Throughout the Texas Appeal, Defendants Maintained
That the Escrow Was for Daugherty's Benefit**

69.   Defendants adhered to their position that the Escrow was for Daugherty's benefit while the Texas Action was on appeal.

70.   In September 2014, David Klos of Highland, expressly in his capacity as Senior Manager of Finance of Highland, represented to the Texas court as follows regarding the Escrow on behalf of HERA:

> [HERA holds a] contingent interest in assets held in escrow pursuant to an Escrow Agreement, a true and correct copy of which is attached hereto as Exhibit 2 (the "Deposit Assets"). The Deposit Assets are not presently controlled by or available to HERA. **Per the Escrow Agreement, if a final, non-appealable judgment against HERA is reached, Abrams & Bayliss, LLP, as Escrow Agent, will transfer the Deposit Assets to HERA.** (Emphasis added.)

71.   The filing also represented that HERA was insolvent and liable to Highland for legal expenses funded on its behalf in the amount of $7,459,568 and that only $2,555,071 was included in the net worth computation because Highland had written off $4,904,497 of the liability as of December 31, 2013, because of "lack of collectability."

72.   HERA's opening appellate brief, filed by Hurst and dated May 20, 2015, posited that "it is undisputed that Daugherty continues to own an interest in HERA and assets representing his interest have been escrowed for

27

App. 0111

his benefit[.]" Hurst continued this theme. "Highland acquired the interests of all the other members of HERA as a result of [the Buyout]. … Daugherty did not sell and still owns his interest in HERA today. … His interests were, however, moved into an escrow account, where they remain to this day." These statements by Hurst were a continuation of the strategy to mislead Daugherty that all the defendants had agreed upon and cooperated to effect during the Texas trial and they were known to be false. Neither during the trial nor after did Highland ever intend to respect the idea that Daugherty continued to own his assets or interests.

73. Meanwhile, in June 2016, as Daugherty attempted to obtain a loan from Highland-affiliate NexBank Capital and provided the bank with requested confidential details of his personal financial information, including his HERA interests held in escrow, Surgent arranged with NexBank's CEO (John Holt) and COO (Matt Siekielski) to receive the details of Daugherty's assets and liabilities as disclosed in the loan application. There was no legitimate basis for this transfer of personal financial information to Highland. On information and belief, Defendants used this information to target and strategize their effort to deprive Daugherty of his HERA interests and Texas judgment and inflict maximum financial pain on Daugherty upon the Texas judgment becoming final and nonappealable. Once the judgment

28

became final and non-appealable, Defendants acted with efficiency in targeting the financial pain they meant to inflict using the information they had improperly obtained.

### The Mandate and the Stolen Escrow Assets

74.    On December 1, 2016, Daugherty's judgment against HERA, which had been affirmed on appeal, became final and non-appealable pursuant to the appellate court's mandate.  The mandate was electronically served on the parties' counsel, including Katz and Hurst, on December 1, 2016, and Katz told Ellington about the mandate.  Defendants sprang into action to consummate the fraud they had set up during the pendency of the Texas Action.

75.    Defendants scrambled to unwind the Escrow.  Thirty-nine minutes after the mandate was distributed by the court, an Andrews Kurth associate sent Abrams & Bayliss an email, copying Katz, and saying, "[w]e need to have a call as early tomorrow as possible regarding the escrow arrangements."

76.    Defendants' acts over the next few days, which culminated in the seizure by Highland of Daugherty's escrow assets, were concealed from Daugherty.  Daugherty would not learn of Defendants' acts until February 2017 when Abrams & Bayliss disclosed them at a superficial level.

29

App. 0113

77.    On February 16, 2017, Abrams & Bayliss unveiled Defendants' fraudulent scheme to Daugherty:

> By letter dated December 2, 2016, Abrams & Bayliss notified Highland that it was resigning as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement. By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.
>
> On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately. On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016 instructions. Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.

78.    Highland encouraged Abrams & Bayliss to resign to terminate the Escrow. Highland's in-house and external counsel who are Defendants in this action were intimately involved in this part of the fraudulent scheme. The Abrams & Bayliss letter copied Ellington, Leventon, and Katz. Leventon and Katz, if not also other of the Defendants, directly participated in encouraging Abrams & Bayliss to resign for reasons they knew—to

30

fraudulent deprive Daugherty of his assets—but apparently concealed, a further demonstration of the Defendants' knowledge of their fraud.

79.    After Highland seized the Escrow assets, efforts to collect Daugherty's judgment have failed, as HERA claims to be insolvent.

80.    On May 17, 2019, this Court in the Delaware Related Action found that the crime-fraud exception applied to otherwise-privileged advice sought from Abrams & Bayliss regarding the Escrow. The Court found that there was a reasonable basis to believe that the legal advice was to enable or aid in the furtherance of a fraud.

### After Pillaging the Escrow, Highland Began Its Onslaught of Collection Efforts Against Daugherty

81.    While Defendants were secretly making good on their fraud and pocketing Daugherty's HERA assets and damages judgment in December 2016, they were simultaneously taking hyper-aggressive collection steps against him. Daugherty, unaware of the concealed fraud, paid the Texas judgment against him in cash.

82.    On December 2, 2016, Katz requested a Writ of Execution against Daugherty. On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

31

83. On December 5, 2016, Katz filed a judgment lien on Daugherty's home on Highland's behalf. On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

84. On December 8, 2016, Katz requested a Writ of Garnishment to seize HERA' assets owed to Daugherty under the judgment. The Writ of Garnishment was premised on HERA having a neutral or positive net worth in December 2016 such that when the Deposit Assets were returned to it, it could pay Daugherty and he could then pay Highland. This was effectively a request for an offset of the judgments—Katz on behalf of Highland was seeking to collect the judgment in Highland's favor by garnishing Daugherty's judgment. On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

85. On December 9, 2016, Highland was granted a second Writ of Execution requested by Katz. Also on December 9, 2016, Katz filed an Application for Turnover directing that Daugherty's interest in Highland affiliates NexBank and Trussway Holdings, Inc., be turned over to Highland. On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

32

86.    On December 14, 2016, nine days after Defendants swept the Escrow and after the onslaught of collection efforts against him, Daugherty paid the fee award against him.  Defendants have caused HERA not to honor the Texas damages award and have never returned to Daugherty the HERA assets that the Texas final judgment made clear he still owns.

## The Fraudulent Allocations

87.    In the Texas Action, Defendants produced invoices in connection with their request for attorneys' fees under two contracts.  Those invoices and Defendants' position regarding the fees attributable to those contract claims demonstrate that the liabilities imposed on HERA by Defendants (the "Imposed Liabilities") are fraudulent and that Highland was already reimbursed for Imposed Liabilities that nevertheless are counted as purported unpaid expenses owed to Highland.

88.    At trial in the Texas Action, Highland's expert opined that of the $3,417,015.71 in Andrews Kurth invoices through October 2013, "the amount of attorneys' fees attributable to the breach of contract claims (through October 2013) is at least $2,000,000." But, under the Expense Allocation Agreement, those Andrews Kurth invoices had already been charged to HERA on the contradictory premise that such proportion was

33

related to Daugherty's claims for compensation from HERA, not Highland's affirmative contract claims.

89.    Until mid-2013, HERA was paying its fabricated share to Andrews Kurth directly.  For example, in its January 2013 invoice, Andrews Kurth billed Highland for its work and HERA wired Andrews Kurth payment.  After Defendants emptied HERA of its cash and other assets, it began fabricating the purportedly unpaid Imposed Liabilities.

90.    Costs Defendants represented in the Texas Action were costs attributable to Highland had actually been charged to and paid by HERA. Defendants obtained a double recovery that damaged Daugherty and fraudulently represented liabilities as being owed by HERA.  For example, under the Expense Allocation Agreement, four invoices from Robert Half Legal that were included in Highland's request for legal fees in the Texas Action were charged to, and paid by, HERA.

91.    On December 14, 2016, Daugherty paid his judgment, which represented "the reasonable fee for the necessary services of Highland's attorneys in this case."  Although all expenses of Defendants related to the Texas Action were funneled through the Expense Allocation Agreement and imposed on HERA, Defendants did not reduce the amount of the Imposed Liabilities at HERA when Daugherty paid the judgment for attorneys' fees

34

and expenses. For the $2.8 million of Highland's legal expenses recovered in the Texas Action to constitute 6.6% of the total legal expenses and be entirely allocable to Highland under the Expense Allocation Agreement, the total legal expenses would have to be approximately $39.6 million.

92.    The invoices that are available make clear the charges are a sham and not properly attributable to HERA and were attributed to HERA solely to harm Daugherty.

93.    When Highland declared bankruptcy on October 16, 2019, it listed DLA Piper, c/o Marc Katz, as a creditor of Highland that was owed approximately $1 million for unpaid legal services. On information and belief, this unpaid liability related to services that Defendants represented in the Delaware Related Action had already been paid by Highland.

**Information Revealed Through Highland's Bankruptcy**

94.    Through the Highland bankruptcy proceedings, Daugherty learned that evidence presented at the two days of trial in Delaware was misleading and designed to continue the Defendants' strategy to protect Dondero and Highland at all costs. All Defendants other than Hurst directly participated in this latest round of misrepresentation.[4]

---

[4] Given Hurst's ongoing involvement on behalf of Dondero and Dondero's trusts in the bankruptcy-related actions, Daugherty cannot rule out that Hurst was also involved in the Delaware trial strategy, but has no

35

95.    During the aborted Delaware trial, Katz, Highland and HERA coordinated a defense that included evidence produced on the eve of trial that third-party, arm's-length transactions had just occurred that would provide a valuation for the assets at issue. The Katz team elicited testimony from Highland executive David Klos that investors in RCP had sold their RCP interests inclusive of MGM shares underlying such interests to Highland in arm's-length transactions. This was not true.

96.    The transactions had not actually occurred. As of March 2, 2020, Highland had still not actually paid the purported purchase price that was proffered as evidence of value during the Delaware trial. Nor was Highland the entity making the purchase. The purchase rights had been negotiated and acquired by Highland on September 30, 2019 and then assigned to Highland Capital Management Services, Inc., an entity 75% owned and controlled by Dondero on October 1, 2019.

97.    According to the Creditors Committee in the bankruptcy, Dondero committed RCP to a second transaction involving the direct sale of MGM shares on behalf of the RCP fund in November 2019, but then kept the transaction secret as long as he could during the bankruptcy. But the

_____

specific knowledge of such involvement. After acting in a rogue and unauthorized fashion to protect Dondero's personal interests, the board that manages Highland during bankruptcy terminated Hurst for insubordination.

36

App. 0120

circumstances, which were a central piece Katz's litigation strategy in Delaware would have been well known to the Highland counsel and Katz in addition to Dondero who carried it out.

98.     Moreover, evidence was presented in the bankruptcy indicating that the transactions were constructed to result in Dondero effectively acquiring the underlying MGM stock assets held by RCP for a price that did not reflect their true value. The value was depressed to approximately $72.50 per share from an actual value that was closer to $90 per share. Dondero, a board member of MGM, would have had inside information at the time of the transaction and the transaction was designed to benefit Dondero and shield Highland. This was not evident from the late-produced evidence that the Katz and Highland team selectively presented at the Delaware trial.

## Highland's Other Judgment Creditors

99.     Daugherty is not the only person with an uncollectable judgment against Highland or its affiliates.  In a situation that Dondero has compared to the "Daugherty scenario," Highland rendered an entity insolvent to defeat a judgment for $8 million obtained by former Highland employee Josh Terry.  The court made the "logical inference that the [Acis Entities] had ... no intention of paying [Mr. Terry's judgment] any time soon

37

App. 0121

based on their conduct after the Arbitration Award" and "found the testimony of almost all of the [Highland-affiliated] witnesses for the [Acis Entities] to be of questionable reliability and, oftentimes, there seemed to be an effort to convey plausible deniability."

100.   Other creditors have faced similar obstacles.  One such case is *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, No. 650097/2009 (N.Y. Sup. Ct.), in which UBS claims that Highland fraudulently transferred certain assets from the counterparty affiliate to the Crusader Fund to make the counterparty judgment proof and to defraud UBS.

101.   Another involves the Highland Credit Strategies Fund, which went through a similar redemption and liquidation process as the Crusader Fund that began in 2008.  Highland was found to have engaged in various types of misconduct, including Dondero personally threatening the redeemer committee's personnel with retribution.  The most important aspect of the misconduct is that Highland effectively moved the assets to other Highland-controlled entities for far less than their actual value.  In fact, Highland paid even less for the interest ($24 million) than it had marked the value on its own books ($28 million) and far less than valuations done by third parties even those hired by Highland (up to $37 million).  Highland did so in secret and the redeemer committee only found out when a line item referring to the

38

App. 0122

$24 million as "Cornerstone sale proceeds" showed up in a regular cash report to the redeemer committee. An arbitration panel found that "Highland not only breached its obligations under the Plan [of liquidation], but engaged in willful misconduct in its sale of the Fund's Cornerstone equity." The panel found Highland's explanations to excuse its conduct as "to put it mildly, far-fetched."

102. The Crusader Fund obtained a $189 million arbitration judgment against Highland and, rather than pay it, Highland declared bankruptcy on October 16, 2019.

**Count One**
**(Fraudulent Transfer)**
**(Against Andrews Kurth, Katz, Hurst,**
**Ellington, Surgent, and Leventon)**

103. Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

104. One of the reasons that HERA has failed to satisfy Daugherty's judgment in the Texas Action is that the Defendants secretly caused the Escrow assets—reserved for a judgment in Daugherty's favor—to be transferred to Highland. Now HERA claims to be insolvent.

105. Dondero testified at trial in the Delaware Related Action that he was relying on the advice of counsel who are Defendants in this action with respect to the buyout of all HERA holders except Daugherty, the

39

App. 0123

purported assignment of assets from HERA in 2013, and the taking of assets from HERA in December 2016, all of which formed part of the fraud that was consummated in December 2016. Legal advice that Highland was permitted to take Daugherty's assets was not rendered in good faith. Instead the legal advice was an integral part of the fraudulent bait-and-switch scheme Katz, Hurst, Leventon, Ellington, and Surgent had formulated to cheat Daugherty out of his compensation.

106. Delaware has a potent fraudulent transfer statute enabling creditors, such as Daugherty, to challenge actions by parent companies siphoning assets from subsidiaries. The statute also recognizes that attorneys are liable under the statute if they acted in bad faith as to a transfer.

107. The transfer of HERA's funds reserved for Daugherty in the Escrow to Highland, achieved through the resignation of Abrams & Bayliss, constitutes a fraudulent transfer under Delaware law. It also contradicts sworn representations and counsel representations of the Defendants and their agents in the Texas Action regarding the Escrow.

108. Defendants are liable to Daugherty for the assets fraudulently or otherwise wrongfully transferred to Highland by or on behalf of HERA.

40

## Count Two
## (Conspiracy to Commit Fraud)
## (Against all Defendants)

109.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

110.    Dondero, through HERA Management, exercises total control over HERA and treats its funds as his own, which is routine for Dondero.

111.    As an example, Josh Terry, a former Highland employee, asserted in a lawsuit:

> Okada, the co-founder of Highland, stated on February 10, 2016, "Dude are you aware Jim [Dondero] hasn't paid any taxes in the past year? And he took out a loan from NexBank to pay them but then he got caught up in one of the leverage situations he did with American [Airlines] and a couple of other stocks and he doesn't have the money until March 31 to actually do this. So he's put a lien on his assets…but if some clerk there decides to put the lien on, it would be a PR nightmare. I was just in his office yelling at him, 'I approved the loan at the bank so you could pay your taxes but you never paid your taxes.'"

112.    In this case, Dondero was not using money from his bank to pay his personal taxes, but was instead siphoning money from one of his subsidiaries.  HERA Management is nothing more than a mere instrumentality or alter ego of Dondero.  Dondero did not even know that he was president of HERA Management because he does not observe any actual

41

App. 0125

distinction between his own interests and those of the entities under his control. All acts of HERA Management advantaged Dondero and disadvantaged Daugherty.

113. Dondero and the other Defendants personally participated in the conspiracy to defraud Daugherty of his compensation and damages awarded by the Texas jury as described herein.

114. Defendants made and caused to be made false representations in the Texas Action that were designed to induce the Texas judge and jury and Daugherty to rely on those false representations. Defendants knew the representations to be false at the time made because at all times Defendants intended to take the assets they represented were set aside for Daugherty's benefit.

115. Defendants formed a conspiracy to cooperate in the scheme to defraud Daugherty and all acted in accordance with the conspiracy to defraud Daugherty.

116. Daugherty relied on Defendants' false representations by not bringing claims for his assets against Highland in the Texas Action because Defendants represented that Highland had no interest in the assets, by paying his judgment without seeking a remedy for Defendants secretly taking his

42

assets for Highland and saying nothing as Daugherty paid the judgment against him.

117. Daugherty was damaged by Defendants' fraudulent scheme in that he should have received his assets related to his HERA interest and the damages judgment related to such assets, but received neither and paid the judgment against him before Defendants disclosed that they had taken his assets.

118. The conspiracy to commit fraud involved a plan to take assets held in a Delaware escrow that Defendants had misrepresented had been set aside in Delaware for Daugherty's benefit. All Defendants knew about this act in furtherance of the conspiracy which required action in Delaware.

**Count Three**
**(Civil Conspiracy)**
**(Against All Defendants)**

119. Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

120. Dondero, through HERA Management, exercises total control over HERA and treats its funds as his own, which is routine for Dondero.

121. Dondero and the other Defendants personally participated in the conspiracy to defraud Daugherty of his compensation and damages awarded by the Texas jury as described herein.

43

App. 0127

122.    Defendants made and caused to be made false representations in the Texas Action that were designed to induce the Texas judge and jury and Daugherty to rely on those false representations.  Defendants knew the representations to be false at the time made because at all times Defendants intended to take the assets they represented were set aside for Daugherty's benefit.

123.    Defendants formed a conspiracy to cooperate in the scheme to defraud Daugherty and all acted in accordance with the conspiracy to defraud Daugherty.  In effect, Defendants aided and abetted the unjust enrichment of Highland through the actions described herein.  These actions were part of the conspiracy to unjustly enrich Highland at the expense of Daugherty.  Defendants took these actions knowingly and as part of their conspiracy to unjustly enrich Highland at the expense of Daugherty.

124.    Highland was unjustly enriched by the taking of the assets in escrow that Defendants had misrepresented had been set aside for Daugherty.  Defendants themselves benefited from Highland's unjust enrichment through the payment of their legal fees and salaries.  Defendants took the actions described herein to aid and abet this unjust enrichment as part of a civil conspiracy to enrich Highland and impoverish Daugherty.

44

125.    Daugherty was impoverished by Defendants' civil conspiracy in that he should have received his assets related to his HERA interest and the damages judgment related to such assets, but received neither and paid the judgment against him before Defendants disclosed that they had taken his assets.

126.    The civil conspiracy involved a plan to take assets held in a Delaware escrow that Defendants had misrepresented had been set aside in Delaware for Daugherty's benefit.  All Defendants knew about this act in furtherance of the conspiracy which required action in Delaware.

### Count Four
### (Breach of Fiduciary Duties)
### (Against Highland ERA Management and Dondero)

127.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

128.    As a fiduciary, HERA Management owed fiduciary duties to HERA and its members.  Fiduciary duties were not expressly disclaimed in HERA's operating agreement.

129.    Dondero was at all relevant times President of HERA Management and the only officer of HERA Management. As such, Dondero owed fiduciary duties to the members of HERA.

45

App. 0129

130. HERA Management, acting through Dondero, had the exclusive legal authority to act on HERA's behalf. In breach of their respective fiduciary duties, HERA Management, through Dondero and agents acting at his instruction, transferred the escrow assets to Highland and against the interests of HERA and its members in December 2016. The transfer was self-dealing and constituted a breach of fiduciary duties.

131. To the extent this claim is considered a derivative claim, Daugherty may bring such claim on behalf of HERA. A member of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed.

132. Efforts to cause the manager, HERA Management (or its sole officer, Dondero), to bring this claim are not likely to succeed because HERA Management and Dondero have a direct and material conflict of interest in the transactions that are challenged. That is, the funds wrongfully transferred from escrow went to Highland Capital and Dondero and demand would be futile.

46

133.    Daugherty has standing to bring a derivative claim because he is currently a member of HERA and was a member of HERA at the time of the transactions of which he complains.

**Count Five**
**(Aiding and Abetting Breach of Fiduciary Duties)**
**(Against All Defendants Other Than Dondero, HERA and HERA Management)**

134.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

135.    The actions of Defendants other than Dondero and HERA Management to effect the transfer of escrow assets to Highland in December 2016 and against the interests of HERA and its members constituted aiding and abetting breach of fiduciary duties.

136.    A fiduciary relationship existed between HERA Management and Dondero, and HERA; there was a breach of fiduciary duties, as described above; and there was knowing participation in that breach by Defendants other than Dondero and HERA Management.

137.    To the extent this claim is considered a derivative claim, Daugherty may bring such claim on behalf of HERA.  A member of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to

47

bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed.

138.    Efforts to cause the manager, HERA Management (or its sole officer, Dondero), to bring this claim are not likely to succeed because Highland Capital and its affiliates, including HERA Management, have a direct and material conflict of interest in the transactions that are challenged. That is, the funds wrongfully transferred from escrow went to Highland Capital and Dondero and demand would be futile.

139.    Daugherty has standing to bring a derivative claim because he is currently a member of HERA and was a member of HERA at the time of the transactions of which he complains.

\* \* \*

WHEREFORE, Daugherty respectfully requests that the Court:

a.    enter judgment in favor of Daugherty and against Dondero, HERA Management, HERA, Andrews Kurth, Katz, Hurst, Ellington, Surgent, and Leventon, jointly and severally;

b.    order Dondero, HERA Management, HERA, Andrews Kurth, Katz, Hurst, Ellington, Surgent, and Leventon, jointly and severally, to return to HERA the equivalent of all the assets fraudulently or otherwise wrongfully caused to be transferred from HERA;

48

App. 0132

c.    award Daugherty damages;

d.    award Daugherty pre- and post-judgment interest;

e.    award Daugherty his reasonable costs and expenses incurred in connection with this action, including reasonable attorneys' fees; and

f.    grant such other relief that is just and proper.

/s/ Thomas A. Uebler
Thomas A. Uebler (#5074)
Joseph L. Christensen (#5146)
Hayley M. Lenahan (#6174)
McCollom D'Emilio Smith
 Uebler LLC
Little Falls Centre Two
2751 Centerville Road, Suite 401
Wilmington, DE 19808
(302) 468-5960

Attorneys for Patrick Daugherty

May 15, 2020

49

App. 0133

IN THE DISTRICT COURT
DALLAS COUNTY, TEXAS

------------------------------------------X

SCOTT BYRON ELLINGTON,

                    PLAINTIFF,

          -against-    Cause No.:
                       DC-22-00304

PATRICK DAUGHERTY,

                    DEFENDANT.

------------------------------------------X

          DATE: March 20, 2024
          TIME: 9:30 A.M.

          VIDEOTAPED DEPOSITION of the Non-Party Witness, JAMES SEERY, taken by the Plaintiff, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, held at the offices of Willkie, Farr & Gallagher, LLP, 787 Seventh Avenue, New York, New York 10019, before Karyn Chiusano, a Notary Public of the State of New York.

1

Page 1

EXHIBIT

8

App. 0134

A P P E A R A N C E S:

THE PETTIT LAW FIRM
   Attorneys for the Plaintiff
   SCOTT BYRON ELLINGTON
   2101 Cedar Springs ~ Suite 1540
   Dallas, Texas 75201
   BY: JULIE PETTIT, ESQ.
   jpettite@pettitfirm.com

LYNN, PINKER, HURST & SCHWEGMANN, LLP
   Attorneys for the Plaintiff
   SCOTT BYRON ELLINGTON
   2100 Ross Avenue ~ Suite 2700
   Dallas, Texas 75201
   BY: MICHAEL K. HURST, ESQ.
       MICHELE NAUDIN, ESQ., via Zoom
   mhurst@lynnllp.com
   mnaudin@lynnllp.com

GRAY REED
   Attorneys for the Defendant
   PATRICK DAUGHERTY
   1601 Elm Street ~ #4600
   Dallas, Texas 75201
   BY: DREW YORK, ESQ.
   dyork@grayreed.com

WILLKIE, FARR & GALLAGHER, LLP,
   Attorneys for the Witness
   JAMES SEERY
   787 Seventh Avenue
   New York, New York 10019
   BY: JOSH LEVY, ESQ.
       BENJAMIN GITELMAN-FONSECA, ESQ.
       MARK STANCIL, ESQ.
       JOHN MORRIS, ESQ.
       SIMONE MARTON, ESQ.
   jlevy@willkie.com
   bgitelman-fonseca@willkie.com
   mstancil@willkie.com

ALSO PRESENT:
   PHIL GLAUBERSON, Videographer
   PATRICK DAUGHTERTY, via Zoom
   SCOTT BYRON ELLINGTON
                        *       *       *
                                2

                                                    Page 2

App. 0135

# F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*    *    *    *.

3

Page 3

App. 0136

JAMES SEERY

THE VIDEOGRAPHER:  Good morning.

We are going on the record at 10:14 A.M., March 20, 2024.

Please note that microphones are sensitive and may pick up whispering and private conversations.

Please mute your phones at this time, and place them away from the microphones as they can interfere with the audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of James Seery, in the matter of Scott Byron Ellington versus Patrick Daugherty, filed in the District Court, 101st Judicial District, Dallas County, Texas, DC-22-00304.

The location of this deposition is Willkie, Farr & Gallagher, LLP, 787 Seventh Avenue, New York, New York.

My name is Phil Glauberson, representing Veritext, and I am the Videographer. The Court Reporter is Karyn Chiusano, from Veritext.

I'm not authorized to administer an

4

Page 4

App. 0137

JAMES SEERY

surprise me because the -- the opinion says what it says.

MR. HURST: Objection; non-responsive.

Q. In 2020, Mr. Seery, was there a lawsuit that Mr. Hurst filed, on behalf of a Highland affiliate, against Josh Terry?

MR. HURST: Objection; foundation.

A. I -- I -- I believe there was.

I -- I forget if it was against Josh Terry or Acis.

Q. And was that lawsuit authorized by the Independent Board of Highland before it was filed?

MR. HURST: Objection; form.

Assumes facts not in evidence.

A. No.

It was not.

Q. And did the Independent Board, subsequently, after the filing, approve it's -- the filing of that lawsuit?

A. No.

It did not.

Q. Did Highland Capital terminate or instruct --

MR. YORK: I'm sorry.

Q. Did they instruct Mr. Hurst and his

231

Page 231

App. 0138

JAMES SEERY

firm to dismiss that lawsuit?

A.    I believe we did.

Q.    Did the estate have to indemnify Acis for legal expenses it incurred in defending that lawsuit?

A.    I -- I -- I don't think there was much cost related to that one.  So, I don't recall.

I don't think that -- if -- if it did, it would not have been a material part of the legal fee issue with Acis.

That was more related to Guernsey.

Q.    Did the estate incur any of its own legal expenses in that case?

A.    I -- I don't know.

Q.    Did you consider it to be professional that a lawsuit was filed without authority of the Independent Board?

MR. HURST:  Objection; form, foundation, speculation.

MR. LEVY:  Object to form.

MR. HURST:  Assumes facts not in evidence.

A.    My opinion is, no.

That's not professional at all, particularly in a bankruptcy.

232

Page 232

App. 0139

JAMES SEERY

A.    2 times 4.

Q.    Yeah.

A.    Yeah.  Yeah.

That's how that works.

Q.    Thank you.  I'm so glad --

A.    Even lawyers can get that.

Q.    Thank you.

I appreciate the compliment.

MR. HURST:  At this time, I will pass the witness.

Thank you.

MR. YORK:  Just a couple of follow-up questions, Mr. Seery.

EXAMINATION BY

MR. YORK:

Q.    The -- the -- just to make sure I'm clear:  Mr. Daugherty had a number of claims that he asserted against Highland in the bankruptcy; correct?

A.    Correct.

The claims against Highland.

Q.    And those -- and those claims were for more than the amount of the settlement; correct?

A.    I think they went for more than ten times the amount of the 4 million.  And, yes, they

245

Page 245

App. 0140

JAMES SEERY

were far more than the amount for the settlement.

Q.    And -- and in the settlement between Highland and Mr. Daugherty, Highland never allocated any amounts of that settlement to any particular claim that Mr. Daugherty had brought; correct?

A.    Yeah.

We would -- we would not have allocated anything.  There was no reason to do that.  I have never seen that done.

MR. YORK:  Pass the witness.

MR. HURST:  I don't have anything else.

Thank you.

Appreciate your time.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  This will end Media Unit 5 and conclude the deposition of James Seery.

We are going off the record at 4:45, March 20, 2024.

THE COURT REPORTER:  Mr. York, would you like a copy of the transcript?

MR. YORK:  Yes.

Please.

THE COURT REPORTER:  Would you like a rough of the transcript?

MR. YORK:  No.

246

Page 246

Veritext Legal Solutions
800-336-4000

App. 0141

JAMES SEERY

We don't need one.

THE COURT REPORTER: Mr. Levy, would you like a copy of the transcript?

MR. LEVY: Yes.

Thank you very much.

THE COURT REPORTER: Do you need a rough of the transcript?

MR. LEVY: No.

We don't need a rough.

THE COURT REPORTER: And Mr. Hurst, would you like a rough of the transcript?

MR. HURST: You know what?

Yes. Send us a rough.

Regular return.

(Whereupon, at 4:47 P.M., the Examination of this witness was concluded.)

     o     o     o     o

247

Page 247

App. 0142

JAMES SEERY

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

_____

JAMES SEERY

Subscribed and sworn to before me this _____ day of _____ 20___.

_____

NOTARY PUBLIC

248

Page 248

App. 0143

JAMES SEERY

C E R T I F I C A T E

STATE OF NEW YORK       )
                    :  SS.:
COUNTY OF NEW YORK      )

I, KARYN CHIUSANO, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of April, 2024.

KARYN CHIUSANO

252

Page 252

| Fill in this information to identify the case: |
|---|
| Debtor 1     Highland Capital Management, L.P. |
| Debtor 2 (Spouse, if filing) |
| United States Bankruptcy Court for the:  Northern District of Texas |
| Case number   19-34054 |

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:     Identify the Claim

**1. Who is the current creditor?**

Patrick Hagaman Daugherty
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Patrick Hagaman Daugherty
Name

3621 Cornell Ave., Suite 830
Number     Street

Dallas               TX          75205
City              State        ZIP Code

Contact phone 972-679-7487

Contact email pdaugherty@glacierlakecap.com

see summary page for notice party information

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Where should payments to the creditor be sent? (if different)

Name

Number     Street

City              State        ZIP Code

Contact phone _____

Contact email _____

**4. Does this claim amend one already filed?**

☐ No
☑ Yes.   Claim number on court claims registry (if known) 77

Filed on 04/06/2020
MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

Official Form 410                          Proof of Claim                                                        page 1

EXHIBIT 9

App. 0145

### Part 2:  Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

---

**7. How much is the claim?**  $_____ 40,710,819.42  **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached addendum, various litigation claims and services

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:  $_____

Amount of the claim that is secured:  $_____

Amount of the claim that is unsecured:  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:  $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.  $_____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

Official Form 410                                    Proof of Claim                                    page 2

App. 0146

| | | Amount entitled to priority |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ **No** ☐ **Yes.** *Check one:* | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10/23/2020
MM / DD / YYYY

**/s/ Patrick Hagaman Daugherty**
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Patrick Hagaman Daugherty |
|---|---|
| | First name          Middle name          Last name |
| Title | |
| Company | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 3621 Cornell Ave., Suite 830 |
| | Number          Street |
| | Dallas          TX          75205 |
| | City          State     ZIP Code |
| Contact phone | 927-679-7487     Email pdaugherty@glacierlakecap.com |

App. 0147

# ADDENDUM TO PROOF OF CLAIM
# FILED BY PATRICK H DAUGHERTY

1. <u>Claimant</u>: Patrick H Daugherty ("Daugherty") files this proof of claim against Highland Capital Management, L.P. (the "Debtor").

2. <u>Description and Amount of the Claim(s)</u>: On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") on the third day of trial with Daugherty in Delaware Chancery Court.

   Daugherty's claims against Debtor (the "Claim"), as of the Petition Date, consists of at least **$40,710,819.42** specifically, the Claim consists of the following items and calculations:

| HERA Judgment | |
|---|---|
| HERA Award | $2,600,000.00 |
| Pre and Post Judgment Interest on HERA Award | $1,221,335.11 |
| Daugherty's HERA Units | |
| HERA Cash | $6,338,702.41 |
| HERA Interest | $3,348,702.21 |
| HERA Restoration Capital Partners | $16,443,221.45 |
| HERA NHF | $26,632.46 |
| HERA NXRT | $86,263.97 |
| Indemnification | |
| Advisers Act | $3,139,452.05 |
| Defense Against False Claims | $1,239,367.98 |
| Interest on Indemnification Award | $1,012,648.25 |
| Fee Shifting/Fees on Fees | $2,463,284.03 |
| 2008 Compensation | |
| Compensation Award | $1,475,816.00 |
| Estimated Interest on Compensation Award | $1,174,537.00 |
| Other Damages | |
| IRA Penalties | $106,279.13 |
| Interest on Loans | $34,428.87 |
| **TOTAL** | **$40,710,819.42** |

3. The Claim arises pursuant to the following:

   i) The causes of action asserted in *Second Amended Verified Complaint* filed by Daugherty in The Court of Chancery of the State of Delaware C.A. No. 2017-0488-MTZ including all attachments referenced therein, (the

"Complaint"). Post-petition interest, attorneys' fees, costs, and other expenses continue to accrue on the claim associated with the Complaint against the Debtor to the extent allowable under applicable law. The Claim includes prejudgment interest on certain claims asserted in the Complaint, interest on certain claims asserted in the Complaint, and attorneys' fees, as further described by the Complaint. A true and correct copy of the Complaint is attached hereto as EXHIBIT "A". Daugherty has supplemented Exhibit A with publicly available transcripts, documents and exhibits as represented by Exhibit B, C, and D

*NOTE: The Debtor has elected to redact or classify as "Highly Confidential" numerous pleadings, documents and exhibits that support Daugherty's claim. Daugherty will amend and provide additional supporting information to the extent the Debtor removes these restrictions.*

ii) In 2008, the Debtor was struggling to generate cash to fund its compensation obligations to employees for the 2008 performance year. The Debtor did not have sufficient cash available to pay bonuses on the February 29, 2009 payments date. Instead it opted to award non-cash bonuses to top performing employees referred to as "2008 Tax Refunds. The Debtor provided Daugherty with a Comprehensive Compensation and Benefits Statement on February 29, 20009 (the "**February 2009 Compensation Letter**") that promised to pay him $1,475,816 in value, and "[i]f [the] actual refund deviates materially from [the] estimate, other **compensation** will be fairly adjusted." The Debtor did not describe the payment as a partnership distribution. Moreover, neither Daugherty nor any of the other persons who received a compensation letter with 2008 Tax Refunds has ever received distributions from the partnership as those payments were reserved only for Dondero, Okada and their affiliates. The IRS has since challenged the Debtor's 2008 tax elections, which was the method the Debtor utilized to fund its obligations. There has been no resolution to the audit/dispute (06252018 0028) with the Internal Revenue Service as of the filing of this claim. A copy of the February 2009 Compensation Letter is attached as Exhibit E.

4. <u>Reservation of Rights</u>: In addition to the foregoing Claim, Daugherty reserves the right in the future to assert any and all additional claims that Daugherty may have against the Debtor under both state and federal law, including, without limitation, any legal or equitable remedies to which Daugherty may be entitled. Daugherty further reserves his right to (a) amend, modify, or supplement this proof of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the purpose of modifying or liquidating the amount of any interest, fees, costs and expenses incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of Daugherty set forth herein; (b) file additional proofs of claims; and (c) pursue actions

App. 0149

against third parties. The filing of this Proof of Claim is in no way intended to be (i) a waiver or release of any rights, claims or defenses against any person, entity or property that Daugherty may have, (ii) a waiver or release of Daugherty's right to have any applicable final orders entered by an Article III judge, (iii) a consent by Daugherty to the jurisdiction of this Court for any purpose other than the adjudication of this Proof of Claim; (iv) an election of remedy, (v) a waiver or release of any right Daugherty may have to a jury trial, (vi) a waiver of any right to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or any other proceeds which may be commenced in this case against or otherwise involving Daugherty, including without any limitation, any adversary proceeding that was or may be commenced by any party or committee in this case.

5. <u>Notices</u>: All notices to Daugherty for this proof of claim shall be sent to:

Jason P. Kathman
Pronske & Kathman, P.C.
2701 Dallas Parkway
Suite 590
Plano, Texas 75093
Office (214) 658-6511
<u>jkathman@pronskepc.com</u>

and

Patrick H Daugherty
3621 Cornell Ave
Dallas, Texas 75205
Cell (972) 679-7487
<u>pdaugherty@glacierlakecap.com</u>

6. <u>Payments</u>: Please remit all payments and distributions related to this proof of claim to:

Patrick H Daugherty
3621 Cornell Ave
Dallas, Texas 75205

Dated: October 23, 2020

*/s/ Patrick H Daugherty*

App. 0150

Case 19-34054-sgj11 Doc 3298 Filed 03/08/22    Entered 03/08/22 13:06:09    Page 1 of 4

Docket #3298  Date Filed: 3/8/2022



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 8, 2022**

*[signature]*

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. § | |

**ORDER APPROVING
SETTLEMENT WITH PATRICK HAGAMAN DAUGHERTY (CLAIM NO. 205)
AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

This matter having come before the Court on the *Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* [Docket No. 3088] (the "Motion"),[2] filed by Highland Capital Management, L.P., the above-captioned reorganized debtor (the "Reorganized Debtor") in

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

DOCS_NY:45264.3 36027/003

EXHIBIT

**10**



1934054220308000000000002

App. 0151

the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the Motion; (b) *Scott Ellington's Objection to the Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Daugherty* [Docket No. 3242] (the "Ellington Objection"), filed by Scott Ellington ("Mr. Ellington"); (c) the *Reorganized Debtor's Reply in Further Support of Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty* [Docket No. 3257]; (d) *Patrick Daugherty's Joinder in Reorganized Debtor's Reply in Further Support of Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205)* [Docket No. 3258], filed by Patrick Hagaman Daugherty ("Mr. Daugherty"); (e) the exhibits identified on *Highland Capital Management L.P.'s Witness and Exhibit List with Respect to Evidentiary Hearing to Be Held March 1, 2022* [Docket No. 3270], including the proposed Settlement Agreement signed by the Reorganized Debtor and Mr. Daugherty (the "Settlement Agreement"), all of which were admitted into evidence without objection; (f) Exhibit SE-2 identified on *Scott Ellington's Amended Witness and Exhibit List for Hearing Scheduled for March 1, 2022 at 1:30 pm (Prevailing Central Time)* [Docket No. 3265] ("Exhibit SE-2"), which was admitted into evidence without objection; (g) the testimony of Mr. James P. Seery, Jr. adduced during the hearing held on March 1, 2022 (the "Hearing"), including assessing Mr. Seery's credibility; and (h) the arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Reorganized Debtor, the Debtor's creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed

2

(1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Reorganized Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth in the record on this Motion, the Court makes the following findings of fact and conclusions of law:[3]

1. At the time of the Hearing, Mr. Ellington (i) did not hold any claims against the Debtor (*see Order Approving Stipulation and Agreed Order Resolving Third Omnibus Objection and Certain Other Claims* [Docket No. 3244]); (ii) was not a Claimant Trust Beneficiary (as that term is defined in Exhibit SE-2); and (iii) because he does not hold claims against the Debtor, could not become a Claimant Trust Beneficiary.

2. Accordingly, Mr. Ellington does not have standing to object to the Motion.

3. Even if Mr. Ellington had standing, the Reorganized Debtor has met its burden of proof under Bankruptcy Rule 9019 that the settlement embodied in the Settlement Agreement

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

3

DOCS_NY:45264.3 36027/003

(and the exhibits annexed thereto) are fair, reasonable, and in the best interests of the Debtor, its successor(s), and all parties-in-interest.

4. Mr. Daugherty's Proof of Claim No. 67 was superseded by Proof of Claim No. 77, and Proof of Claim No. 77 was superseded by Proof of Claim No. 205, such that Proof of Claim Nos. 67 and 77 shall be disallowed and Proof of Claim No. 205 shall be treated in the manner set forth in the Settlement Agreement.

Based on the foregoing, it is hereby **ORDERED** that:

1. The Motion is **GRANTED** as set forth herein.

2. The Ellington Objection is **OVERRULED** in its entirety.

3. The Settlement Agreement is approved in all respects pursuant to Federal Rule of Bankruptcy Procedure 9019.

4. The Reorganized Debtor and Mr. Daugherty are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

5. Proofs of Claim Nos. 67 and 77 are **DISALLOWED** with prejudice.

6. Proof of Claim No. 205 is **ALLOWED** in the amounts set forth in the Settlement Agreement.

7. The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

4

DOCS_NY:45264.3 36027/003

Final Execution Copy

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement") is made and entered into by and between (i) Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), and (ii) Patrick Hagaman Daugherty ("Daugherty" and together with HCMLP, the "Parties," and individually as a "Party"). This Settlement provides for the treatment of certain claims asserted by Daugherty against the Debtor, and for the Parties to take certain other specified actions in settlement thereof.

### RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, the Debtor's chapter 11 case (the "Bankruptcy") is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, on February 2 and 3, 2021, the Court conducted a confirmation hearing with respect to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1808] (the "Plan");

WHEREAS, on February 8, 2021, the Court rendered an opinion from the bench in which it confirmed the Plan [Docket No. 1924];

WHEREAS, on February 22, 2021, the Court issued an order confirming the Plan [Docket No. 1943];

WHEREAS, on August 11, 2021, the Effective Date (as defined in the Plan) occurred [Docket No. 2700];

WHEREAS, Daugherty is a former employee and limited partner of the Debtor and has

DOCS_NY:42669.9 36027/002

App. 0155

served in other positions with affiliates and former affiliates of the Debtor;

WHEREAS, at the time of his resignation, Daugherty owned 19.1% of the preferred units of Highland Employee Retention Assets LLC ("HERA"), an employee deferred compensation vehicle managed by the Debtor and Highland ERA Management, LLC ("ERA") and contends that he owned or had the right to own all of the preferred units of HERA;

WHEREAS, prior to his resignation from HCMLP, Daugherty was awarded units of HERA, which vehicle owned interests in Restoration Capital Partners, LP ("RCP"), an HCMLP managed private equity fund, and other investments;

WHEREAS, in April 2012, the Debtor commenced an action against Daugherty in Texas state court (the "Texas Action"), and Daugherty subsequently asserted counterclaims for breach of contract and defamation, and third-party claims against HERA and others;

WHEREAS, after a three-week trial, the jury returned a verdict partially in favor of the Debtor, but Daugherty prevailed on his claims against the Debtor and James Dondero ("Dondero") for defamation with malice and a third-party claim against HERA and was awarded damages of $2.6 million against HERA, plus prejudgment and post-judgment interest at 5% (the "HERA Judgment");[1]

WHEREAS, in July 2017, after being unable to collect on the HERA Judgment, Daugherty commenced an action against the Debtor, Dondero, HERA, and ERA Management in the Delaware Chancery Court (the "Delaware Court"), in a case captioned *Daugherty v. Highland Capital Management, L.P., et al.*, C.A. No. 2017-0488-MTZ, for fraudulent transfer, promissory estoppel, unjust enrichment, indemnification, and fees on fees (the "Highland Delaware Case");

---

[1] The Debtor prevailed on its claims against Mr. Daugherty for breach of contract and breach of fiduciary duty for non-monetary damages and obtained an award of $2.8 million in attorney's fees. The HERA Judgment was affirmed on appeal on December 1, 2016.

2

App. 0156

WHEREAS, the Delaware Court in the Highland Delaware Case (i) found that the Dondero-related defendants improperly withheld dozens of documents in discovery on privilege grounds, and (ii) ruled that there was "a reasonable basis to believe that a fraud has been perpetrated" such that the Delaware Court applied the "crime-fraud exception" to the attorney-client privilege assertion, and such rulings have not been overturned;

WHEREAS, Daugherty asserts that such withholding of documents and the failure to search defendants' and their employees personal electronic devices for stored documents and texts as well as other emails and domain names such as sasmgt.com and gmail.com which were in their possession and control and to provide required discovery injured him by undermining his attempts to build an evidentiary record to support his claims against the Debtor and the other defendants in the Highland Delaware Case;

WHEREAS, on October 14, 2019, the Highland Delaware Case proceeded to trial and two days later, on October 16, 2019, before the completion of the trial and before the Delaware Court ruled on Daugherty's and the Debtor's cross-motions for summary judgment regarding indemnification and fees on fees, the Debtor filed for bankruptcy;

WHEREAS, on December 1, 2019, Daugherty filed a separate lawsuit in the Delaware Court, captioned *Daugherty v. Dondero, et al.*, C.A. No. 2019-0956-MTZ, against Dondero, HERA, ERA, Hunton Andrews Kurth LLP ("Andrews Kurth"), Marc Katz ("Katz"), Michael Hurst ("Hurst"), the Debtor's Chief Compliance Officer, the Debtor's then in-house counsel (Isaac Leventon ("Leventon")), and the Debtor's then general counsel (Scott Ellington ("Ellington")), for conspiracy to commit fraud, among other claims (the "HERA Delaware Case" and together with the Highland Delaware Case, the "Delaware Cases");

WHEREAS, on April 1, 2020, Daugherty filed a general, unsecured, non-priority claim

3

App. 0157

against the Debtor in the amount of at "least $37,483,876.59," and such claim was denoted by the Debtor's claims agent as Proof of Claim No. 67 ("Proof of Claim No. 67");

WHEREAS, on April 6, 2020, Daugherty filed a general, unsecured, non-priority claim against the Debtor in the amount of at "least $37,482,876.62" that superseded Proof of Claim No. 67 and that was denoted by the Debtor's claims agent as Proof of Claim No. 77 ("Proof of Claim No. 77");

WHEREAS, on August 31, 2020, the Debtor commenced an adversary proceeding against Daugherty by filing a complaint (the "Complaint") in which the Debtor: (1) objected to Proof of Claim No. 77 on various grounds (the "Claim Objection"), and (2) asserted a cause of action for the subordination of part of Daugherty's claim pursuant to section 510(b) of the Bankruptcy Code. Adv. Proc. No. 20-03107 (the "Adv. Proc.") [Adv. Docket No. 1] (the "Adversary Proceeding");

WHEREAS, on September 29, 2020, Daugherty filed his answer to the Complaint [Adv. Docket No. 8] (the "Answer");

WHEREAS, on September 24, 2020, Daugherty filed his *Motion to Confirm Status of Automatic Stay, or Alternatively to Modify Automatic Stay* [Docket No. 1099] (the "Stay Motion") pursuant to which he sought to sever the Debtor from the Highland Delaware Case and then consolidate the remaining claims in the Highland Delaware Case into the HERA Delaware Case and proceed with one case against the non-Debtor parties;[2]

WHEREAS, on October 23, 2020, Daugherty filed a motion seeking leave to amend his Proof of Claim No. 77 [Docket No. 1280] (the "POC Amendment Motion"). The amended proof

---

[2] On October 8, 2020, the Debtor commenced a second adversary proceeding against Daugherty (the "Second Adversary Proceeding"), seeking to enjoin him from prosecuting the Delaware Cases. Adv. Proc. 20-03128 ("2d Adv. Proc.") [2d Adv. Proc. Docket No. 1]. On January 29, 2021, the parties filed a Settlement that resolved the Second Adversary Proceeding, and the Second Adversary Proceeding was subsequently dismissed with prejudice. [2d Adv. Proc. Docket No. 12].

4

of claim attached to the POC Amendment Motion increased Daugherty's general, unsecured, non-priority claim against the Debtor to the amount of at "least $40,410,819.42" and sought to supersede Proof of Claim No. 67 and Proof of Claim No. 77;

WHEREAS, on October 23, 2020, Daugherty filed his *Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 Motion*, seeking for his Claim to be temporarily allowed for voting purposes in this amount of $40,410,819.42 [Docket No. 1281] (the "3018 Motion");

WHEREAS, on November 3, 2020, the Court granted the Stay Motion [Docket No. 1327];

WHEREAS, the Debtor opposed the 3018 Motion, and after conducting an evidentiary hearing for the limited purpose of determining the 3018 Motion, the Court entered an order temporarily allowing Daugherty's Claim only for voting purposes in the amount of $9,134,019 [Docket No. 1474];

WHEREAS, on December 10, 2020, the Court entered an order [Docket No. 1533] granting the POC Amendment Motion, and Daugherty was permitted to file an amendment to his proof of claim. On December 23, 2020, Daugherty filed an amended proof of claim, designated by the Debtor's claim agent as Proof of Claim No. 205 ("Proof of Claim No. 205" or the "Daugherty Claim"). Proof of Claim No. 205 superseded Proof of Claim No. 77 and increased the amount of the Daugherty's Claim to $40,710,819.42;

WHEREAS, on November 30, 2020, Daugherty filed his Motion to Lift the Automatic Stay (the "Lift Stay Motion") [Docket No. 1491] seeking to lift the automatic stay to allow him to finish his trial in the Delaware Court and liquidate his claims. The Debtor opposed the Lift Stay Motion, and after a hearing was held on December 17, 2020, the Court denied the relief requested in the Lift Stay Motion [Docket No. 1612];

5

WHEREAS, except with respect to the Reserved Claim (as defined below), the Parties have agreed to settle and resolve all claims and disputes between them and their respective current affiliates, managed entities, and employees, including the Daugherty Claim, on the terms set forth in this Settlement:

## AGREEMENT

**NOW, THEREFORE**, after good-faith, arms-length negotiations, and in consideration of the foregoing, it is hereby stipulated and agreed that:

1. Allowed Claims: In full satisfaction of the entirety of the Daugherty Claim against the Debtor and HCMLP Released Parties (defined below), excluding the Reserved Claim, Daugherty shall receive (a) an allowed general unsecured Class 8 claim in the amount of $8,250,000; (b) an allowed subordinated general unsecured Class 9 claim in the amount of $3,750,000; and (c) a one-time lump sum cash payment in the amount of $750,000 to be paid within 5 business days of Bankruptcy Court approval of this Settlement Agreement.

2. Recovery: The Debtor makes no representation or warranty as to the recovery on Class 8 or Class 9 claims under the Plan.

3. Observation Access: As soon as practicable following entry of an order of the Bankruptcy Court approving this Settlement, HCMLP shall use reasonable efforts to petition the Claimant Trust Oversight Board[3] to permit Daugherty to have access as an observer to meetings of the Claimant Trust Oversight Board, subject to policies, procedures, and agreements applicable to other observers of the Claimant Trust Oversight Board, including policies, procedures, and agreements related to confidentiality and common interest. Whether Daugherty will be granted observer access and any continuing observer access is and will remain at the sole discretion of the

---

[3] The Claimant Trust Oversight Board refers to the Oversight Board as defined in the August 11, 2021 Highland Claimant Trust Agreement establishing the Claimant Trust, as defined therein.

6

Claimant Trust Oversight Board.

4.    RCP Track Record:  HCMLP shall use reasonable efforts to provide Daugherty with data constituting the investment performance track record of RCP during Daugherty's tenure at HCMLP.  Daugherty shall not be entitled to any compensation with respect to the performance of RCP.  HCMLP makes no representations or warranties regarding such data and takes no responsibility with respect to the use of such data for any purposes.

5.    Daugherty Releases: Except as specifically provided in this paragraph 5, and to the maximum extent permitted by applicable law, the Debtor, on behalf of itself and each of the HCMLP Entities and HCMLP Parties (as those terms are defined in paragraph 6 below), hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue Daugherty, his successors, affiliates, and assigns, (and in each such category to include their respective advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, and designees) (collectively, the "Daugherty Additional Release Parties" and together with Daugherty, the "Daugherty Released Parties"), in each case acting in such capacity, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, or the Delaware Cases, all existing as of the date hereof (collectively, the "HCMLP Released Claims"); provided, however, that such release shall not

7

apply with respect to any and all defenses that HCMLP or the HCMLP Entities may have to the Reserved Claim or the Reserve Motion (as those terms are defined herein) or Daugherty's obligations under this Settlement. For the avoidance of doubt, the HCMLP Released Claims include all claims or causes of action and facts, known or unknown, that exist as of the date hereof but do not include or apply to claims or causes of action based on facts occurring after the date hereof.

6.    HCMLP Releases: Except as specifically provided in this paragraph 6, and to the maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty Released Parties, hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (a)(i) HCMLP; (ii) Strand Advisors Inc.; (iii) the Claimant Trust; (iv) the Claimant Trust Oversight Board; (v) the Highland Litigation Sub-Trust; (vi) the Highland Indemnity Trust; (vii) any entity of which greater than fifty percent of the voting ownership is held directly or indirectly by HCMLP as of the date hereof and any entity otherwise directly or indirectly controlled by HCMLP as of the date hereof,; and (viii) any entity managed by either HCMLP or a direct or indirect subsidiary of HCMLP, including Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Master, L.P. (and all of their respective general partners, feeder funds, managers, and affiliates) (the foregoing (a)(i) through (a)(viii) the "HCMLP Entities"), and (b) with respect to each such HCMLP Entity, such HCMLP Entity's respective current (meaning employed in their respective roles as of the date hereof) advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders (but not the shareholders of Strand Advisors Inc.), agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "HCMLP Parties," and together with the

8

HCMLP Entities, the "HCMLP Released Parties"),[4] in each case acting in such capacity, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, the Daugherty Claim, or the Highland Delaware Case (collectively, the "Daugherty Released Claims"); provided, however, that such release shall not apply with respect to the Reserved Claim or the Reserve Motion (as those terms are defined in paragraph 9 below) or HCMLP's obligations under this Settlement. This release expressly applies to all current employees of HCMLP as the Reorganized Debtor (as defined in the Plan), in their capacities as such. For the avoidance of doubt, the Daugherty Released Claims includes all claims or causes of action and facts, known or unknown, that exist as of the date hereof but do not include or apply to claims or causes of action based on facts occurring after the date hereof.

7.    Reservation of Daugherty Rights: Notwithstanding anything contained herein to the contrary, the term HCMLP Released Parties shall not include (a) NexPoint Advisors, L.P. (or any of its subsidiaries and employees, advisors, or agents), (b) the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and any of their respective employees, advisors, or agents), (c) NexBank, SSB (or any of its subsidiaries, employees, advisors, or agents), (d) James Dondero or any trust in which Dondero or any of his family members are a trustee or beneficiary (or any trustee acting for such trust), including but not limited to Hunter

---

[4] The Daugherty Additional Released Parties and the HCMLP Released Parties are collectively referred to as the "Additional Released Parties."

9

Mountain Investment Trust, The Get Good Trust, Dugaboy Investment Trust, SLHC Investment Trust, (e) HERA (subject to paragraph 8 below), (f) ERA (subject to paragraph 8 below), (g) Grant Scott, (h) Mark Okada and any trust in which Mark Okada or any of his family members are a beneficiary (or any trustee acting for such trust in their respective capacities), (i) Ellington, (j) Leventon, (k) Katz, (l) Hurst, (m) Andrews Kurth, or (m) any other former employee (as of the date hereof) of the HCMLP Released Parties.

8.      HERA and ERA:  The Parties acknowledge and agree that as of the date hereof, HERA and ERA have no material assets other than potential claims that may exist against persons or entities not released at or prior to the date hereof, and no claims against the HCMLP Released Parties. The allowed claims provided in paragraph 1 hereof are expressly agreed to in order to satisfy any liability the Debtor may have in connection with the HERA Judgment.  To facilitate recovery of such potential claims – which expressly excludes any and all claims by or in the name of HERA and ERA against any of the HCMLP Released Parties --  HCMLP will transfer its interests in HERA and ERA to Daugherty.  Such transfer will include the HERA and ERA books and records (spreadsheet) maintained on HCMLP's system.  Such transfer will be without representation or warranty of any type; including, for the avoidance of doubt, without any representation or warranty as to the merits of the potential claims or the efficacy of the transfer of the potential claims.  Such transfer will be without any liability or material cost to HCMLP or its affiliates or the other HCMLP Released Parties, including any liability in respect of any assets that HERA or ERA ever actually or allegedly owned, possessed, or controlled and that were actually or allegedly transferred, conveyed, sold, written off or otherwise disposed of (in any such case, a "Disposition").  In connection with the transfer, HERA and ERA have expressly released the HCMLP Released Parties from any and all claims, including any claims actions or remedies related

10

to any Disposition, either of them may have against any HCMLP Released Party now or in the future (the "HERA and ERA Release"). Daugherty on behalf of himself and each of the Daugherty Released Parties acknowledges, accepts, and agrees not to challenge the HERA and ERA Release or support any challenge thereto. A copy of the HERA and ERA Release is annexed hereto as **Exhibit A.** Daugherty acknowledges and agrees that even though HERA and ERA are not HCMLP Released Parties under this Agreement, Daugherty and all Daugherty Released Parties shall (a) not seek to hold any HCMLP Released Party liable for any action or inaction taken by or on behalf of HERA or ERA, including through any derivative, veil-piercing or similar cause of action or remedy; and (b) not seek to recover damages or obtain any form of relief against any HCMLP Released Party on account of any action or inaction taken by or on behalf of HERA or ERA, including through any veil piercing or similar cause of action or remedy. If, for any reason, HERA or ERA, or any person or entity acting on their behalf, recovers anything from any HCMLP Released Party, Daugherty shall promptly turnover to HCMLP or its successors and assigns any amounts actually recovered by Daugherty or any Daugherty Released Party, from HERA or ERA arising from, related to, or derived from any claim that HERA or ERA or any person or entity acting on their behalf has or may have against any HCMLP Released Party. HCMLP will provide reasonable assistance to Daugherty to assist with the preparation of any required HERA K-1s for 2021, but any requirement to provide such K-1s will be the obligation, if any, of HERA.

9.     IRS Compensation Claim: In section 4(ii) of the Addendum to Proof of Claim No. 205, Daugherty contends that he has a contingent, unliquidated claim against the Debtor arising out of a 2008/2009 compensation letter (the "Reserved Claim"), which claim is also related to an audit/dispute between the Debtor and the Internal Revenue Service (the "IRS") (the dispute between the Debtor and IRS being referred to herein as the "IRS Audit Dispute"). The Debtor

11

App. 0165

disputes the validity and amount of the Reserved Claim.  Daugherty shall retain the Reserved

Claim solely against the Debtor and not against any other HCMLP Released Party, and the Debtor

reserves the right to assert any and all defenses thereto.  Any litigation by and between the Debtor

and Daugherty concerning the validity and amount of the Reserved Claim shall be stayed until the

IRS makes a final determination with respect to the IRS Audit Dispute; provided, however, that

Daugherty may file a motion with the Bankruptcy Court to have the Reserved Claim estimated for

purposes of establishing a reserve as a "Disputed Claim" under the Debtor's Plan (the "Reserve

Motion"), and the Debtor (and any successor) reserves the right to assert any and all defenses

thereto.  Notwithstanding the foregoing, Daugherty may address any personal claim or personal

liability to the IRS as a result of the IRS Audit Dispute, including settlement of any such claims;

provided, however, Daugherty agrees to forego settling or addressing any claims with the IRS

without the written consent of the Debtor until March 31, 2022.

10.     Current HCMLP Employees: The HCMLP Parties set forth on **Appendix A** hereto

are currently employed by the Debtor are HCMLP Released Parties.  By executing a copy of this

Settlement and delivering it to Daugherty, each of the persons on Appendix A agrees not to sue,

attempt to sue, or threaten or work with or assist  any entity or person to sue, attempt to sue, or

threaten any Daugherty Released Party on or in connection with any claim or cause of action

arising prior to the date of this Settlement.

11.     Dismissal and Motions in Other Actions.  Within ten business days after approval

of this Settlement by the Bankruptcy Court, the Parties shall take all steps necessary (a) to dismiss

with prejudice (i) the Highland Delaware Case, as against the Debtor and any HCMLP Released

Party, and (ii) the HERA Delaware Case, as against every HCMLP Released Party, (b) to file an

agreed motion and proposed order to partially vacate the final judgment entered against Daugherty

12

in the Texas Action, (c) withdraw HCMLP's objection to the Daugherty motion to recuse in the Texas Action, and (d) to dismiss the Adversary Proceeding with prejudice. The parties shall file the foregoing motions and withdrawals substantially in the form of the documents annexed hereto as **Exhibit B**.

12. Additional Third Party Claims Discovery: The Debtor (a) shall accept service of any subpoenas via email served by Daugherty in connection with the Delaware Cases on behalf of itself, the HCMLP Entities, the HCMLP Parties (but only in their capacity as employees of HCMLP); and (b) acknowledge and consent to the jurisdiction of the Delaware Chancery Court for purposes of enforcing any such subpoenas, subject in all respects to the rights that the HCMLP Entities and HCMLP Parties to defend the requested production, if any.

13. Settlement of Third Party Claims: Daugherty shall not settle any claims or causes of action against any current or former director, officer, employee, agent or representative of HCMLP or Strand Advisors Inc. (collectively, the "Potentially Indemnified Parties") to the extent such claims have been brought or could have been brought against any Potentially Indemnified Parties, if any such settlement designates, defines or describes the settled claims as arising out of or relating to simple negligence or as having otherwise been within the scope of employment of the Potentially Indemnified Party.

14. Claims Register: As soon as practicable after the Settlement Effective Date, HCMLP shall instruct the claims agent in the Debtor's chapter 11 case to adjust the claims register in accordance with this Settlement.

15. Daugherty Representations: Daugherty represents and warrants to each of the HCMLP Released Parties that (a) he has full authority to release the Daugherty Released Claims and has not sold, transferred, or assigned any Daugherty Released Claim to any other person or

13

entity and that (b) no person or entity other than Daugherty has been, is, or will be authorized to bring, pursue, or enforce any Daugherty Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) Daugherty.

16.    HCMLP Representations: Each of HCMLP and each HCMLP Released Party who has signed this Settlement represents and warrants to Daugherty that (a) he, she or it has not sold, transferred, pledged, assigned or hypothecated any HCMLP Released Claim to any other person or entity and (b) he, she, or it has full authority to release any HCMLP Released Claims that such HCMLP Released Party personally has against Daugherty.

17.    Additional HCMLP Representations: HCMLP represents and warrants that it is releasing the HCMLP Released Claims on behalf of the HCMLP Entities to the maximum extent permitted by any contractual or other legal rights HCMLP possesses.  To the extent any of the HCMLP Entities dispute HCMLP's right to release the HCMLP Released Claims on behalf of any of the HCMLP Entities, HCMLP shall use commercially reasonable efforts to support Daugherty's position, if any, that such claims were released herein.  For the avoidance of doubt, HCMLP will have no obligations to assist Daugherty under this paragraph if HCMLP has been advised by external counsel that such assistance could subject HCMLP to liability to any third party or if such assistance would require HCMLP to expend material amounts of time or money.  HCMLP shall not argue in any forum that the non-signatory status of any of the HCMLP Entities to this Settlement shall in any way affect the enforceability of this Settlement vis-à-vis any of the HCMLP Entities.  The Parties agree that all of the HCMLP Entities are intended third-party beneficiaries of this Release.

18.    HCMLP Covenant: HCMLP and the HCMLP Entities covenant and agree that they will not pursue or seek to enforce any injunctions entered in the Texas Action against

14

Daugherty.

19.    <u>Entire Agreement; Modification</u>: This Settlement contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties. This Settlement may not be modified other than by a signed writing executed by the Parties.

20.    <u>Bankruptcy Court Approval</u>: Notwithstanding anything to the contrary contained herein, the effectiveness of HCMLP and the Claimant Trust's execution of this Settlement shall be subject to entry of an order of the Bankruptcy Court approving this Settlement. HCMLP shall take all steps necessary to file with the Bankruptcy Court a motion for an order approving this Settlement pursuant to Federal Rule of Bankruptcy Procedure 9019 and section 363 of the Bankruptcy Code (the "<u>Motion</u>"). The parties agree to cooperate in the preparation and prosecution of the Motion which shall be filed no later than 5 business day after execution of this Settlement, unless such time is extended by mutual agreement.

21.    <u>Counterparts</u>: This Settlement may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which will be deemed an original but all of which together constitute one and the same instrument and shall be effective against a Party or Additional Released Party upon approval of the Settlement by the Bankruptcy Court.

22.    <u>Governing Law; Jurisdiction</u>: This Settlement will be exclusively governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of law principles, and all claims relating to or arising out of this Settlement, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Delaware, excluding Delaware's conflicts of law principles. The Bankruptcy Court will retain exclusive jurisdiction over all disputes relating to this Settlement.

15

23.     <u>Headings</u>:  Paragraph headings included herein are for convenience and shall have no impact whatsoever on the meaning or interpretation of any part of this Settlement.

[Remainder of page intentionally left blank]

16

In witness whereof, the parties hereto, intending to be legally bound, have executed this

Settlement as of the day and year set forth below:

Dated:  *11-21-21*     HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____

Name: James P. Seery, Jr.
Title:   Chief Executive Officer

HIGHLAND CLAIMANT TRUST

By: _____

Name: James P. Seery, Jr.
Title:  Claimant Trustee

PATRICK HAGAMAN DAUGHERTY

Dated: *11/22/21*

By: _____
Name:  Patrick Hagaman Daugherty

App. 0171

**EXHIBIT A**

# HERA RELEASE AGREEMENT

This HERA Release Agreement ("HERA Release Agreement") is entered into as of November 21, 2021 by and among Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), Patrick Hagaman Daugherty ("Daugherty"), Highland Employee Retention Assets, LLC ("HERA") and Highland ERA Management, LLC ("ERA" and together with HCMLP, and HERA, the "Parties," and individually as a "Party").

WHEREAS, reference is hereby made to the Settlement Agreement (the "Settlement") of even date herewith and attached hereto made and entered into by and between the Debtor, the Highland Claimant Trust, and Daugherty.

WHEREAS, the Settlement settles all of Daugherty's claims against the HCMLP Released Parties, including all claims against the HCMLP Released Parties relating to transfers of assets from HERA.

WHEREAS, the Settlement includes, among other things, the transfer by HCMLP to Daugherty of HCMLP's interests in HERA and ERA.

WHEREAS, under the Settlement such transfer is being made without any liability to any of the HCMLP Released Parties of any type and is conditional on the full release of, and covenant not to sue, each of the HCMLP Released Parties, by and from HERA, ERA, Daugherty and the Daugherty Released Parties.

WHEREAS, neither HERA nor ERA filed proofs of claim in the Bankrupty and have no claims against HCMLP.

WHEREAS, out of an abundance of caution to confirm that HERA, ERA, Daugherty, and the Daugherty Released Parties have no claims against the HCMLP Released Parties, this HERA Release Agreement is being entered into contemporaneously with the Settlement and constitutes an

essential part thereof.

WHEREAS, capitalized terms used herein but not otherwise defined herein have the respective meanings set forth in the Settlement.

NOW, THEREFORE, in consideration of the entry into of the Settlement, the transfer of the equity interests in HERA and ERA to Daugherty in accordance with the Settlement, and for other good and valuable consideration, including the provisions set forth herein, the parties hereto further agree as follows:

1.     Upon entry of an order of the Bankruptcy Court approving this Settlement and to the maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty Additional Release Parties, together with each of HERA and ERA (Daugherty, the Daugherty Additional Release Parties, HERA and ERA shall be collectively referred to herein as the "HERA Releasing Parties"), each hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, any of the HCMLP Released Parties for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, the Daugherty Claim, Highland Delaware Case, or the HERA Delaware Case (collectively, "Claims"), in each case that in any way arise from or otherwise in any way relate to HERA or ERA, including, without limitation, any actual or potential claims, whether known or unknown, in any way related to or

App. 0174

arising out of the formation, management, operation or assets of HERA, ERA or any of their respective predecessors or successors, including the transfer of any assets to or from HERA or ERA, it being understood that all remaining assets of HERA have been transferred to HCMLP prior to the date hereof, and in addition to the releases set forth above, each of the HERA Releasing Parties irrevocably waives and releases and covenants not to sue with respect to any Claims against any of the HCMLP Released Parties in any way related to any such transfers or assets, whether *in personam* with respect to the HCMLP Released Parties or *in rem* with respect to any of their assets (collectively, the "HERA Released Claims") or any other Disposition.

2.    This Release constitutes a part of, and is supplemental to, the provisions of the Settlement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

App. 0175

In witness whereof, the parties hereto, intending to be legally bound, have executed this

HERA Release Agreement as of the date set forth above.


HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title:   Chief Executive Officer

PATRICK HAGAMAN DAUGHERTY

By: _____
Name:   Patrick Hagaman Daugherty


HIGHLAND EMPLOYEE RETENTION ASSETS, LLC

By: Highland ERA Management, LLC, its manager

By: Highland Capital Management. LP

By: _____
Name: James P. Seery, Jr.
Title:   Chief Executive Officer


HIGHLAND ERA MANAGEMENT, LLC

By: _____
Name:   James P. Seery, Jr.
Title:   Authorized Signatory


App. 0176

**EXHIBIT B**

App. 0177

CAUSE NO. 12-04005

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| PATRICK DAUGHERTY, | § | |
| | § | |
| Defendant and Counter-Plaintiff, | § | DALLAS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| SIERRA VERDE, LLC, HIGHLAND | § | |
| EMPLOYEE RETENTION ASSETS | § | |
| LLC, JAMES DONDERO, PATRICK | § | |
| BOYCE, AND WILLIAM L. BRITAIN, | § | |
| | § | |
| Third-Party Defendants. | § | |
| | § | |
| | § | 68th JUDICIAL DISTRICT |

## AGREED MOTION TO PARTIALLY VACATE THE FINAL JUDGMENT DATED JULY 14, 2014

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Highland Capital Management, LP ("Highland") and Defendant Patrick Daugherty ("Daugherty" and together with Highland, the "Parties") file this *Agreed Motion to Partially Vacate the Final Judgment dated July 14, 2014* (the "Motion"), and respectfully show the following:

1. On July 14, 2014, this Court entered a *Final Judgment* (the "Judgment") that, among other things, granted Highland's motion for injunctive relief against Daugherty.

2. The Judgment was amended on March 23, and June 23, 2017.

3. On October 16, 2019, filed a petition under chapter 11 in the United States Bankruptcy Court for the District of Delaware ("Highland's Bankruptcy Case"). On October 24,

AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 1 OF 5
4851-6473-6986.4

2019, as a result of the commencement of Highland's Bankruptcy Case, the Supreme Court of Texas issued an order abating a related case that Daugherty had brought in that court, Case No. 19-0758. Highland's Bankruptcy Case was subsequently transferred to the United States Bankruptcy Court for the Northern District of Texas.

4.    Daugherty asserted certain claims against Highland in Highland's Bankruptcy Case. The Parties have fully and finally resolved their disputes pursuant to a settlement agreement (the "Settlement Agreement") reached in the Highland Bankruptcy Case pursuant to which, among other things, (a) all of Daugherty's known and unknown claims against each of the Highland Released Parties (as those terms are defined in the Settlement Agreement) are resolved, and (b) this Motion seeking the *vacatur* of certain provisions of the Judgment specifically set forth below is being filed.

5.    Highland and Daugherty hereby agree and stipulate that the Court has plenary power to issue an order granting this Motion because the Court retained authority to enforce the permanent injunction rendered in the Judgment, and that changed circumstances have now arisen such that the Court should dissolve the permanent injunction. Highland and Daugherty further agree and stipulate that this Motion shall be treated as an agreement of the Parties pursuant to Texas Rule of Civil Procedure 11, and is fully enforceable. *See Coale v. Scott*, 331 S.W.3d 829, 831-32 (Tex. App.—Amarillo 2011, no pet.) ("Irrespective of whether a trial court lost its plenary jurisdiction over its judgment, the trial court's authority to approve a Rule 11 agreement does not depend on whether it has such jurisdiction.").

6.    Highland and Daugherty agree that the following portions of the Judgment shall be vacated pursuant to their settlement in the Highland Bankruptcy:

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 2 OF 5**
4851-6473-6986.4

App. 0179

a.  The second full paragraph on Page 2 of the Judgment, which begins "The Court, after considering the jury's findings regarding Daugherty's breaches of contract and breaches of fiduciary duty . . .";

b.  The permanent injunction rendered against Daugherty in the third full paragraph on Page 2 of the Judgment, which begins "It is therefore further ORDERED that Daugherty be and hereby is commanded to cease and desist from . . .";

c.  The fourth and fifth full paragraphs on Page 2 of the Judgment awarding Highland a monetary judgment against Daugherty for reasonable and necessary attorney's fees, as well as post-judgment interest on that award[1]; and

d.  The jury's answers to Questions 1, 2, 5, 6, 9 and 12 in the Verdict, which was attached as Exhibit 1 to the Judgment.

7.      Highland and Daugherty further agree that, as a result of the vacation of the permanent injunction in the Judgment, Highland hereby withdraws any pending motions to show cause or motions for contempt against Daugherty that allege Daugherty violated or is violating the permanent injunction. Highland also agrees not to seek to enforce the permanent injunction in any manner in the future.

---

[1] Daugherty previously satisfied the monetary judgment awarded to Highland, and Highland filed a release of the monetary judgment. Although Highland and Daugherty have agreed to vacate the monetary judgment awarded to Highland, Daugherty waives and relinquishes any right or claim to recover any amount previously paid in satisfaction of the Judgment and Highland shall not be required to reimburse Daugherty for his prior satisfaction of the monetary judgment. To the extent Daugherty is entitled to indemnification for any liabilities, losses, and damages allegedly incurred by him for actions taken in connection with Highland's business, including the liabilities Daugherty allegedly incurred in connection with this action and the Judgment, such indemnification claims have been fully and finally satisfied and resolved under the Settlement Agreement.

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 3 OF 5**
4851-6473-6986.4

8.    Concurrent with the filing of this Motion, Daugherty will file a motion to dismiss his as-yet unfiled petition for review pending before the Supreme Court of Texas under Case No. 19-0758.

9.    Highland and Daugherty further agree that any portions of the Judgment that are not specifically vacated pursuant to this Motion shall remain in full force and effect.

WHEREFORE, Highland and Daugherty pray that the Court grant this Motion in its entirety, and for all further relief, at law or in equity, the Court deems necessary.

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 4 OF 5**
4851-6473-6986.4

App. 0181

Respectfully submitted,

GRAY REED & McGRAW LLP

By: ___/s/ Sonya D. Reddy_____
      ANDREW K. YORK
      State Bar No. 24051554
      E-mail: dyork@grayreed.com
      SONYA D. REDDY
      State Bar No. 24079188
      E-mail: sreddy@grayreed.com

1601 Elm Street, Suite 4600
Dallas, Texas 75201
(214) 954-4135
(214) 953-1332 (Fax)

**ATTORNEYS FOR PATRICK DAUGHERTY**

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing document has been transmitted by electronic transmission to all counsel of record on February ___, 2021, as follows:

Marc D. Katz
Crystal J. Woods
DLA PIPER LLP (US)
1717 Main St., Suite 3700
Dallas, Texas 75201
214-743-4545 (Fax)
marc.katz@dlapiper.com
crystal.woods@dlapiper.com

Attorneys for Highland Capital
Management, L.P.

Michael K. Hurst
A. Shonn Brown
Jonathan Childers
LYNN PINKER COX HURST, LLP
2100 Ross Ave., Suite 2700
Dallas, Texas 75201
(214) 981-3839 (Fax)
mhurst@lynnllp.com
sbrown@ lynnllp.com
jchilders@ lynnllp.com

Attorneys for Third-Party Defendants HERA,
Patrick Boyce, and William Britain

/s/ Sonya D. Reddy_____
SONYA D. REDDY

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 5 OF 5**
4851-6473-6986.4

App. 0182

**APPENDIX A** (signatures to follow)

1. James P. Seery, Jr.
2. Cameron Baynard
3. Nathan Burns
4. Timothy Cournoyer
5. Naomi Chisum
6. Stetson Clark
7. Sean Fox
8. Matthew Gray
9. Kristin Hendrix
10. David Klos
11. Vishal Patel
12. Thomas Surgent
13. Michael Throckmorton

18

App. 0183

## TRANSFER AGREEMENT

This Transfer Agreement (this "*Agreement*") is entered into by and between Highland Capital Management, L.P. ("*Transferor*") and Patrick Hagaman Daugherty ("*Transferee*"). Each of Transferor and Transferee are individually referred to as a "*Party*" and together, collectively referred to as the "*Parties.*"

WHEREAS, Transferor is the sole member of Highland ERA Management, LLC, a Delaware limited liability company ("*ERA*", and such membership interest, the "*Interest*");

WHEREAS, Transferor and Transferee are parties to that certain Settlement Agreement dated November 21, 2021 (the "*Settlement*");

WHEREAS, Section 8 of the Settlement requires Transferor to transfer its interest in ERA to Transferee as contemplated more fully in the Settlement;

WHEREAS, in satisfaction of its obligations under Section 8 of the Settlement, Transferor desires to transfer the Interest to Transferee, as provided more fully below.

NOW, THEREFORE AND IN CONSIDERATION of the mutual covenants contained herein, and other good and valuable consideration, the parties intending to be legally bound hereby agree as follows:

1.    Transfer of Interest.  Transferor hereby sells, transfers, assigns, sets over and otherwise conveys to Transferee, and Transferee hereby receives and takes from Transferor, all right, title and interest of Transferor in, to and under the Interest

2.    Applicable Law.  It is also understood and agreed that this Agreement shall be governed by and construed in accordance with Delaware law, without regard to its conflict of laws rules.

3.    Modification of Agreement.  It is expressly understood and agreed that this Agreement may not be altered, amended, waived, modified, or otherwise changed in any respect or particular whatsoever, except in writing, which writing must be signed by authorized representatives of each Party.

4.    Execution of Agreement.  It is understood and agreed that this Agreement may be executed in any number of identical counterparts, each of which shall be deemed original for all purposes.


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]


MDSU W0280437.v1

**EXHIBIT**

**11**

exhibitsticker.com

App. 0184

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on the date appearing next to each Party's signature and this Agreement shall be effective on the date the last signature has been signed upon this Agreement

TRANSFEROR:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:

Name:

Title:    CEO/CFO

Dated:    4/1/22

TRANSFEREE:

Patrick Hagaman Daugherty

Date:    4/1/22

MDSU W02R0437.v1

App. 0185

## TRANSFER AGREEMENT

This Transfer Agreement (this "*Agreement*") is entered into by and between Highland Capital Management, L.P. ("*Transferor*") and Patrick Hagaman Daugherty ("*Transferee*"). Each of Transferor and Transferee are individually referred to as a "*Party*" and together, collectively referred to as the "*Parties*."

WHEREAS, Transferor purports to be the sole Member of Highland Employee Retention Assets LLC, a Delaware limited liability company ("*HERA*"), and Transferor and Transferee are the only holders of HERA's outstanding Common Units and Series A Preferred Units (such Common Units and Series A Preferred Units collectively, the "*Interests*");

WHEREAS, Transferor and Transferee are parties to that certain Settlement Agreement dated November 21, 2021 (the "*Settlement*"); and

WHEREAS, Section 8 of the Settlement requires Transferor to transfer its interests in HERA to Transferee as contemplated more fully in the Settlement.

NOW, THEREFORE AND IN CONSIDERATION of the mutual covenants contained herein, and other good and valuable consideration as set forth in the Settlement, the parties intending to be legally bound hereby agree as follows:

1.    Transfer of Interests. Transferor hereby sells, transfers, assigns, sets over and otherwise conveys to the Transferee, and the Transferee Designee hereby receives and takes from Transferor, all right, title and interest in and to the Transferor's Interests.

2.    Applicable Law. It is also understood and agreed that this Agreement shall be governed by and construed in accordance with Delaware law, without regard to its conflict of laws rules.

3.    Modification of Agreement. It is expressly understood and agreed that this Agreement may not be altered, amended, waived, modified, or otherwise changed in any respect or particular whatsoever, except in writing, which writing must be signed by authorized representatives of each Party.

4.    Execution of Agreement. It is understood and agreed that this Agreement may be executed in any number of identical counterparts, each of which shall be deemed original for all purposes.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

MDSU W0280435.v2

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on the date appearing next to each Party's signature and this Agreement shall be effective on the date the last signature has been signed upon this Agreement.

TRANSFEROR:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:

Name:

Title: CEO/CRO

Dated: 4/1/22

TRANSFEREE:

By: Patrick Hagaman Daugherty

Date: 4/1/22

The undersigned consents and agrees to the Transfers and each of the provisions hereof applicable to the undersigned:

HIGHLAND ERA MANAGEMENT, LLC

By:

Name: Patrick H. Daugherty

Title: President and Chief Investment Officer

Date: 4/1/22

MIDSU W0280435.v2

App. 0187

# TRANSFER AGREEMENT

This Transfer Agreement (this *Agreement*) is entered into by and between Patrick Daugherty ("**Transferor**") and Angry Horse Land, LLC ("**Transferee**"). Each of Transferor and Transferee are individually referred to as a "Party" and together, collectively referred to as the "Parties".

WHEREAS, Transferor has received Highland Capital Management's purported interest in Highland Employee Retention Assets LLC, a Delaware limited liability company ("***Highland Employee Vessel***", and such membership interest, the "***Interest***");

WHEREAS, Transferor and Transferee had previously agreed to allocate any Interests received from the Highland Capital Management Settlement upon approval by the bankruptcy court and transfer to Transferor (the "***Settlement***");

WHEREAS, Transferor desires to transfer the Interest to Transferee, as provided more fully below.

NOW, THEREFORE AND IN CONSIDERATION of the mutual covenants contained herein and other good and valuable consideration, the parties intending to be legally bound hereby agree as follows:

1. <u>Transfer of interest</u>. Transferor hereby sells, transfers, assigns, sets over and otherwise conveys to Transferee, Transferee hereby receives and takes from Transferor, all right, title and interest of Transferor in, to and under the Interest.

2. <u>Applicable Law.</u> It is also understood and agreed that this agreement shall be governed by and construed in accordance with Delaware law, without regard to its conflict of laws rules.

3. <u>Modification of Agreement</u>. It is expressly understood and agreed that this Agreement may not be altered, amended, waived, or otherwise changed in any respect or particular whatsoever, except in writing, which writing must be signed by authorized representatives of each party.

4. <u>Execution of Agreement</u>. It is understood and agreed that this Agreement may be executed in any number of identical counterparts, each of which shall be deemed original for all purposes.

IN WITNESS WHEROF the Parties hereto have caused this Agreement to be executed on the date appearing next to each Party's signature and this Agreement shall be effective on the date the last signature has been signed upon this Agreement.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

App. 0188

TRANSFEROR:

PATRICK H DAUGHERTY

By: _____

Name: _____

Title: _____

Date: _4/1/22_

TRANSFEREE:

ANGRY HORSE LAND, LLC

By: _____

Name: _____

Title: _____

Date: _4/1/2022_



Thomas A. Uebler
(302) 468-5963
tuebler@mdsulaw.com

May 11, 2022

**EXHIBIT**

**12**

**BY FEDEX**
Lynn Pinker Hurst & Schwegmann
2100 Ross Avenue, Suite 2700
Dallas, TX 75201

> Re:   Transfer of Client Files of Highland Employee Retention Assets LLC and
> Highland ERA Management, LLC

Dear Sir or Madam:

This firm represents Highland Employee Retention Assets LLC ("HERA")

and Highland ERA Management, LLC ("ERA"), which were formerly owned and

controlled by Highland Capital Management, L.P. ("Highland"). I understand that

your firm has in the past provided legal services to HERA and ERA.

I am contacting you to facilitate the transfer of HERA's and ERA's client

files, including any litigation files, from your firm. With respect to client files,

Delaware follows the "entire-file" approach. *See TCV VI, L.P. v. Tradingscreen*

*Inc.*, 2018 WL 1907212, at *6-7 (Del. Ch. Apr. 23, 2018). This approach means

that "[o]n request, a lawyer must allow a client or former client to inspect and copy

any document possessed by the lawyer relating to the representation . . ." and "a

client is entitled to retrieve documents in possession of a lawyer relating to

Little Falls Centre Two  |  2751 Centerville Road, Suite 401  |  Wilmington, Delaware 19808
M 302-468-5960  |  F 302-691-6834  |  mdsulaw.com

representation of the client. That right extends to documents placed in the lawyer's possession as well as to documents produced by the lawyer." *Id.* at *5 (quoting *Restatement (Third) of the Law Governing Lawyers* § 46(2), 46 cmt. c. (Am. Law. Inst. 2000)).

This approach also includes the transfer of all privileged information. *See Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLP*, 80 A.3d 155, 161-62 (Del. Ch. 2013) (explaining that, as a matter of law under Section 259 of the Delaware General Corporation Law, absent an express carve out in the agreement, the privilege over all pre-merger communications—including attorney-client communications—passed to the surviving corporation). The agreements by which Highland transferred HERA and ERA did not carve out an exception for attorney-client communications; therefore, such communications passed pursuant to the transfer.

Please contact me at your earliest convenience so that I may coordinate the transfer of the entire files of HERA and ERA.

Sincerely,

*/s/ Thomas A. Uebler*

Thomas A. Uebler



<br />

Thomas A. Uebler
(302) 468-5963
tuebler@mdsulaw.com

May 11, 2022

BY FEDEX
DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801

    Re:    Transfer of Client Files of Highland Employee Retention Assets LLC and
            Highland ERA Management, LLC

Dear Sir or Madam:

This firm represents Highland Employee Retention Assets LLC ("HERA")

and Highland ERA Management, LLC ("ERA"), which were formerly owned and

controlled by Highland Capital Management, L.P. ("Highland"). I understand that

your firm has in the past provided legal services to HERA and ERA.

I am contacting you to facilitate the transfer of HERA's and ERA's client

files, including any litigation files, from your firm. With respect to client files,

Delaware follows the "entire-file" approach. *See TCV VI, L.P. v. Tradingscreen*

*Inc.*, 2018 WL 1907212, at *6-7 (Del. Ch. Apr. 23, 2018). This approach means

that "[o]n request, a lawyer must allow a client or former client to inspect and copy

any document possessed by the lawyer relating to the representation . . ." and "a

client is entitled to retrieve documents in possession of a lawyer relating to

Little Falls Centre Two | 2751 Centerville Road, Suite 401 | Wilmington, Delaware 19808
M 302-468-5960 | F 302-691-6834 | mdsulaw.com

App. 0192

representation of the client. That right extends to documents placed in the lawyer's possession as well as to documents produced by the lawyer." *Id.* at *5 (quoting *Restatement (Third) of the Law Governing Lawyers* § 46(2), 46 cmt. c. (Am. Law. Inst. 2000)).

This approach also includes the transfer of all privileged information. *See Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLP*, 80 A.3d 155, 161-62 (Del. Ch. 2013) (explaining that, as a matter of law under Section 259 of the Delaware General Corporation Law, absent an express carve out in the agreement, the privilege over all pre-merger communications—including attorney-client communications—passed to the surviving corporation). The agreements by which Highland transferred HERA and ERA did not carve out an exception for attorney-client communications; therefore, such communications passed pursuant to the transfer.

Please contact me at your earliest convenience so that I may coordinate the transfer of the entire files of HERA and ERA.

Sincerely,

*/s/ Thomas A. Uebler*

Thomas A. Uebler

App. 0193



Thomas A. Uebler
(302) 468-5963
tuebler@mdsulaw.com

May 11, 2022

BY FEDEX
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807

Re:    Transfer of Client Files of Highland Employee Retention Assets LLC and
Highland ERA Management, LLC

Dear Sir or Madam:

This firm represents Highland Employee Retention Assets LLC ("HERA")

and Highland ERA Management, LLC ("ERA"), which were formerly owned and

controlled by Highland Capital Management, L.P. ("Highland"). I understand that

your firm has in the past provided legal services to HERA and ERA.

I am contacting you to facilitate the transfer of HERA's and ERA's client

files, including any litigation files, from your firm. With respect to client files,

Delaware follows the "entire-file" approach. *See TCV VI, L.P. v. Tradingscreen

Inc.*, 2018 WL 1907212, at *6-7 (Del. Ch. Apr. 23, 2018). This approach means

that "[o]n request, a lawyer must allow a client or former client to inspect and copy

any document possessed by the lawyer relating to the representation . . ." and "a

client is entitled to retrieve documents in possession of a lawyer relating to

Little Falls Centre Two | 2751 Centerville Road, Suite 401 | Wilmington, Delaware 19808
M 302-468-5960 | F 302-691-6834 | mdsulaw.com

App. 0194

representation of the client. That right extends to documents placed in the lawyer's possession as well as to documents produced by the lawyer." *Id.* at *5 (quoting *Restatement (Third) of the Law Governing Lawyers* § 46(2), 46 cmt. c. (Am. Law. Inst. 2000)).

This approach also includes the transfer of all privileged information. *See Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLP*, 80 A.3d 155, 161-62 (Del. Ch. 2013) (explaining that, as a matter of law under Section 259 of the Delaware General Corporation Law, absent an express carve out in the agreement, the privilege over all pre-merger communications—including attorney-client communications—passed to the surviving corporation). The agreements by which Highland transferred HERA and ERA did not carve out an exception for attorney-client communications; therefore, such communications passed pursuant to the transfer.

Please contact me at your earliest convenience so that I may coordinate the transfer of the entire files of HERA and ERA.

Sincerely,

*/s/ Thomas A. Uebler*

Thomas A. Uebler

App. 0195



Thomas A. Uebler
(302) 468-5963
tuebler@mdsulaw.com

May 11, 2022

BY FEDEX
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Re:    Transfer of Client Files of Highland Employee Retention Assets LLC and
Highland ERA Management, LLC

Dear Sir or Madam:

This firm represents Highland Employee Retention Assets LLC ("HERA")

and Highland ERA Management, LLC ("ERA"), which were formerly owned and

controlled by Highland Capital Management, L.P. ("Highland"). I understand that

your firm has in the past provided legal services to HERA and ERA.

I am contacting you to facilitate the transfer of HERA's and ERA's client

files, including any litigation files, from your firm. With respect to client files,

Delaware follows the "entire-file" approach. *See TCV VI, L.P. v. Tradingscreen*

*Inc.*, 2018 WL 1907212, at *6-7 (Del. Ch. Apr. 23, 2018). This approach means

that "[o]n request, a lawyer must allow a client or former client to inspect and copy

any document possessed by the lawyer relating to the representation . . ." and "a

Little Falls Centre Two | 2751 Centerville Road, Suite 401 | Wilmington, Delaware 19808
M 302-468-5960 | F 302-691-6834 | mdsulaw.com

App. 0196

client is entitled to retrieve documents in possession of a lawyer relating to representation of the client. That right extends to documents placed in the lawyer's possession as well as to documents produced by the lawyer." *Id.* at *5 (quoting *Restatement (Third) of the Law Governing Lawyers* § 46(2), 46 cmt. c. (Am. Law. Inst. 2000)).

This approach also includes the transfer of all privileged information. *See Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLP*, 80 A.3d 155, 161-62 (Del. Ch. 2013) (explaining that, as a matter of law under Section 259 of the Delaware General Corporation Law, absent an express carve out in the agreement, the privilege over all pre-merger communications—including attorney-client communications—passed to the surviving corporation). The agreements by which Highland transferred HERA and ERA did not carve out an exception for attorney-client communications; therefore, such communications passed pursuant to the transfer.

Please contact me at your earliest convenience so that I may coordinate the transfer of the entire files of HERA and ERA.

Sincerely,

*/s/ Thomas A. Uebler*

Thomas A. Uebler



|  | HUNTON ANDREWS KURTH LLP |
|---|---|
|  | 600 TRAVIS, SUITE 4200 |
|  | HOUSTON, TEXAS 77002-2929 |

TEL  713 · 220 · 4200
FAX  713 · 220 · 4285

SCOTT LOCHER
DIRECT DIAL: 713 · 220 · 4416
EMAIL: slocher@HuntonAK.com

May 25, 2022

FILE NO: 099990.0000548

**Via U.S. Regular Mail & Email: tuebler@mdsulaw.com**
Thomas A. Uebler
McCollom D'Emilio Smith Uebler LLC
Little Falls Centre Two
2751 Centerville Road, Suite 401
Wilmington, DE 19808

> Re: *May 11, 2022 Request for Transfer of Client Files of Highland Employee Retention Assets, LLC and Highland ERA Management, LLC*

Dear Mr. Uebler:

I am a Deputy General Counsel of Hunton Andrews Kurth ("HuntonAK," "Firm," "we," or "our") and write in response to your May 11, 2022 letter to the Firm seeking transfer of all of our Highland Employee Retention Assets LLC ("HERA") and Highland ERA Management, LLC ("ERA") client files to you as their counsel.

Our records and research indicate that the Firm represented ERA and/or HERA in connection with only two matters. The first matter was opened on June 1, 2012, for which our records indicate we represented Highland Capital Management, LP ("Highland") and HERA, and for which only 1.6 hours of attorney time was recorded. We have located no files for this matter other than an electronic record of the recorded time.

The second matter was in connection with the 2017 Delaware lawsuit that you filed for Patrick Daugherty (as plaintiff) against HERA, ERA, Highland, and James Dondero (the "2017 Delaware Action"). We represented these parties as defendants against Daugherty's claims from on or about July 21, 2017 until February 1, 2018, when Marc Katz left the Firm to join DLA Piper. As such, our representation of HERA, ERA, Highland, and Dondero on the 2017 Delaware Action ceased on February 1, 2018. Soon thereafter, at the clients' request, we transferred our file for the 2017 Delaware Action to DLA Piper. We did not retain copies of any paper-file contents. We did retain copies of the electronic file contents. Thus, while DLA Piper has *all* of our former 2017 Delaware Action file, we have only a part of it.

**EXHIBIT**

**13**

App. 0198

## HUNTON
ANDREWS KURTH

Thomas A Uebler
May 25, 2022
Page 2

Additionally, given that Daugherty now wholly owns and controls HERA and ERA, we believe we are constrained in what we may transfer. Your HERA and ERA file transfer request equates to Daugherty gaining access to his litigation adversaries' attorney's files. In this unique circumstance of a litigant seeking his adversary's attorney's file by acquiring control of one (or more) of his litigation adversary's attorney's former jointly-represented clients, the case law we have reviewed favors protecting the co-client's justified expectation that its attorney's files will not be disclosed to its litigation adversary. *See, e.g., Facebook, Inc. v. ConnectU, Inc.*, 2009 WL 10680755 (N.D. Cal. Sept. 2, 2009); *In re Bounds*, 443 B.R. 729 (Bankr. W.D. Tex. 2010); *see also Suntrust Bank v. Blue Water Fiber, L.P.*, 210 F.R.D. 196 (recognizing but not deciding the "novel issue").

The opinion cited in your letter, *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLP*, 80 A.3d 155 (Del. Ch. 2013), did not involve or address this unique circumstance. Therefore, without the consents of our other joint clients (here, Highland and Dondero), we would only transfer file materials that were unique to HERA and ERA, although which we suspect our file will contain few or no such documents, and third-party communications, pleadings, and the like, which presumably you already have.

We have notified Dondero's counsel at DLA Piper and will notify Highland's counsel of your request. In light of these circumstances, we urge you to withdraw your request to this Firm. Please direct additional communications regarding this matter to me.

Very truly yours,

Scott Locher

SL/jrh

App. 0199

LAW OFFICES
## WILLIAMS & CONNOLLY LLP·

JOHN K. VILLA
(202) 434-5117
jvilla@wc.com

680 MAINE AVENUE SW
WASHINGTON, DC 20024
(202) 434-5000
WWW.WC.COM

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

July 22, 2022

<u>Via Email</u>

Thomas A. Uebler, Esq.
McCollom D'Emilio Smith Uebler LLC
Little Falls Centre Two
2751 Centerville Road, Suite 401
Wilmington, DE 19808

> Re:    Request for Transfer of Files of Highland Employee Retention Assets, LLC and <u>Highland ERA Management, LLC</u>

Dear Tom:

I write on behalf of DLA Piper LLP (US) ("DLA") in response to your letter dated May 11, 2022, requesting the transfer of certain files of Highland Employee Retention Assets, LLC ("HERA") and Highland ERA Management, LLC ("ERA"). We understand that your client Patrick Daugherty now wholly owns and controls HERA and ERA. As you note, HERA and ERA were formerly affiliated with Highland Capital Management, LP ("HCMLP"), and DLA formerly represented them, along with HCMLP and James Dondero, in connection with *Daugherty v. Highland Capital Management, L.P. et al.*, No. 2017-0488 (Del. Ch.) (the "*Daugherty* Case"), where we understand you represented Mr. Daugherty.[1] We are not aware of other representations by DLA of HERA or ERA.

First, the defendants in the *Daugherty* Case and DLA agreed that the client file for that representation would be far narrower than you propose. The engagement letter for the *Daugherty* Case defined the "Client File" to include only "correspondence . . . executed copies of agreements, filings, pleadings, deposition transcriptions, and closing binders." *See* Exhibit, Terms of Service § 10. The Client File was specifically defined to *exclude* "materials or documents that include [DLA's] attorney work product, mental impressions, notes, drafts, or internal firm correspondence or emails."

---

[1] We understand that there was prior litigation between the parties in Texas state court captioned *Highland Capital Management, L.P. v. Daugherty*, No. 12-04005 (Dallas Cty. Dist. Ct., 68th Jud. Dist.). HERA was represented by a different law firm in that matter—not DLA or Hunton Andrews Kurth LLP, where some of the DLA lawyers who worked on the *Daugherty* Case also formerly practiced—and ERA was not a party.

**EXHIBIT**

**14**

App. 0200

WILLIAMS & CONNOLLY LLP·
Thomas A. Uebler, Esq.
July 22, 2022
Page 2

Second, as you know, DLA's representations of HERA and ERA in the *Daugherty* Case were joint representations in which DLA also represented HCMLP and Mr. Dondero. Mr. Daugherty is still adverse to Mr. Dondero in the *Daugherty* case and in *Daugherty v. Dondero*, No. 2019-0956 (Del. Ch.). That means that your request for the client file would result in DLA providing to one litigation party the privileged and work product-protected communications of its litigation adversary. Such a production "would be anathema to the principles underlying the policy of fostering unfettered attorney-client communication." *Facebook, Inc. v. ConnectU, Inc.*, No. 07-cv-01389, 2009 WL 10680755, at *11 (N.D. Cal. Sept. 2, 2009); *cf. In re Bounds*, 443 B.R. 729, 733 (Bankr. W.D. Tex. 2010) (not allowing creditor access to portion of corporation's files containing confidential material of jointly represented litigation adversary, the debtor); *Chambers v. Gold Medal Bakery, Inc.*, 983 N.E.2d 683 (Mass. 2013) (holding that a director motivated by interests contrary to corporation is not entitled to corporation's privileged documents). We thus are not able to provide you with any privileged communications concerning the *Daugherty* Case without the consent of both Mr. Dondero and HCMLP or a court order.

Third, we further note that your letter relies on Delaware law, and it is far from clear that Delaware law applies to the question of HERA's and ERA's entitlement to a client file. The DLA attorneys who led the representation of HERA and ERA are Texas lawyers working out of DLA's Dallas, Texas office. HERA and ERA are headquartered in Texas and were (and are now) run by Texans; they simply are incorporated in Delaware. The Texas Disciplinary Rules of Professional Conduct make clear that it is those rules that apply to lawyers barred in Texas. Tex. Disc. R. of Prof'l Conduct 8.5(a). The Delaware Rules of Professional Conduct are not to the contrary. Rule 8.5 of the Delaware Rules is meant to ensure that only "one set of rules of professional conduct" governs given conduct of a lawyer. Del. Rule of Prof'l Conduct 8.5 cmt. 3. And, in general, "the rules of professional conduct to be applied shall be . . . the rules of the jurisdiction in which the lawyer's conduct occurred." *Id.* 8.5(b)(2). Delaware's version of Rule 8.5 does allow that "conduct in connection with a matter before a tribunal" would be governed by the rules of that tribunal. *Id.* 8.5(b)(1). But that rule is narrow, *see id.* cmt. 3 (noting rule does not apply to conduct in preparation for litigation before a tribunal), and your request for the client file is not a request about a DLA lawyer's "conduct" before the Delaware Court of Chancery. As a result, we believe that the relevant law to consider here is that of Texas, not Delaware. In any event, however, we are confident that Delaware law would honor the engagement letter defining the scope of the client file for the *Daugherty* Case.

In light of the foregoing, we are not able to provide HERA and ERA with the client file without the consent of Mr. Dondero and HCMLP or a court order. The documents you are requesting are overwhelmingly privileged and/or protected by the work-product doctrine. Any remaining documents—such as pleadings, court filings, and transcripts from the *Daugherty* Case—also arose from a joint representation of HCMLP and Mr. Dondero and therefore qualify as their confidential information under Texas's rules of professional conduct. *See* Tex. Disciplinary Rule of Prof'l Conduct 1.5(a) (defining "confidential information" to include "unprivileged client information," which is defined as "all information relating to a client or furnished by the client, other than privileged information, acquired by the lawyer during the course of or by reason of the representation of the client"). We are constrained in our ability to provide

App. 0201

**WILLIAMS & CONNOLLY** LLP.
Thomas A. Uebler, Esq.
July 22, 2022
Page 3

HERA and ERA with such documents without Mr. Dondero's and HCMLP's consent. *Id.* 1.5(b)(1)(ii). In any event, we note that you presumably already have the pleadings, filings, and transcripts from the *Daugherty* Case.

We are nevertheless in the process of notifying Mr. Dondero and HCMLP of your request.

Sincerely,

John K. Villa

Attachment

## Thomas Uebler

**From:**       Hough, Steven C.
**Sent:**       Monday, February 11, 2013 3:18 PM
**To:**         'TSurgent@hcmlp.com'
**Cc:**         Abrams, Kevin
**Subject:**    RE: Books and Records [HERA] [RE: Daugherty fax]
**Attachments:** Daugherty books and records demand response letter (00239298-2).doc


Thomas:

Attached for your review is a draft letter to Patrick Daugherty denying his books and records demand on HERA.

We look forward to receiving your comments.  Please let us know if you would like to set up a telephone call to discuss.

Sincerely,

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294
E-Mail: Hough@AbramsBayliss.com
* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Abrams, Kevin
**Sent:** Thursday, February 07, 2013 2:15 PM
**To:** 'TSurgent@hcmlp.com'; Hough, Steven C.
**Subject:** Re: Books and Records [HERA] [RE: Daugherty fax]

Sounds good.

Kevin G. Abrams
Abrams & Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, DE 19807
Main: 302-778-1000
Direct: 302-778-1002
Facsimile: 302-778-1001
Cell: 302-547-8000
E-Mail: abrams@abramsbayliss.com<mailto:abrams@abramsbayliss.com>

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If

1

EXHIBIT

15

App. 0203

you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Thomas Surgent <TSurgent@hcmlp.com>
**To:** Hough, Steven C.
**Cc:** Abrams, Kevin
**Sent:** Thu Feb 07 13:42:52 2013
**Subject:** RE: Books and Records [HERA] [RE: Daugherty fax]

FYI: We are forwarding Pat his calculation statement momentarily

**From:** Hough, Steven C. [mailto:Hough@AbramsBayliss.com]
**Sent:** Thursday, February 07, 2013 12:37 PM
**To:** Thomas Surgent
**Cc:** Abrams, Kevin
**Subject:** Books and Records [HERA] [RE: Daugherty fax]

Thomas:

In the faxed copy of Patrick Daugherty's demand letter, his requested categories of documents are cutoff mid-sentence. Daugherty indicated that he also sent copies of his demand letter to HERA via certified mail. Could you please send us a copy of Daugherty's demand letter, as received by HERA via certified mail, so that we can see what, if anything, is missing from the faxed copy of Daugherty's demand letter?

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294
E-Mail: Hough@AbramsBayliss.com
* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

```
-----Original Message-----
From: Thomas Surgent [mailto:TSurgent@hcmlp.com]
Sent: Thursday, February 07, 2013 11:00 AM
To: Hough, Steven C.; 'Michael K. Hurst (mhurst@ghjhlaw.com)'; 'Katz, Marc
(MarcKatz@andrewskurth.com)'; 'Paul Lackey (pbl@lhlaw.net)'
Cc: Scott Ellington; Greg Zarin
Subject: Daugherty fax
```

App. 0204

Attached.  We are sending him his calculation statement shortly with respect to the HERA offer, which he separately requested yesterday.

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

3

App. 0205



# GRAY REED.

ANDREW K. YORK
DIRECT DIAL: (469) 320-6114
EMAIL: dyork@grayreed.com

1601 ELM STREET, SUITE 4600
DALLAS, TEXAS 75201
www.grayreed.com

January 30, 2024

**VIA EMAIL: jmorris@pszjlaw.com**

Mr. John Morris
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024

Re:    Highland Capital Management, L.P. and Patrick Daugherty Settlement Agreement

Dear John:

As you know, Gray Reed represents Patrick Daugherty and Highland Employee Retention Assets, LLC ("HERA" or the "Vessel"). Pursuant to the November 22, 2021 settlement agreement between Highland Capital Management, L.P. ("Highland") and Mr. Daugherty, Highland transferred its interests in HERA to Mr. Daugherty and his affiliates. The transfer included the HERA books and records maintained on Highland's system.

As Mr. Daugherty and Mr. Seery discussed last summer, Mr. Daugherty and HERA appreciate the documents Highland has provided to date. However, HERA continues to seek the remaining source documents, emails, governance actions, and other activity of HERA since its inception. For example, HERA has not received any email correspondence between HERA's in-house counsel (Scott Ellington, Isaac Leventon, Thomas Surgent, Eric Girard, and others) and HERA's outside legal counsel at Gruber Hurst, Andrews Kurth, DLA Piper, and Abrams and Bayliss, among others. Other email exchanges regarding the transfer of assets, allocation of expenses, creation of governance documents, solicitation of preferred unit holder signatures, board member communication, and anyone directing the operations of HERA is all important to the continuing operations of HERA. Additionally, HERA has received only a few documents in native format. Those documents were Microsoft Excel files. Highland has not produced any Microsoft Word or Powerpoint documents in native format (with corresponding metadata) despite the production of numerous PDF documents that indicate they were originally created using Word or Powerpoint. The metadata associated with both the native files and PDF versions are of critical importance to HERA.

4876-7188-7265.3

**EXHIBIT**

**16**

App. 0206

Mr. John Morris
January 30, 2024
Page 2


Accordingly, HERA requests Highland supplement its production of the transferred books and records with at least the following categories:

- All original Word, Excel and Powerpoint documents concerning HERA or the Vessel. This request include originally created documents and drafts, as well as modified or amended versions of the same.
- All email correspondence concerning HERA or the Vessel.
- All documents related to the transfer of HERA or the Vessel assets.
- All documents related to expenses of HERA or Vessel assets.
- All email and documents concerning HERA or Vessel assets, legal communications, tax issues, or unit holder communications.

All of these requested documents, files and communications should include the corresponding metadata. I am happy to discuss with you what metadata should be included with the load file for the production. Finally, I recommend Highland utilize an outside vendor to collect and produce these requested documents, files and communications due to the sensitive nature of the information, as well as any potential for a conflict of interest among any existing Highland employees that are asked to participate in the collection and production efforts.

Again, my clients appreciate Highland's efforts on this matter to date, and its attention to these additional requests. Please feel free to reach out to me if you have any questions.

Very truly yours,

Andrew K. York

AKY/sll

cc:    Patrick Daugherty (via email)

4876-7188-7265.3

App. 0207

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Tuesday, March 05, 2024 4:55 PM
**To:** Drew K. York <dyork@grayreed.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** [EXTERNAL] Highland Capital/HERA

Drew,

On March 8, 2022, the court entered an order approving the settlement between Highland and Mr. Daugherty. Docket No. 3299. Since that time, HCMLP has provided an enormous number of documents and information to Mr. Daugherty as required by the settlement. HCMLP believes that after these exhaustive, good faith efforts it has fully complied with all of its obligation under the Settlement Agreement.

To summarize:

· on March 10, 2022, we sent an e-mail to you with certain books and records,

· on May 5, 2022, we sent three separate e-mails to Mr. Uebler with more books and records,

· last year, HCMLP made available to Mr. Daugherty and his accountant a share site file depository with 180 MBs of data including (a) corporate and related documents from the legal filing system; (b) 11 years' worth of financial statements exported from QuickBooks (which include detailed, entry-level financials for each year encapsulating all recorded accounting entries for HERA); (c) approximately 320 invoices from 35 different vendors (nearly all of which were law firms); (d) nearly 30 other statements and spreadsheets; and (e) nine years of tax returns.

· In addition—with no obligation to do so—the HCMLP team helped in the filing of the HERA tax returns during the transition year and provided historical RCP return information.

Under the circumstances, HCMLP stands by its prior statement that it has fulfilled its obligations under the Settlement Agreement.

For completeness, and to avoid any misunderstanding, we strongly disagree with your suggestion that emails constitute "books and records." Even if they did, (a) HERA and ERA had no employees, (b) no person used an e-mail address with a "HERA" or "ERA" URL, (c) neither HERA nor ERA ever had a shared services agreement with HCMLP, and (d) HCMLP's e-mails are not now, and never were, HERA and ERA's property.

HCMLP reserves all rights under the Court's order and with respect to any further request for "books and records." We consider this matter closed.

Please let me know if you have any questions.

Regards,

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

**See More** from Drew York

EXHIBIT

17

App. 0208

## Thomas Uebler

**From:**          Tyler, Annette
**Sent:**          Tuesday, March 5, 2013 5:38 PM
**To:**            'legal-invoices@hcmlp.com'
**Cc:**            'Thomas Surgent'
**Subject:**       Daugherty Litigation
**Attachments:**   20130305172813646.pdf

Attached is our invoice for services rendered duringFebruary 2013.

Thank you,
Annette

Annette B. Tyler
Assistant to Kevin G. Abrams
Abrams &Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, Delaware  19807
Direct:  302-778-1012
Facsimile:  302-778-1001
E-Mail:  tyler@abramsbayliss.com

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

1

**EXHIBIT**

**18**

App. 0209

# ABRAMS & BAYLISS LLP

20 MONTCHANIN ROAD
SUITE 200
WILMINGTON, DE 19807
302-778-1000

TAX ID NO. 56-2528254

HIGHLAND EMPLOYEE RETENTION ASSETS
c/o Highland Capital Mgmt, L.P.
300 Crescent Court - Suite 700
Dallas, TX 75201

| | |
|---|---|
| Invoice Date: | March 5, 2013 |
| Invoice No. | 11386 |
| Account No. | 729.00 |
| Page: | 1 |

Attn:   Thomas Surgent, Esq.

Re:   Daugherty Litigation

## Activities

| Date | Initials | Description | Hours | Amount |
|---|---|---|---|---|
| 01/02/2013 | KGA | Analyze Dondero positions and Dameris questions re buyout proposal | 0.30 | 250.50 |
| | SCH | Communication with Dameris re buyout proposal; emails re HERA board actions | 0.20 | 89.00 |
| 01/03/2013 | SCH | Review Dameris questions; review memos and LLC agreement; legal research re Dameris questions; emails re HERA call; discussion with Abrams re buyout structure; draft memo re buyout approaches | 4.20 | 1,869.00 |
| | KGA | Analyze Dameris questions re Dondero transaction; analyze board succession, unit transfer and LLC agreement amendment questions; prepare outline to address Dameris questions | 1.00 | 835.00 |
| 01/04/2013 | KGA | Analyze steps required by Board and Dondero to complete units sales and HERA governance changes; strategy call with clients; draft and revise step transaction list | 2.40 | 2,004.00 |
| | SCH | Prepare for conference call; conference call with Dameris, Sargent and Abrams; revise memo re buyout approaches; draft and revise memo re buyout steps; analyze buyout steps | 4.70 | 2,091.50 |
| 01/09/2013 | KGA | Review and prepare comments on Dondero transaction documents; related messages with working group | 1.00 | 835.00 |
| 01/10/2013 | KGA | Review and revise Dondero transaction documents | 0.30 | 250.50 |
| | SCH | Communication with Highland re LLC agreement; review and comment on buyout documents; legal research re fiduciary duties; discussion with Bayliss, Farrell and Shindel re precedent offer and transfer documents; review precedent offer and transfer documents | 6.30 | 2,803.50 |
| 01/11/2013 | KGA | Review and revise Dondero transaction documents; related messages with working group; review, analyze and prepare comments on Dondero transaction documents; teleconfernece with client represnetatives re Dondero transaction documents; further attention to revising Dondero-related documents | 1.50 | 1,252.50 |
| | SCH | Communication with Abrams re HERA documents; review and comment on | | |

App. 0210

| | | | Hours | |
|---|---|---|---|---|
HIGHLAND EMPLOYEE RETENTION ASSETS

Re:  Daugherty Litigation

Invoice Date:  March 5, 2013
Invoice No.  11386
Account No.  729.00
Page:  2

| Date | Atty | Description | Hours | Amount |
|---|---|---|---|---|
| | | LLC amendments and buyout documents; draft memo re buyout documents; review HERA documents; emails re HERA documents; conference call with Dameris and Surgent re HERA documents | 11.90 | 5,295.50 |
| 01/14/2013 | SCH | Call with Surgent and Dameris re buyout documents; discussion with Abrams re buyout documents; discussion with Dameris re release; draft and revise buyout amendment documents; communication with Dameris and Surgent re buyout amendment documents | 2.50 | 1,112.50 |
| 01/15/2013 | SCH | Email re HERA buyout documents; review HERA buyout documents; review HERA buyout blacklines; draft memo re HERA buyout blacklines | 0.80 | 356.00 |
| 01/16/2013 | SCH | Emails re HERA call; review HERA comments on buyout documents; draft and revise buyout document provision; communications with Surgent re buyout document provision | 2.90 | 1,290.50 |
| | KGA | Review Buyer and working group comments on Dondero transaction documents; review client comments on Dondero deal document;s related messages with working group; teleconference with working group re Dondero transaction documents | 2.10 | 1,753.50 |
| 01/17/2013 | SCH | Discussion with Surgent and analyze buyout timing issues | 0.30 | 133.50 |
| | KGA | Address changes to transaction documents; related messages with working group; address client questions re Dondero transaction | 0.90 | 751.50 |
| 01/18/2013 | SCH | Communication with Surgent re index; review index; discussion with Surgent re buyout; analyze buyout issues | 0.50 | 222.50 |
| 01/23/2013 | SCH | Discussion with Surgent re buyout and HERA; analyze buyout and HERA issues | 0.70 | 311.50 |
| | KGA | Status report from client re buyout timetable | 0.10 | 83.50 |
| 01/24/2013 | KGA | Review and prepare comments on new LLC agreement, expense agreement and offset resolutions | 0.50 | 417.50 |
| 01/25/2013 | SCH | Review and comment on HERA documents | 5.30 | 2,358.50 |
| | KGA | Address changes to HERA operating agreement and board resolution re expense allocation | 0.90 | 751.50 |
| 01/27/2013 | SCH | Prepare for conference call; emails re conference call; conference call with Surgent re HERA corporate documents | 0.80 | 356.00 |
| | KGA | Revise comments on Dondero-proposed amendments to operating agreement; prepare and conduct teleconference with Surgent re operation agreement amendments | 0.90 | 751.50 |
| 01/28/2013 | SCH | Review revised LLC agreement draft; comment on revised LLC agreement draft; discussion with Surgent re corporate documents and buyout status; draft memo re Surgent questions and corporate documents; analyze Surgent questions and corporate documents; discussion with Surgent re questions and corporate documents; draft memo re Surgent call; communication with Surgent re HERA amendments | 5.90 | 2,625.50 |
| | KGA | Review changes to Dondero transaction documents | 0.40 | 334.00 |

App. 0211

| HIGHLAND EMPLOYEE RETENTION ASSETS | Invoice Date: | March 5, 2013 |
|---|---|---|
| | Invoice No. | 11386 |
| Re: Daugherty Litigation | Account No. | 729.00 |
| | | Page: 3 |

| Date | | Description | Hours | |
|---|---|---|---|---|
| 01/29/2013 | SCH | Conference call with Surgent re buyout developments; review LLC agreement drafts; discussion with Surgent re LLC agreement and buyout documents; analyze Surgent questions; discussion with Abrams re Surgent questions; discussion with Surgent re questions | 1.50 | 667.50 |
| | KGA | Review changes to operating agreement; prepare outline for strategy call with client; call with client re Dondero risk tolerance in new offer and operating agreement amendments; address client questions re second-steps buyout offer | 1.00 | 835.00 |
| 02/05/2013 | SCH | Discussion with Surgent re buyout developments; analyze client's buyout questions; discussion with Surgent re disclosures to selling members | 0.60 | 267.00 |
| | KGA | Address client questions re possible requests for additional disclosures re Dondero offer | 0.20 | 167.00 |
| 02/06/2013 | SCH | Review new disclosure statement; discussion with Surgent re new disclosure statement; draft memo re statement; review and prepare comments re revised statement; email re revised statement | 0.90 | 400.50 |
| | KGA | Address Daugherty financial position and disclosure statement | 0.10 | 83.50 |
| 02/07/2013 | SCH | Review books and records letter; draft memo re books and records letter; draft memo re books and records response; communication with Surgent re demand letter; emails re Daugherty letters | 1.90 | 845.50 |
| | KGA | Address Daugherty books and records demand and formulate objections and response timetable; messages re Daugherty books and records demand | 0.30 | 250.50 |
| 02/08/2013 | SCH | Discussion with Surgent re books and records response; legal research re books and records demand; review precedent books and records responses; draft memo re books and records demand; draft and revise letter re books and records demand | 3.70 | 1,646.50 |
| 02/11/2013 | KGA | Review responses to Daugherty books and records demand | 0.10 | 83.50 |
| | SCH | Communication with Surgent re books and records response; review Daugherty letter; communication with Surgent re buyout offer acceptance; draft and revise books and records response; draft memo re books and records response | 2.20 | 979.00 |
| 02/12/2013 | KGA | Messages re timetable and contents of books and records response to Daugherty; address client questions re changes to Dondero offer terms; address Rourke questions re Dondero offer terms | 0.50 | 417.50 |
| | SCH | Communication with Surgent re Daugherty letter; review Daugherty letter; emails re books and records; communication with Surgent re books and records response; legal research re deadline; draft memo re deadline; communication with Surgent re buyout question; review transfer agreement, offer to purchase; draft memo re buyout question; review revised transfer agreement; legal research re third-party beneficiaries; draft memo re revised transfer agreement | 3.10 | 1,379.50 |
| 02/13/2013 | KGA | Address offer changes requested by Rourke; related messages with working group; messages re 220 response letter to Daugherty | 0.30 | 250.50 |
| | SCH | Communication with Surgent re buyout question; draft memo re buyout question; legal research re third-party beneficiaries and cooperation; | | |

App. 0212

HIGHLAND EMPLOYEE RETENTION ASSETS

Re:  Daugherty Litigation

Invoice Date:  March 5, 2013
Invoice No.    11386
Account No.    729.00
Page:  4

|  | Hours |  |
|---|---|---|
| discussion with Surgent re buyout question and transfer agreement; communication with Daugherty and Surgent re books and records demand | 2.00 | 890.00 |
| For Current Services Rendered | 77.70 | 40,348.50 |

### Expenses

| | |
|---|---|
| Telephone Charges | 239.87 |
| Photocopying | 9.45 |
| Total Expenses | 249.32 |

### Advances

| | |
|---|---|
| Online Legal Research | 173.90 |
| Total Advances | 173.90 |
| Total Current Work | 40,771.72 |

### Payments

| | |
|---|---|
| Total Payments for 03/05/2013 | -40,771.72 |

**TOTAL AMOUNT DUE:**                                                    $0.00

WIRING INSTRUCTIONS:

ABRAMS & BAYLISS LLP OPERATING ACCOUNT
Account No. 2910 3917

M&T Bank
ABA No. 031100092

App. 0213

# ANDREWS
**ATTORNEYS** **KURTH** LLP

Andrews Kurth LLP
P.O. Box 201785
Houston, Texas 77216-1785
713.220.4200 Phone
713.220.4285 Fax
andrewskurth.com
Taxpayer I.D. #74-1027135

February 11, 2013

Highland Capital Management, LP
Accounts Payable
300 Crescent Court Suite 700
Dallas, TX 75201

As of  January 31, 2013
Invoice No. 10594508
10613 0029223 / 0203709

---

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| 01/01/13 | Review and analysis of proposed protocol for gathering documents to respond to Daugherty's document request; correspondence with Greg Zarin and Isaac Leventon regarding same; preparation of outline of argument for ▮▮▮▮ hearing. | M. KATZ | Partner | 1.50 | 645.00 | 967.50 |
| 01/01/13 | Attention to email correspondence with clients regarding discovery searches and protocol and upcoming hearings | W.J. MOORE | Associate | 0.30 | 475.00 | 142.50 |
| 01/02/13 | Preparation for conference with Daugherty's counsel regarding medical records and use of Looper Reed deposition testimony documents in support of ▮▮▮▮ ▮▮▮▮and preparation of joint status report regarding same; preparation of response to Daugherty's ▮▮▮▮: | M. KATZ | Partner | 2.00 | 645.00 | 1,290.00 |
| 01/02/13 | Draft Response to Supplemental ▮▮▮▮ and supporting Affidavit; review prior correspondence and pleadings to assist in drafting same; conference with attorney W. Moore regarding motion to compel production of medical records and review correspondence regarding same. | I.A. CROSBY | Senior Atty | 5.80 | 425.00 | 2,465.00 |
| 01/02/13 | Draft and revise response to ▮▮▮▮ and affidavit related to same; draft and revise motion for leave to use pertinent documents marked as privileged; receive, review, and respond to communications regarding same, outstanding rule 11 agreement, and search protocols related to outstanding discovery requests; | J.R. REGAS | Associate | 1.30 | 380.00 | 494.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798531

App. 0214

Page 2                              ANDREWS KURTH LLP                           As of January 31, 2013
                                                                                Invoice No. 10594508
                                                                                10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|---|---|---|---|---|---|---|
| | analyze and develop litigation strategy related to same | | | | | |
| 01/02/13 | Meet with team and discuss action items; prepare / finalize Motion to Compel Health Records; review and revise Motion for Leave to Supplement ████████████ review and revise Response to ████████████ (filed by Daugherty) Supplement; discuss same with J Regas and I Crosby; review and prepare timeline relating to ███████ prepare email memorandum regarding Kaplan protocol on motions; email correspondence with opposing counsel regarding various issues, including ██████ discovery, and need for conference on items; email correspondence with clients forwarding drafts; prepare for hearings on ████████████ | W.J. MOORE | Associate | 8.00 | 475.00 | 3,800.00 |
| 01/03/13 | Prepare for and participate in teleconference with opposing counsel regarding medical records and use of attorney depositions and exhibits, pursuant to Special Master Protocol; review protocol; follow-up emails with M Katz regarding same and revise email to J Kaplan regarding request for expedited consideration; email correspondence with M Katz regarding summary of arguments; revise Motion on Medical records, pursuant to discussion with M Katz; prepare for hearing on ████████████ prepare brief regarding Motion for Leave to Supplement | W.J. MOORE | Associate | 6.50 | 475.00 | 3,087.50 |
| 01/03/13 | Plan, prepare for, and participate in telephone conference with opposing counsel regarding motions to compel medical records and documents related to outstanding job offers and motion for leave to use pertinent documents produced in conjunction with motion for ████████████ analyze and develop litigation strategy related to same | J.R. REGAS | Associate | 1.10 | 380.00 | 418.00 |
| 01/03/13 | Finalize Response to Supplemental ████████████ and supporting Affidavit; telephone conference | I.A. CROSBY | Senior Atty | 1.90 | 425.00 | 807.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798532

App. 0215

Page 3                                   ANDREWS KURTH LLP                     As of January 31, 2013
                                                                              Invoice No. 10594508
                                                                              10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK



| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | with Looper Reed regarding medical records and additional discovery issues; begin preparing for ▮▮▮▮ hearings. | | | | | |
| 01/03/13 | Correspondence with Judge Kaplan regarding ruling on motion to compel medical records; finalized response to Daugherty's ▮▮▮▮▮▮▮; preparation for hearing on ▮▮▮ | M. KATZ | Partner | 1.40 | 645.00 | 903.00 |
| 01/03/13 | Review all document productions and create a general document production log to include ▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮ electronically file Response to Daugherty's Supplement to His Motion to Strike Highland's and Third Party Defendants' Answer and Special Exceptions and for ▮▮▮▮ Against Defendants and Their Counsel; draft the transmittal letter to Counsel enclosing the Response to Daugherty's Supplement to His Motion to Strike Highland's and Third Party Defendants' Answer and Special Exceptions and for ▮▮▮▮ Against Defendants and Their Counsel and serve same via fax; create three hearing notebooks for the January 7, 2013 Hearing on Highland's ▮▮▮ and Daugherty's ▮▮▮ and ▮▮▮. | E. J. THOMPSON | Paralegal | 7.00 | 240.00 | 1,680.00 |
| 01/04/13 | Create a bench notebook for Judge Hoffman for the January 7, 2013 Hearing on Highland's ▮▮▮ and Daugherty's ▮▮▮; verify all identified documents have been destroyed pursuant to the Rule 11 Agreement; contact Toni Reagor, 68th JDC court reporter, to determine if a transcript was made of the July 2, 2012 hearing on Motion to Seal; draft the Amended Notice of Hearing on Highland, Cornerstone, and Dondero's ▮▮▮ Against | E. J. THOMPSON | Paralegal | 4.20 | 240.00 | 1,008.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4806.

PLAINTIFFS 0798533

App. 0216

Page 4                                    ANDREWS KURTH LLP                        As of January 31, 2013
                                                                                   Invoice No. 10594508
                                                                                   10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | Daugherty and Looper Reed & McGraw P.C.; electronically file the Amended Notice of Hearing; draft the transmittal letter to Counsel enclosing the Amended Notice of Hearing on Highland, Cornerstone, and Dondero's ███████████ Against Daugherty and Looper Reed & McGraw P.C. and serve same via fax and email. | | | | | |
| 01/04/13 | Correspondence to Judge Kaplan regarding ruling on motion to compel medical records; correspondence with Daugherty's counsel regarding joint support and outstanding discovery issues; preparation for hearing on ███████ | M. KATZ | Partner | 2.00 | 645.00 | 1,290.00 |
| 01/04/13 | Receive, review, and respond to communications regarding pertinent hearing transcripts; work on joint status report related to ██████████ | J.R. REGAS | Associate | 0.40 | 380.00 | 152.00 |
| 01/04/13 | Continue preparing for ████████ hearing; review files for ████████ relating to same; finalize Supplement / Motion for Leave to Use Attorney Depositions and Exhibits; teleconference with opposing counsel regarding ███████ ████████ resetting; teleconference with court regarding same; email update to clients | W.J. MOORE | Associate | 5.80 | 475.00 | 2,755.00 |
| 01/07/13 | Complete Joint Report briefing and supplementation; work with internal team to prepare for filing; prepare forms for Joint Report and send to opposing counsel with emails; subsequent emails with opposing counsel regarding same and timing of filing | W.J. MOORE | Associate | 4.00 | 475.00 | 1,900.00 |
| 01/07/13 | Receive, review, and respond to communications regarding joint status reports; draft and revise motions related to same; receive, review, and respond to communications from A. S. Brown, R. Crockett, and Judge Kaplan regarding hearing related to same; receive, review, and respond to communications from R. Crocket regarding joint status report relating to motion for leave to use pertinent documents; | J.R. REGAS | Associate | 0.90 | 380.00 | 342.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798534

App. 0217

Page 5                                    ANDREWS KURTH LLP                        As of January 31, 2013
                                                                                  Invoice No. 10594508
                                                                                  10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | analyze and develop litigation strategy related to same | | | | | |
| 01/07/13 | Finalize joint status reports on discovery issues and correspondence with Daugherty's counsel concerning same; preparation for hearing on motion of Bell Medical Records; preparation of supplemental discovery responses. | M. KATZ | Partner | 1.10 | 645.00 | 709.50 |
| 01/07/13 | Draft supplemental discovery responses to first requests for production and first sets of interrogatories to both Cornerstone and Highland; forward copies of Highland's supplemental responses to G. Zarin and J. Vanacour and conference with G. Zarin regarding same; participate in communications with Looper Reed regarding the Joint Status reports and timing of individual motions to be heard by the Special Master; draft Motion to Compel P. Daugherty's Medical Records. | I.A. CROSBY | Senior Atty | 6.80 | 425.00 | 2,890.00 |
| 1/08/13 | Conference with attorney M. Katz to develop plan for discovery; telephone conference with J. Vanacour, G. Zarin, and I. Leventon regarding various discovery issues; review and finalize Joint Status Report and Joint Appendix regarding Daugherty's medical records and exchange emails with Looper Reed in preparation for finalizing same; coordinate with paralegal E. Thompson regarding collection of data and documents for I. Leventon to assist in further document production and retrieval, and email him regarding same; review and revise Joint Status Report regarding Motion for Leave to Use Documents and Deposition Testimony and exchange emails with Looper Reed in preparation for finalizing same. | I.A. CROSBY | Senior Atty | 3.50 | 425.00 | 1,487.50 |
| 01/08/13 | Attention to matters regarding preparation of objections and responses to Daugherty document requests to Highland Cornerstone, Dondero and Sierra Verde and telephone conference with Greg Zarin, Isaac Leventon and Jason | M. KATZ | Partner | 1.80 | 645.00 | 1,161.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798535

App. 0218

Page 6                          ANDREWS KURTH LLP                    As of January 31, 2013
                                                                    Invoice No. 10594508
                                                                    10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|---|---|---|---|---|---|---|
| | Vanacour regarding same; preparation of joint submission on outstanding discovery issues to Judge Kaplan. | | | | | |
| 01/08/13 | Compile all documents produced by Plaintiffs to date and burn to a CD; draft the Joint Appendix in Support of Joint Status Report on Highland's Motion to Compel Daugherty's Discovery Responses and Production Relating to Medical Conditions; draft the transmittal letter to Isaac Leventon enclosing the CD of Plaintiffs' document productions to date and returning the CD of Daugherty's HR files and send via hand delivery; electronically file Highland's Motion to Compel Daugherty's Discovery Responses and Production Relating to Medical Conditions; electronically file the Joint Appendix in Support of the Joint Status Report on Highland's Motion to Compel Daugherty's Discovery Responses and Production Relating to Medical Conditions; draft the transmittal letter to Counsel and Judge Kaplan enclosing Highland's Motion to Compel, Joint Status Report, and Joint Appendix and serve same via fax and email. | E. J. THOMPSON | Paralegal | 3.40 | 240.00 | 816.00 |
| 01/08/13 | Attention to numerous emails regarding joint report on health records with client and opposing counsel | W.J. MOORE | Associate | 1.00 | 475.00 | 475.00 |
| 01/09/13 | Work with team to prepare notebooks for hearing on Joint Reports on Medical records; work on Joint Report regarding attorney deposition and testimony, including email correspondence with opposing counsel regarding same; work with I Crosby on document production issues; attention to email correspondence with clients regarding document collection and responses to requests | W.J. MOORE | Associate | 4.30 | 475.00 | 2,042.50 |
| 01/09/13 | Create hearing notebooks for Marc Katz and Will Moore for the January 11, 2013 Hearing on Discovery Issues with Judge Kaplan; review all Plaintiffs' | E. J. THOMPSON | Paralegal | 5.20 | 240.00 | 1,248.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4806.

PLAINTIFFS 0798536

Page 7                                    ANDREWS KURTH LLP                    As of January 31, 2013
                                                                              Invoice No. 10594508
                                                                              10613 0029223 / 0203709

E:   DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | document productions and create detailed production log to include ████████████ | | | | | |
| 01/09/13 | ████████ regarding document requests to Cornerstone and correspondence with Chris Corrigan regarding same; preparation of objections to document requests to Cornerstone; attention to matters regarding identification of case witnesses. | M. KATZ | Partner | 2.50 | 645.00 | 1,612.50 |
| 01/09/13 | Follow-up with Cornerstone's C. Corrigan regarding document requests; review and make comments to production log of all documents produced by Cornerstone and Highland to date; send production log and privilege logs to I. Leventon to assist in organization and collaboration of document production moving forward; draft Motion for Leave to Use Documents to comply with Judge Kaplan's Standing Order; exchange emails with Looper Reed regarding Joint Report regarding same. | I.A. CROSBY | Senior Atty | 1.30 | 425.00 | 552.50 |
| 01/09/13 | Receive, review, and respond to communication regarding outstanding document requests | J.R. REGAS | Associate | 0.50 | 380.00 | 190.00 |
| 01/10/13 | Analyze and develop litigation strategy for hearing on motion to compel medical records | J.R. REGAS | Associate | 0.20 | 380.00 | 76.00 |
| 01/10/13 | Finalize Joint Report, Motion to Compel and Appendix regarding use of deposition testimony and exhibits; email J. Vanacour and G. Zarin regarding same; assist in preparing for hearing on motions to compel; draft weekly update to G. Zarin and J. Vanacour. | I.A. CROSBY | Senior Atty | 2.50 | 425.00 | 1,062.50 |
| 01/10/13 | Preparation and promotion for leave to use deposition testimony and documents for Luther Reed in case; preparation for hearing on motion to compel medical records. | M. KATZ | Partner | 2.20 | 645.00 | 1,419.00 |
| 01/10/13 | Compile exhibits to Joint Status Report on the Motion for Leave to Use of Certain of Daugherty's Counsel's Deposition Testimony | E. J. THOMPSON | Paralegal | 2.40 | 240.00 | 576.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798537

App. 0220

Page 8                                       ANDREWS KURTH LLP                          As of January 31, 2013
                                                                                        Invoice No. 10594508
                                                                                        10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | and Exhibits; draft the Joint Appendix in Support of Joint Status Report on the Motion for Leave; electronically file Highland, Cornerstone, and Dondero's Motion for Leave to Supplement ▓▓▓▓▓ With Pertinent Documents and Deposition Testimony; electronically file the Joint Appendix in Support of Joint Status Report on the Motion for Leave to Use of Certain of Daugherty's Counsel's Deposition Testimony and Exhibits; draft the transmittal letter to Counsel and Judge Kaplan enclosing Plaintiffs' Motion for Leave to Supplement ▓▓▓▓▓ With Pertinent Documents and Deposition Testimony, Joint Status Report on the Motion for Leave to Use of Certain of Daugherty's Counsel's Deposition Testimony and Exhibits, and Joint Appendix in Support of Joint Status Report and serve same via fax and email; finalize the hearing notebooks for the January 11, 2013 hearing on discovery issues. | | | | | |
| 01/10/13 | Finalize Joint Status Report regarding use of attorney deposition transcript and exhibits, including motion and appendix; various emails with opposing counsel regarding same; serve same on JAMS; work with M Katz to prepare for hearing on Joint Report items at JAMS; work with I Crosby on weekly update | W.J. MOORE | Associate | 4.50 | 475.00 | 2,137.50 |
| 01/11/13 | Prepare for and attend hearing on issues, ▓▓▓ protocols; follow up discussion with M Katz; work with M Katz to prepare list of action items and prepare same; debrief with team regarding same | W.J. MOORE | Associate | 4.00 | 475.00 | 1,900.00 |
| 01/11/13 | Per Marc Katz's request, gather additional materials for the hearing on discovery issues and courier same to JAMS. | B. J. THOMPSON | Paralegal | 0.70 | 240:00 | 168.00 |
| 01/11/13 | Preparation for and conduct hearing on motion to compel medical records; conference with Daugherty's counsel concerning discovery issues; telephone conference with Jim Dondero | M. KATZ | Partner | 3.80 | 645.00 | 2,451.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798538

Page 9                                    ANDREWS KURTH LLP                            As of January 31, 2013
                                                                                       Invoice No. 10594508
                                                                                       10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|---|---|---|---|---|---|---|
| | regarding results of hearing; telephone conference with Greg Zarin regarding case status and strategy; preparation of submission to special master regarding Hoffman's prior denial of Daugherty's ███████ ████████ preparation of joint status report on motion to compel telephone records. | | | | | |
| 01/11/13 | Assist in preparing for the motion to compel hearing before Special Master Kaplan; conference with W. Moore regarding the outcome of the motion to compel hearing and next steps. | I.A. CROSBY | Senior Atty | 0.60 | 425.00 | 255.00 |
| 01/11/13 | Analyze and develop litigation strategy related to ████████ ████and Motion to Compel Medical Records | J.R. REGAS | Associate | 0.50 | 380.00 | 190.00 |
| 01/14/13 | Analyze and develop litigation strategy related to outstanding discovery, pending order related to same; ██████████, and pursuit of medical records | J.R. REGAS | Associate | 0.50 | 380.00 | 190.00 |
| 01/14/13 | Meeting with M. Katz and W. Moore to discuss discovery responses ████████████, and further motions to compel; review email correspondence with Looper Reed regarding proposed order to submit to Special Master Kaplan; and continue drafting objections and responses to written discovery requests. | I.A. CROSBY | Senior Atty | 1.30 | 425.00 | 552.50 |
| 01/14/13 | Attention to matters regarding preparation of proposed order on motion to compel medical records; attention to matters regarding court's denial of Daugherty's █████████████; telephone conference with Greg Zarin regarding case status and strategy and issues concerning responding to discovery requests; preparation of responses to document requests to Highland, Dondero, Cornerstone, and Sierra Verde. | M. KATZ | Partner | 1.00 | 645.00 | 645.00 |
| 01/14/13 | Contact Toni Reagor, 68th JDC court reporter, regarding the transcript to the July 2, 2012 hearing; attend meeting with Marc Katz, Isabel, Crosby, Will Moore, and Jason Regas to discuss strategy, upcoming deadlines, and | E. J. THOMPSON | Paralegal | 1.20 | 240.00 | 288.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798539

App. 0222

Page 10            ANDREWS KURTH LLP            As of January 31, 2013
Invoice No. 10594508
10613 0029223 / 0203709

RE: DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | assignments; calendar the deadline for Daugherty to serve Amended Responses to Interrogatory No. 4 and deadline for Daugherty to file an Amended Counterclaim; upload the recent court filings and discovery to the AK p drive; update the pleading index and discovery index with the recent documents and include a hyperlink to the document on the AK p drive. | | | | | |
| 01/14/13 | Meet with team to discuss action items, strategy, and next steps; email correspondence with counsel for Daugherty regarding Motion to Compel Order, review and revise same; follow-up email correspondence internally and with opposing counsel regarding same; discuss ■■■■■ review recent CBRE / Hillcrest subpoena and attention to follow up; work internally with team on AT&T records issues | W.J. MOORE | Associate | 3.00 | 475.00 | 1,425.00 |
| 01/15/13 | Review and analysis of ■■■■■ and detailed email memoranda to M Katz regarding same; teleconference with M Katz regarding same | W.J. MOORE | Associate | 4.50 | 475.00 | 2,137.50 |
| 01/15/13 | Attention to email correspondence regarding discovery issues; work with M Katz regarding telephone records, ■■■■ issues, and scheduling; request teleconference from J Kaplan regarding same; attention to follow up correspondence; begin work on briefing relating to phone records per discussion with M Katz | W.J. MOORE | Associate | 2.00 | 475.00 | 950.00 |
| 01/15/13 | Upload the recent court filings to the AK p drive; update the pleading index with the recent documents and include a hyperlink to the document on the AK p drive. | E. J. THOMPSON | Paralegal | 0.40 | 240.00 | 96.00 |
| 01/15/13 | Review and analysis of ■■■■■ correspondence with Thomas Surgent and Paul Lackey regarding same; attention to matters regarding preparation of joint report on outstanding | M. KATZ | Partner | 3.30 | 645.00 | 2,128.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798540

App. 0223

Page 11                     ANDREWS KURTH LLP                     As of January 31, 2013
                                                                 Invoice No. 10594508
                                                                 10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | discovery items and correspondence with Judge Kaplan concerning same; telephone conference with Greg Zarin regarding case status and strategy. | | | | | |
| 01/15/13 | Continue drafting Highland's, Cornerstone's, Dondero's, and Sierra Verde's responses to Daugherty's second requests for production. | I.A. CROSBY | Senior Atty | 3.90 | 425.00 | 1,657.50 |
| 01/15/13 | Receive, review, and respond to communications from Judge Kaplan and opposing counsel regarding telephonic hearing related to issues surrounding motion to compel medical records and arguments in Plaintiff's ██████ | J.R. REGAS | Associate | 0.40 | 380.00 | 152.00 |
| 01/16/13 | Plan, prepare for, and attend telephone conference with Judge Kaplan regarding potential need for medical records and related ██████; analyze and develop litigation strategy related to same | J.R. REGAS | Associate | 0.70 | 380.00 | 266.00 |
| 1/16/13 | Continue drafting discovery responses on behalf of Cornerstone, Highland, Sierra Verde, and Dondero; email P. Daugherty's attorney regarding document production. | I.A. CROSBY | Senior Atty | 0.60 | 425.00 | 255.00 |
| 01/16/13 | Review and analysis of ██████ conference with Mike Aigen and Paul Lackey regarding ██████ correspondence with Thomas Surgent regarding ██████; preparation for and conduct hearing with Judge Kaplan on discovery issues; correspondence with Greg Zarin regarding case matters; conference with Chris Corrigan regarding document requests to Cornerstone. | M. KATZ | Partner | 4.20 | 645.00 | 2,709.00 |
| 01/16/13 | Attention to various emails with opposing counsel regarding discovery issues and complaints, including intended motion to compel and attorneys fees issues; make formal request for conference pursuant to Special Master Order on items to be | W.J. MOORE | Associate | 3.70 | 475.00 | 1,757.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798541

App. 0224

Page 12                                 ANDREWS KURTH LLP                                As of January 31, 2013
                                                                                        Invoice No. 10594508
                                                                                        10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | compelled, pursuant to internal discussion on same; participate and attend teleconference with special master on discovery and ▉▉▉ issues; attention to Special Master Order on previous Joint Report; | | | | | |
| 01/16/13 | Further review of ▉▉▉ and additional email memorandum to M Katz regarding ▉▉▉ | W.J. MOORE | Associate | 1.20 | 475.00 | 570.00 |
| 01/17/13 | Review initial drafts of objections and responses to Daugherty requests for production; comment on same and discuss comments and objections with I Crosby; attention to status update to clients; work with I Crosby on document production follow ups and status; attention to correspondence from court regarding trial date issues; email correspondence with M Katz and opposing counsel regarding same; email correspondence with opposing counsel regarding document complaints and attorneys fee production issue | W.J. MOORE | Associate | 4.00 | 475.00 | 1,900.00 |
| 01/17/13 | Complete first draft of Highland's, Cornerstone's, Sierra Verde's, and Dondero's responses to Daugherty's Second Requests for Production; prepare email memorandum to Cornerstone's C. Corrigan regarding document production; and prepare weekly update to G. Zarin and J. Vanacour. | I.A. CROSBY | Senior Atty | 4.20 | 425.00 | 1,785.00 |
| 01/17/13 | Attention to matters regarding preparation of objections to Daugherty's document requests; attention to matters regarding review and analysis of Cornerstone documents; attention to matters regarding correspondence with court concerning status of trial date and correspondence with Greg Zarin regarding same. | M. KATZ | Partner | 2.00 | 645.00 | 1,290.00 |
| 01/18/13 | Correspondence with Daugherty's counsel regarding outstanding discovery matters; telephone conference with Greg Zarin regarding case issues; telephone conference with Michael Hurst regarding case issues. | M. KATZ | Partner | 1.40 | 645.00 | 903.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798542

App. 0225

Page 13                                   ANDREWS KURTH LLP                              As of January 31, 2013
                                                                                          Invoice No. 10594508
                                                                                          10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| 01/18/13 | Review email correspondence regarding discovery. | I.A. CROSBY | Senior Atty | 0.30 | 425.00 | 127.50 |
| 01/18/13 | Receive, review, and respond to communications from R. Crockett regarding required conference on use of attorney deposition transcripts and exhibits in substantive case | J.R. REGAS | Associate | 0.20 | 380.00 | 76.00 |
| 01/18/13 | Revise Highland's Objections and Responses to Daugherty's Second Request for Production, Dondero's Objections and Responses to Daugherty's Second Request for Production, Cornerstone's Objections and Responses to Daugherty's Second Request for Production, and Sierra Verde's Objections and Responses to Daugherty's Second Request for Production using the correct response language from Isabel Crosby's master response document. | E. J. THOMPSON | Paralegal | 3.50 | 240.00 | 840.00 |
| 01/18/13 | Review final drafts of discovery responses for Highland, Dondero, Sierra Verde, and Cornerstone; circulate same to clients; email correspondence with opposing counsel regarding various discovery issues, including deposition scheduling; document production issues and complaints regarding same, and request for teleconference on Highland's necessary items for conference; discuss same with M Katz, including need for telephone records; begin review of telephone records and previous discovery and filings relating to same in anticipation of teleconference with opposing counsel; email correspondence with G Zarin regarding trial scheduling and email correspondence with opposing counsel regarding same; attention to subpoenas in Bank of America case scheduling and correspondence | W.J. MOORE | Associate | 4.30 | 475.00 | 2,042.50 |
| 01/21/13 | Attention to matters regarding preparation of motion for leave to use deposition and documents of Looper Reed; attention to matters regarding Daugherty's upcoming deposition in CBRE matter. | M. KATZ | Partner | 0.80 | 645.00 | 516.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798543

App. 0226

| Page 14 | ANDREWS KURTH LLP | As of January 31, 2013 |
|---|---|---|
| | | Invoice No. 10594508 |
| | | 10613 0029223 / 0203709 |

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|---|---|---|---|---|---|---|
| 01/22/13 | Finalize responses to requests for production on behalf of Cornerstone, Sierra Verde, Highland, and Dondero; exchange emails with C. Corrigan regarding document production; review AT&T records to assist W. Moore with the Joint Report regarding motion to compel P. Daugherty's telephone records and review insert to Joint Report regarding same. | I.A. CROSBY | Senior Atty | 3.50 | 425.00 | 1,487.50 |
| 01/22/13 | Attention to issues regarding deposition of Daugherty in CBRE and correspondence with Lisa Psai regarding same. | M. KATZ | Partner | 0.40 | 645.00 | 258.00 |
| 01/22/13 | Attention to matters regarding preparation of joint report on outstanding issues regarding phone records; correspondence with Greg Zarin regarding case matters; preparation of status report regarding outstanding discovery issues; receipt of correspondence from Looper Reed regarding requested depositions; correspondence with counsel for HEAR, Boyce and Britain regarding discovery issues and issues concerning HEAR; correspondence with Thomas Surgent regarding issues concerning HEAR. | M. KATZ | Partner | 2.50 | 645.00 | 1,612.50 |
| 01/22/13 | Telephone call with the 68th JDC Court Reporter, Toni Reagor, regarding the July 2, 2012 Hearing Transcript; draft the transmittal letter to Counsel enclosing 1) Highland's Objections and Responses to Daugherty's Second Request for Production, 2) Dondero's Objections and Responses to Daugherty's Second Request for Production, 3) Cornerstone's Objections and Responses to Daugherty's Second Request for Production, and 4) Sierra Verde's Objections and Responses to Daugherty's Second Request for Production and serve same via email and certified mail, return receipt requested; review Daugherty's AT&T Records and verify the date range of the records. | B. J. THOMPSON | Paralegal | 1.20 | 240.00 | 288.00 |
| 01/22/13 | Receive, review, and respond to | J.R. REGAS | Associate | 0.30 | 380.00 | 114.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4806.

PLAINTIFFS 0798544

App. 0227

Page 15                                ANDREWS KURTH LLP                      As of January 31, 2013
                                                                             Invoice No. 10594508
                                                                             10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | communications regarding required conference on privileged materials and outstanding discovery | | | | | |
| 01/22/13 | Prepare for and participate in teleconference with opposing counsel regarding telephone records, employment records, and use of attorney deposition testimony and exhibits to deposition; update team regarding same; extensive email correspondence with M Katz regarding discovery issues and telephone records; prepare briefing on telephone records joint report per client directive, including review of internal spreadsheet regarding entries on cell phone records and discussions with I Crosby regarding same; email correspondence with counsel regarding preferred trial date; work with I Crosby to finalize document request responses and objections | W.J. MOORE | Associate | 4.90 | 475.00 | 2,327.50 |
| 01/23/13 | Review and analyze amended counterclaim and internal discussion regarding changes; detailed email correspondence to M Katz regarding discovery status and issues; email correspondence regarding status of amended discovery responses; meet with M Katz and I Crosby to discuss action items and strategy; review redlines to counterclaim; review redaction log of phone records and discuss issues relating to same with M Katz; draft additional argument relating to same; review analysis of C Asby regarding privilege log for phone records; finalize Joint Report on telephone records, and email correspondence with clients regarding same; send Joint Report to opposing counsel for insertion of arguments, with email; work with I Crosby on document production issues and status; work on drafting of additional Joint Reports (medical records and employment records) | W.J. MOORE | Associate | 6.50 | 475.00 | 3,087.50 |
| 01/23/13 | Compose an email to Toni Reagor, 68th JDC Court Reporter, to determine if there are any | E. J. THOMPSON | Paralegal | 1.90 | 240.00 | 456.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798545

App. 0228

Page 16                                 ANDREWS KURTH LLP                      As of January 31, 2013
                                                                              Invoice No. 10594508
                                                                              10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | additional hearings in which a transcript was made that we have not ordered; review the Court's online docket for Daugherty's Amended Answer, Counterclaim, and Third-Party Petition and download same; compare Daugherty's Original Answer, Counterclaim, and Third-Party Petition to Daugherty's Amended Answer, Counterclaim, and Third-Party Petition; attention to electronic and paper file management. | | | | | |
| 01/23/13 | Telephone conference with Jim Dondero regarding outstanding discovery issues; correspondence with Greg Zarin and Scott Ellington regarding outstanding discovery issues and case strategy; attention to matters regarding finalizing joint submission on Daugherty's phone records; review and analysis of drafts of ▮▮▮▮▮ ████████████ correspondence with counsel for HEAR regarding case matters; review and analysis of Daugherty's amended counterclaim and preparation of correspondence to Greg Zarin regarding same. | M. KATZ | Partner | 3.60 | 645.00 | 2,322.00 |
| 01/23/13 | Review changes to Amended Counterclaim and prepare brief memorandum to G. Zarin and J. Vanacour analyzing changes and next steps with respect to same; meet with attorneys W. Moore and M. Katz to discuss next steps with respect to discovery and discovery motions; assist W. Moore in preparing the Joint Report regarding P. Daugherty's telephone records; and exchange emails with Cornerstone's C. Corrigan and M. Wallace regarding collection and retrieval of potentially responsive documents for P. Daugherty's Requests for Production. | I.A. CROSBY | Senior Atty | 5.00 | 425.00 | 2,125.00 |
| 01/23/13 | Review phone records and corresponding privilege log produced by Defendant to determine ▮ ████████████ | C.J. ASBY | Associate | 3.20 | 290.00 | 928.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

(

PLAINTIFFS 0798546

App. 0229

Page 17                          ANDREWS KURTH LLP                    As of January 31, 2013
                                                                     Invoice No. 10594508
                                                                     10613 0029223 / 0203709

**E:    DAUGHERTY, PATRICK**

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| 01/23/13 | Receive, review, and respond to communications regarding amended answer and joint status report related to phone records; review and analyze revisions to Amended Answer | J.R. REGAS | Associate | 0.70 | 380.00 | 266.00 |
| 01/24/13 | Telephone conference with P. Daugherty's counsel regarding document production and responses to requests for production; attention to document production issues and coordinate with Cornerstone regarding same. | I.A. CROSBY | Senior Atty | 1.20 | 425.00 | 510.00 |
| 01/24/13 | Review and analysis of ▮▮▮ conference with counsel for HBAR regarding ▮▮▮ telephone conference with Thomas Surgent regarding ▮▮▮ attention to matters regarding motion for leave to use Looper Reed depositions and documents for substantive case matters. | M. KATZ | Partner | 3.30 | 645.00 | 2,128.50 |
| 01/24/13 | Attention to matters regarding preparation for deposition of Daugherty in CBRE matter. | M. KATZ | Partner | 0.20 | 645.00 | 129.00 |
| 01/24/13 | Research ▮▮▮ and provide case summaries to W. Moore. | M.D. MUTSCHINK | Associate | 3.30 | 320.00 | 1,056.00 |
| 01/24/13 | Review the Joint Status Report on Daugherty's Employment Opportunities Records and Correspondence and begin compiling exhibits; review the Joint Status Report on Daugherty's Telephone Records and begin compiling exhibits. | E. J. THOMPSON | Paralegal | 1.10 | 240.00 | 264.00 |
| 01/24/13 | Receive and review joint status reports regarding motion to compel discovery related to employment opportunities and information designated as privileged (testimony by Daugherty's attorneys and related exhibits) | J.R. REGAS | Associate | 0.30 | 380.00 | 114.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

**PLAINTIFFS 0798547**

App. 0230

ANDREWS KURTH LLP                    As of January 31, 2013
                                                                                Invoice No. 10594508
                                                                                10613 0029223 / 0203709

**E:    DAUGHERTY, PATRICK**

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| 01/24/13 | Receive and review July 2nd hearing on Motion to Seal pertinent pleadings | J.R. REGAS | Associate | 0.80 | 380.00 | 304.00 |
| 01/24/13 | Work on Joint Reports on Phone Records, Employment Records, and Attorney Deposition and exhibits briefing, including supplemental legal research and drafting; email communications with opposing counsel regarding same; identify deposition cites for Joint Report on attorney deposition and exhibits and send same to opposing counsel, after discussing with M Katz; work with I Crosby on document production issues and review strategy for Cornerstone Documents; work with E Thompson to begin preparing appendices and exhibits to reports; begin preparation of accompanying motions; | W.J. MOORE | Associate | 8.30 | 475.00 | 3,942.50 |
| 01/25/13 | Assist trial team with processing electronic data from client; review and analysis of file extension report provided by litigation support to evaluate and determine the processing specifications for the electronic data. | A. D. JONES | Partner | 0.40 | 595.00 | 238.00 |
| 01/25/13 | Receive and review revisions to joint status report on motion to compel pertinent documents related to employment opportunities and excerpts from Plaintiff's attorneys' depositions | J.R. REGAS | Associate | 0.30 | 380.00 | 114.00 |
| 01/25/13 | Finalize the exhibits to the Joint Status Report on the Motion to Compel Responses from Daugherty Regarding Defamation Damages and Employment Opportunities and Correspondence, the Joint Status Report of Daugherty's Telephone Records, and the Joint Status Report on the Motion for Leave to Use of Certain of Daugherty's Counsel's Deposition Testimony and Exhibits; draft the Joint Appendix in Support of Joint Status Report on Motion to Compel Responses from Daugherty Regarding Defamation Damages and Employment Opportunities and Correspondence; draft the Joint | E. J. THOMPSON | Paralegal | 5.50 | 240.00 | 1,320.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798548

App. 0231

Page 19                                ANDREWS KURTH LLP                        As of January 31, 2013
                                                                               Invoice No. 10594508
                                                                               10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
|  | Appendix in Support of Joint Status Report on Daugherty's Telephone Records; draft the Joint Appendix in Support of Joint Status Report on the Motion for Leave to Use of Certain of Daugherty's Counsel's Deposition Testimony and Exhibits; draft the transmittal letter to Counsel and Kaplan enclosing 1) Motion to Compel Daugherty's Discovery Responses and Production Relating to Defamation Damages and Employment Opportunities, 2) Joint Appendix in Support of Joint Status Report, 3) Motion to Compel Daugherty's Discovery Responses and Production Relating to Telephone Records, 4) Joint Appendix in Support of Joint Status Report, 5) Motion for Leave to Use Certain of Daugherty's Counsel's Deposition Testimony and Exhibits, and 6) Joint Appendix in Support of Joint Status Report; contact Michael Wallace regarding Cornerstone's client document production. | | | | | |
| 01/25/13 | Prepare and send weekly update to G. Zarin and J. Vanacour; exchange correspondence and assist in coordination of various discovery matters including filing and preparation of Joint Status Reports regarding Highland's motions to compel and regarding document retrieval and review from Cornerstone. | I.A. CROSBY | Senior Atty | 1.00 | 425.00 | 425.00 |
| 01/25/13 | Finalize Joint Reports on telephone records, employment records, and attorney deposition testimony exhibits, including reviewing, analyzing, incorporating and revising Daugherty's counsel's requested additions and edits; prepare Motions to accompany joint reports; prepare appendices for exhibits to same; multiple email correspondence with opposing counsel regarding reports; work with E Thompson to finalize and compile filings; email correspondence with clients regarding same | W.J. MOORE | Associate | 8.00 | 475.00 | 3,800.00 |
| 01/25/13 | Finalized joint reports on phone | M. KATZ | Partner | 2.40 | 645.00 | 1,548.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4808.

PLAINTIFFS 0798549

App. 0232

Page 20                            ANDREWS KURTH LLP                    As of January 31, 2013
                                                                        Invoice No. 10594508
                                                                        10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | records, employment and related records and issues concerning use of Looper Reed depositions and documentation and correspondence with counsel for Daugherty regarding same; receipt and review of Daugherty's amended interrogatory responses and preparation of correspondence to Judge Kaplan regarding medical records. | | | | | |
| 01/28/13 | Electronically file the following documents: 1) Motion to Compel Daugherty's Discovery Responses and Production Relating to Defamation Damages and Employment Opportunities, which attaches the Joint Status Report on Highland's Motion to Compel Responses from Daugherty Regarding Defamation Damages and Employment Opportunities and Correspondence; 2) Joint Appendix in Support of Joint Status Report on Highland's Motion to Compel Responses from Daugherty Regarding Defamation Damages and Employment Opportunities and Correspondence; 3) Motion to Compel Daugherty's Discovery Responses and Production Relating to Telephone Records, which attaches the Joint Status Report of Daugherty's Telephone Records; 4) Joint Appendix in Support of Joint Status Report on Daugherty's Telephone Records; 5) Motion for Leave to Use Certain of Daugherty's Counsel's Deposition Testimony and Exhibits, which attaches the Joint Status Report on the Motion for Leave to Use of Certain of Daugherty's Counsel's Deposition Testimony and Exhibits; and 6) Joint Appendix in Support of Joint Status Report on the Motion for Leave to Use of Certain of Daugherty's Counsel's Deposition Testimony and Exhibits; telephone conference with Isabel Crosby and Litigation Support re processing the .pst files received from Cornerstone; draft the transmittal letter to the 68th JDC Court Coordinator enclosing Exhibit F | E. J. THOMPSON | Paralegal | 2.50 | 240.00 | 600.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798550

App. 0233

Page 21                          ANDREWS KURTH LLP                    As of January 31, 2013
                                                                     Invoice No. 10594508
                                                                     10613 0029223 / 0203709

RE:   DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | and portions of Exhibit G of Joint Appendix filed under seal and submitted to Judge Hoffman for in camera review. | | | | | |
| 01/28/13 | Review and analysis of Daugherty's interrogatory responses and preparation of correspondence to Judge Kaplan regarding Daugherty's continuing issues regarding medical records; receipt and review of correspondence from Daugherty's counsel regarding document production and preparation of response thereto; receipt of correspondence from Judge Kaplan regarding status of pending rulings on outstanding discovery matters; receipt and review of correspondence from Daugherty's counsel regarding deposition of Patrick Boyce; preparation of motion to quash deposition of Patrick Boyce; correspondence with counsel HEAR regarding same. | M. KATZ | Partner | 2.20 | 645.00 | 1,419.00 |
| 01/28/13 | Receive, review, and respond to communications regarding dates for production of outstanding discovery and protocols related to same | J.R. REGAS | Associate | 0.30 | 380.00 | 114.00 |
| 01/28/13 | Receive, review, and respond to communications regarding Motion to Quash; receive and review deposition notice of P. Boyce relating to same | J.R. REGAS | Associate | 0.30 | 380.00 | 114.00 |
| 01/28/13 | Receive and review joint status report for phone records and employment opportunities | J.R. REGAS | Associate | 0.30 | 380.00 | 114.00 |
| 01/28/13 | Receive, review, and respond to communications regarding revised discovery responses; analyze and develop litigation strategy related to medical records | J.R. REGAS | Associate | 0.30 | 380.00 | 114.00 |
| 01/28/13 | Receive and review notice of jury trial | J.R. REGAS | Associate | 0.20 | 380.00 | 76.00 |
| 01/28/13 | ████████████ | C.J. ASBY | Associate | 2.00 | 290.00 | 580.00 |
| 01/28/13 | Review P. Daugherty's Amended Interrogatory Responses in preparation for drafting letter to the Special Master re-urging motion to compel medical records; draft letter to the Special Master re-urging motion to compel | I.A. CROSBY | Senior Atty | 6.50 | 425.00 | 2,762.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

**PLAINTIFFS 0798551**

App. 0234

Page 22                          ANDREWS KURTH LLP                    As of January 31, 2013
                                                                     Invoice No. 10594508
                                                                     10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | medical records and send to G. Zarin and J. Vanacour for review prior to serving on the Special Master; exchange correspondence with P. Daugherty's counsel regarding document production disputes; exchange correspondence with G. Zarin, J. Vanacour, and I. Leventon regarding same; review deposition notice to Boyce and coordinate preparation of motion to quash with attorney J. Regas. | | | | | |
| 01/28/13 | Attention to correspondence from special master regarding receipt of Joint Reports; work with B Thompson to properly file same with court; send same to clients; attention to email correspondence from opposing counsel regarding deposition scheduling and document production issues; work with I Crosby to prepare responses to same; review and revise letter to court regarding re-urging of medical records, and attention to client comments regarding same; review Kaplan response to letter; discuss background and legal research needed regarding form and organization of electronic data with C Asby; review deposition notice of Boyce and discuss same with M Katz and arguments for potential Motion to Quash | W.J. MOORE | Associate | 5.50 | 475.00 | 2,612.50 |
| 01/29/13 | Review Daugherty amended discovery responses and email team regarding same; attention to email correspondence regarding viability of moving for medical records; email correspondence with I Crosby regarding amended complaint and special exceptions issues; review Notice of Deposition of Boyce and discuss potential Motion to Quash with J Regas; discuss same and discovery issues with M Katz; work with I Crosby on document production issues and protocol; review detailed email from I Leventon regarding same; discuss same and document production issues with I Crosby; | W.J. MOORE | Associate | 4.90 | 475.00 | 2,327.50 |
| 01/29/13 | Review Amended Counterclaim and prior special exceptions to | I.A. CROSBY | Senior Atty | 5.10 | 425.00 | 2,167.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798552

App. 0235

Page 23                          ANDREWS KURTH LLP                    As of January 31, 2013
                                                                     Invoice No. 10594508
                                                                     10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | analyze which, if any, special exceptions should be re-urged and prepare brief update to M. Katz regarding same; conference with J. Regas regarding substance and basis for the motion to quash Boyce's deposition; review Second Amended Interrogatory Responses and analyze impact on proposed motion to re-urge the motion to compel medical records and provide brief update to M. Katz regarding analysis; telephone conference with I. Leventon regarding internal Highland processes for document retrieval and collection and to discuss substance of a proposed ESI protocol and to exchange emails regarding same; conferences internally to prepare for document review and production. | | | | | |
| 01/29/13 | Review documents produced by Cornerstone for attorney-client privilege and responsiveness to Defendant's request for production. | C.J. ASBY | Associate | 3.60 | 290.00 | 1,044.00 |
| 01/29/13 | Conference with I. Crosby and E. Thompson to discuss the strategy for handling and processing the various forms of electronic data that have been collected in the case. | A. D. JONES | Partner | 0.50 | 595.00 | 297.50 |
| 01/29/13 | Receive, review, and respond to communications from S. Brown regarding Motion to Quash; draft and revise same; review pertinent communications related to same | J.R. REGAS | Associate | 1.50 | 380.00 | 570.00 |
| 01/29/13 | Receive, review, and respond to communications regarding outstanding ▆▆▆▆▆ | J.R. REGAS | Associate | 0.20 | 380.00 | 76.00 |
| 01/29/13 | Upload the recent court filings and discovery to the AK p drive; update the pleading index and discovery index with the recent documents and include a hyperlink to the document on the AK p drive; attention to electronic and paper file management. | E. J. THOMPSON | Paralegal | 1.40 | 240.00 | 336.00 |
| 01/29/13 | Receipt and review of Daugherty's supplemental discovery responses; attention to matters regarding ▆▆▆▆▆ ▆▆▆▆ and conference with Scott Ellington regarding | M. KATZ | Partner | 1.80 | 645.00 | 1,161.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798553

App. 0236

Page 24                          ANDREWS KURTH LLP                    As of January 31, 2013
                                                                     Invoice No. 10594508
                                                                     10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|---|---|---|---|---|---|---|
| | ▆▆▆▆▆ preparation of motion to quash deposition of Patrick Boyce; attention to matters regarding deposition of Pat Daugherty in Dondero divorce proceeding and CBRE matter; attention to issues regarding status of review and analysis of documentation in connection with preparation of response to Daugherty's request for production. | | | | | |
| 01/30/13 | Contact the 68th JDC Clerk and cancel the hearing on Plaintiffs' ▆▆▆▆▆ Against Patrick Daugherty and Looper Reed & McGraw P.C.; draft a letter to Counsel canceling the February 4, 2013 hearing on Plaintiffs ▆▆▆▆▆ Against Patrick Daugherty and Looper Reed & McGraw P.C.; compile documents and create hearing notebooks (3) for the February 4, 2013 hearing on discovery issues before Judge Kaplan. | E. J. THOMPSON | Paralegal | 1.40 | 240.00 | 336.00 |
| 01/30/13 | Attention to issues regarding scheduling and preparation for deposition of Patrick Daugherty in CBRE matter. | M. KATZ | Partner | 0.40 | 645.00 | 258.00 |
| 01/30/13 | Receipt of correspondence from Judge Kaplan regarding requested oral argument on outstanding discovery motions and preparation for oral argument on same; preparation of motion to quash deposition of Patrick Boyce; correspondence with Greg Zaria regarding strategy concerning motion to compel medical records and motion to quash deposition of Patrick Boyce. | M. KATZ | Partner | 2.00 | 645.00 | 1,290.00 |
| 01/30/13 | Receive, review, and respond to communications from Judge Kaplan regarding pending discovery motions | J.R. REGAS | Associate | 0.20 | 380.00 | 76.00 |
| 01/30/13 | Receive, review, and respond to communications regarding deposition of P. Boyce; work on Motion to Quash same; analyze and develop litigation strategy with S. Brown relating to same; receive and review Boyce's Motion to Quash; receive, review, and respond to communications | J.R. REGAS | Associate | 1.10 | 380.00 | 418.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

**PLAINTIFFS 0798554**

App. 0237

Page 25                          ANDREWS KURTH LLP                          As of January 31, 2013
                                                                           Invoice No. 10594508
                                                                           10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | regarding medical records | | | | | |
| 01/30/13 | Receive, review, and respond to communications regarding outstanding█████████ | J.R. REGAS | Associate | 0.20 | 380.00 | 76.00 |
| 01/30/13 | Review of documents produced by client to determine privilege and responsiveness to Defendant's requests for production | C.J. ASBY | Associate | 4.40 | 290.00 | 1,276.00 |
| 01/30/13 | Begin reviewing Cornerstone documents to identify responsive documents for production and coordinate with internal litigation support team regarding production of same; brief review of motion to quash Boyce's deposition and provide comments to same. | I.A. CROSBY | Senior Atty | 5.80 | 425.00 | 2,465.00 |
| 01/30/13 | Detailed email to G Zarin regarding action items / issues in case; review responses thereto and discussion regarding medical records; work with C Asby on research relating to form of electronic document production issues; prepare and send out letter canceling hearing on █████ █████and requesting same from Daugherty; attention to correspondence relating to same; work with I Crosby on document production issues; revise and circulate Motion to Quash Boyce subpoena; review correspondence from Special Master regarding hearing on Joint Reports; | W.J. MOORE | Associate | 4.50 | 475.00 | 2,137.50 |
| 01/31/13 | Revise, supplement and circulate Motion to Quash Boyce deposition; revise same per client comments and oversee filing of same; prepare for teleconference on discovery conference, including review and additional discovery relating to ordinary course electronic production; participate in teleconference with opposing counsel regarding document production and medical records; begin work on Joint Reports; attention to correspondence from special master regarding hearing | W.J. MOORE | Associate | 6.40 | 475.00 | 3,040.00 |
| 01/31/13 | Draft ESI production protocol and forward to I. Leventon for review and comments; discuss substance of motion to quash Boyce's deposition with M. Katz and make revisions to same; prepare for and | I.A. CROSBY | Senior Atty | 6.80 | 425.00 | 2,890.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

**PLAINTIFFS 0798555**

App. 0238

Page 26                          ANDREWS KURTH LLP                    As of January 31, 2013
                                                                     Invoice No. 10594508
                                                                     10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|---|---|---|---|---|---|---|
| | participate in telephone conference with Looper Reed regarding motion to compel medical records and their motion to compel production of documents in a particularized format; prepare lengthy weekly update to G. Zarin, I. Leventon and J. Vanacour; continue reviewing Cornerstone's documents in anticipation of producing same. | | | | | |
| 01/31/13 | | C.J. ASBY | Associate | 8.20 | 290.00 | 2,378.00 |
| 01/31/13 | Conference with I. Crosby to discuss various matters related to the production of electronic data. | A. D. JONES | Partner | 0.70 | 595.00 | 416.50 |
| 01/31/13 | Receive, review, and respond to communications regarding deposition of P. Boyce; work on Motion to Quash same; analyze and develop litigation strategy with S. Brown relating to same | J.R. REGAS | Associate | 1.20 | 380.00 | 456.00 |
| 01/31/13 | Draft the index for hearing notebooks for the February 4, 2013 hearing before Judge Kaplan; compile the Motions, Joint Status Reports, and Joint Appendices submitted to Judge Kaplan January 25, 2013 and create 3 hearing notebooks. | E. J. THOMPSON | Paralegal | 1.70 | 240.00 | 408.00 |
| 01/31/13 | Attention to matters regarding Daugherty's deposition in CBRE matter; telephone conference with Thomas Surgent regarding ▬▬▬▬▬ preparation for hearing on motions to compel employment records, medical records and phone records; attention to matters regarding preparation of motion to quash deposition of Patrick Boyce and telephone conference with Greg Zarin regarding same. | M. KATZ | Partner | 1.80 | 645.00 | 1,161.00 |

| | | | | Total | | |
|---|---|---|---|---|---|---|
| Total Services | | | | 315.20 | | $ 138,913.50 |
| Less 15% Discount | | | | | | (20,837.03) |
| Total Current Services | | | | | | $ 118,076.47 |

| Disbursements | Value |
|---|---|
| Total for Computer Aided Research - Lexis | 443.95 |
| Total for Computer Aided Research - Westlaw | 136.14 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
arding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798556

App. 0239

Page 27                              ANDREWS KURTH LLP                    As of January 31, 2013
                                                                         Invoice No. 10594508
                                                                         10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Disbursements | Value |
|---|---|
| Total for Court Reporter | 318.00 |
| Total for Delivery Expense - FEDEX | 6.25 |
| Total for Delivery Expense Outside Vendor | 157.87 |
| Total for Document Services | 4.80 |
| Total for Document Services - Scanning | 128.00 |
| Total for Filing Fees | 55.22 |
| Total for Local Transportation | 5.00 |
| Total for Postage | 35.30 |
| Total for Professional Svcs | 1,428.90 |
| Total for Secretarial Overtime | 46.00 |
| Total for Telecopy Charges | 445.00 |
| Total for Telephone | 2.54 |

**Total Disbursements**                                                  $ 3,212.97

**Total Current Services and Disbursements This Matter**                  $ 121,289.44

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

**PLAINTIFFS 0798557**

App. 0240

Page 28                          ANDREWS KURTH LLP                          As of January 31, 2013
                                                                           Invoice No. 10594508
                                                                           10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

## SUMMARY OF FEES

| Number | Name | Hours | Value |
|--------|------|-------|-------|
| 10012 | JONES, A. D. | 1.60 | 952.00 |
| 10613 | KATZ, M. | 51.60 | 33,282.00 |
| 10662 | ASBY, C.J. | 21.40 | 6,206.00 |
| 10820 | MOORE, W.J. | 110.10 | 52,297.50 |
| 10586 | MUTSCHINK, M.D. | 3.30 | 1,056.00 |
| 10922 | REGAS, J.R. | 14.90 | 5,662.00 |
| 10821 | CROSBY, I.A. | 67.60 | 28,730.00 |
| 09891 | THOMPSON, E. J. | 44.70 | 10,728.00 |
|  |  | 315.20 | $138,913.50 |

Less 15% Discount                                          $ (20,837.03)
                                                           $ 118,076.47

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798558

App. 0241



**ANDREWS**
**ATTORNEYS  KURTH** LLP

Andrews Kurth LLP
P.O. Box 201785
Houston, Texas  77216-1785
713.220.4200 Phone
713.220.4285 Fax
andrewskurth.com
Taxpayer I.D. #74-1027138

February 11, 2013

## PLEASE RETURN THIS COPY WITH YOUR PAYMENT

Highland Capital Management, LP
Accounts Payable
300 Crescent Court Suite 700
Dallas, TX 75201

As of  January 31, 2013
Invoice No. 10594508
10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

### INVOICE SUMMARY

| | |
|---|---|
| Total Services | $ 118,076.47 |
| Total Disbursements | 3,212.97 |
| **Total Current Services and Disbursements Due This Bill** | **$ 121,289.44** |

### SUMMARY OF ACCOUNTS RECEIVABLE

| Invoice Date | Invoice Number | Total Balance Due |
|---|---|---|
| 10/11/12 | 10582325 | 283,351.82 |
| 01/17/13 | 10592454 | 107,031.61 |
| 2/11/13 | 10594508 | 121,289.44 |

Total balance outstanding for this matter
As Of February 11, 2013        $ 511,672.87

**PLEASE RETURN THIS COPY WITH YOUR PAYMENT**
Payment due upon receipt
Please Reference Invoice Number & Client/Matter Number on Your Payment

Please send remittance to:
ANDREWS KURTH LLP
P.O. Box 201785
Houston, TX 77216-1785

Wire Transfer Information:
JPMorgan Chase, 712 Main Street, Houston, TX 77002
ABA: 021000021
Acct #: 00100184952
Swift Code: CHASUS33
Fax Remittance Info: 713-238-7131
AccountsReceivable@akllp.com

ACH Information:
JPMorgan Chase
ABA: 111000614
Acct #: 00100184952

For Questions or Comments Regarding this Invoice, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798559

App. 0242

# ANDREWS
**ATTORNEYS** **KURTH** LLP

Andrews Kurth LLP
P.O. Box 201785
Houston, Texas 77216-1785
713.220.4200 Phone
713.220.4285 Fax
andrewskurth.com
Taxpayer I.D. #74-1027138

March 6, 2013

Highland Capital Management, LP
Accounts Payable
300 Crescent Court Suite 700
Dallas, TX 75201

As of February 28, 2013
Invoice No. 10597391
10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| 02/01/13 | Preparation for hearings on motions to compel discovery from Daugherty and motion to use deposition and documents from Looper Reed; correspondence with Daugherty's counsel regarding outstanding discovery issues; attention to issues regarding motion to compel Daugherty's deposition in Dondero divorce litigation and correspondence with Scott Hershman concerning same. | M. KATZ | Partner | 3.00 | 645.00 | 1,935.00 |
| 02/01/13 | Work on preparation for Special Master hearing on discovery matters; work on Joint Report, including legal research, relating to Daugherty's Motion to Compel | W.J. MOORE | Associate | 2.00 | 475.00 | 950.00 |
| 02/02/13 | Preparation for hearing on motion to compel employment documents and phone records. | M. KATZ | Partner | 2.50 | 645.00 | 1,612.50 |
| 02/03/13 | Preparation of outline of argument for hearing on discovery matters and for use of Looper Reed depositions and documents; attention to matters regarding use of court reporter and potential mandamus issues. | M. KATZ | Partner | 3.30 | 645.00 | 2,128.50 |
| 02/03/13 | Prepare for hearing before Special Master on various discovery matters, including pulling additional documents and evidence needed; review Appointment Order per request from M Katz and comment on objection and appeal procedure. | W.J. MOORE | Associate | 2.50 | 475.00 | 1,187.50 |
| 02/04/13 | Final preparations for and participation in hearing with Special Master on Motion to Compel Employment Records, Telephone Records, and Attorney | W.J. MOORE | Associate | 7.90 | 475.00 | 3,752.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798560

App. 0243

Page 2                          ANDREWS KURTH LLP                    As of February 28, 2013
                                                                    Invoice No. 10597391
                                                                    10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|---|---|---|---|---|---|---|
| | Depositions and Exhibits; attention to email to client regarding same; prepare and circulate drafts of Orders Relating to Motions; work on insert for Joint Report on Daugherty's Motion to Compel relating to organization of documents; review and revise Joint Report on Motion to Reurge Health Records request. | | | | | |
| 02/04/13 | Prepare for and conduct hearing before Judge Kaplan on various discovery motions; telephone conference with Greg Zarin regarding results of hearing; correspondence with Scott Hershman regarding subpoena for deposition of Pat Daugherty in Dondero divorce proceeding and issues relating thereto; attention to e-discovery issues. | M. KATZ | Partner | 3.50 | 645.00 | 2,257.50 |
| 02/04/13 | Draft Joint Report re-urging motion to compel Daugherty's medical records and forward to G. Zarin and J. Vanacour for review; draft insert for Joint Report regarding Highland's internal document retrieval process and forward to W. Moore for inclusion in same; exchange emails with I. Leventon regarding a proposed ESI protocol and make revisions to the protocol based on such communications; forward ESI protocol to Looper and Reed and follow-up with Gruber Hurst to discuss substance of same. | I.A. CROSBY | Senior Atty | 5.70 | 425.00 | 2,422.50 |
| 02/05/13 | Continue drafting Joint Status reports regarding Daugherty's motion to compel and regarding Highland's motion to re-urge motion to request medical records; telephone conference with I. Leventon to discuss volume of data and search protocol at Highland to assist in drafting same; set up similar conference with Cornerstone's M. Wallace to discuss same regarding Cornerstone; and exchange emails with Looper Reed regarding the Joint Status reports. | I.A. CROSBY | Senior Atty | 6.50 | 425.00 | 2,762.50 |
| 02/05/13 | Attention to matters regarding review and production of electronic documents and preparation of joint report to | M. KATZ | Partner | 2.30 | 645.00 | 1,483.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798561

App. 0244

Page 3 | ANDREWS KURTH LLP | As of February 28, 2013
Invoice No. 10597391
10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | Kaplan concerning same; preparation of joint status report on motion to re-urge, motion to compel medical records; preparation of drafts of orders on Kaplan's prior discovery rulings. | | | | | |
| 02/05/13 | Compile exhibits to the Joint Status Report on Highland's Motion to Re-Urge, or Alternatively to Reset, Its Motion to Compel Daugherty's Discovery Responses and Production Relating to Medical Conditions; draft the Joint Appendix in Support of Joint Status Report on Highland's Motion to Re-Urge, or Alternatively to Reset, Its Motion to Compel Daugherty's Discovery Responses and Production Relating to Medical Conditions; draft the transmittal letter to Counsel and Judge Kaplan enclosing Highland's Motion to Re-Urge, the Joint Status Report, and the Joint Appendix in Support of the Joint Status Report. | E. J. THOMPSON | Paralegal | 1.50 | 240.00 | 360.00 |
| 02/05/13 | Work on Joint Reports on Medical Records and on Daugherty's Motion to Compel; exchange medical records information with opposing counsel; numerous, extensive emails with opposing counsel regarding substance of Daugherty's Motion to Compel and discovery protocol in general; emails and teleconference with I Leventon regarding issues in Joint Report on Daugherty's Motion to Compel; substantially revised insert and recirculate. | W.J. MOORE | Associate | 9.40 | 475.00 | 4,465.00 |
| 02/05/13 | Work on issues related to ESI agreement; Receive, review, and respond to communications from opposing counsel regarding joint status report and relief sought in Daugherty's Motion to Compel | J.R. REGAS | Associate | 0.80 | 380.00 | 304.00 |
| 02/06/13 | Receive, review, and respond to communications regarding requests for production regarding ▮▮▮▮▮▮; analyze and develop litigation strategy related to same | J.R. REGAS | Associate | 0.40 | 380.00 | 152.00 |
| 02/06/13 | Further revisions to Insert to Joint Report on Daugherty's Motion to Compel, pursuant to comments | W.J. MOORE | Associate | 8.50 | 475.00 | 4,037.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798562

App. 0245

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | from I Leventon, and further email correspondence with same; numerous, extended emails with opposing counsel regarding the substance and propriety of including certain arguments in such Joint Report; supplement Joint Report on Daugherty's Motion to Compel, pursuant to opposing counsel's new revisions; finalize and file Joint Report on Medical Records; circulate proposed Orders on Telephone Records, numerous internal and external email exchanges on forms of orders, including various revisions thereto proposed by opposing counsel; email correspondence with Special Master regarding extension of time to finalize orders | | | | | |
| 02/06/13 | Attention to matters regarding production of documents from Cornerstone; preparation of joint status report on Daugherty's motion to compel; attention to matters regarding special exceptions to Daugherty's counterclaims; attention to matters regarding production of Highland documents; correspondence with Thomas Surgent regarding ▓▓▓▓ | M. KATZ | Partner | 3.00 | 645.00 | 1,935.00 |
| 02/06/13 | Participate in Joint Status Conference with Looper Reed regarding Daugherty's proposed motion to compel responses to Requests for Production; exchange emails with G. Zarin and C. Corrigan regarding Highland's and Cornerstone's positions with respect to same; prepare and send email to Looper Reed in follow-up to same; telephone conference with Cornerstone's M. Wallace regarding document retrieval efforts and policies and prepare brief summary regarding same for inclusion in Joint Status Report on Daugherty's motion to compel production; exchange emails with Looper Reed and finalize motion to re-urge motion to compel Daugherty's medical records and supporting appendix for submission to Special Master | J.A. CROSBY | Senior Atty | 8.10 | 425.00 | 3,442.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798563

App. 0246

Page 5                              ANDREWS KURTH LLP                         As of February 28, 2013
                                                                             Invoice No. 10597391
                                                                             10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | Kaplan and filing with Judge Hoffman; review and revise Joint Appendix in support of Daugherty's motion to compel production and exchange emails regarding same. | | | | | |
| 02/07/13 | Review proposed amended scheduling order and make comments to same; begin drafting Special Exceptions to Daugherty's First Amended Counterclaim on behalf of Dondero, Highland, and Sierra Verde; continue exchanging emails with G. Zarin and C. Corrigan and with Looper Reed regarding proposed resolution to Looper Reed's complaints with respect to particular responses to requests for production; review, revise, and exchange drafts of proposed orders before sending to the Special Master; draft weekly update to G. Zarin and J. Vanacour. | I.A. CROSBY | Senior Atty | 7.00 | 425.00 | 2,975.00 |
| 02/07/13 | Attention to matters regarding ██████████; attention to matters regarding ████████ and correspondence with Greg Zarin regarding same; attention to matters regarding production of electronic discovery and correspondence with defendants' counsel concerning discovery issues. | M. KATZ | Partner | 2.40 | 645.00 | 1,548.00 |
| 02/07/13 | Download the file-stamp copies of the Motions to Compel and Joint Status Reports; attention to electronic and paper file management; review the Court's online docket for Judge Hoffman's notes regarding Special Exceptions from the September 10, 2012 Hearing; upload the recent court filings to the AK p drive; update the pleading index with the recent documents and include a hyperlink to the document on the AK p drive. | B. J. THOMPSON | Paralegal | 2.50 | 240.00 | 600.00 |
| 02/07/13 | Forward file-stamped versions of Medical Records to clients with follow-up correspondence; work with I Crosby and G Zarin on ongoing discovery disputes/requests for categories of | W.J. MOORE | Associate | 5.50 | 475.00 | 2,612.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798564

App. 0247

Page 6                                ANDREWS KURTH LLP                        As of February 28, 2013
                                                                              Invoice No. 10597391
                                                                              10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | documents from Daugherty; numerous emails and revisions exchanged with opposing counsel regarding forms of orders relating to telephone records and employment opportunities; email correspondence with clients regarding same and needs for inclusion in orders; email form of order relating to Employment Records to Special Master with explanation as to why the parties were unable to agree; email correspondence with S Brown, Gruber Hurst, regarding request for Joint Report / Motion to Compel Boyce deposition and protocol and procedure for same; extensive emails with opposing counsel regarding claim that Highland has violated protective order. | | | | | |
| 02/07/13 | Work on search protocols related to discovery disputes; work on amended scheduling order | J.R. REGAS | Associate | 0.70 | 380.00 | 266.00 |
| 02/08/13 | Review Kaplan Orders on Motion to Use Counsel Testimony and Exhibits, Motion to Compel Production Relating to Telephone Records, Motion to Compel Production Relating to Employment Opportunities, Motion to Reurge Request for Medical Records, and Daugherty's Motion to Compel Production; attention to email correspondence from G. Zarin regarding ████████████ email correspondence with opposing counsel regarding intention to file Motion and Joint Report to Compel Boyce deposition. | W.J. MOORE | Associate | 3.50 | 475.00 | 1,662.50 |
| 02/08/13 | Attention to matters regarding status of electronic document review and production; receipt and review of court orders concerning outstanding discovery issues and attention to matters regarding preparation of objections thereto; correspondence with Greg Zarin regarding ████████ attention to matters regarding preparation of joint status report | M. KATZ | Partner | 2.20 | 645.00 | 1,419.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798565

App. 0248

Page 7         ANDREWS KURTH LLP        As of February 28, 2013
Invoice No. 10597391
10613 0029223 / 0203709

E:   DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|---|---|---|---|---|---|---|
| | on motion to quash deposition notice of Patrick Boyce; correspondence with Michael Hurst regarding case issues. | | | | | |
| 02/09/13 | Preparation of correspondence to Greg Zarin regarding ▮▮▮▮▮▮ and telephone conference with Greg Zarin regarding same; preparation of outline of issues regarding objecting to orders; correspondence with Michael Hurst regarding Kaplan's orders. | M. KATZ | Partner | 1.30 | 645.00 | 838.50 |
| 02/10/13 | Receive, review, and respond to communications regarding objections to Judge Kaplan. | J.R. REGAS | Associate | 1.50 | 380.00 | 570.00 |
| 02/11/13 | Work on summary of Special Master orders; analyze and develop strategy related to Motion to Quash P. Boyce deposition and removal of Special Master | J.R. REGAS | Associate | 3.20 | 380.00 | 1,216.00 |
| 02/11/13 | Review Daugherty's draft of joint status report regarding Motion to Compel the Boyce deposition; work with I Crosby on preparation of Motion to Withdraw Special Master Appointment; work with J Regas on Objections to Kaplan Orders on Telephone Records, Employment Records; teleconference with Gruber Hurst regarding potential for Motion to Withdraw Special Master Appointment and position on same; teleconference with opposing counsel on same and on effect on Motion to Compel the Boyce deposition; attention to client comments and revisions reflecting same; attention to email from opposing counsel to Kaplan regarding status of Motion to Compel Boyce deposition in light of Motion to Withdraw, and response from Kaplan regarding the same; prepare and send same to G. Zarin. | W.J. MOORE | Associate | 8.10 | 475.00 | 3,847.50 |
| 02/11/13 | Meeting with Jim Dondero, Scott Ellington, Lane Britain, Patrick Boyce, and Greg Zarin regarding ▮▮▮▮▮▮ preparation of request to withdraw appointment of special master; preparation of objections to various orders of special master | M. KATZ | Partner | 3.50 | 645.00 | 2,257.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798566

App. 0249

Page 8                          ANDREWS KURTH LLP                          As of February 28, 2013
                                                                          Invoice No. 10597391
                                                                          10613 0029223 / 0203709

RE:     DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|---|---|---|---|---|---|---|
| | ;correspondence with Daugherty's counsel regarding outstanding discovery issues; review and analysis of ▮ | | | | | |
| 02/11/13 | Compile ▮ and create a notebook for Marc Katz and Highland in preparation for Mr. Katz's meeting with Highland to discuss ▮ revise the index and finalize notebooks for Marc Katz and Highland; upload the recent court filings to the AK p drive; update the pleading index with the recent documents and include a hyperlink to the document on the AK p drive; calculate and calendar the deadline to file Objections to Judge Kaplan's February 8, 2013 Orders. | E. J. THOMPSON | Paralegal | 2.50 | 240.00 | 600.00 |
| 02/11/13 | Participate in telephone conference with Gruber Hurst to discuss ▮ draft and revise per G. Zarin's comments a Request to Withdraw Appointment of the Special Master; telephone conference with G. Zarin to discuss ▮ | I.A. CROSBY | Senior Atty | 4.10 | 425.00 | 1,742.50 |
| 02/11/13 | Finalize research for Special Exceptions to Daugherty's Amended Counterclaims and incorporate research into Special Exceptions addressing ▮ | C.J. ASBY | Associate | 3.50 | 290.00 | 1,015.00 |
| 02/12/13 | Telephone conferences with the clerk regarding hearing on request to withdraw the appointment of the Special Master and finalize notice of hearing on same; exchange emails and drafts with Looper Reed and Gruber Hurst regarding proposed Scheduling Order based on new trial date. | I.A. CROSBY | Senior Atty | 1.10 | 425.00 | 467.50 |
| 02/12/13 | Draft the Notice of Hearing on | E. J. THOMPSON | Paralegal | 0.90 | 240.00 | 216.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

**PLAINTIFFS 0798567**

App. 0250

Page 9                          ANDREWS KURTH LLP                    As of February 28, 2013
                                                                    Invoice No. 10597391
                                                                    10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | Highland's Request to Withdraw the Appointment of the Special Master; electronically file the Notice of Hearing; draft the transmittal letter to Counsel enclosing the Notice of Hearing and serve same via email and fax. | | | | | |
| 02/12/13 | Preparation of objections to recommendations and rulings of Judge Kaplan; correspondence with court regarding hearing on request to withdraw appointment of Kaplan as special master; receipt of correspondence from Daugherty's counsel regarding subpoena in CBRE matter and Daugherty's intended document production and telephone conference with Elliott Schuler regarding same; review and analysis of ▮▮▮▮▮▮ | M. KATZ | Partner | 2.20 | 645.00 | 1,419.00 |
| 02/12/13 | Legal research regarding issues concerning objections to orders issued by Special Master. | J.R. REGAS | Associate | 6.90 | 380.00 | 2,622.00 |
| 02/12/13 | Review subpoena in Hillcrest matter provided by opposing counsel; attention to email correspondence from opposing counsel regarding production of tax documents; attention to email correspondence with Daugherty's counsel regarding intended production; email correspondence with opposing counsel regarding amended scheduling order; review and revise initial draft, and prepare email with additional issues to be addressed. | W.J. MOORE | Associate | 4.10 | 475.00 | 1,947.50 |
| 02/13/13 | Work on briefs in support of objections to orders by Special Master. | J.R. REGAS | Associate | 3.20 | 380.00 | 1,216.00 |
| 02/13/13 | Finalized objections to portions of Kaplan's rulings and recommendations and correspondence with Greg Zarin regarding same; correspondence with Scott Hershman regarding Daugherty's deposition in Dondero divorce proceeding; correspondence with counsel for HERA regarding case status and strategy issues. | M. KATZ | Partner | 2.50 | 645.00 | 1,612.50 |
| 02/13/13 | Begin compiling exhibits to | E. J. THOMPSON | Paralegal | 3.60 | 240.00 | 864.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798568

Page 10                          ANDREWS KURTH LLP                    As of February 28, 2013
                                                                     Invoice No. 10597391
                                                                     10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | Objections to Special Master's Rulings; electronically file Objections to Special Master's Rulings; draft the transmittal letter to the 68th JDC Court Coordinator enclosing portions of Exhibit F to Objections to Special Master's Rulings to be submitted to Judge Hoffman for in camera review and serve same via hand delivery to the Court and via fax to Counsel; draft the transmittal letter to Counsel enclosing Objections to Special Master's Rulings and serve same via certified mail, return receipt requested, to Counsel, and via email to Judge Kaplan and Counsel. | | | | | |
| 02/13/13 | Review and revise Objections to Special Master's Orders; send follow-up email regarding Scheduling Order. | I.A. CROSBY | Senior Atty | 0.90 | 425.00 | 382.50 |
| 02/14/13 | Review attorney notes and discovery requests to identify outstanding issues and prepare proposal regarding same; follow-up with Cornerstone's C. Corrigan regarding discovery proposal. | I.A. CROSBY | Senior Atty | 1.90 | 425.00 | 807.50 |
| 02/14/13 | Telephone conference with Greg Zarin regarding status and strategy; attention to matters regarding Daugherty's document requests to Cornerstone and ▓▓▓▓▓ correspondence with Thomas Surgent regarding ▓▓▓▓▓ attention to matters regarding finalizing agreed scheduling order and attention to matters regarding status of hearing on request to remove Kaplan. | M. KATZ | Partner | 1.00 | 645.00 | 645.00 |
| 02/14/13 | Work on discovery issues and develop search terms related to same; work on transition items with Isabel relating to same; receive, review, and respond to communications regarding HERA discovery responses and agreed scheduling order | J.R. REGAS | Associate | 0.90 | 380.00 | 342.00 |
| 02/14/13 | Work on discovery issues, including status of HERA responses and documentation; | W.J. MOORE | Associate | 2.00 | 475.00 | 950.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798569

ANDREWS KURTH LLP          As of February 28, 2013
Invoice No. 10597391
10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | review and revised proposed search criteria based upon additional discovery dispute resolutions; review amended scheduling order; email correspondence with opposing counsel regarding same and ESI Agreement | | | | | |
| 02/15/13 | Email correspondence with opposing counsel and clients regarding ESI protocol agreement, revise and re-circulate same. | W.J. MOORE | Associate | 2.00 | 475.00 | 950.00 |
| 02/15/13 | Receive, review, and respond to communications regarding revisions to ESI agreement; receive and review written newly served discovery requests from Daugherty | J.R. REGAS | Associate | 0.90 | 380.00 | 342.00 |
| 02/15/13 | Attention to matters regarding agreement on proposed protocol for review and production of electronic documents; receipt and review of Daugherty's second request for production to HERA, Boyce and Britain and third request for production to Highland, Cornerstone, Sierra Verde, and Dondero and attention to matters regarding preparation of objections thereto. | M. KATZ | Partner | 1.50 | 645.00 | 967.50 |
| 02/15/13 | Prepare weekly update to G. Zarin and J. Vanacour; review proposed changes to ESI discovery protocol received from Looper Reed and discuss strategy for production of documents by the Special Master's deadline. | I.A. CROSBY | Senior Atty | 0.50 | 425.00 | 212.50 |
| 02/15/13 | Calculate and calendar the deadline for Plaintiffs' to serve Responses to Daugherty's Third Set of Requests for Production; calculate and calendar the deadline for HERA, Boyce, and Britain to serve Responses to Daugherty's Second Request for Production. | E. J. THOMPSON | Paralegal | 0.20 | 240.00 | 48.00 |
| 02/18/13 | Analyze issues regarding creation of new/clean Summation database which will include ███████ | E. J. THOMPSON | Paralegal | 2.90 | 240.00 | 696.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

**PLAINTIFFS 0798570**

App. 0253

Page 12                                  ANDREWS KURTH LLP                          As of February 28, 2013
                                                                                     Invoice No. 10597391
                                                                                     10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | ▮▮▮▮ contact Platinum IDS to determine ▮▮▮▮ draft the Amended Notice of Hearing on Plaintiff's Request to Withdraw the Appointment of the Special Master; electronically file the Amended Notice of Hearing; draft the transmittal letter to Counsel enclosing the Amended Notice of Hearing and serve same via fax and email. | | | | | |
| 02/18/13 | Review Third Requests for Production, begin making notes regarding responses to same, and forward to G. Zarin, J. Vanacour, and I. Leventon for review; continue second review of Cornerstone documents in preparation for production; review revised ESI protocol to identify changes, if any, necessary for Cornerstone document production; finalize notice of hearing on Motion to Withdraw Appointment of Special Master and send email to G. Zarin, J. Vanacour, and I. Leventon regarding same and ▮▮▮▮ | I.A. CROSBY | Senior Atty | 6.00 | 425.00 | 2,550.00 |
| 02/18/13 | Attention to matters regarding status of document review and document production; attention to matters regarding ▮▮▮▮ attention to matters regarding preparation for deposition of Patrick Daugherty in Dondero divorce proceeding and correspondence with Daugherty's counsel regarding supplemental subpoena duces tecum to Daugherty in divorce proceeding. | M. KATZ | Partner | 2.00 | 645.00 | 1,290.00 |
| 02/18/13 | Review and comment on revisions to ESI Agreement; attention to correspondence regarding amended notice of hearing on motion to withdraw special master appointment; review orders relating to and subpoena served on P Daugherty in connection with deposition in divorce proceeding; | W.J. MOORE | Associate | 2.90 | 475.00 | 1,377.50 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798571

App. 0254

Page 13                          ANDREWS KURTH LLP                    As of February 28, 2013
                                                                     Invoice No. 10597391
                                                                     10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | teleconference with counsel for Daugherty regarding deposition and subpoena request for documents; internal email regarding same. | | | | | |
| 02/18/13 | Analyze and develop litigation strategy; receive, review, and respond to communications regarding revisions to ESI agreement, documents requested in divorce proceedings, and hearing on Motion to Withdraw Appointment of the Special Master | J.R. REGAS | Associate | 0.90 | 380.00 | 342.00 |
| 02/19/13 | Receive, review, and respond to communications regarding deposition of P. Daugherty, pertinent information for document production, and revisions to ESI agreement | J.R. REGAS | Associate | 0.30 | 380.00 | 114.00 |
| 02/19/13 | Conduct final review, privilege analysis, and confidentiality designation analysis of Cornerstone documents in anticipation of producing same; review Third Set of Requests for Production to Cornerstone and prepare email to Cornerstone's C. Corrigan and M. Wallace regarding anticipated responses and document searches to assist in responding to same; follow-up with C. Corrigan regarding proposed resolution to discovery dispute regarding Second Set of Requests for Production. | I.A. CROSBY | Senior Atty | 4.90 | 425.00 | 2,082.50 |
| 02/19/13 | Preparation for deposition of Patrick Daugherty in Dondero's divorce proceeding; correspondence with Greg Zarin regarding status of document review and document production and issues related thereto. | M. KATZ | Partner | 1.50 | 645.00 | 967.50 |
| 02/20/13 | Calculate and calendar deadlines pursuant to the Amended Agreed Scheduling Order entered February 15, 2013; email correspondence with Litigation Support regarding a new/clean database and which records need to be included in the new database. | E. J. THOMPSON | Paralegal | 1.40 | 240.00 | 336.00 |
| 02/20/13 | Draft First Requests for Production from Dondero to Daugherty; begin outlining First Requests for Production from Sierra Verde to Daugherty; | I.A. CROSBY | Senior Atty | 5.40 | 425.00 | 2,295.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798572

App. 0255

Page 14                          ANDREWS KURTH LLP                    As of February 28, 2013
                                                                      Invoice No. 10597391
                                                                      10613 0029223 / 0203709

### RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | exchange emails with I. Leventon regarding document review. | | | | | |
| 02/20/13 | Represent Highland at deposition of P Daugherty in Dondero divorce proceeding. | W.J. MOORE | Associate | 7.50 | 475.00 | 3,562.50 |
| 02/20/13 | Receive, review, and respond to communications from opposing counsel regarding revisions to ESI agreement; receive, review, and respond to communications from I. Leventon regarding internal document review database and additional written discovery | J.R. REGAS | Associate | 0.40 | 380.00 | 152.00 |
| 02/20/13 | Attention to matters regarding court's amended scheduling order and issues regarding discovery deadline; preparation of supplemental document requests to Daugherty; attention to matters regarding document review and responses to Daugherty's document production; attention to matters regarding Daugherty's deposition testimony in Dondero lawsuit. | M. KATZ | Partner | 3.70 | 645.00 | 2,386.50 |
| 02/21/13 | Attention to matters regarding review and analysis of Highland and Cornerstone documents and preparation of initial production of Cornerstone documents; attention to matters regarding ▮▮▮▮▮▮ receipt and review of Daugherty's motion to compel deposition of Patrick Boyce filed with Judge Kaplan and attention to issues with respect thereto. | M. KATZ | Partner | 2.10 | 645.00 | 1,354.50 |
| 02/21/13 | Complete training of Highland's document review database; receive and review documents related to same; receive, review, and respond to communications regarding Motion to Compel Deposition of P. Boyce and ESI agreement; analyze and develop litigation strategy related to same; review and analyze Daugherty's Third Set of Requests for Production | J.R. REGAS | Associate | 1.90 | 380.00 | 722.00 |
| 02/21/13 | Review Motion to Compel Boyce | W.J. MOORE | Associate | 3.20 | 475.00 | 1,520.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

**PLAINTIFFS 0798573**

App. 0256

Page 15                          **ANDREWS KURTH LLP**              As of February 28, 2013
                                                                    Invoice No. 10597391
                                                                    10613 0029223 / 0203709

E:   DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| : | deposition and preparation of response thereto; attention to discovery and document production issues; participate in discovery database training with I Leventon; complete secondary review of portion of documents to be produced. | | | | | |
| 02/21/13 | Coordinate with litigation support regarding production of Cornerstone documents;review Third Set of Requests for Production to Highland, Sierra Verde, and Dondero and prepare email to I. Leventon regarding anticipated responses and document searches to assist in responding to same; telephone conference with I. Leventon regarding use of Highland's database to review documents and protocol for same; begin reviewing documents previously flagged by I. Leventon and G. Zarin for review in anticipation of producing same. | I.A. CROSBY | Senior Atty | 6.50 | 425.00 | 2,762.50 |
| 02/21/13 | Coordinate with Litigation Support regarding a new/clean database and which records need to be included in the new database; coordinate with Litigation Support regarding the Cornerstone production for February 22, 2013; code the responsive Cornerstone documents Confidential in preparation for production. | E. J. THOMPSON | Paralegal | 2.90 | 240.00 | 696.00 |
| 02/22/13 | Attention to matters regarding scheduling continuation of Daugherty's deposition in Dondero divorce proceeding and attention to issues regarding ▇▇▇▇▇▇ attention to matters regarding preparation of preparation of document production to Daugherty and preparation of supplemental document requests to Daugherty; attention to matters regarding preparation of response to Daugherty's motion to compel Boyce deposition and correspondence with Michael Hurst regarding same. | M. KATZ | Partner | 2.50 | 645.00 | 1,612.50 |
| 02/22/13 | Final review and approval of | I.A. CROSBY | Senior Atty | 2.40 | 425.00 | 1,020.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

**PLAINTIFFS 0798574**

App. 0257

Page 16                          ANDREWS KURTH LLP                    As of February 28, 2013
                                                                     Invoice No. 10597391
                                                                     10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | Cornerstone production set; finish review of Highland's initial document production set and flag issues for further review and privilege analysis; prepare weekly status update to G. Zarin and J. Vanacour. | | | | | |
| 02/22/13 | Attention to email correspondence with S Hershman regarding ███████ teleconference and email correspondence with I Crosby regarding issue and potential quality control / secondary review matters with respect to Highland production set; work with I Crosby and litigation support to finalize and produce Cornerstone documents; work on potential response / approach relating to Motion to Compel Boyce Deposition; email correspondence to Gruber Hurst regarding Motion to Compel, and attention to email correspondence from special master regarding same; finalize and circulate ESI agreement to all counsel; teleconference with J Regas regarding discovery issues and next steps | W.J. MOORE | Associate | 4.50 | 475.00 | 2,137.50 |
| 02/22/13 | Receive, review, and respond to communications regarding Motion to Compel Deposition of P. Boyce, production of documents pursuant to Special Master's Order, and drafting of additional discovery requests to Daugherty; analyze and develop litigation strategy related to same | J.R. REGAS | Associate | 1.20 | 380.00 | 456.00 |
| 02/25/13 | Receive, review, and respond to communications regarding Boyce deposition and production of responsive documents | J.R. REGAS | Associate | 0.30 | 380.00 | 114.00 |
| 02/25/13 | Correspondence with S. Hershman regarding ███████ review requests for production to be served on Daugherty; email correspondence with I Leventon regarding status of production set; coordinate pickup of same. | W.J. MOORE | Associate | 1.50 | 475.00 | 712.50 |
| 12/25/13 | Revise and finish drafting Dondero's First Requests for Production to Daugherty; begin | I.A. CROSBY | Senior Atty | 3.00 | 425.00 | 1,275.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798575

App. 0258

Page 17                          ANDREWS KURTH LLP                    As of February 28, 2013
                                                                     Invoice No. 10597391
                                                                     10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | outlining Highland's Third Requests for Production to Daugherty; outline status of current discovery; and begin drafting Sierra Verde's First Requests for Production to Daugherty. | | | | | |
| 02/25/13 | Attention to matters regarding Daugherty's scheduling of hearing on motion to compel deposition of Patrick Boyce; attention to matters regarding preparation for continuation of deposition of Patrick Daugherty in Dondero's divorce proceeding; attention to matters regarding production of documents in response to Daugherty's request for production and telephone conference with Isaac Leventon regarding same; preparation of supplemental document requests to Daugherty. | M. KATZ | Partner | 2.40 | 645.00 | 1,548.00 |
| 02/25/13 | Review the Court's online docket to determine if Daugherty set a hearing on the Motion to Compel the Deposition of Patrick Boyce; calendar the hearing on Daugherty's Motion to Compel the Deposition of Patrick Boyce; calculate and calendar the deadline to file a Response to Daugherty's Motion to Compel the Deposition of Patrick Boyce; update the general document production log with the February 22, 2013 Cornerstone production set; code previous Highland productions in Summation to include ▮▮▮▮ | E. J. THOMPSON | Paralegal | 2.90 | 240.00 | 696.00 |
| 02/26/13 | Review the hard drive received from Highland; coordinate with Litigation Support to verify the load file complies with the ESI Agreement; telephone conference with Will Moore, Brian Chase, and Isaac Leventon to discuss the format and metadata for the Highland production set. | E. J. THOMPSON | Paralegal | 1.50 | 240.00 | 360.00 |
| 02/26/13 | Telephone conference with Isaac Leventon, Jason Vanacour and Greg Zarin regarding ▮▮▮▮ | M. KATZ | Partner | 3.00 | 645.00 | 1,935.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798576

App. 0259

Page 18                          ANDREWS KURTH LLP                  As of February 28, 2013
                                                                    Invoice No. 10597391
                                                                    10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|---|---|---|---|---|---|---|
| | ████████ receipt and review of correspondence from Daugherty's counsel regarding potential motion to compel and motion for contempt with respect to document production; attention to matters regarding document production issues; attention to matters regarding preparation of motion to compel and motion for contempt with respect to Daugherty's refusal to produce documents regarding defamation as per Kaplan's order. | | | | | |
| 02/26/13 | Preparation of electronic production to Daugherty; preparation of motion to compel / contempt and strategy for filings; numerous email exchanges with opposing counsel regarding document production status and issues, and compliance with Judge Kaplan Orders, including review of orders and production. | W.J. MOORE | Associate | 3.50 | 475.00 | 1,662.50 |
| 02/26/13 | Receive, review, and respond to communications from opposing counsel regarding threatened motion to compel documents and Daugherty's failure to produce documents related to employment opportunities as ordered by the Special Master; receive, review, and respond to communications regarding complying with ESI agreement | J.R. REGAS | Associate | 0.80 | 380.00 | 304.00 |
| 02/27/13 | Work on Motion to Compel; review pertinent pleadings related to same; receive, review, and respond to communications regarding production of documents responsive to outstanding discovery requests | J.R. REGAS | Associate | 2.80 | 380.00 | 1,064.00 |
| 02/27/13 | Work with E Thompson on production issues, and email correspondence with Gruber Hurst regarding same; work with J Regas on Motion to Compel relating to employment records, including review of previous email correspondence with opposing counsel on issue | W.J. MOORE | Associate | 1.50 | 475.00 | 712.50 |
| 2/27/13 | Copy the Concordance load file of the Highland production set to a | E. J. THOMPSON | Paralegal | 1.00 | 240.00 | 240.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4608.

PLAINTIFFS 0798577

App. 0260

Page 19                          ANDREWS KURTH LLP                    As of February 28, 2013
                                                                     Invoice No. 10597391
                                                                     10613 0029223 / 0203709

RE:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
|  | flash drive; draft the transmittal letter to Looper Reed enclosing the 16GB flashdrive containing the Concordance load file for PLAINTIFFS 0004050-0070804 and serve same via hand delivery; coordinate with Special Delivery to exchange hard drives with Highland. |  |  |  |  |  |
| 02/27/13 | Attention to matters regarding production of Highland documents; telephone conference with Chris Corrigan regarding scope of Cornerstone documents requested via supplemental document request of Daugherty; preparation of motion for attorneys fees with respect to defamation claim and brief in support; preparation of motion to compel Daugherty's records regarding defamation claim per order of Judge Kaplan. | M. KATZ | Partner | 2.00 | 645.00 | 1,290.00 |
| 02/27/13 | Preparation of Third Set of Requests for production to Daugherty. | C.J. ASBY | Associate | 5.30 | 290.00 | 1,537.00 |
| 02/28/13 | Work with E Thompson regarding production load file issue and email correspondence with I Leventon regarding same; review and revise Motion to Compel and for Attorney Fees; work on discovery issues and drafts | W.J. MOORE | Associate | 2.50 | 475.00 | 1,187.50 |
| 02/28/13 | Draft and revise Motion to Compel employment records and request for attorneys fees; receive, review, and respond to communications regarding concordance file, Daugherty's request for a privilege log, and responsive documents to Daugherty's outstanding discovery requests | J.R. REGAS | Associate | 3.30 | 380.00 | 1,254.00 |
| 02/28/13 | Coordinate with Litigation Support to load Highland's production (PLAINTIFFS 4050-70804) to Summation; copy the Summation load file of the Highland production set to a flash drive; draft the transmittal letter to Gruber Hurst enclosing the 16GB flashdrive containing the Summation load file for PLAINTIFFS 0004050-0070804 and serve same via certified mail, return receipt requested; telephone | E. J. THOMPSON | Paralegal | 1.50 | 240.00 | 360.00 |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798578

App. 0261

Page 20                        ANDREWS KURTH LLP                  As of February 28, 2013
                                                                 Invoice No. 10597391
                                                                 10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

| Date | Services | Name | Position | Hours | Rate | Value |
|------|----------|------|----------|-------|------|-------|
| | call with Jason Rodriguez, IT Manager at Looper Reed, regarding problems with the Concordance load file; conference with Will Moore regarding Looper Reed's problems with the Concordance load file. | | | | | |
| 02/28/13 | Preparation for deposition of Patrick Daugherty per Bank of America subpoena; attention to matters regarding preparation of motion for contempt and to show cause with respect to Daugherty's testimony in Dondero divorce proceeding; preparation of motion for attorneys fees and motion to compel compliance with Judge Kaplan's order with respect to Daugherty's litigation tactics concerning his defamation claim. | M. KATZ | Partner | 2.70 | 645.00 | 1,741.50 |

| | | Hours | Value |
|---|---|---|---|
| Total Services | | 267.20 | $ 122,795.50 |
| Less 15% Discount | | | (18,419.33) |
| Total Current Services | | | $ 104,376.17 |

### Disbursements

| | Value |
|---|---|
| Total for Computer Aided Research - Lexis | 789.67 |
| Total for Computer Aided Research - Westlaw | 544.43 |
| Total for Delivery Expense Outside Vendor | 47.67 |
| Total for Document Services | 25.60 |
| Total for Document Services - Scanning | 13.00 |
| Total for Local Transportation | 6.00 |
| Total for Miscellaneous | -20.00 |
| Total for Postage | 32.55 |
| Total for Professional Svcs | 2,223.63 |
| Total for Secretarial Overtime | 134.32 |
| Total for Telecopy Charges | 60.00 |
| **Total Disbursements** | **$ 3,856.87** |
| **Total Current Services and Disbursements This Matter** | **$ 108,233.04** |

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4806.

PLAINTIFFS 0798579

App. 0262

Page 21                          ANDREWS KURTH LLP                    As of February 28, 2013
                                                                     Invoice No. 10597391
                                                                     10613 0029223 / 0203709

E:    DAUGHERTY, PATRICK

## SUMMARY OF FEES

| Number | Name | Hours | Value |
|--------|------|-------|-------|
| 10613 | KATZ, M. | 56.10 | 36,184.50 |
| 10662 | ASBY, C.J. | 8.80 | 2,552.00 |
| 10820 | MOORE, W.J. | 82.60 | 39,235.00 |
| 10922 | REGAS, J.R. | 30.40 | 11,552.00 |
| 10821 | CROSBY, I.A. | 64.00 | 27,200.00 |
| 09891 | THOMPSON, E. J. | 25.30 | 6,072.00 |
| | | 267.20 | $122,795.50 |

Less 15% Discount                                            $ (18,419.33)
                                                              $ 104,376.17

Payment due upon receipt
To assist in complying with regulations under IRS §274,
additional documentation for overtime meals and travel meals is available upon request.
For Questions or Comments Regarding this Bill, Please Contact the Accounting Department at (713) 220-4606.

PLAINTIFFS 0798580

App. 0263

## Thomas Uebler

| | |
|---|---|
| **From:** | Thomas Surgent <TSurgent@hcmlp.com> |
| **Sent:** | Tuesday, January 15, 2013 11:52 AM |
| **To:** | Paul Lackey (pbl@lhlaw.net); Michael Aigen (mpa@lhlaw.net); Patrick Boyce; Lane Britain; Ted Dameris; Scott Ellington; Katz, Marc (MarcKatz@andrewskurth.com) |
| **Cc:** | Hough, Steven C. |
| **Subject:** | HERA docs for review |
| **Attachments:** | HERA (1st) Amendment (Walia-related) to Second Amended Restated LLC Agreement (00236187-5).doc; HERA (2d) Amendment (indemnification) to Second Amended Restated LLC Agreement (00236453-2).doc; HERA Member Consent (2d) (indemnification) (00236456-2).doc; HERA (3d) Amendment (amendment) to Second Amended Restated LLC Agreement (00236454-2).doc; HERA - Written Consent (3d) Approving Transfer and Amendment Amendment (00236464-2).doc; HERA Member Consent (3d) (transfer and amendment) (00236465-2).doc; PRIVILEGED Offer to Purchase (1-15-2013).docx; HERA Transfer Agreement (00236189-3).doc; HERA - Written Consent Removing Dougherty and Appointing Ellington (00236185-3).doc; HERA - Written Consent Removing Walia and Approving Amendment (00236186-3).doc; HERA - Written Consent Approving Indemnification Amendment (00236462).doc |

**Importance:** High

Attached are revised versions of all the HERA docs for review, which incorporate Delaware counsel comments.  Paul/Michael: I will call you to discuss the form of release contained in the transfer agreement to determine what final tweaks are necessary to cover the issue previously discussed.  Marc: I will call you to explain.

Otherwise the docs should be done other than filling in blanks.

Plan is to get this closed this week, so we need to finalize quickly.

**THOMAS SURGENT | CHIEF COMPLIANCE OFFICER & DEPUTY GENERAL COUNSEL**



HIGHLAND CAPITAL
MANAGEMENT, LP

300 Crescent Court  |  Suite 700 |  Dallas, Texas 75201
Office: 972.419-6205        |        Fax: 972.628.4147
tsurgent@hcmlp.com       |        www.hcmlp.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

1

**EXHIBIT**

**19**

App. 0264

**WRITTEN CONSENT**
**OF BOARD OF DIRECTORS**
**OF**
**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

Effective as of January ___, 2013

THE UNDERSIGNED members of the board of directors (the "*Board*") of Highland Employee Retention Assets LLC, a Delaware limited liability company (the "*Company*"), acting pursuant to the Delaware Limited Liability Company Act and the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the "*Company Agreement*"), as amended, do hereby adopt the following resolutions by written consent:

WHEREAS, the Company desires to amend Sections 5.1 and 5.2 of the Company Agreement in the form previously reviewed by the undersigned (the "*Amendment*");

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the affirmative vote or written consent of at least 75% of the members of the Board is required in order to amend, alter, change or repeal any of the provisions of the Company Agreement;

WHEREAS, pursuant to Article IX of the Company Agreement, the prior written consent of the Board is required to assign Series A Preferred Units of the Company;

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the Company adopting the Amendment;

WHEREAS, the holders of a majority-in-interest of the Company's Series A Preferred Units have accepted [BUYER'S] Offer to Purchase dated [January ___, 2013] (the "*Offer*");

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the assignment of Series A Preferred Units of the Company to [BUYER] pursuant to the Offer to Purchase dated [January ___, 2013] (the "*Assignment*").

NOW, THEREFORE, BE IT

RESOLVED, that, subject to and conditioned upon a majority-in-interest of the Company's Series A Preferred Units having consented to and ratified the Amendment and having accepted the Offer, the Board approves the proposed Amendment;

RESOLVED FURTHER, that, subject to and conditioned upon a majority-in-interest of the Company's Series A Preferred Units having consented to and ratified the Assignment and having accepted the Offer, the Board approves the Assignment;

RESOLVED FURTHER, that the Company's directors be, and they hereby are, authorized, empowered and directed for, in the Company's name and behalf, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other

{A&B-00236464-}

App. 0265

agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions; and that all acts and deeds of the directors and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the Company's acts and deeds;

RESOLVED FURTHER, that this authorization shall remain in effect until further written notice from the Company.

*[Signature Page to Follow]*

2

App. 0266

IN WITNESS WHEREOF, the undersigned have executed this Consent to be effective as of the date first set forth above.

**<u>DIRECTORS</u>:**

_____
Patrick Boyce

_____
John Honis

_____
William L. Britain

_____
Ted Dameris

_____
Scott Ellington

**WRITTEN CONSENT
OF BOARD OF DIRECTORS
OF
HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

Effective as of January __, 2013

THE UNDERSIGNED members of the board of directors (the "*Board*") of Highland Employee Retention Assets LLC, a Delaware limited liability company (the "*Company*"), acting pursuant to the Delaware Limited Liability Company Act and the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the "*Company Agreement*"), as amended, do hereby adopt the following resolutions by written consent:

WHEREAS, the Company desires to amend Article VIII of the Company Agreement in the form previously reviewed by the undersigned (the "*Amendment*");

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the affirmative vote or written consent of at least 75% of the members of the Board is required in order to amend, alter, change or repeal any of the provisions of the Company Agreement;

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the Company adopting the Amendment.

NOW, THEREFORE, BE IT

RESOLVED, that, subject to and conditioned upon a majority-in-interest of the Company's Series A Preferred Units having consented to and ratified the Amendment, the Board approves the proposed Amendment;

RESOLVED FURTHER, that the Company's directors be, and they hereby are, authorized, empowered and directed for, in the Company's name and behalf, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions; and that all acts and deeds of the directors and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the Company's acts and deeds;

RESOLVED FURTHER, that this authorization shall remain in effect until further written notice from the Company.

*[Signature Page to Follow]*

{A&B-00236462-}

App. 0268

IN WITNESS WHEREOF, the undersigned have executed this Consent to be effective as of the date first set forth above.

**DIRECTORS:**

_____
Patrick Boyce


_____
John Honis


_____
William L. Britain


_____
Ted Dameris


_____
Scott Ellington

{A&B-00236462-}

App. 0269

A&B Comments on DRAFT: 1/9/13

## WRITTEN CONSENT
## OF BOARD OF DIRECTORS
## OF
## HIGHLAND EMPLOYEE RETENTION ASSETS LLC

Effective as of January __, 2013

THE UNDERSIGNED members of the board of directors (the *"Board"*) of Highland Employee Retention Assets LLC, a Delaware limited liability company (the *"Company"*), acting pursuant to the Delaware Limited Liability Company Act and the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the *"Company Agreement"*), do hereby adopt the following resolutions by written consent:

WHEREAS, Mr. R. Joseph Dougherty has resigned as a member of the Board of the Company and the Company now desires to accept his resignation;

WHEREAS, the Company desires to appoint Mr. Scott Ellington to serve on the Board to fill such vacancy;

WHEREAS, Mr. Ellington is a holder of Series A Preferred Units of the Company and is willing to serve on the Board;

NOW, THEREFORE, BE IT

RESOLVED, that the Company hereby accepts Mr. Dougherty's resignation from the Board to be effective immediately;

RESOLVED FURTHER, that the Company hereby approves the appointment of Mr. Ellington to the Board to serve as a director of the Company;

RESOLVED FURTHER, that the Company's directors be, and they hereby are, authorized, empowered and directed for, in the Company's name and behalf, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions; and that all acts and deeds of the directors and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the Company's acts and deeds;

RESOLVED FURTHER, that this authorization shall remain in effect until further written notice from the Company.

*[Signature Page to Follow]*

{A&B-00236185-}

App. 0270

IN WITNESS WHEREOF, the undersigned have executed this Consent to be effective as of the date first set forth above.

**DIRECTORS:**

_____
Patrick Boyce

_____
John Honis

_____
William L. Britain

_____
Ted Dameris

_____
Amit Walia

{A&B-00236185-}

App. 0271

A&B Comments on DRAFT 1/09/13

**WRITTEN CONSENT
OF BOARD OF DIRECTORS
OF
HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

Effective as of January __, 2013

THE UNDERSIGNED members of the board of directors (the "*Board*") of Highland Employee Retention Assets LLC, a Delaware limited liability company (the "*Company*"), acting pursuant to the Delaware Limited Liability Company Act and the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the "*Company Agreement*"), do hereby adopt the following resolutions by written consent:

WHEREAS, the Company desires to remove Mr. Amit Walia from the Board of the Company;

WHEREAS, the Company desires to amend Section 5.1 of the Company Agreement in the form previously reviewed by the undersigned (the "*Amendment*"); and

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the affirmative vote or written consent of at least 75% of the members of the Board is required in order to amend, alter, change or repeal any of the provisions of the Company Agreement.

NOW, THEREFORE, BE IT

RESOLVED, that the remaining members of the Board unanimously approve the removal of, and hereby remove, Mr. Walia from the Board to be effective immediately;

RESOLVED FURTHER, that the remaining members of the Board unanimously approve the proposed Amendment;

RESOLVED FURTHER, that the Company's directors be, and they hereby are, authorized, empowered and directed for, in the Company's name and behalf, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions; and that all acts and deeds of the directors and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the Company's acts and deeds;

RESOLVED FURTHER, that this authorization shall remain in effect until further written notice from the Company.

*[Signature Page to Follow]*

{A&B-00236186-}

App. 0272

IN WITNESS WHEREOF, the undersigned have executed this Consent to be effective as of the date first set forth above.

**<u>DIRECTORS</u>:**

_____
Patrick Boyce

_____
John Honis

_____
William L. Britain

_____
Ted Dameris

_____
Scott Ellington

{A&B-00236186-}

App. 0273

A&B Comments 1/14/13 on DRAFT 1/09/13

**AMENDMENT
TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THIS AMENDMENT (this *"Amendment"*) to the Second Amended and Restated Limited Liability Company Agreement of HIGHLAND EMPLOYEE RETENTION ASSETS LLC (the *"Company"*) dated as of February 16, 2012 (the *"Company Agreement"*) is entered into as of January __, 2013 (the *"Effective Date"*) by and among the members of the board of directors of the Company (the *"Board"*). All capitalized terms used but not defined in this Amendment and defined in the Company Agreement shall have the meanings ascribed to them in the Company Agreement.

WHEREAS, the Company desires to amend Section 5.1 of the Company Agreement;

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the Company requires the affirmative vote or written consent of at least 75% of the members of the Board in order to amend, alter, change or repeal any of the provisions of the Company Agreement.

NOW, THEREFORE, the Company amends the Company Agreement as follows as of the Effective Date:

1.      Section 5.1 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.1    General. The Company shall be managed by a Board of Directors (the *"Board"*), which shall at all times consist of five members, consisting of the following individuals:

> Patrick Boyce
> John Honis
> William L. Britain
> Ted Dameris
> Scott Ellington

The Board shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company. The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement. Each member of the Board shall serve until such member shall cease to hold Series A Preferred Units or until such member's death, resignation or removal from the Board by the unanimous affirmative vote of the remaining Board members. Any vacancies on the Board shall be filled by holder(s) of Series A Preferred Units elected by a majority of the

{A&B-00236187-}

App. 0274

remaining members of the Board, or if no such majority decision can be reached, by the holder(s) of the greatest number of Series A Preferred Units who are not then currently a member of the Board and who are willing to serve on the Board, or if no Series A Preferred Units remain outstanding, as determined by a majority of the remaining members of the Board.

2.      This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original, facsimile or scanned signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed document. All such fully executed original, facsimile or scanned counterparts will collectively constitute a single document.

3.      Except as modified hereby, the Company Agreement shall remain in full effect and the Amendment shall be binding upon the Company and its successors and assigns. If any inconsistency exists or arises between the terms of the Amendment and the terms of the Company Agreement, the Amendment shall prevail.

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first set forth above.

**DIRECTORS**:

_____
Patrick Boyce

_____
John Honis

_____
William L. Britain

_____
Ted Dameris

_____
Scott Ellington

{A&B-00236187-}

App. 0276

A&B Comments 1/14/13 on DRAFT 1/09/13

**SECOND AMENDMENT
TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THIS SECOND AMENDMENT (this *"Amendment"*) to the Second Amended and Restated Limited Liability Company Agreement of HIGHLAND EMPLOYEE RETENTION ASSETS LLC (the *"Company"*) dated as of February 16, 2012 (the *"Company Agreement"*), as amended, is entered into as of January __, 2013 (the *"Effective Date"*) by and among the members of the board of directors of the Company (the *"Board"*). All capitalized terms used but not defined in this Amendment and defined in the Company Agreement shall have the meanings ascribed to them in the Company Agreement.

WHEREAS, the Company desires to amend Article VIII of the Company Agreement;

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the Company requires the affirmative vote or written consent of at least 75% of the members of the Board in order to amend, alter, change or repeal any of the provisions of the Company Agreement;

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the Company adopting the within Amendment.

NOW, THEREFORE, the Company amends the Company Agreement as follows as of the Effective Date:

1.      Article VIII of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

ARTICLE VIII

INDEMNIFICATION

Section 8.1     Indemnification and Liability.   (a) To the maximum extent permitted by applicable law, no current or future member of the Board, no current or future officer of the Company nor the Initial Member (each an "Indemnitee") shall be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, (iii) for breach of fiduciary duty owed to the Company and/or its members or (iv) for losses due to any such mistake, action or inaction, or breach of fiduciary duty.

(b)     To the fullest extent permitted by applicable law as the same exists or may hereafter be amended, the Company shall indemnify and hold harmless, and advance expenses including attorneys' fees, to an Indemnitee against all liabilities and claims against each such person arising from such person's performance of his duties in conformance with the terms of this Agreement. Notwithstanding the preceding sentence, the Company shall be required to indemnify, or advance expenses to, an Indemnitee in

{A&B-00236453-}

connection with a proceeding (or part thereof) commenced by such Indemnitee only if the commencement of such proceeding (or part thereof) by the Indemnitee was authorized by the Board.

(c)     An Indemnitee may consult with legal counsel or accountants selected by the Board and/or the Initial Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

(d)     The rights conferred upon Indemnitees in this Article VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a member of the Board, an officer of the Company or the Initial Member and shall inure to the benefit of the Indemnitee's heirs, executors, administrators and successors. Any amendment, alteration or repeal of this Article VIII that adversely affects any right of an Indemnitee or its successors shall be prospective only and shall not limit or eliminate any such right with respect to any liability or claim involving any occurrence or any alleged occurrence of any action or omission that took place prior to such amendment or repeal.

2.     This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original, facsimile or scanned signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed document. All such fully executed original, facsimile or scanned counterparts will collectively constitute a single document.

3.     Except as modified hereby, the Company Agreement shall remain in full effect and the Amendment shall be binding upon the Company and its successors and assigns. If any inconsistency exists or arises between the terms of the Amendment and the terms of the Company Agreement, the Amendment shall prevail.

*[Signature page follows]*

{A&B-00236187-}                                        2

App. 0278

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first set forth above.

**DIRECTORS**:

_____
Patrick Boyce

_____
John Honis

_____
William L. Britain

_____
Ted Dameris

_____
Scott Ellington

{A&B-00236453-}

App. 0279

**THIRD AMENDMENT
TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THIS THIRD AMENDMENT (this "*Amendment*") to the Second Amended and Restated Limited Liability Company Agreement of HIGHLAND EMPLOYEE RETENTION ASSETS LLC (the "*Company*") dated as of February 16, 2012 (the "*Company Agreement*"), as amended, is entered into as of January __, 2013 (the "*Effective Date*") by and among the members of the board of directors of the Company (the "*Board*"). All capitalized terms used but not defined in this Amendment and defined in the Company Agreement shall have the meanings ascribed to them in the Company Agreement.

WHEREAS, the Company desires to amend Sections 5.1 and 5.2 of the Company Agreement;

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the Company requires the affirmative vote or written consent of at least 75% of the members of the Board in order to amend, alter, change or repeal any of the provisions of the Company Agreement;

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the Company adopting the within Amendment;

WHEREAS, the holders of a majority-in-interest of the Company's Series A Preferred Units have accepted [BUYER'S] Offer to Purchase dated [January ___, 2013].

NOW, THEREFORE, the Company amends the Company Agreement as follows as of the Effective Date:

1.     Section 5.1 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.1    General.  The Company shall be managed by a Board of Directors (the "*Board*"), which shall at all times consist of five members, consisting of the following individuals:

Patrick Boyce
John Honis
William L. Britain
Ted Dameris
Scott Ellington

The Board shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to

{A&B-00236454-}

App. 0280

bind the Company. The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement. Each member of the Board shall serve until such member's death, resignation or removal from the Board by the unanimous affirmative vote of the remaining Board members. Any vacancies on the Board shall be filled by majority vote of the remaining members of the Board, or if no such majority decision can be reached, as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

2.    Section 5.2 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.2    Delegation of Powers of the Board. (a) Subject to Sections 5.2(b) and 5.2(c) and ARTICLE XI hereof, the Board shall have the exclusive and complete authority, acting without the consent or approval of, or notice to, the Member and in the Board's sole and absolute discretion, to operate the Company and its business and to make all determinations or elections or to consent to any matter otherwise described in this Agreement. Neither the Member nor any other unitholder shall have the authority to remove any member of the Board.

(b)    Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company shall not, and shall not have power or authority and shall not be authorized to, and the Board shall not, and shall not have power or authority and shall not be authorized to cause the Company to, take any of the following actions without the prior affirmative vote or written consent of at least 75% of the members of the Board:

(i)    dissolve, wind-up or liquidate, in whole or in part, or cause or consent to the dissolution, winding up or liquidation, in whole or in part, of the Company;

(ii)    be a party to any merger or consolidation or sell, transfer, assign, convey or lease any asset of the Company, or cause or consent to any merger or consolidation or sale, transfer, assignment, conveyance or lease of any assets of the Company;

(iii)    directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity, or cause the Company to directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity;

(iv)    incur or assume any indebtedness or obligations except for liabilities under Section 3.3, or cause the Company, to incur or assume any indebtedness or obligations except for liabilities under Section 3.3; or

{A&B-00236187-}    2

App. 0281

(v)    take any Bankruptcy Action with respect to the Company, or take, cause or consent to any Bankruptcy Action with respect to the Company.

(c)    Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company may amend, alter, change or repeal any of the provisions of this Agreement (including, without limitation, the last sentence of Section 5.2(a) hereof) only upon either the prior affirmative vote or written consent of at least 75% of the members of the Board or as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

3.    This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original, facsimile or scanned signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed document. All such fully executed original, facsimile or scanned counterparts will collectively constitute a single document.

4.    Except as modified hereby, the Company Agreement shall remain in full effect and the Amendment shall be binding upon the Company and its successors and assigns. If any inconsistency exists or arises between the terms of the Amendment and the terms of the Company Agreement, the Amendment shall prevail.

*[Signature page follows]*

{A&B-00236187-}    3

App. 0282

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first set forth above.

**<u>DIRECTORS</u>:**

_____

Patrick Boyce

_____

John Honis

_____

William L. Britain

_____

Ted Dameris

_____

Scott Ellington

**WRITTEN CONSENT**
**OF HOLDER OF SERIES A PREFERRED UNITS**
**OF**
**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THE UNDERSIGNED holder of Series A Preferred Units of Highland Employee Retention Assets LLC hereby consents to and ratifies the below amendment to the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the "*Company Agreement*"), as amended:

Article VIII of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

ARTICLE VIII

INDEMNIFICATION

Section 8.1    Indemnification and Liability.    (a) To the maximum extent permitted by applicable law, no current or future member of the Board, no current or future officer of the Company nor the Initial Member (each an "Indemnitee") shall be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, (iii) for breach of fiduciary duty owed to the Company and/or its members or (iv) for losses due to any such mistake, action or inaction, or breach of fiduciary duty.

(b)    To the fullest extent permitted by applicable law as the same exists or may hereafter be amended, the Company shall indemnify and hold harmless, and advance expenses including attorneys' fees, to an Indemnitee against all liabilities and claims against each such person arising from such person's performance of his duties in conformance with the terms of this Agreement. Notwithstanding the preceding sentence, the Company shall be required to indemnify, or advance expenses to, an Indemnitee in connection with a proceeding (or part thereof) commenced by such Indemnitee only if the commencement of such proceeding (or part thereof) by the Indemnitee was authorized by the Board.

(c)    An Indemnitee may consult with legal counsel or accountants selected by the Board and/or the Initial Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

{A&B-00236456-}

App. 0284

(d)    The rights conferred upon Indemnitees in this Article VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a member of the Board, an officer of the Company or the Initial Member and shall inure to the benefit of the Indemnitee's heirs, executors, administrators and successors. Any amendment, alteration or repeal of this Article VIII that adversely affects any right of an Indemnitee or its successors shall be prospective only and shall not limit or eliminate any such right with respect to any liability or claim involving any occurrence or any alleged occurrence of any action or omission that took place prior to such amendment or repeal.

IN WITNESS WHEREOF, the undersigned has executed this Consent to be effective as of the date set forth below.

HOLDER OF SERIES A PREFERRED UNITS:

Name:_____

By:_____

Number of Series A Preferred Units Held:_____

Dated:_____

{A&B-00236456-}

App. 0285

**WRITTEN CONSENT**
**OF HOLDER OF SERIES A PREFERRED UNITS**
**OF**
**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THE UNDERSIGNED holder of Series A Preferred Units of Highland Employee Retention Assets LLC hereby consents to and ratifies the below amendment to the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the "*Company Agreement*"), as amended:

Section 5.1 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.1    General.  The Company shall be managed by a Board of Directors (the "*Board*"), which shall at all times consist of five members, consisting of the following individuals:

> Patrick Boyce
> John Honis
> William L. Britain
> Ted Dameris
> Scott Ellington

The Board shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company.  The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement.  Each member of the Board shall serve until such member's death, resignation or removal from the Board by the unanimous affirmative vote of the remaining Board members.  Any vacancies on the Board shall be filled by majority vote of the remaining members of the Board, or if no such majority decision can be reached, as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

Section 5.2 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.2    Delegation of Powers of the Board. (a) Subject to Sections 5.2(b) and 5.2(c) and ARTICLE XI hereof, the Board shall have the exclusive and complete authority, acting without the consent or approval of, or notice to, the Member and in

{A&B-00236465-}

App. 0286

the Board's sole and absolute discretion, to operate the Company and its business and to make all determinations or elections or to consent to any matter otherwise described in this Agreement. Neither the Member nor any other unitholder shall have the authority to remove any member of the Board.

(b)    Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company shall not, and shall not have power or authority and shall not be authorized to, and the Board shall not, and shall not have power or authority and shall not be authorized to cause the Company to, take any of the following actions without the prior affirmative vote or written consent of at least 75% of the members of the Board:

(i)    dissolve, wind-up or liquidate, in whole or in part, or cause or consent to the dissolution, winding up or liquidation, in whole or in part, of the Company;

(ii)    be a party to any merger or consolidation or sell, transfer, assign, convey or lease any asset of the Company, or cause or consent to any merger or consolidation or sale, transfer, assignment, conveyance or lease of any assets of the Company;

(iii)    directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity, or cause the Company to directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity;

(iv)    incur or assume any indebtedness or obligations except for liabilities under Section 3.3, or cause the Company, to incur or assume any indebtedness or obligations except for liabilities under Section 3.3; or

(v)    take any Bankruptcy Action with respect to the Company, or take, cause or consent to any Bankruptcy Action with respect to the Company.

(c)    Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the

{A&B-00236465-}

Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company may amend, alter, change or repeal any of the provisions of this Agreement (including, without limitation, the last sentence of Section 5.2(a) hereof) only upon either the prior affirmative vote or written consent of at least 75% of the members of the Board or as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

THE UNDERSIGNED further consents to and ratifies the Board's approval of the assignment of Series A Preferred Units of the Company to [BUYER] pursuant to the Offer to Purchase dated [January ___, 2013].

IN WITNESS WHEREOF, the undersigned has executed this Consent to be effective as of the date set forth below.

<u>HOLDER OF SERIES A PREFERRED UNITS:</u>

Name:_____

By:_____

Number of Series A Preferred Units Held:_____

Dated:_____

{A&B-00236465-}

App. 0288

## TRANSFER AGREEMENT

This Transfer Agreement (this *"Agreement"*) is entered into by and among _____ (*"Seller"*) and _____ (*"Purchaser"*). Each of Seller and Purchaser are individually referred to as a *"Party"* and together, collectively referred to as the *"Parties."*

WHEREAS, Seller holds _____ units of the Series A Preferred Units of Highland Employee Retention Assets LLC, a Delaware limited liability company (*"HERA"*) (the *"Interests"*); and

WHEREAS, Seller desires to transfer the Interests and all of its rights, claims and interests related to or arising from the Interests and settle and release any and all claims that Seller may have with respect to HERA, the Interests, the Board Members of HERA, the Purchaser, Highland Capital Management, L.P. and its affiliates.

NOW, THEREFORE AND IN CONSIDERATION of the mutual covenants contained herein, and other good and valuable consideration, the parties intending to be legally bound hereby agree as follows:

1.      Transfer of Interests.  Subject to the terms and conditions set forth in this Agreement, Seller hereby sells, transfers, assigns, sets over and otherwise conveys to Purchaser, and Purchaser hereby purchases and takes from Seller, all right, title and interest (whether now owned or hereafter acquired or arising and wherever located) of Seller in, to and under the Interests.

2.      Payment.  The purchase price for the Interests purchased hereby (the *"Payment Amount"*) is $_____.

3.      Representations and Warranties of Seller.  Seller hereby represents and warrants as follows:

(a)     It has all requisite power, authority and capacity, corporate, limited partnership or otherwise, to execute, deliver and perform under this Agreement. Its execution, delivery and performance of this Agreement have been duly authorized by all necessary action. This Agreement has been duly executed and delivered by Seller. This Agreement is a legal, valid and binding agreement of such party, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer or conveyance or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity.

(b)     Seller's Interests are owned of record and beneficially by Seller, free and clear of any obligation, lien, claim, pledge, security interest, liability, charge, contingency or other encumbrance or claim of any nature. Seller has not assigned, pledged or otherwise in any manner whatsoever sold or transferred either by instrument in writing or otherwise, any right, title, interest or claim which it has or may have in HERA or the Interests or any matters arising out of, related thereto, or in connection therewith.

{A&B-00236189-}

App. 0289

(c)    Seller has had access to all information as it deems necessary and appropriate in connection with its decision to enter into this Agreement, including, without limitation, that Seller is aware of the terms of the Second Amended and Restated Operating Agreement of the Company dated February 16, 2012 (as amended, the "*Operating Agreement*"), including Article XII thereof, and the amendment to the Operating Agreement being effected in connection with the tender of at least a majority-in-interest of the Series A Preferred Units of HERA in the Offer, which permits the HERA Member(s) holding a majority-in-interest of the Series A Preferred Units to amend, alter, change or repeal any of the provisions (except Article VIII) of the HERA Operating Agreement. Seller hereby consents to and ratifies this amendment and the Operating Agreement as so amended by the Board and the Board's approval of the assignment of Series A Preferred Units of the Company to Buyer pursuant to the Offer. Seller believes that the Payment Amount, as set forth above and calculated under the terms of the Offer, including application of the Adjustment Amount as determined in Purchaser's sole discretion, is a fair value for the Interests and the sale of the Interests and the Payment Amount is not based on anything other than the fair value of the Interests.

(d)    None of HERA or any of its Board members or any of their respective affiliates has recommended or induced Seller to enter into this Agreement.

4.    <u>Representations and Warranties of Purchaser</u>. Purchaser hereby represents and warrants as follows:

Purchaser has all requisite power, authority and capacity, corporate, individual or otherwise, to execute, deliver and perform under this Agreement. The execution, delivery and performance by Purchaser of this Agreement have been duly authorized by all necessary action. This Agreement has been duly executed and delivered by Purchaser. This Agreement is a legal, valid and binding agreement of Purchaser, enforceable against each in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer or conveyance or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity. Purchaser has had access to all information as it deems necessary and appropriate in connection with its decision to enter into this Agreement. None of HERA or any of its Board members or any of their respective affiliates has recommended or induced Purchaser to enter into this Agreement.

5.    <u>Waiver and Release</u>. Seller does hereby and for its predecessors, successors, assigns and affiliates and for all other persons or entities claiming by, through or under any of them, hereby fully, irrevocably and forever RELEASE, ACQUIT AND FOREVER DISCHARGE Purchaser, HERA, Highland Capital Management, L.P., James Dondero and their respective predecessors, successors, assigns, affiliates, subsidiaries, and all their respective past, present and future officers, directors, board members, managers, partners, attorneys, agents, representatives and employees (collectively, the "*Released Parties*"), of and from any and all claims, liabilities, actions, causes of action, demands, rights,

damages, costs, loss of service, expense and compensation whatsoever, both individually and in their official capacities, from the beginning of time through the date of this Agreement, related to, or arising from, any matter whatsoever, whether or not related to HERA, whether or not in contract, in equity, in tort or otherwise, whether pursuant to any rule, regulation, law or otherwise, whether direct or indirect, whether known or unknown, and whether fixed, accrued, contingent or otherwise, which Seller ever had, now have or may hereafter have. Seller acknowledges that his waiver and release herein includes any claims, disputes, obligations, rights, damages, injury, or causes of action which may arise out of facts existing or actions taken by the Released Parties as of the date of this Agreement but which are as yet unknown and which may not be known until some period in the future.

6.    Covenant Not to Sue. Seller covenants and agrees that it will not again raise, participate in, assist, or in any way pursue any claims which are being released and discharged in this Agreement in any forum of any kind, including, without limitation, the federal, state or local courts, or federal, state or local agencies or offices of any kind, be they administrative, regulatory, judicial, quasi-judicial, or otherwise.

7.    Cooperation. Seller acknowledges and agrees to cooperate with Purchaser and HERA in the event of any future litigation, including any litigation related to HERA. This cooperation includes, but is not limited to, providing background information related to any litigation and Seller's role in the facts underlying the litigation, providing deposition and trial testimony, assisting counsel in preparing for trial, attending depositions and trial, and any other work that Purchaser and HERA reasonably request related to litigation. Additionally, Purchaser agrees not to cooperate with any parties adverse to Purchaser or HERA in any litigation, including any litigation related to HERA.

8.    Non-Disparagement. Seller agrees to take no action which is intended, or would reasonably be expected, to harm any of the Released Parties or their reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity to any of them. Seller agrees that he will not disparage or comment negatively with respect to any of the Released Parties.

9.    Confidentiality. Except for the disclosure required under Section 11 below, Seller covenants and agrees that the terms and conditions of this Agreement are to be held strictly confidential by him and not revealed to any other person or entity, unless in response to the lawful process of any judicial or governmental authority or as otherwise required by law, with the exception of his attorneys, auditors, other professional advisors, insurers and parent company affiliates who need to know the information and who have been advised of the confidential nature of such information and have agreed to hold such information confidential.

10.    Freedom of Choice. Each signatory to this Agreement agrees it has been entered into freely and without duress after having consulted with the attorneys and/or professionals of his/her choice. This Agreement, or any portion thereof, shall not be construed against the Party who initially prepared it, but shall be construed as if all Parties jointly prepared each and every part thereof, and any uncertainty or ambiguity shall not be interpreted to the detriment of any Party on such basis.

11.    Miscellaneous. The Parties acknowledge that they had the opportunity to be represented by counsel, and fully understand their rights and obligations under the Agreement. The Parties

{A&B-00236189-}                                    3

App. 0291

acknowledge and agree that each of HERA and the other parties and persons released herein are intended third party beneficiaries of this Agreement, and agree to deliver to HERA a copy of this Agreement promptly following the execution thereof. Further, the Parties declare they have completely read this Agreement, and they enter into the Agreement freely, voluntarily and without coercion or duress. Seller understands that Purchaser is relying upon the representations made by Seller in this Agreement, and Seller knowingly waives (i) any claim that this settlement was induced by any misrepresentation or nondisclosure, and (ii) any right to rescind or avoid this settlement based upon presently existing facts, known or unknown.

12.     Applicable Law. Subject to Section 18, it is also understood and agreed that this Agreement shall be governed by and construed in accordance with Delaware law, without regard to its conflict of laws rules. Subject to Section 18, the Parties irrevocably consent to and agree to submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware (and if the Court of Chancery of the State of Delaware is unavailable, any state court or federal court sitting in Delaware) over any and all disputes among the Parties hereto, whether at law or in equity, based upon, arising out of or relating to this Agreement or the facts and circumstances leading to its execution and delivery, whether in contract, tort or otherwise. Subject to Section 18, the Parties agree that process may be served upon them in any manner authorized by the laws of the State of Delaware and hereby waive, and agree not to assert in any such dispute, any claim that (a) such Party is not subject to the personal jurisdiction of such courts, (b) such Party and its property is immune from any legal process issued by such courts or (c) any litigation commenced in such courts is brought in an inconvenient forum.

13.     Severability. In case any provision of this Agreement shall be held invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

14.     No Admission of Liability. By entering into this Agreement, the Parties do not admit any liability on the part of any Party. In fact, the Parties explicitly and expressly deny any and all liability whatsoever from any and all claims, demands, damages, actions, causes of action, or suits of any kind or nature arising out of HERA and the Interests.

15.     Modification of Agreement. It is expressly understood and agreed that this Agreement may not be altered, amended, waived, modified, or otherwise changed in any respect or particular whatsoever, except in writing, which writing must be signed by authorized representatives of each Party. The Parties further acknowledge and agree that they will make no claims at any time or place that this Agreement has been orally supplemented, modified, or altered in any respect whatsoever.

16.     Further Assurances. Seller agrees that from time to time, it will promptly execute and deliver all further instruments and documents, and take any and all further action, that may be necessary or appropriate, or that Purchaser may reasonably request, in order to collect upon, perfect, protect or more fully evidence the Interests purchased hereunder, or otherwise to enable Purchaser to exercise and enforce any of its rights and remedies related to the Interests.

17.     Execution of Agreement. It is understood and agreed that this Agreement may be executed in any number of identical counterparts, each of which shall be deemed original for all purposes.

{A&B-00236189-}                                4

App. 0292

18.    Arbitration.  In the event there is an unresolved legal dispute between the parties and/or any of their respective Released Parties that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that a party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.  The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award.  The arbitrators shall be duly licensed to practice law in the State of Delaware.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Rules of the Court of Chancery of the State of Delaware; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Rules of the Court of Chancery of the State of Delaware.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  The arbitrators will not have the authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules.  The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Wilmington, Delaware, or another mutually agreeable site.  Each party shall bear its own attorney's fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on the date appearing next to each Party's signature and this Agreement shall be effective on the date the last signature has been signed upon this Agreement.

SELLER:

_____

Name:

Dated:_____

PURCHASER:

[_____]

By:_____
Name:
Title:

Date:_____

App. 0294

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

## Offer to Purchase
## Statement
January ___, 2013

To the holders (each a "Seller") of Series A Preferred Units of Highland Employee Retention
Assets, LLC ("*HERA*"):

_____ ("*Purchaser*") invites you, on the terms and subject to the
conditions set forth in this Offer to Purchase, which we refer to herein as this "Statement," to sell
all of your Series A Preferred Units of HERA ("*Interests*"), which we refer to herein as the
"*Offer*".

Interests tendered for purchase will be purchased, on the terms and subject to the conditions set
forth in this Statement for a cash purchase price determined as follows:

- ____% of the [December 31, 2012] estimated value of your Interests as reflected on the
  statement previously provided to Seller by HERA (the "*Unadjusted Purchase Price*"),
  LESS

- the Adjustment Amount, if any.

As used herein the "*Adjustment Amount*" shall be equal to the total of the full costs and
expenses (including costs and expenses of legal counsel) of HERA or any of its members,
officers, directors, agents, representatives, or equity holders (each, a "HERA Party"), plus any
diminution in value of HERA's assets, incurred in connection with any litigation, dispute, or
claim commenced by any Seller (or any action taken by Seller that results in any third party
making a claim) against a HERA Party or that does or could impact adversely any of HERA's
assets, or Seller's disclosure of matters and information regarding HERA and its assets (except
as required by law or directed and authorized in writing by HERA), all of the foregoing to be
determined in Purchaser's sole discretion.

**The Offer is subject to a minimum tender condition, which we may elect to waive as
discussed in Section 5 of "Description of the Offer". Additionally, we reserve the right, in
our sole discretion, to amend the terms of the Offer.**

**To tender your Interests pursuant to the Offer you must follow the procedures described in
this Statement.**

**We have not authorized any person to make any recommendation on our behalf as to
whether you should tender or refrain from tendering your Interests in the Offer. We have
not authorized any person to give any information or to make any representation on our
behalf in connection with the Offer other than those contained in this Offer or in the
related Transfer Agreement. If given or made, any recommendation, information or
representation must not be relied upon as having been authorized by us.**

> **Commented [A1]:** Consider clarifying what statement is being referred to (date? title?).

> **Commented [A2]:** We should restate Article XII's key provisions in the Offer instead of cross-referencing the Operating Agreement because Article XII requires the consent of 75% of the Board and contemplates funds being placed into a Dispute Escrow and reallocated pro rata to other Series A Preferred Unit holders.

App. 0295

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

**THE OFFER WILL EXPIRE AT 5:00 P.M., DALLAS TIME, ON JANUARY ___, 2013, UNLESS THE OFFER IS EXTENDED. WE MAY EXTEND THE OFFER PERIOD AT ANY TIME.**

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

**Summary Term Sheet**

*We are providing this summary term sheet for your convenience. It highlights material information in this Offer, but you should realize that it does not describe all of the details of the Offer to the same extent that they are described in the body of this Offer. We urge you to read the entire Statement because it contains the full details of the Offer.*

**Who will be the purchaser of Interests in the Offer?**

- The Purchaser is _____ (the "*Purchaser*").

**What will be the purchase price for Interests tendered in the Offer?**

- Subject to the terms and conditions set forth in this Statement, Interests that are tendered will be purchased at a cash purchase price determined as follows:
  - ____% of the [December 31, 2012] estimated value of Seller's Interests as reflected on the statement previously provided to Seller by HERA (the "*Unadjusted Purchase Price*"), LESS
  - the Adjustment Amount, if any.

  As used herein the "*Adjustment Amount*" shall be equal to the total of the full costs and expenses (including costs and expenses of legal counsel) of HERA or any of its members, officers, directors, agents, representatives, or equity holders (each, a "HERA Party"), plus any diminution in value of HERA's assets, incurred in connection with any litigation, dispute, or claim commenced by any Seller (or any action taken by Seller that results in any third party making a claim) against a HERA Party or that does or could impact adversely any of HERA's assets, or Seller's disclosure of matters and information regarding HERA and its assets (except as required by law or directed and authorized in writing by HERA), all of the foregoing to be determined in Purchaser's sole discretion.

**How can I determine what my purchase price would be in the Offer?**

- At your request, a statement can be provided to you that calculates the anticipated purchase price for your Interests.

**What will be the form of the purchase price in the Offer?**

- If your Interests are purchased in the Offer, you will be paid the purchase price in cash, less any applicable withholding taxes and without interest.

**What amount of Interests will be purchased in the Offer?**

- Subject to the terms and conditions set forth in this Statement, the Purchaser is offering to purchase all Interests in the Offer.

**Is the Offer subject to a financing condition?**

- No.

**What are the primary conditions to the Offer?**

- The Offer is subject to receipt of tenders for the Offer from the holders of at least a majority-in-interest of the Series A Preferred Units of HERA.

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

**Will the terms of the HERA Operating Agreement be amended following the Offer?**

- If the Purchase is completed, Purchaser will become the holder of at least a majority-in-interest of the Series A Preferred Units of HERA and will be able to amend HERA's Operating Agreement without obtaining approval from HERA's Board or other holders of Series A Preferred Units of HERA. Purchaser reserves the right to amend the terms of the Operating Agreement in the event the Purchase is completed.

**How long do I have to decide whether to tender my Interests in the Offer? Can the Offer be extended past the initial expiration date?**

- You may tender your Interests pursuant to the Offer until the Offer expires. Currently, the Offer is scheduled to expire at 5:00 p.m., Dallas time, on January ___, 2013.
- We can extend the Offer past this scheduled expiration date in our sole discretion. If we choose to do so, you will be able to tender your Interests until 5:00 p.m., Dallas time, on the day selected as the new expiration date.

**Can the terms of the Offer be amended?**

- We reserve the right in our sole discretion to amend the Offer in any respect.

**How do I tender my Interests?**

- To tender your Interests, you must complete the actions described under Section 2 of "Description of the Offer."

**How and when will I be paid if I tender my Interests for Purchase?**

- If your Interests are purchased pursuant to the Offer, you will be paid the applicable purchase price, in cash, without interest, promptly upon receipt of tenders from the holders of at least a majority-in-interest of the Series A Preferred Units of HERA and the acceptance of the Interests for payment. [There may be tax consequences to receiving this payment. See "Certain Tax Consequences," below.]

**Once I have tendered my Interests in the Offer, can I withdraw my tender?**

- No, unless the Offer expires or is terminated.

**What are the tax consequences if I tender my Interest?**

- The transaction will be treated as a sale of a partnership interest for those members who tender their units. You should consult your personal tax advisor for the specific tax consequences resulting from the sale. In general, gain or loss will be recognized to the extent the sales price of the partnership interest exceeds a member's tax basis in his partnership interest. Given the nature of the underlying assets held by HERA, it is anticipated that the vast majority of that gain or loss would be long term capital gain or loss.

**How do I calculate the basis in my partnership interest?**

- You should consult your tax advisor for your actual tax basis. However, in general a member's tax basis in his partnership interest should equal the discounted value of the HERA property included on his 2011 W-2 (this amount was reflected as a contribution on your 2011 K-1), plus or minus any taxable income/(loss) reported to him on his 2011, 2012 and 2013

App. 0298

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

K-1s from HERA, less any cash distributions received from the partnership after 5/15/11. Please note that the capital balances reflected on the 2011 K-1 reflect those tax basis capital balances as of 12/31/11 according to the partnerships records.

**Will I still be allocated income /(loss) from HERA for 2012 & 2013 and owe tax on that income as well?**

- Yes, a tendering member will still receive a 2012 and 2013 K-1 and be subject to tax on the income reflected on those K-1s in addition to any gain / loss on sale of the partnership interest. However, as mentioned above the K-1 income / loss does adjust the basis in their partnership interest. A unitized estimate of the 2012 taxable income expected to be reported on the 2012 HERA K-1s is available upon request. That template also includes the unitized cash distribution paid by the partnership in 2012. Those amounts are very rough and subject to change. The 2013 K-1 for a tendering member will only reflect their share of income from HERA through the date they sell their partnership interest. No estimate for 2013 is currently available.

**How will the transaction affect non-tendering members from a tax perspective?**

- Non-tendering members will continue to receive K-1s reflecting their share of taxable income related to a full year of HERA activity in 2013. However, depending on the percentage of units tendered, HERA may be required to file two partnership tax returns for 2013. One for the 1-1-13 to 1-xx-13 period and a second return for the period beginning 1-xx-13 and ending on 12/31/13. If this is the case a non-tendering member will receive two K-1s related to the 2013 calendar year. Both would need to be included in their 2013 tax return. From a tax perspective, there should not be any other significant impact of the transaction to a non-tendering member.

**[Whom can I talk to if I have questions about the Offer?]**

App. 0299

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

**Background of the Offer.**

Purchaser believes that there are many Interest holders that would prefer to receive immediate liquidity with respect to their Interests rather than wait for distributions to occur over time.

As a result, the primary purpose of the Offer is to provide Interest holders that desire the opportunity to receive immediate liquidity with respect to their Interests to sell their Interests.

**Certain Effects of the Offer.**

The Offer is conditional on a minimum tender of a majority-in-interest of the Interests. In the event this condition is satisfied and the Purchase is completed, the Purchaser will be able to amend the terms of HERA's Operating Agreement in its sole and absolute discretion. See Section 7 of "Description of the Offer" for a more detailed description of certain effects of the Offer and related transactions on Non-Electing Holders (as hereinafter defined).

App. 0300

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

**Description of the Offer**

**1.      The Election; Amount of Interests to be Purchased or Exchanged.**

On the terms and subject to the conditions of this Offer, holders of Interests can elect whether or not they wish to sell their Interests.

Interests tendered for purchase will be purchased, on the terms and subject to the conditions set forth in this Statement for a cash price determined as follows:

- ____% of the [December 31, 2012] estimated value of Seller's Interests as reflected on the statement previously provided to Seller by HERA (the "***Unadjusted Purchase Price***"), LESS
- the Adjustment Amount, if any.

As used herein the "***Adjustment Amount***" shall be equal to the total of the full costs and expenses (including costs and expenses of legal counsel) of HERA or any of its members, officers, directors, agents, representatives, or equity holders (each, a "HERA Party"), plus any diminution in value of HERA's assets, incurred in connection with any litigation, dispute, or claim commenced by any Seller (or any action taken by Seller that results in any third party making a claim) against a HERA Party or that does or could impact adversely any of HERA's assets, or Seller's disclosure of matters and information regarding HERA and its assets (except as required by law or directed and authorized in writing by HERA), all of the foregoing to be determined in Purchaser's sole discretion.

A holder that does not tender its Interests for purchase is referred to herein as a "***Non-Electing Holder***." See Section 7 for a description of certain effects of the Offer and related transactions on Non-Electing Holders.

Interests properly tendered for purchase will be purchased at the applicable purchase price upon the terms and conditions of the Offer. See Section 4 for a more detailed description of the terms of our Offer.

**The Offer is subject to the tender for purchase of at least a majority-in-interest of the aggregate Interests. See Section 5.**

**2.      Procedures for Tendering.**

For Interests to be properly tendered for purchase, we must receive before or on the expiration date a properly completed and executed Transfer Agreement, the form of which is attached as Appendix A, together with all documents contemplated thereby.

For purposes of the Offer, the term "expiration date" means 5:00 p.m., Dallas time, on January ___, 2013, unless and until we in our sole discretion extend the period of time during which the offer will remain open. If extended by us, the term "expiration date" will refer to the latest time and date at which the offer, as extended, will expire. See Section 9 for a description of our right to extend, delay, terminate or amend the Offer.

To be validly tendered all required documents must be received by us at the following address prior to the expiration date:

Highland Capital Management, L.P.

App. 0301

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

300 Crescent Court, Suite 700
Dallas, TX 75201
Attention: Thomas Surgent

**The method of delivery of all documents is at your election and risk. If you decide to make delivery by mail, we recommend you use registered mail with return receipt requested, properly insured. In all cases, sufficient time should be allowed to ensure timely delivery.**

We will determine, in our sole discretion, all questions as to the validity, form, eligibility, including time of receipt, and acceptance of any tender of Interests. Our determination will be final and binding on all parties. We reserve the absolute right to reject any or all tenders we determine not to be in proper form or the acceptance of which we determine may be unlawful. We also reserve the absolute right to waive any of the conditions of the Offer and any defect or irregularity in the tender of any particular Interests or any particular Interest holder. No tender will be deemed to be properly made until all defects or irregularities have been cured by the tendering holder or waived by us. We assume no duty or obligation to provide you with any notice of any defects or irregularities in any tender. Our interpretation of the terms of and conditions to the Offer will be final and binding. By tendering Interests to us, you agree to accept all decisions we make concerning these matters and waive any right you might otherwise have to challenge those decisions.

To tender your Interests you will be required to complete, execute and deliver a Transfer Agreement. Among other things, the Transfer Agreement requires you to make certain representations and warranties, including with respect to your ownership of the tendered Interest; to release any and all claims that you may have against HERA, Highland, and certain parties associated with them; and to agree to take such further actions as may be necessary to effect the transfer of your Interests pursuant to the Offer.

A tender of shares for purchase under the procedures described herein will constitute your acceptance of the terms and conditions of the applicable Offer.

Our acceptance for purchase of an Interest tendered pursuant to the Offer will constitute a binding agreement between you and us upon the terms and conditions of such Offer described in this Statement and related documents.

3.      **Withdrawal Rights; Change in Election.**

Interests tendered in the Offer may not be withdrawn at any time before the expiration date. After the expiration date, unless we have already accepted your tendered Interests for payment, you may withdraw your Interests at any time after 5:00 p.m., Dallas time, on January ___, 2013. Except as otherwise provided in the preceding sentence, tenders of Interests for purchase pursuant to this Offer are irrevocable and may not be withdrawn.

For a withdrawal to be effective, we must receive a notice of withdrawal in written form on a timely basis. The notice of withdrawal must specify the name of the person who tendered the Interests to be withdrawn, identify the Interests to be withdrawn and the name of the registered holder.

We will determine, in our sole discretion, all questions as to the form and validity, including time of receipt, of notices of withdrawal. Our determination shall be final and binding on all parties.

App. 0302

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

We assume no duty or obligation to provide you with any notice of any defects or irregularities in any notice of withdrawal.

**4.    Purchase of Interests and Payment of Purchase Price.**

Upon the terms and subject to the conditions of the Offer, we will accept for payment and pay for, and thereby purchase, Interests validly tendered for purchase and not properly withdrawn.

For purposes of the Offer, we will be deemed to have accepted for payment, and therefore purchased, Interests that are properly tendered for purchase and not properly withdrawn only when, as and if we accept such Interests for payment.

Upon the terms and subject to the conditions of the Offer, after the expiration date, we will purchase and pay for Interests accepted for payment under the Offer, provided that we reserve the right to accept and/or pay for any tendered Interest prior to the expiration date. Our intention is to commence payment for the tendered Interests upon receipt of tendered Interests for a majority-in-interest of Series A Preferred Units. In all cases, payment for Interests tendered and accepted for payment pursuant to the Offer will be made only after our timely receipt of a properly completed and duly executed Transfer Agreement and the documents described in the Transfer Agreement.

**Under no circumstances will we pay interest on the purchase price, regardless of any delay in making payment.** In addition, the Offer is subject to the conditions set forth below.

**5.    Conditions of the Offer.**

We will not be required to accept for payment, purchase or pay for any Interests tendered for purchase, and we may terminate or amend the Offer or postpone the acceptance of Interests tendered, if at any time on or after the date hereof and prior to acceptance of tendered Interests we have not received tenders accepting the Offer from holders of at least a majority-in-interest of the Series A Preferred Units of HERA.

No assurance can be given that this condition will be satisfied.

The condition listed above is for our sole benefit and we may assert this condition regardless of the circumstances (including our action or inaction) that give rise to the condition and we may, in our sole discretion, waive the condition listed above, before the expiration date. Our failure at any time to exercise any of the foregoing rights shall not be deemed a waiver of any of these rights, and each of these rights shall be deemed an ongoing right that may be asserted by us at any time prior to the expiration of the Offer.

**6.    Certain Effects of the Offer on Non-Electing Holders.**

Non-Electing Holders will have no assurance as to the ultimate value that will be received by HERA in respect of its assets (many of which are highly illiquid), nor the timing of any distributions by HERA to any Non-Electing Holders following completion of the Purchase contemplated herein. In addition, in the event the Purchase is completed, Purchaser will be able to amend the terms of the Operating Agreement in its discretion without the consent of any Non-Electing Holder.

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

7.    **Certain Tax Consequences.**

The transaction will be treated as a sale of a partnership interest for those members who tender their units.   You should consult your personal tax advisor for the specific tax consequences resulting from the sale.  In general, gain or loss will be recognized to the extent the sales price of the partnership interest exceeds a member's tax basis in his partnership interest.   Given the nature of the underlying assets held by HERA, it is anticipated that the vast majority of that gain or loss would be long term capital gain or loss.

- **How do I calculate the basis in my partnership interest?**

You should consult your tax advisor for your actual tax basis.   However, in general a member's tax basis in his partnership interest should equal the discounted value of the HERA property included on his 2011 W-2 (this amount was reflected as a contribution on your 2011 K-1), plus or minus any taxable income/(loss) reported to him on his 2011, 2012  and 2013 K-1s from HERA, less any cash distributions received from the partnership after 5/15/11. Please note that the capital balances reflected on the 2011 K-1 reflect those tax basis capital balances as of 12/31/11 according to the partnerships records.

- **Will I still be allocated income /(loss) from HERA for 2012 & 2013 and owe tax on that income as well?**

Yes, a tendering member will still receive a 2012 and 2013 K-1 and be subject to tax on the income reflected on those K-1s in addition to any gain / loss on sale of the partnership interest.  However, as mentioned above the K-1 income / loss does adjust the basis in their partnership interest.  A unitized estimate of the 2012 taxable income expected to be reported on the 2012 HERA K-1s is available upon request.  That template also includes the unitized cash distribution paid by the partnership in 2012.  Those amounts are very rough and subject to change.  The 2013 K-1 for a tendering member will only reflect their share of income from HERA through the date they sell their partnership interest.  No estimate for 2013 is currently available.

- **How will the transaction affect non-tendering members from a tax perspective?**

Non-tendering members will continue to receive K-1s reflecting their share of taxable income related to a full year of HERA activity in 2013.  However, depending on the percentage of units tendered, HERA may be required to file two partnership tax returns for 2013.  One for the 1-1-13 to 1-xx-13 period and a second return for the period beginning 1-xx-13 and ending on 12/31/13.  If this is the case a non-tendering member will receive two K-1s related to the 2013 calendar year.  Both would need to be included in their 2013 tax return.   From a tax perspective, there should not be any other significant impact of the transaction to a non-tendering member.

8.    **Extension of the Offer; Termination; Amendment.**

We reserve the right, in our sole discretion, at any time and from time to time, and regardless of whether or not any of the events set forth in Section 5 occur, to extend the period of time during which the Offer is open and thereby delay acceptance of Interests for purchase or exchange by giving notice of such extension.  We also reserve the right, in our sole discretion, to terminate the Offer and not accept for payment or pay for any Interests not already accepted for payment upon

App. 0304

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

the occurrence of any of the conditions specified in Section 5 by giving notice of such termination.

We also reserve the right, in our sole discretion, and regardless of whether any of the events set forth in Section 5 occur or are deemed by us to have occurred, to amend the Offer in any respect.

9.      **Miscellaneous.**

**We have not authorized any person to make any recommendation on our behalf regarding whether you should tender or refrain from tendering your Interests in the Offer. We have not authorized any person to provide any information or make any representation in connection with the Offer, other than those contained in this Statement.**

Any questions or requests for assistance may be directed to us as follows:

[Contact Person[s] and Number(s)]

**Commented [A3]:** We should ask Purchaser to obtain and disclose to the HERA Series A Preferred Unit holders a fairness opinion supporting the financial fairness of this Offer.

App. 0305

# In The Matter Of:

*Dougherty v.*
*Hyland Capital*

*Isaac Leventon*
*June 18, 2019*



*Min-U-Script® with Word Index*

**EXHIBIT**

**20**

App. 0306

Dougherty v.
Hyland Capital

Isaac Leventon
June 18, 2019

**Page 1**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,

    Plaintiff,

VS.

HIGHLAND CAPITAL MANAGEMENT,
L.P., HIGHLAND EMPLOYEE
RETENTION ASSETS, LLC,
HIGHLAND ERA MANAGEMENT,
LLC, AND JAMES DONDERO

    Defendants,

and

HIGHLAND EMPLOYEE RETENTION
ASSETS, LLC.

    Nominal Defendant.

C.A. No. 2017-0488-MTZ

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
ISAAC LEVENTON
JUNE 18, 2019
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF ISAAC LEVENTON, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and -numbered cause on the 18th of June, 2019, from 9:20 a.m. to 4:52 p.m., before Melisa Duncan, CSR in and for the State of Texas, reported by machine shorthand, at the offices of DLA Piper, 1900 North Pearl, Suite 2200, Dallas, Texas, in accordance with the Delaware Rules of Civil Procedure and agreement hereinafter set forth.

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF(S):

    Joseph L. Christensen
    jchristensen@mdsulaw.com
    Thomas A. Uebler
    tuebler@mdsulaw.com
    McCOLLOM D'EMILIO SMITH UEBLER, LLC
    2751 Centerville Road, Suite 401
    Wilmington, Delaware 19808
    302.468.5960

FOR THE DEFENDANT(S):

    Marc Katz
    marc.katz@dlapiper.com
    Crystal Woods
    crystal.woods@dlapiper.com
    Breegan O'Connor
    breegan.o'connor@dlapiper.com
    DLA PIPER
    1900 North Pearl Street, Suite 2200
    Dallas, Texas 75201
    214.743.4534

ALSO PRESENT:

    Patrick Daugherty

**Page 3**

I N D E X

                        PAGE

Appearances . . . . . . . . . . . . . . . . . . . . . 2

ISAAC LEVENTON

    Examination by Mr. Christensen. . . . . . . . . . 5

Highly Confidential Portion . . . . . . . . . . . . . 89

Signature and Changes . . . . . . . . . . . . . . . . 201

Reporter's Certificate. . . . . . . . . . . . . . . . 202

E X H I B I T S

NO.        DESCRIPTION                PAGE

Exhibit 1 . . . . . . . . . . . . . . . . . . . . . 7
    Notice of Deposition
Exhibit 2 . . . . . . . . . . . . . . . . . . . . . 56
    Plaintiff's First Request for Production of
    Documents Directed to Defendants
Exhibit 3 . . . . . . . . . . . . . . . . . . . . . 89
    Patrick Daugherty's Reply in Support of Motion
    to Compel Escrow-Related Discovery
Exhibit 4 . . . . . . . . . . . . . . . . . . . . . 90
    Exhibits G-O to Patrick Daugherty's Reply Brief
    in Support of Motion to Compel
Exhibit 5 . . . . . . . . . . . . . . . . . . . . . 93
    Emails, February 16, 2017, AB_FTL0000639 - '641
Exhibit 6 . . . . . . . . . . . . . . . . . . . . . 114
    Abrams & Bayliss Invoice, HCM0045317 - '318
Exhibit 7 . . . . . . . . . . . . . . . . . . . . . 122
    Emails, December 13, 2013, AB_FTL0000471 - '472
Exhibit 8 . . . . . . . . . . . . . . . . . . . . . 127
    Email, December 12, 2013, AB_FTL0000265
Exhibit 9 . . . . . . . . . . . . . . . . . . . . . 139
    Emails, December 13, 2013, AB_FTL0000378 - '379
Exhibit 10 . . . . . . . . . . . . . . . . . . . . . 147
    Emails, December 13, 2013, HCM0000674 - '675
Exhibit 11 . . . . . . . . . . . . . . . . . . . . . 148
    Emails, December 13, 2013, HCM0057812
Exhibit 12 . . . . . . . . . . . . . . . . . . . . . 159
    Memorandum, February 21, 2014,
    AB_FTL0000891 - '907

**Page 4**

E X H I B I T S  (Continued)

NO.        DESCRIPTION                PAGE

Exhibit 13. . . . . . . . . . . . . . . . . . . . . 163
    Emails, December 16, 2013, AB_FTL0000883
Exhibit 14. . . . . . . . . . . . . . . . . . . . . 166
    Emails, April 11, 2014, HCM0029112
Exhibit 15. . . . . . . . . . . . . . . . . . . . . 168
    Emails, December 16, 2013, HCM0028766
Exhibit 16. . . . . . . . . . . . . . . . . . . . . 169
    Emails, December 17, 2013, HCM0057877
Exhibit 17. . . . . . . . . . . . . . . . . . . . . 170
    Escrow Agreement, HCM0057879 - '884
Exhibit 18. . . . . . . . . . . . . . . . . . . . . 180
    Emails, January 16, 2014, HCM0000793
Exhibit 19. . . . . . . . . . . . . . . . . . . . . 181
    Affidavit Regarding Assets Held in Escrow
Exhibit 20. . . . . . . . . . . . . . . . . . . . . 183
    Exhibit E
Exhibit 21. . . . . . . . . . . . . . . . . . . . . 193
    Emails, March 24, 2014, HCM0052068
Exhibit 22. . . . . . . . . . . . . . . . . . . . . 198
    Emails, August 22, 2017, HCM0068015

App. 0307

Dougherty v.
Hyland Capital

Isaac Leventon
June 18, 2019

Page 189

did you do any search for any other documents related to this litigation?

A. Not that I recall.

Q. Okay. Shifting back into sort of individual capacity.

I think before we talked about the custodian stuff, you said that you didn't recall whether you drafted this agreement or not; is that right?

A. Correct. I don't know who drafted this.

Q. Okay. Did you have anything to do with the allocation split that's reflected in paragraph 3 on the second page of this agreement?

A. Yes.

Q. And what was your involvement?

A. I think I conducted a calculation that gave rise to the split.

Q. Okay. How did you perform that calculation?

A. I don't --

MR. KATZ: I'm going to --

A. I don't remember.

Q. (BY MR. CHRISTENSEN) If you look back to the first page of the agreement and the C paragraph, C whereas paragraph.

A. I'm reading that, yes.

Q. When you're finished reading that, could you let

Page 190

me know if that refreshes your recollection about how you calculated.

A. I actually read it before I answered the prior question. And, no, it did not refresh my recollection.

Q. Okay. Do you manage the legal invoices that come into Highland?

MR. KATZ: Objection, form.

A. Yes.

Q. (BY MR. CHRISTENSEN) Does anyone else manage those invoices?

A. I'm primarily responsible.

Q. Did Andrews Kurth provide services to HERA at any time?

A. I think I'll need to consult with counsel in order to determine whether or not that I would answer -- be attorney client or not.

MR. CHRISTENSEN: You want to consult?

MR. KATZ: Sure.

(Recess from 4:11 p.m. to 4:20 p.m.)

(Requested portion was read.)

A. Yes.

Q. (BY MR. CHRISTENSEN) What was the scope of those services?

MR. KATZ: I'm going to object to form.

And you can answer to the extent you can

Page 191

answer without disclosing privileged information.

A. Andrews Kurth provided services to HERA pursuant to the joint defense agreement.

Q. (BY MR. CHRISTENSEN) Apart from the joint defense agreement, is there an engagement letter between Andrews Kurth and HERA?

A. I don't know one way or another.

Q. Did the joint defense agreement provide for allocation of fees?

A. I don't know one way or another.

Q. When was the joint defense agreement entered into?

A. Toward the beginning of the litigation, but otherwise, I can't be more specific.

Q. With respect to the legal services that Andrews Kurth provided to Highland or HERA, were there any of those expenses that were not covered by the expense allocation agreement that we looked at and is marked as Exhibit 20?

MR. KATZ: Objection, form.

THE WITNESS: Could you read the question back, ma'am.

(Requested portion was read.)

A. Yes.

Q. (BY MR. CHRISTENSEN) Okay. Would those be

Page 192

expenses related to representation by Andrews Kurth of Highland only?

A. Potentially.

Q. What other scope of services did Andrews Kurth provide, in connection with the Texas action, that were not covered by the expense allocation agreement?

A. That wasn't my testimony.

Q. Can you clarify?

A. You asked about any services provided by Andrews Kurth.

Q. And what did you have in mind?

A. Andrews Kurth provided a host of services to Highland over a variety of matters.

Q. Right. And I guess I'm trying to say -- see if I can ask it simpler.

The expense allocation agreement covers expenses associated with the Texas action, right?

A. Correct.

Q. Were there any legal expenses incurred by Highland to pay Andrews Kurth that were related to the Texas action that were not covered by the expense allocation agreement?

MR. KATZ: Objection, form.

A. I don't believe there would have been any such expenses, no.

App. 0308

**Page 193**

Q. (BY MR. CHRISTENSEN) So in other words, all invoices that came from Andrews Kurth in connection with the Texas action would have been allocated in accordance with this expense allocation agreement?

A. All invoices that came in with respect to anybody in the Texas action would have been allocated that way including Andrews Kurth.

Q. And so that would include also Gruber Hurst?

A. Yes.

Q. And Abrams & Bayliss?

A. Yes.

Q. Any other firms?

A. We had some experts.

Q. Do you remember who they were?

A. I don't.

(Exhibit 21 was marked.)

Q. (BY MR. CHRISTENSEN) So the court reporter has marked as Exhibit 21 an email and its attachment. The email is from Drew Wilson to Kristin Hendrix on Monday, March 24, 2014. It appears to be attaching a spreadsheet that had originated with you. Is that correct that the spreadsheet originated with you?

A. I first attached the spreadsheet to the email at the bottom of the chain.

Q. And turning to the spreadsheet itself. Looking

**Page 194**

at the page 1 of 5. And up at the top there is an entry that appears to be a payment to Abrams & Bayliss in the amount of $108,167.98. Then there are also entries for Andrews Kurth, Gruber Hurst. Another entry for Andrews Kurth. Two more entries for Gruber Hurst. And then another entry for Andrews Kurth.

A. I see that.

Q. How do I find what bills those payments relate to?

A. I disagree with the premise of your question.

Q. Okay. Want to explain?

A. This is not the spreadsheet that I attached to the bottom email in the chain.

Q. Okay. And how can you tell?

A. Because the "legal data pivot tables all invoices" spreadsheet is one with which I'm familiar and document HCM 0052069 is not that spreadsheet.

Q. Okay. What does that spreadsheet look like?

A. It's a list of legal invoices and matter numbers and amounts and law firms.

Q. And is this something that you create through that HOME system that we talked about?

A. I don't create it.

Q. Okay. Who creates it?

A. I believe our -- we have an outside vendor that

**Page 195**

has created it for us.

Q. How do they have access to your legal invoices?

A. You hire a vendor to help create tools for you.

Q. Okay.

A. You give them temporary access to your system.

Q. So do they do it through this HOME system that we talked about or how would they do it?

A. It would draw data from the same source as the HOME system.

Q. Okay. Remind me how the HOME system draws its data?

A. There's a data storage warehouse.

Q. Okay.

A. And so that would be the same source.

Q. Okay. Even though this isn't the spreadsheet that you attached, are you able to track invoices that appear to be reflected here on page 1?

A. Not really, no. This is not a format I would use.

Q. If you were given the date of when an invoice is paid, would you be able to go to your HOME system and see what invoice that correlated to?

A. Maybe. Probably. Actually -- I -- I have to come back to maybe. I'd have to check.

Q. If you had to track the legal expenses that had

**Page 196**

been attributed to HERA, how would you go about doing that?

A. I would go to the "legal data pivot table all invoices" spreadsheet. That's where I would start.

Q. And where would you go from there?

A. That's where I would look. That would contain the information I needed.

Q. And would that be broken down by entity?

A. Yes.

Q. The one that you attached here, do you know if that was broken down by entity?

A. It would have been, yes.

Q. Okay. So that would have been legal invoices related to HERA?

A. I would have to -- I would have to speculate without actually seeing that attachment. I'd have to -- I'd have to speculate.

MR. CHRISTENSEN: I don't think that that spreadsheet has been produced. So if you guys can locate that and produce it, we would appreciate it. If it has been produced, I'm happy to be directed to it.

MR. UEBLER: If we can have that original email with the attachment, that would be preferable.

Q. (BY MR. CHRISTENSEN) Turning to page 3 of that spreadsheet in Exhibit 21. Down at the bottom there are

App. 0308a

Dougherty v.
Hyland Capital

Isaac Leventon
June 18, 2019

Page 201

CHANGES AND SIGNATURE

PAGE        LINE        CHANGE                    REASON

_____

_____

_____

_____

_____

                        - - -

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

        I, ISAAC LEVENTON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

                        _____
                                ISAAC LEVENTON

Page 202

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                §
                                  §
    Plaintiff,                    §
                                  §
VS.                               §
                                  §
HIGHLAND CAPITAL MANAGEMENT,      §
L.P., HIGHLAND EMPLOYEE           §
RETENTION ASSETS, LLC,            §   C.A. No. 2017-0488-MTZ
HIGHLAND ERA MANAGEMENT,          §
LLC, AND JAMES DONDERO            §
                                  §
    Defendants,                   §
                                  §
and                               §
                                  §
HIGHLAND EMPLOYEE RETENTION       §
ASSETS, LLC.                      §
                                  §
    Nominal Defendant.            §
                                  §

REPORTER'S CERTIFICATION OF THE
ORAL AND VIDEOTAPED DEPOSITION OF
ISAAC LEVENTON
JUNE 18, 2019

        I, Melisa Duncan, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

        That the witness, ISAAC LEVENTON, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

        I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Page 203

        Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

        Certified to by me on this, the 21st day of June, 2019.

                        _Melisa Duncan_

                        _____
                        MELISA DUNCAN, Texas CSR 6135
                        Expiration Date: 12/31/19

App. 0309

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                        :

                  Plaintiff,           :
                                  :
      v                                  : C. A. No.
                                  : 2017-0488-MTZ
HIGHLAND CAPITAL MANAGEMENT, L.P.,        :
HIGHLAND EMPLOYEE RETENTION ASSETS        :
LLC, HIGHLAND ERA MANAGEMENT LLC, and     :
JAMES DONDERO,                            :
                                  :
                 Defendants,         :
                                  :
      and                                :
                                  :
HIGHLAND EMPLOYEE RETENTION               :
ASSETS LLC,                               :
                                  :
               Nominal Defendant.    :

- - -

Chancery Courtroom 12A
Leonard L. Williams Justice Center
500 North King Street
Wilmington, Delaware
Monday, October 14, 2019
9:19 a.m.

- - -

BEFORE: HON. MORGAN T. ZURN, Vice Chancellor

- - -

TRIAL TRANSCRIPT - VOLUME I

---

CHANCERY COURT REPORTERS
Leonard L. Williams Justice Center
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0525

**EXHIBIT**

**21**

App. 0310

2

APPEARANCES:

    THOMAS A. UEBLER, ESQ.
    JOSEPH L. CHRISTENSEN, ESQ.
    HAYLEY M. LENAHAN, ESQ.
    McCollom D'Emilio Smith Uebler LLC
      for Plaintiff

    MATTHEW P. DENN, ESQ.
    DLA Piper LLP (US)
        -and-
    MARC D. KATZ, ESQ.
    CRYSTAL J. WOODS, ESQ.
    of the Texas Bar
    DLA Piper LLP (US)
      for Defendants

    JOHN M. SEAMAN, ESQ.
    Abrams & Bayliss LLP
      for Nonparty Abrams & Bayliss LLP

- - -

App. 0311

P. H. Daugherty - Redirect                    184

Highland.

Q.        And when did you start working for Highland?

A.        September 21st, 2009.

Q.        And have you had any other positions for Highland during your employment?

A.        For the first two years of my employment, I was litigation counsel. And then I was promoted to assistant general counsel.

Q.        And what do you do as an assistant general counsel?

A.        My primary role is to manage litigation. But I also support a variety of the other internal teams at Highland, such as real estate, private equity, and then some of our back-office functions. Accounting, for example.

Q.        Are there limitations on any of the affiliates or business units that you provide services for?

A.        No. I provide services for whichever of our affiliates need it, at any given time, under either directly my role at Highland or through shared services agreements with the affiliates.

Q.        And are there particular departments

CHANCERY COURT REPORTERS

App. 0312

P. H. Daugherty - Redirect                203

(Resumed at 3:15 p.m.)

THE COURT:  Please be seated.

You may proceed.

MR. KATZ:  Thank you, Your Honor.

BY MR. KATZ:

Q.       Mr. Leventon, did you understand that HERA had indemnification obligations to its codefendants?

A.       Yes.

Q.       Can you tell us about those.

A.       So under the HERA LLC agreement, it had indemnification obligations to, essentially, any -- any affiliate that was being sued on account of anything related to or arising out of HERA's business. So in the particular case in Texas, it was Highland, Mr. Dondero, Mr. Boyce, and Mr. Britain.

Q.       And those indemnification obligations were in both the second and third amended LLCs?

A.       They were in the second and third.  I think they may even have predated that.  I think they may have been in the earlier versions as well.

Q.       Did Andrews Kurth provide services to HERA in the Texas action?

A.       Yes.

CHANCERY COURT REPORTERS

App. 0313

P. H. Daugherty - Redirect                    204

Q.    Can you tell us about Andrews Kurth's role.

A.    So Andrews Kurth, which was your firm at the time, was initially sole counsel to all of the Highland affiliates involved in the Daugherty litigation. Subsequently, HERA and two of the board members who had been sued by Mr. Daugherty -- and those gentlemen were Mr. Boyce and Mr. Britain -- retained a firm called Gruber Hurst, a gentleman by the name of Michael Hurst, as their counsel. But Andrews Kurth continued to pull laboring oar on a variety of the HERA-related issues in the case. Andrews Kurth never withdrew as counsel for HERA. It's just that that role was supplemented by the addition of the Gruber Hurst firm.

Q.    And when did, approximately, when did the Gruber Hurst firm get involved?

A.    I want to say it was in early 2013.

Q.    The -- does it refresh your recollection that it was after Mr. Daugherty filed his counterclaims?

A.    I -- I apologize. Actually, I'm not sure when they were retained.

Q.    Okay.

App. 0314

P. H. Daugherty - Redirect                205

A.        I thought it was early 2013, but I could be shown a document to be refreshed.  What I do specifically remember was that they -- they were co-counsel, essentially, for HERA and the HERA board members, along with Andrews Kurth.

Q.        And there was a joint defense agreement between the firms?

A.        There was -- well, there was a joint defense agreement between the defendants, so all the Highland entities and then HERA, Boyce and Britain included, Mr. Dondero included, and then there was a co-representation by Andrews Kurth and Gruber Hurst.

Q.        Okay.  Can we call out Exhibit 107, please.  And another document that was entered into around the time of the assignment agreement -- expense allocation agreement we talked about, was this document called the Written Consent of Manager of Highland Employee Retention Assets LLC.

Can you tell us what this document is?

A.        So this document is essentially a true-up.  So this is taking the previously incurred expenses that Highland had paid out of pocket, and Highland is being reimbursed in the amount of $1,056,727 from HERA for expenses that Highland had

**In The Matter Of:**

*Daugherty v.*
*Highland Capital*

*Scott Ellington*
*August 12, 2019*



Min-U-Script® with Word Index

EXHIBIT

22

App. 0316

Daugherty v.
Highland Capital

Scott Ellington
August 12, 2019

Page 1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                )
            Plaintiff,    ) C.A. No. 2017-0488-MTZ
v.                                )
HIGHLAND CAPITAL MANAGEMENT,      )
L.P., HIGHLAND EMPLOYEE           )
RETENTION ASSETS LLC,             )
HIGHLAND ERA MANAGEMENT LLC,      )
and JAMES DONDERO,                )
            Defendants,           )
and                               )
HIGHLAND EMPLOYEE                 )
RETENTION ASSETS LLC,             )
            Nominal Defendant.    )
_____   )

DEPOSITION OF SCOTT ELLINGTON

LAS VEGAS, NEVADA

MONDAY, AUGUST 12, 2019

Reported by: Mickey Marez, RPR, NV CCR No. 950
Job No.: 2019-74557

Page 2

DEPOSITION OF SCOTT ELLINGTON, held at Encore at Wynn Las Vegas, located at 3121 South Las Vegas Boulevard, Las Vegas, Nevada, on Monday, August 12, 2019, at 9:45 a.m., before Mickey Marez, Certified Court Reporter, in and for the State of Nevada

APPEARANCES:

FOR THE PLAINTIFF:
BY: THOMAS A. UEBLER, ESQ.
MCCOLLOM D'EMILIO SMITH UEBLER, LLC
2751 CENTERVILLE ROAD, SUITE 401
WILMINGTON, DELAWARE 19808
TELEPHONE: (302)468-5963
E-MAIL: tuebler@mdsulaw.com

FOR THE DEFENDANTS:
BY: MARC D. KATZ, ESQ.
DLA PIPER, LLP
1900 NORTH PEARL STREET, SUITE 2200
DALLAS, TEXAS 75201
TELEPHONE: (214)743-4534
E-MAIL: marc.katz@dlapiper.com

* * * * *

Page 3

INDEX

WITNESS:  SCOTT ELLINGTON

EXAMINATION                                   PAGE
BY THOMAS A. UEBLER, ESQ.                       6


EXHIBITS

NUMBER        DESCRIPTION                     MARKED
EXHIBIT 1     BANKRUPTCY COURT DECISION         22
              WEEKLY NEWS & COMMENTS -
              VOLUME 60, ISSUE 9

EXHIBIT 2     E-MAILS, 12-12-13,                58
              AB_FTL0000265

EXHIBIT 3     E-MAILS, 12-13-13,                60
              HCM0069101

EXHIBIT 4     DEFENDANT'S RESPONSES AND         69
              OBJECTIONS TO PLAINTIFF'S
              SECOND SET OF
              INTERROGATORIES

EXHIBIT 5     E-MAILS, 02-14-14,                74
              HCM0060517

Page 4

EXHIBIT 6     COURT OF APPEALS FIFTH            78
              DISTRICT OF TEXAS AT DALLAS
              - MANDATE,
              PLAINTIFF00038278 - '38279

EXHIBIT 7     LETTER, 12-01-16,                 79
              PLAINTIFF00038275 - '38276

EXHIBIT 8     E-MAILS, 12-03-16,                80
              HCM0020190 - '20191

EXHIBIT 9     E-MAILS, 12-03-16,                86
              AB_FTL10000007 - '8

EXHIBIT 10    E-MAILS, 12-05-16,                95
              AB_FTL10000282 - '283

EXHIBIT 11    COMMITMENT FOR TITLE              97
              INSURANCE (T-7),
              PLAINTIFF00001624 - '1635

EXHIBIT 12    PLAINTIFF HIGHLAND CAPITAL       105
              MANAGEMENT, L.P.'S
              APPLICATION FOR WRIT OF

App. 0317

Daugherty v.
Highland Capital

Scott Ellington
August 12, 2019

Page 101

A.  Or I don't recall if -- I may have known at some point, but I certainly didn't remember until you showed me this.

Q.  Let me ask it in a different way.

A.  Yeah.

Q.  Did Pat Daugherty satisfy the judgment that Highland Capital obtained against him?

A.  I believe he ultimately did, yes.

Q.  He did that by wire payment?

A.  I don't know how he did it.

Q.  Or sometime around December 14, 2016, does that --

A.  I don't know when he did it. I -- I just know that he did.

Q.  Okay.

So, as of the time he sent that wire, Highland Capital had both Daugherty's judgment and the Abrams & Bayliss escrow assets; is that right?

MARC KATZ: Objection. Form.

THE WITNESS: Say that again. I'm sorry.

BY MR. UEBLER:

Q.  Yeah. Sure.

So, at the time Highland received Daugherty's wire --

A.  Uh-huh.

Page 102

Q.  -- Highland held both Daugherty's cash that he used to pay his judgment and the Abrams & Bayliss escrow assets?

A.  Yes. Highland had been paid what HERA owed of the Abrams & Bayliss -- Abrams & Bayliss escrow assets, yes.

Q.  And --

A.  There were both.

Q.  And what's the basis, again, for saying that HERA owed Highland Capital anything?

A.  The agreements that we've looked at today during this deposition laid out that -- that there was an -- an allocation of how expenses were going to be broken down in the litigation, there was already accrued expenses that were being born by Highland Capital Management L.P., that HERA was agreeing to pay those assets. That's what I'm basing that statement upon.

Q.  Did Highland Capital Management ever intend to pay Pat Daugherty a judgment on behalf of HERA?

MARC KATZ: Objection. Form.

THE WITNESS: Highland Capital pay Pat Daugherty a judgment on behalf of HERA? I don't know why Highland Capital would pay a judgment on behalf of HERA.

Page 103

BY MR. UEBLER:

Q.  Who controls HERA?

MARC KATZ: Objection. Form.

THE WITNESS: Who controls HERA? I would assume -- I don't know this, but I've seen that there's a manager of HERA. I don't know if the entity even still exists.

BY MR. UEBLER:

Q.  And who's that?

A.  Highland ERA LLC.

Q.  Highland Capital Management Employees make business decisions for HERA; correct?

MARC KATZ: Objection. Form.

THE WITNESS: I don't know the answer to that.

BY MR. UEBLER:

Q.  You don't --

A.  I don't know who makes business decisions for HERA.

Q.  Who hired Gruber Hurst?

A.  Who hired Gruber Hurst? Would have been me because someone has to sign an engagement letter. And at that time, I don't believe that HERA had anyone who could sign one. I don't know that for a fact.

Q.  So, you were acting on behalf of HERA when

Page 104

you hired Gruber Hurst?

A.  Under a shared services agreement or affiliated -- affiliated arrangement, yes.

COURT REPORTER: (Court reporter requested clarification of prior testimony.)

THE WITNESS: Under a shared services agreement or affiliated arrangement, yes.

BY MR. UEBLER:

Q.  And where would I find that agreement or arrangement?

A.  Well, an affiliated arrangement is regulatorily (sic) required as an RIA. And then a shared services agreement, I know that -- that they exist. I don't know that there was one existing for HERA. I don't know if there's a blanket one for all affiliates. I just know it exists.

Q.  If Highland wanted to cause HERA to satisfy the judgment in Daugherty's favor, Highland could make that happen; couldn't it?

A.  The manager could make it happen, presumably.

Q.  James Dondero could make it happen?

A.  Yeah. As the manager of HERA, sure. But it would be HERA paying, not Highland paying on its behalf.

Q.  You didn't think Daugherty could come up with

App. 0318

Page 101

A.  Or I don't recall if -- I may have known at some point, but I certainly didn't remember until you showed me this.

Q.  Let me ask it in a different way.

A.  Yeah.

Q.  Did Pat Daugherty satisfy the judgment that Highland Capital obtained against him?

A.  I believe he ultimately did, yes.

Q.  He did that by wire payment?

A.  I don't know how he did it.

Q.  Or sometime around December 14, 2016, does that --

A.  I don't know when he did it.  I -- I just know that he did.

Q.  Okay.

So, as of the time he sent that wire, Highland Capital had both Daugherty's judgment and the Abrams & Bayliss escrow assets; is that right?

MARC KATZ: Objection.  Form.

THE WITNESS: Say that again.  I'm sorry.

BY MR. UEBLER:

Q.  Yeah.  Sure.

So, at the time Highland received Daugherty's wire --

A.  Uh-huh.

Page 102

Q.  -- Highland held both Daugherty's cash that he used to pay his judgment and the Abrams & Bayliss escrow assets?

A.  Yes.  Highland had been paid what HERA owed of the Abrams & Bayliss -- Abrams & Bayliss escrow assets, yes.

Q.  And --

A.  There were both.

Q.  And what's the basis, again, for saying that HERA owed Highland Capital anything?

A.  The agreements that we've looked at today during this deposition laid out that -- that there was an -- an allocation of how expenses were going to be broken down in the litigation, there was already accrued expenses that were being born by Highland Capital Management L.P., that HERA was agreeing to pay those assets.  That's what I'm basing that statement upon.

Q.  Did Highland Capital Management ever intend to pay Pat Daugherty a judgment on behalf of HERA?

MARC KATZ: Objection.  Form.

THE WITNESS: Highland Capital pay Pat Daugherty a judgment on behalf of HERA?  I don't know why Highland Capital would pay a judgment on behalf of HERA.

Page 103

BY MR. UEBLER:

Q.  Who controls HERA?

MARC KATZ: Objection.  Form.

THE WITNESS: Who controls HERA?  I would assume -- I don't know this, but I've seen that there's a manager of HERA.  I don't know if the entity even still exists.

BY MR. UEBLER:

Q.  And who's that?

A.  Highland ERA LLC.

Q.  Highland Capital Management Employees make business decisions for HERA; correct?

MARC KATZ: Objection.  Form.

THE WITNESS: I don't know the answer to that.

BY MR. UEBLER:

Q.  You don't --

A.  I don't know who makes business decisions for HERA.

Q.  Who hired Gruber Hurst?

A.  Who hired Gruber Hurst?  Would have been me because someone has to sign an engagement letter.  And at that time, I don't believe that HERA had anyone who could sign one.  I don't know that for a fact.

Q.  So, you were acting on behalf of HERA when

Page 104

you hired Gruber Hurst?

A.  Under a shared services agreement or affiliated -- affiliated arrangement, yes.

COURT REPORTER: (Court reporter requested clarification of prior testimony.)

THE WITNESS: Under a shared services agreement or affiliated arrangement, yes.

BY MR. UEBLER:

Q.  And where would I find that agreement or arrangement?

A.  Well, an affiliated arrangement is regulatorily (sic) required as an RIA.  And then a shared services agreement, I know that -- that they exist.  I don't know that there was one existing for HERA.  I don't know if there's a blanket one for all affiliates.  I just know it exists.

Q.  If Highland wanted to cause HERA to satisfy the judgment in Daugherty's favor, Highland could make that happen; couldn't it?

A.  The manager could make it happen, presumably.

Q.  James Dondero could make it happen?

A.  Yeah.  As the manager of HERA, sure.  But it would be HERA paying, not Highland paying on its behalf.

Q.  You didn't think Daugherty could come up with

App. 0319

Page 117

A.  I have no idea.  That would be an accounting question.

MR. UEBLER: Let's go off the record.

(Pause in the proceedings.)

MR. UEBLER: Mr. Ellington, I don't have any more questions.  Thanks for your time today.

THE WITNESS: Okay.  Thank you very much.  I appreciate it.  Thank you.

MARC KATZ: And we'll reserve.

MR. UEBLER: All right.

(Proceedings concluded at 12:14 PM.)

COURT REPORTER: (Court reporter confirmed with counsel if they were interested in a rough copy of the transcript.)

MR. UEBLER: Sure, I'll take a rough.

MARC KATZ: Yes, please.

Page 118

CERTIFICATE OF DEPONENT

PAGE    LINE    CHANGE              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

*   *   *   *   *

I, SCOTT ELLINGTON, deponent herein, do hereby certify and declare the within and foregoing transcription to be my deposition in said action; that I have read, corrected, and do hereby affix my signature to said deposition under penalty of perjury.

_____
SCOTT ELLINGTON, Deponent

Job No. 3369

Page 119

CERTIFICATE OF REPORTER

STATE OF NEVADA    )
COUNTY OF CLARK    )

I, Mickey Marez, a duly commissioned and licensed court reporter, Clark County, state of Nevada, do hereby certify:  That I reported the taking of the deposition of the witness, SCOTT ELLINGTON, commencing on Monday, August 12, 2019, at 9:45 a.m.;

That prior to being examined, the witness was, by me, duly sworn to testify to the truth.  That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of said shorthand notes.

I further certify that I am not a relative or employee of an attorney or counsel or any of the parties, nor a relative or employee of an attorney or counsel involved in said action, nor a person financially interested in the action; that a request has been made to review the transcript.

IN WITNESS THEREOF, I have hereunto set my hand in my office in the County of Clark, state of Nevada, this 14th day of August, 2019.

_____
Mickey Marez, RPR, NV CCR No. 950

App. 0320

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                          :
                                            :
                    Plaintiff,              :
                                            :
        v                                   : C. A. No.
                                            : 2017-0488-MTZ
HIGHLAND CAPITAL MANAGEMENT, L.P.,          :
HIGHLAND EMPLOYEE RETENTION ASSETS          :
LLC, HIGHLAND ERA MANAGEMENT LLC, and       :
JAMES DONDERO,                              :
                                            :
                    Defendants,             :
                                            :
        and                                 :
                                            :
HIGHLAND EMPLOYEE RETENTION                  :
ASSETS LLC,                                 :
                                            :
                    Nominal Defendant.      :


                        - - -

                Chancery Courtroom 12A
                Leonard L. Williams Justice Center
                500 North King Street
                Wilmington, Delaware
                Monday, October 14, 2019
                9:19 a.m.
                        - - -

BEFORE: HON. MORGAN T. ZURN, Vice Chancellor

                        - - -


            TRIAL TRANSCRIPT - VOLUME I


------------------------------------------------------------
                CHANCERY COURT REPORTERS
            Leonard L. Williams Justice Center
            500 North King Street - Suite 11400
                Wilmington, Delaware 19801
                    (302) 255-0525

EXHIBIT

23

App. 0321

2

APPEARANCES:

    THOMAS A. UEBLER, ESQ.
    JOSEPH L. CHRISTENSEN, ESQ.
    HAYLEY M. LENAHAN, ESQ.
    McCollom D'Emilio Smith Uebler LLC
      for Plaintiff

    MATTHEW P. DENN, ESQ.
    DLA Piper LLP (US)
        -and-
    MARC D. KATZ, ESQ.
    CRYSTAL J. WOODS, ESQ.
    of the Texas Bar
    DLA Piper LLP (US)
      for Defendants

    JOHN M. SEAMAN, ESQ.
    Abrams & Bayliss LLP
      for Nonparty Abrams & Bayliss LLP

- - -

App. 0322

P. H. Daugherty - Cross                103

elaborate going away dinner, similar to the one that we had just had for his birthday, he -- his people at the firm, mainly Patrick Boyce and Lane Britain and Thomas Surgent, were actively unwinding compensation that had been given to me, trying to extract negative information about me from my team, and turning the turrets on me while I was getting all this lovey-dovey, you know, we want things to be good for you.

And oh, by the way, nobody came to me and said, "Yeah, we want to pay you out on all your deferred comp and here's the numbers." What I got was three documents from Michael Collins saying you will sign all of these or none of these. And until you do, we're not giving you a dime. So that's what was really going on.

Q.    All right. Well, let's go through that one by one.

A.    Sure.

Q.    So Mr. Dondero did reach out to you and said that they would like to throw a fairly elaborate going away party/dinner for you?

A.    Yes.

Q.    Okay. Also, in the months after you

App. 0323

P. H. Daugherty - Cross                     104

left, Highland paid you approximately 1.2 million in various deferred comp plans and other benefits; isn't that correct?

A.        No.  They gave me what was already in my 401K.  They transitioned it away from the Highland ESOP, or whatever, to my IRA.  And I believe there was 41,000 -- there was some amount that was paid -- oh, I know what it was; HERA.

When HERA vested -- I got to the three-year cliff, then they -- all of us got hit with a pretty big tax bill because of the vesting.  So when you say Highland paid out, Highland paid everybody out enough for them to pay their taxes.  I was the biggest holder of HERA, and so I think they made a distribution of -- I want to -- I recall it being under a million, but it was purely to pay my taxes. And by the way, everybody got that.

Q.        Right.  And, Mr. Daugherty, I'm just asking about your payment that they didn't pay you out your deferred compensation.  So let me ask you this question:  In the months after you left, Highland paid to you 34,000 -- over $34,000 for your PTO, over $800,000 in your OptionIT, over $41,000 from the HERA tax bill, 202,000 from your 401K, and 140,000 on your

S. Ellington - Direct                    345

Q.       And you are the seniormost in-house attorney at Highland?

A.       Correct.

Q.       Do you have a team of folks under you?

A.       I do.

Q.       Can you briefly tell us what your team consists of or who your team consists of?

A.       Sure.  It's about -- there's 16 to 20 people, depending on how you view it, that are in the legal and compliance department that all report to me, except for Thomas Surgent, solely in his chief compliance officer role, reports directly to Mr. Dondero per the SEC regulations.

Q.       And do you -- in your legal role, do you also provide services or have you provided services to HERA?

A.       Yes.

Q.       You know what I'm talking about when I refer to HERA?

A.       Correct.

Q.       Is that typical with respect to your role at Highland as far as providing services to affiliates of Highland?

A.       Yes.  There's contractual arrangements

CHANCERY COURT REPORTERS

App. 0325

S. Ellington - Direct                    346

and shared services agreements that allow for that.

Q.    Do you have -- are there any affiliates to whom you or those entities you provide services where you don't have an express shared services agreement?

A.    Possibly, just due to the functionality of those entities not having employees or directors.

Q.    Okay.  And who do you report to at Highland?

A.    James Dondero.

Q.    And what is your -- what is Jim's role at Highland?

A.    Jim is the president of Highland and the day-to-day decision-maker.

Q.    And we've heard some testimony in this case about who controls Highland.  Can you tell us who controls Highland?

A.    It's my understanding that Highland Capital Management, L.P. is ultimately owned by a set of trusts that have independent trustees.

Q.    Okay.  Now, you know who Pat Daugherty is.

A.    Yes.

CHANCERY COURT REPORTERS

App. 0326

S. Ellington - Cross                    362

Q.        You testified earlier that as an employee of Highland Capital, you perform work for certain affiliates of Highland Capital?

A.        Yes, that's correct.

Q.        And HERA is one of those affiliate?

A.        Yes.

Q.        You referred to something called a shared services agreement, I think.

A.        Yes.

Q.        You're not aware of a shared services agreement for HERA, are you?

A.        Not with specificity.  I believe you asked me about this in my depo; and I remember telling you, I think, that there's a blanket shared services agreement that covers affiliates in their entirety.

Q.        You performed work for HERA on behalf of Highland Capital.

A.        Or on behalf of HERA itself due to an agreement.  Could be either/or.

Q.        But you're not aware of the specific agreement.

A.        No, but if there's a blanket agreement it covers all affiliates, HERA would fall in that definition.

CHANCERY COURT REPORTERS

App. 0327

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,             :

            Plaintiff,     :

     v                  : C. A. No.
                       : 2017-0488-MTZ
HIGHLAND CAPITAL MANAGEMENT, L.P.,  :
HIGHLAND EMPLOYEE RETENTION ASSETS  :
LLC, HIGHLAND ERA MANAGEMENT LLC, and :
JAMES DONDERO,           :

          Defendants,    :

    and               :

HIGHLAND EMPLOYEE RETENTION     :
ASSETS LLC,            :

        Nominal Defendant.  :

- - -

Chancery Courtroom 12A
Leonard L. Williams Justice Center
500 North King Street
Wilmington, Delaware
Monday, October 14, 2019
9:19 a.m.
- - -

BEFORE: HON. MORGAN T. ZURN, Vice Chancellor

- - -

TRIAL TRANSCRIPT - VOLUME I

_____

CHANCERY COURT REPORTERS
Leonard L. Williams Justice Center
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0525

EXHIBIT

24

App. 0328

2

APPEARANCES:

    THOMAS A. UEBLER, ESQ.
    JOSEPH L. CHRISTENSEN, ESQ.
    HAYLEY M. LENAHAN, ESQ.
    McCollom D'Emilio Smith Uebler LLC
      for Plaintiff

    MATTHEW P. DENN, ESQ.
    DLA Piper LLP (US)
        -and-
    MARC D. KATZ, ESQ.
    CRYSTAL J. WOODS, ESQ.
    of the Texas Bar
    DLA Piper LLP (US)
      for Defendants

    JOHN M. SEAMAN, ESQ.
    Abrams & Bayliss LLP
      for Nonparty Abrams & Bayliss LLP

- - -

CHANCERY COURT REPORTERS

App. 0329

J. Dondero - Cross                                    307

A.      Yes.

Q.      I'm going to flip back up to the first page of the expense allocation agreement.

On your screen there, I just highlighted a line for you.  I don't know -- can you see that on your screen?

A.      Yes.

Q.      It says, "WHEREAS, HCMLP and HERA believe that the below expense allocation agreement is fair, equitable and reasonable."

Did I read that correctly?

A.      Yes.

Q.      You don't know who determined, on behalf of HERA, that the expense allocation was fair, equitable and reasonable, do you?

A.      No.

Q.      You didn't make that determination, did you?

A.      No.

Q.      Let's take a look at JX-122 in your binder.  JX-122 is in Binder 4.

Do you see an agreement called an "ASSIGNMENT AGREEMENT"?

A.      Yes.

App. 0330

J. Dondero - Cross                                                    308

Q.          At your deposition, you didn't recall seeing the assignment agreement before; is that right?

A.          Yes.

Q.          Let's flip to the last page of this one.

You signed the assignment agreement on behalf of HERA through Highland ERA Management; is that right?

A.          Yes.

Q.          You signed on behalf of Highland Capital also?

A.          Yes.

Q.          In connection with this agreement, you determined, as the president of the manager of HERA, that it was in HERA's best interests to transfer its assets to Highland; is that right?

A.          Yeah, at the advice of counsel.

Q.          So you agree with that statement?

Let's break that down a little bit. So you determined, as president of the manager of HERA, that it was in HERA's best interests to transfer its assets to Highland?

A.          I rely on counsel.  And the document says what it says.  I mean, if it says that, then,

App. 0331

J. Dondero - Cross                                      309

yes, I believe it was the right thing to do.

Q.        I want to try a third time.  And I'm not asking you what the document says.  I'm just asking if you agree that, as president of the manager of HERA, you determined that it was in the best interest of HERA to transfer its assets to Highland?

A.        And I'm saying I didn't make a determination myself.

Q.        Okay.  Let's see if we can refresh your recollection.

Would you turn back to JX-623, please, in your witness binder.  That's your deposition transcript.  This time I'm going to look at page 46 of the deposition transcript, which is page 13 of 59. Let me know when you're on page 46 of your deposition transcript.

A.        I am.

Q.        Beginning on line 17, I asked you: "Did you determine, as the president of the manager of HERA, that it was in HERA's best interest to transfer its assets to Highland?

"Answer:  In best interest, yeah.  I mean, necessary, right?  There was operating expenses. There were legal expenses.  And I think you covered it

CHANCERY COURT REPORTERS

App. 0332

J. Dondero - Cross                                    310

in the last documents in terms of [what] we needed to fund expenses and operations."

Does that refresh your recollection regarding whether you determined, as president of the manager of HERA, that it was in HERA's best interests to transfer its assets to Highland?

A.      I think I'm trying to say the same thing there.  I don't believe I'm being inconsistent.  I relied on counsel.  The document says that I agree -- I believe our counsel is good and I believe they recommended the right thing.  So if it says it's in the best interests of HERA, I believe it is in the best interests of HERA.  And I was speculating as to the reasons why.

I'm sorry.  What's your question?

Q.      I think I've gotten the answer.  Thank you.

It wasn't just that you relied on counsel, though, was it?

You thought the document was strategized, reviewed, and vetted by counsel as appropriate, given facts and circumstances, expenses and ownership?

A.      Strategized, reviewed -- yes, we

CHANCERY COURT REPORTERS

App. 0333

J. Dondero - Cross                                    311

expected outside counsel to be thorough in their consideration of all the variables.

Q.    I'm going to ask you the same series of questions now that I asked you before. We'll start with in-house counsel.

Which in-house counsel at Highland did you rely on in connection with the allocation agreement -- excuse me -- the assignment agreement?

A.    At that time and place, which was a number of years ago, I believe it was the people I just mentioned, in the order I mentioned them. I believe Thomas Surgent, Isaac Leventon and, to a lesser extent, Scott Ellington. But I could be wrong on the mix or exactly who was doing what.

Q.    Before I ask the Court to seal the courtroom again, are you going to be able to give us any specific advice that you received from any of those in-house lawyers in connection with the assignment agreement?

A.    No. I never got specifically involved with the tactics or the strategies or the documentation.

Q.    Which outside counsel were you referring to?

CHANCERY COURT REPORTERS

App. 0334

J. Dondero - Cross                    312

A.        I don't know.  I know there was at least DLAP and Abrams & Bayliss, Delaware counsel. But I think there was a third or fourth law firm, too. I don't even know the names of them.

Q.        Do you believe Highland Capital received advice from Abrams & Bayliss in connection with the assignment agreement?

A.        I don't know.

Q.        This is, again, related to the assignment agreement.  It's your understanding that HERA was receiving $9.5 million worth of services from Highland at the time; is that right?

A.        I have no idea.

Q.        Would you turn back to JX-623 in your binder, please.  This time we're going to look at page 48.  Let me know when you're there.  It's page 13 of 59, if that helps.

A.        Yeah.

Q.        Starting on line 1 of page 48, I asked:  "So is it your position that HERA was receiving [9.5] million worth of services from Highland at [that] time?

        "Answer:  Yeah.  I believe it would have been an appropriate transfer.  That's why it was

CHANCERY COURT REPORTERS

App. 0335

J. Dondero - Cross                          313

done."

Does that help refresh your recollection?

A.      And, again, in the next sentence I'm validating -- it says the same thing, that we're relying on counsel and that I believe counsel was correct.

Q.      The next sentence is where you referred to having the documents strategized, reviewed, and vetted by counsel; is that what you're referring to?

A.      Yes.

Q.      Let's shift gears for a minute and talk about Restoration Capital Partners.  You're familiar with that entity; right?

A.      Yes.

Q.      One of the private equity investments of Restoration Capital Partners is Celtic Pharma?

A.      I believe so.

Q.      You told me in your deposition that there's ongoing litigation relating to Celtic Pharma; is that right?

A.      Yes.

Q.      The litigation is being prosecuted by

CHANCERY COURT REPORTERS

App. 0336

**mbobo@mwblawyer.com**

| | |
|---|---|
| **From:** | Hough, Steven C. |
| **Sent:** | Wednesday, November 28, 2012 10:23 PM |
| **To:** | 'Ted Dameris' |
| **Cc:** | Abrams, Kevin |
| **Subject:** | RE: HERA - Options for Settlement |

Ted:

The HERA LLC agreement's forfeiture provisions apply to the involuntary forfeiture of restricted units in HERA. Accordingly, these provisions do not govern a member's voluntary relinquishment of his vested units. We understand that Mr. Daugherty has solely vested units in HERA.

The HERA LLC agreement is silent about how voluntarily relinquished units are to be redistributed. Accordingly, HERA's board may reallocate such units, and need not do so pro rata, so long as it acts reasonably. We caution that the board, which manages HERA, owes fiduciary duties to both the LLC itself and to its members. Kelly v. Blum, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010).

Sincerely,

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294
E-Mail: Hough@AbramsBayliss.com
* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** Ted Dameris [mailto:TDameris@hcmlp.com]
**Sent:** Tuesday, November 27, 2012 10:13 AM
**To:** Abrams, Kevin
**Cc:** Hough, Steven C.
**Subject:** Re: HERA - Options for Settlement

Yes. For example, if someone left prior to vesting, the board would vote to reallocate those shares to either current or new members. Would the board have this same ability if Daugherty voluntarily forfeited his shares?

On Nov 27, 2012, at 9:09 AM, "Abrams, Kevin" <abrams@AbramsBayliss.com> wrote:

> In referring to reallocation, we assume you mean distribution per whatever formulas and procedures exist in the llc agreement. If you are thinking about something else, let me know.

1

EXHIBIT

25

App. 0337

**From:** Ted Dameris [mailto:TDameris@hcmlp.com]
**Sent:** Tuesday, November 27, 2012 9:36 AM
**To:** Hough, Steven C.
**Cc:** Abrams, Kevin
**Subject:** RE: HERA - Options for Settlement

Since the LLC Agreement does not address the impact on other members' interests if a member voluntarily relinquishes his interest in HERA, does Delaware law give any guidance?

Would the Board have the ability to reallocate? – or would it simply increase everyone's pro-rata share?  Our preference would be for a majority of the board to reallocate.

**From:** Hough, Steven C. [mailto:Hough@AbramsBayliss.com]
**Sent:** Monday, November 26, 2012 3:58 PM
**To:** Ted Dameris
**Cc:** Abrams, Kevin
**Subject:** RE: HERA - Options for Settlement

Ted:

Although Patrick Daugherty's preferred units in HERA have vested and are non-forfeitable, we see nothing in the HERA LLC agreement that would prohibit Mr. Daugherty from voluntarily waiving his interest in HERA. The HERA LLC agreement does not address the impact on other members' interests of a member voluntarily relinquishing his interest in HERA.

Mr. Daugherty may assign or transfer his preferred units in HERA, including to another LLC, with the prior written consent of HERA's board, Art. IX, which acts "by majority vote (either by meeting or written consent)," § 5.1. Although the HERA LLC agreement bars the transfer of restricted preferred units, Ex. A § II.1.5, it does not bar the transfer of Mr. Daugherty's vested preferred units, § 3.1; Ex. A §§ I.1.1, II.1.2.

Sincerely,

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294
E-Mail: Hough@AbramsBayliss.com
* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Ted Dameris [mailto:TDameris@hcmlp.com]
**Sent:** Monday, November 26, 2012 12:14 PM

2

App. 0338

**To:** Abrams, Kevin; Hough, Steven C.
**Subject:** RE: HERA - Options for Settlement

Can we pick this back up.  Thx.

**From:** Abrams, Kevin [mailto:abrams@AbramsBayliss.com]
**Sent:** Monday, November 12, 2012 6:25 PM
**To:** Ted Dameris
**Subject:** Re: HERA - Options for Settlement

Thanks for being flexible. We will get back to you early next week.

Kevin G. Abrams
Abrams & Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, DE 19807
Main: 302-778-1000
Direct: 302-778-1002
Facsimile: 302-778-1001
Cell: 302-547-8000
E-Mail: abrams@abramsbayliss.com<mailto:abrams@abramsbayliss.com>

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

_____

**From:** Ted Dameris <TDameris@hcmlp.com>
**To:** Abrams, Kevin
**Sent:** Mon Nov 12 19:17:10 2012
**Subject:** RE: HERA - Options for Settlement

Next week is fine.  We will just put options as placeholders since this portion is not critical to the final settlement.

**From:** Abrams, Kevin [mailto:abrams@AbramsBayliss.com]
**Sent:** Monday, November 12, 2012 6:13 PM
**To:** Ted Dameris
**Subject:** Re: HERA - Options for Settlement

Thanks for the questions. I am conducting a trial this week and unfortunately have very limited time during the day through friday. Let me know when you need an answer so we can try to help you out.

Kevin G. Abrams
Abrams & Bayliss LLP
20 Montchanin Road
Suite 200

3

App. 0339

Wilmington, DE 19807
Main: 302-778-1000
Direct: 302-778-1002
Facsimile: 302-778-1001
Cell: 302-547-8000
E-Mail: abrams@abramsbayliss.com<mailto:abrams@abramsbayliss.com>

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Ted Dameris <TDameris@hcmlp.com>
**To:** Abrams, Kevin; Hough, Steven C.
**Sent:** Mon Nov 12 18:24:53 2012
**Subject:** HERA - Options for Settlement

We are exploring a variety of options relating to a potential settlement with Pat Daugherty. Can you please review the LLC Agreement and Delaware law and advise on the following issues:

1) Can Daugherty voluntarily "forfeit" or "waive" his interest in HERA? If so, what happens? Do the other holders of the LLC simply acquire a larger prorata share?

2) Can Daugherty transfer his interest to another LLC? If so, what are the mechanics/approvals to make that happen?

**TED DAMERIS  |  MANAGING DIRECTOR – REAL ESTATE**
**HIGHLAND CAPITAL MANAGEMENT, LP**
300 Crescent Court  |  Suite 700  |  Dallas, Texas 75201
O: 972.419.4416  |  C: 214.415.2251  |  F: 972.628.4147
tdameris@hcmlp.com  |  www.hcmlp.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction It may contain confidential, proprietary or legally privileged information If you receive this message in error, please immediately delete it

4

App. 0340

**Thomas Uebler**

| | |
|---|---|
| **From:** | Tyler, Annette |
| **Sent:** | Wednesday, January 9, 2013 7:43 PM |
| **To:** | 'legal-invoices@hcmlp.com' |
| **Cc:** | 'Thomas Surgent' |
| **Subject:** | Daugherty Litigation |
| **Attachments:** | HERA 1-9-13 stmt.pdf |

Attached is our invoice for services rendered during December 2012.

Thank you,
Annette

Annette B. Tyler
Assistant to Kevin G. Abrams
Abrams &Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, Delaware  19807
Direct:  302-778-1012
Facsimile:  302-778-1001
E-Mail:  tyler@abramsbayliss.com

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**EXHIBIT**

**26**

exhibitsticker.com

App. 0341

# ABRAMS & BAYLISS LLP

20 Montchanin Road
Suite 200
Wilmington, DE 19807
302-778-1000

Tax ID No. 56-2528254

| | |
|---|---|
| HIGHLAND EMPLOYEE RETENTION ASSETS | Invoice Date: January 9, 2013 |
| c/o Highland Capital Mgmt, L.P. | Invoice No. 11050 |
| 300 Crescent Court - Suite 700 | Account No. 729.00 |
| Dallas, TX  75201 | Page:  1 |

Attn:    Thomas Surgent, Esq.

Re:  Daugherty Litigation

## Activities

| Date | | Description | Hours | |
|---|---|---|---|---|
| 12/06/2012 | KGA | Messages with board members | 0.10 | 79.50 |
| | SCH | Emails re disqualification and settlement | 0.20 | 89.00 |
| 12/07/2012 | SCH | Emails re settlement | 0.10 | 44.50 |
| | KGA | Messages with clients re settlement negotiations | 0.10 | 79.50 |
| 12/09/2012 | SCH | Emails re board meetings and settlement | 0.20 | 89.00 |
| 12/10/2012 | SCH | Emails re settlement proposals; review order re motions to disqualify | 0.20 | 89.00 |
| | KGA | Messages with directors re settlement issues | 0.10 | 79.50 |
| 12/12/2012 | SCH | Email re settlement proposals | 0.10 | 44.50 |
| | KGA | Review settlement term sheet | 0.10 | 79.50 |
| 12/22/2012 | SCH | Emails re HERA LLC agreement | 0.20 | 89.00 |
| | KGA | Review client questions re board voting procedures and Dondero buyout offer; review HERA operating agreement; prepare talking points re responses to client questions | 1.00 | 795.00 |
| 12/23/2012 | SCH | Review LLC agreement; conference call with HERA directors re LLC agreement; draft memo re LLC agreement and Dondero proposal | 1.70 | 756.50 |
| | KGA | Review and analyze client questions re board procedures and Dondero buyout offer; review HERA operating agreement; prepare advice to directors re board procedures and Dondero offer; teleconference with directors | 1.50 | 1,192.50 |
| 12/24/2012 | KGA | Review LLC operating agreement and analyze client questions re Dondero buyout offer; revise advice memo to clients re board reconstitution and Dondero buyout | 0.70 | 556.50 |
| | SCH | Analyze indemnification issues and LLC agreement; draft memo re LLC agreement amendments | 2.10 | 934.50 |
| 12/25/2012 | SCH | Emails re HERA LLC agreement and Dondero buyout | 0.10 | 44.50 |

App. 0342

HIGHLAND EMPLOYEE RETENTION ASSETS

Re: Daugherty Litigation

| | Invoice Date: | January 9, 2013 |
|---|---|---|
| | Invoice No. | 11050 |
| | Account No. | 729.00 |
| | Page: | 2 |

| | | | Hours | |
|---|---|---|---|---|
| 12/26/2012 | KGA | Analyze client questions re Dondero taking board control; review LLC agreement; revise advice messages to client; follow up messages with Dameris re Dondero buyout proposal | 0.60 | 477.00 |
| | SCH | Analyze potential amendments to HERA LLC agreement; emails re HERA LLC agreement; legal research re indemnification and amendments to LLC agreements; draft message to Dameris re electing and replacing directors, amendment to LLC agreements and indemnification; draft messages to Dameris re HERA LLC agreement amendments | 2.70 | 1,201.50 |
| 12/29/2012 | SCH | Legal research re indemnification; draft message to Dameris re HERA LLC agreement and Dondero buyout proposal | 2.10 | 934.50 |
| 12/30/2012 | KGA | Revise advice memo to Dameris re director indemnification issues | 0.20 | 159.00 |
| | SCH | Draft memo re HERA LLC agreement amendments; emails re HERA LLC agreement amendments | 0.60 | 267.00 |
| | | For Current Services Rendered | 14.70 | 8,081.50 |

## Expenses

| | |
|---|---|
| Photocopying | 7.50 |
| Total Expenses | 7.50 |

## Advances

| | |
|---|---|
| Online Legal Research | 78.98 |
| Total Advances | 78.98 |
| Total Current Work | 8,167.98 |

**TOTAL AMOUNT DUE:** $8,167.98

## WIRING INSTRUCTIONS:

ABRAMS & BAYLISS LLP OPERATING ACCOUNT
Account No. 2910 3917

M&T Bank
ABA No. 031100092

App. 0343

**Thomas Uebler**

| | |
|---|---|
| **From:** | Abrams, Kevin |
| **Sent:** | Sunday, December 30, 2012 12:44 PM |
| **To:** | 'TDameris@hcmlp.com' |
| **Cc:** | Hough, Steven C. |
| **Subject:** | Fw: HERA Memo |
| **Attachments:** | HERA memo 12-30-12.doc |

We have further considered the indemnification rights of the hera directors and revised the indemnification section of our summary advice memo. Our new recommendation is at the end of section 4 of the below email. The rest of our analysis is unchanged. Please let us know if you have any additional questions.

Kevin G. Abrams
Abrams & Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, DE 19807
Main: 302-778-1000
Direct: 302-778-1002
Facsimile: 302-778-1001
Cell: 302-547-8000
E-Mail: abrams@abramsbayliss.com<mailto:abrams@abramsbayliss.com>

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From**: Hough, Steven C.
**To**: Abrams, Kevin
**Sent**: Sun Dec 30 12:36:51 2012
**Subject**: HERA Memo

1.  What vote is required to amend the HERA LLC agreement?
Section 5.2(b)(iv) requires "the prior affirmative vote or written consent of at least 75% of the members of the Board" to "amend, alter, change or repeal any of the provisions" of the HERA LLC agreement.  A vote of HERA's members on such amendments is neither provided by the LLC agreement nor required by Delaware's LLC statute.

2.  How are HERA's board members selected and removed?
Section 5.1 provides that HERA shall be managed by a six-member board comprised of R. Joseph Dougherty, Patrick Boyce, John Honis, William L. Britain, Amit Walia, and Ted Dameris.

Section 5.1 provides that "[a]ny vacancies on the Board shall be filled by holder(s) of Series A Preferred Units elected by a majority of the remaining members of the Board, or if no such majority

1

**EXHIBIT**

**27**

exhibitsticker.com

App. 0344

## 1.  What vote is required to amend the HERA LLC agreement?

Section 5.2(b)(iv) requires "the prior affirmative vote or written consent of at least 75% of the members of the Board" to "amend, alter, change or repeal any of the provisions" of the HERA LLC agreement.  A vote of HERA's members on such amendments is neither provided by the LLC agreement nor required by Delaware's LLC statute.

## 2.  How are HERA's board members selected and removed?

Section 5.1 provides that HERA shall be managed by a six-member board comprised of R. Joseph Dougherty, Patrick Boyce, John Honis, William L. Britain, Amit Walia, and Ted Dameris.

Section 5.1 provides that "[a]ny vacancies on the Board shall be filled by holder(s) of Series A Preferred Units elected by a majority of the remaining members of the Board, or if no such majority decision can be reached, by the holder(s) of the greatest numbers of Series A Preferred Units who are not then currently a member of the Board and who are willing to serve on the Board, or if no Series A Preferred Units remain outstanding, as determined by a majority of the remaining members of the Board."

Section 5.1 provides that "[e]ach member of the Board shall serve until... such member's... removal from [the] Board by the unanimous affirmative vote of the remaining Board members."  Section 5.2 amplifies that "[n]either the Member nor any other unitholder shall have the authority to remove any member of the Board."

## 3.  Must HERA's board members retain a membership interest in HERA?

Section 5.1 provides that "[e]ach member of the Board shall serve until such member shall cease to hold Series A Preferred Units."

## 4.  Do HERA's board members have mandatory indemnification rights?

Section 8.1(b) provides that "[e]xcept as may be restricted by applicable law, no member of the Board, no officer of the Company nor the Member [Highland Capital Management, L.P.] shall be liable for and the Company shall indemnify each such person and/or the Member against... all liabilities and claims (including reasonable attorney's fees and expenses in defending against such liabilities and claims) against each such person and/or the Member, arising from each such person's and/or the Member's performance of its duties in conformance with the terms of this Agreement."

HERA may be able to amend its LLC agreement following the HERA directors' resignations to eliminate or impair the indemnification rights of its board members, officers, and Highland Capital Management.  Accordingly, HERA should amend its LLC agreement to provide that HERA may not eliminate or impair these indemnification rights after the occurrence of the act or omission that is the subject of the liability or

App. 0345

claim against the board member, officer, or Highland Capital Management.  HERA also should amend its LLC agreement to provide advancement rights to its board members, officers, and Highland Capital Management.

<u>5.  How should HERA's board be reconstituted in conjunction with the Dondero buyout?</u>
Prior to the sale to Dondero, HERA should remove Amit from its board and confirm that Dondero will hold the majority of the Series A Preferred Units in HERA.  HERA should complete the sale to Dondero, have all HERA directors sell and resign upon consummation of the stock sale, and Dondero should act by consent to appoint HERA's new director(s).

App. 0346

**mbobo@mwblawyer.com**

| | |
|---|---|
| **From:** | Hough, Steven C. |
| **Sent:** | Friday, January 4, 2013 6:15 PM |
| **To:** | 'TDameris@hcmlp.com' |
| **Cc:** | Abrams, Kevin |
| **Subject:** | Buyout Steps [HERA] |

Ted:

As we discussed on our telephone call earlier today, our list of steps to be taken in connection with Dondero's proposed HERA buyout follow.

I. **The following preliminary steps should be taken prior to an affiliate of James Dondero conditionally offering to purchase all outstanding units of HERA:**
   A. <u>Dougherty:</u> Joe Dougherty accepts offer from Dondero and leaves HERA's board
      1. Dondero's buyout offer to Dougherty should be on the same terms as his buyout offer to HERA's other Unitholders
      2. A majority of the remaining HERA board members elect Scott Ellington (or another HERA Unitholder) to fill this vacancy on the Board
   B. <u>Walia:</u> Five Board members (Boyce, Britain, Dameris, Ellington, and Honis) unanimously vote to remove Amit Walia from the Board
      1. A majority of the remaining HERA board members elect a HERA Unitholder to fill this vacancy on the Board
   C. <u>Amendments:</u> At least 75% of HERA's board members agree to amend HERA's LLC agreement to provide:
      1. that the indemnification rights of HERA's board members, officers, and "the Member" (Highland Capital Management) may not be eliminated or impaired after the occurrence of the act or omission that is the subject of the liability or claim against the board member, officer, or the Member (Highland Capital Management)
      2. advancement rights to HERA's board members, officers, and the Member (Highland Capital Management)

II. **HERA's board should amend HERA's LLC agreement at the same time that Dondero makes his buyout offer to HERA's Unitholders:**
   A. <u>Amendment to Permit HERA Governance by Members:</u> At least 75% of HERA's board members agree to amend HERA's LLC agreement to provide that holder(s) of the majority of HERA's Series A Preferred Units may amend, alter, change, or repeal any of the provisions of HERA's LLC agreement
      1. This amendment is voluntarily subjected to and conditioned upon a vote of HERA's Unitholders
   B. <u>Buyout Terms:</u> Dondero offers to buyout all of HERA's Unitholders on the same terms and conditions:
      1. Dondero will effect the HERA buyout through an entity other than Highland Capital Management or HERA ("Buyer")
      2. Buyer will obtain and disclose to the HERA Unitholders a fairness opinion supporting the financial fairness of his buyout offer to HERA's Unitholders
      3. The buyout offer will be open to, and made on the same terms and conditions to, all HERA Unitholders (including Patrick Daugherty)
      4. The buyout offer will remain open for a reasonable set period of time to give all HERA Unitholders a reasonable opportunity to participate in the buyout (subject to Dondero's right to purchase units at any time and from time to time)
      5. Per Dondero's demand, the selling HERA Unitholder must agree to a broad release of all claims against Buyer, Dondero, the HERA board members, Highland Capital Management, HERA, and all related entities, affiliates, associates, and agents
      6. Per Dondero's demand, the selling HERA Unitholder must acknowledge the validity of Article XII (entitled "DISPUTE RESOLUTION; CONFIDENTIALITY") of HERA's LLC agreement and agree that its provisions apply to payment of the buyout consideration by Dondero
   C. <u>Board Consent to Transfer of Units:</u> HERA's board consents in writing to its Unitholders assigning their interests in HERA to Buyer

1

EXHIBIT

28

App. 0347

1.   This consent is voluntarily subjected to a vote of HERA's Unitholders
   D.  <u>Buyer's Minimum Sale Condition:</u> The buyout and the amendments to HERA's LLC agreement identified in Section II are made contingent upon Buyer acquiring a majority of HERA's Unitholdings
   E.  <u>Buyout Initial Closing:</u> Holders of a supermajority of the Units will simultaneously approve the sale and authorization documents to allow Dondero to immediately become the holder of a majority of the Units

**III.  HERA Governance Amendment: Following the successful consummation of the buyout, Buyer will make multiple amendments to HERA's LLC agreement to convert HERA from a board-managed LLC to a member-managed LLC**
   A.  <u>Notice:</u> Following all of the above, notice should be sent by HERA to all HERA Unitholders identifying the amendments to HERA's LLC agreement and the actions taken in connection with the buyout


Sincerely,

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294
E-Mail: Hough@AbramsBayliss.com
* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

App. 0348

**Thomas Uebler**

| | |
|---|---|
| **From:** | Helen Kim <HKim@hcmlp.com> |
| **Sent:** | Thursday, January 10, 2013 8:19 AM |
| **To:** | Hough, Steven C. |
| **Cc:** | Abrams, Kevin; Thomas Surgent |
| **Subject:** | RE: DRAFT HERA DOCS |
| **Attachments:** | HERA Second Amended Restated LLC Agreement (Current).doc |

Mr. Hough,

Per your request to Thomas, attached please find a Word version of the requested HERA agreement.

Best regards,

_____

**HELEN KIM** | PARALEGAL



**HIGHLAND CAPITAL**
MANAGEMENT, LP

300 CRESCENT COURT | SUITE 700 | DALLAS, TEXAS 75201
O: 972.419.2513 | F: 972.628.4147
HKim@hcmlp.com | www.hcmlp.com

---

**From:** Thomas Surgent
**Sent:** Wednesday, January 09, 2013 7:21 PM
**To:** Helen Kim
**Subject:** FW: DRAFT HERA DOCS

Can you get this to him in the morning

---

**From:** Hough, Steven C. [mailto:Hough@AbramsBayliss.com]
**Sent:** Wednesday, January 09, 2013 5:12 PM
**To:** Thomas Surgent
**Cc:** Abrams, Kevin
**Subject:** RE: DRAFT HERA DOCS

Thomas:

To facilitate our review of these documents, could you please send us a copy of HERA's operative February 16, 2012, Second Amended and Restated Limited Liability Company Agreement in Microsoft Word DOC format? We previously received this document only as a scanned Adobe PDF.

Sincerely,

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294

1

EXHIBIT

**29**

App. 0349

E-Mail: Hough@AbramsBayliss.com
* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Abrams, Kevin
**Sent:** Wednesday, January 09, 2013 1:45 PM
**To:** 'TSurgent@hcmlp.com'
**Cc:** Hough, Steven C.
**Subject:** Re: DRAFT HERA DOCS

Thanks for the drafts. We will start reviewing today.

Kevin G. Abrams
Abrams & Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, DE 19807
Main: 302-778-1000
Direct: 302-778-1002
Facsimile: 302-778-1001
Cell: 302-547-8000
E-Mail: abrams@abramsbayliss.com<mailto:abrams@abramsbayliss.com>

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From**: Thomas Surgent <TSurgent@hcmlp.com>
**To**: 'Paul Lackey (pbl@lhlaw.net)' <pbl@lhlaw.net>; 'Michael Aigen (mpa@lhlaw.net)' <mpa@lhlaw.net>; Lane Britain <LBritain@hcmlp.com>; Patrick Boyce <PBoyce@hcmlp.com>; John Honis <JHonis@hcmlp.com>; Scott Ellington <SEllington@hcmlp.com>; Abrams, Kevin
**Cc**: Ted Dameris <TDameris@hcmlp.com>
**Sent**: Wed Jan 09 13:41:15 2013
**Subject**: DRAFT HERA DOCS

Attached for your review are drafts of the proposed HERA docs (in chronological order):

1.  Dougherty resignation
2.  Resolution accepting resignation and appointing Ellington
3.  Resolution removing Walia and approving amendment
4.  Form of Amendment to HERA operating agreement

2

App. 0350

5. Offer to Purchase HERA interests
6. Form of Transfer Agreement
7. Form of Amended and Restated LLC Agreement (post all transactions)

Please let me know if you have any comments.

THOMAS SURGENT | CHIEF COMPLIANCE OFFICER &
DEPUTY GENERAL COUNSEL



300 Crescent Court | Suite 700 | Dallas, Texas 75201
Office: 972.419-6205          |          Fax: 972.628.4147
tsurgent@hcmlp.com          |          www.hcmlp.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

3

App. 0351

**SECOND AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this *"Agreement"*) is entered into as of this 16th day of February, 2012 by Highland Employee Retention Assets LLC, a Delaware limited liability company (the *"Company"*), and Highland Capital Management, L.P., a Delaware limited partnership (the *"Initial Member"*), as the sole initial member of the Company and the members of the Board of the Company set forth on the signature pages hereof.

WHEREAS, the original Limited Liability Company Agreement of the Company was entered into on October 26, 2009 (the *"Original Agreement"*);

WHEREAS, the Original Agreement was amended and restated effective May 13, 2011 (as amended, the *"Restated Agreement"*)

WHEREAS, at least 75% of the Board of Directors of the Company has recommended certain amendments to the Restated Agreement;

WHEREAS, in order to incorporate such amendments and restate the Restated Agreement, the parties hereto hereby approve the further amendment and restatement of the Restated Agreement on the terms set forth herein;

NOW THEREFORE, the Restated Agreement of the Company is hereby further amended and restated in its entirety as follows:

ARTICLE I

NAME AND PLACE OF BUSINESS

The name of the Company is Highland Employee Retention Assets LLC. Its registered office in the State of Delaware is 1209 Orange Street, Wilmington, Delaware 19801, in the County of New Castle. The name of its registered agent at such address is The Corporation Trust Company. Its principal place of business is 13455 Noel Road, Suite 800, Dallas, TX 75240 or such other place or places as the Board of Directors may hereafter determine.

ARTICLE II

BUSINESS, PURPOSE, AND TERM OF COMPANY

Section 2.1    Purposes. The purpose of the Company shall be to receive and hold assets to be contributed by the Initial Member and to distribute the proceeds of such assets from time to time to certain employees of the Initial Member (or of affiliates of the Initial Member, as applicable) as the Board may from time to time determine in order to create a retention initiative

App. 0352

for such employees and to engage in such other lawful purposes and activities in connection with the foregoing.

Section 2.2    Term of Company. The term of the Company shall commence on the date the Certificate of Formation is filed with the Delaware Secretary of State in accordance with the provisions of the Act and shall continue on a perpetual basis unless dissolved pursuant to ARTICLE VI of this Agreement.

Section 2.3    Powers of the Company. In addition to the purpose set forth in Section 2.1 above and subject to Section 5.2, the Company shall have the power:

(a)    to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(b)    to acquire, by purchase, mortgage, lease, contribution of property or otherwise, and to own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(c)    to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with the Initial Member or any person or other entity that directly or indirectly controls, is controlled by, or is under common control with the Initial Member, or any agent of the Company necessary to, in connection with, convenient to, or incidental to, the accomplishment of the purpose of the Company;

(d)    to lend or borrow money and to invest its funds, in each case as necessary to, convenient to, or incidental to, the accomplishment of the purpose of the Company;

(e)    to sue and be sued;

(f)    to appoint employees and fix their compensation; and

(g)    to indemnify any officer, director, employee, agent or holder of Series A Preferred Units of the Company.

## ARTICLE III

## MEMBERSHIP UNITS; CAPITAL CONTRIBUTIONS

Section 3.1    Membership Units. The capital interests in the Company shall consist of (a) Common Units and (b) Series A Preferred Units, each having the respective rights set forth on Exhibit A, attached. No holder of Series A Preferred Units shall be deemed a member of the Company until such units vest in accordance with Exhibit A, thereafter, such vested holders together with the Initial Member shall be members of the Company (collectively, the "*Members*").

2

App. 0353

Section 3.2    <u>Capital Contribution by Members</u>.  Capital Contributions shall be made, in cash or in kind, from time to time as the Board shall determine.

Section 3.3    <u>Tax Contributions</u>.  To the extent the Company does not possess sufficient available cash to fund the current tax obligations of the Company, the Initial Member shall fund to the Company the full amount of such deficiency in the form of either (a) one or more capital contributions or (b) one or more loans at the then prevailing prime rate maintained by the Company's primary banking institution.

Section 3.4    <u>Capital Accounts</u>.    (a) The Company shall establish and maintain a separate Capital Account for each Member in accordance with Section 704 of the Code and the Treasury Regulations promulgated thereunder, including Treasury Regulations §1.704-a(b) (each such Capital Account, a "*Capital Account*").  The Capital Account maintained for each member shall be equal to:

(i)    the capital contributions made by such member to the Company, if any; *increased by*

(ii)    the aggregate amount of Net Income and other items of income and gain allocated to such Member pursuant to this ARTICLE III; *decreased by*

(iii)    the aggregate amount of distributions made by the Company to such Member; *decreased by*

(iv)    the aggregate amount of Net Loss and other items of deduction, expenditure and loss allocated to such member pursuant to this ARTICLE III.

(b)    The maintenance of Capital Accounts pursuant to this ARTICLE III is intended to comply with the requirements of Section 704 of the Code and the Treasury Regulations promulgated thereunder, and the provisions of this Agreement regarding the maintenance of Capital Accounts shall be interpreted and applied consistently therewith.  If, in the opinion of the Board, the manner in which the Capital Accounts are to be maintained pursuant to this ARTICLE III should be modified in order to comply with the requirements of Section 704 of the Code and the Treasury Regulations promulgated thereunder, then, notwithstanding anything to the contrary contained in this ARTICLE III, the Board may change the manner in which the Capital Accounts are maintained, and the Board shall have the right, upon delivery of written notice to each other Member and without obtaining the consent of any member, to amend this Agreement to reflect any such change in the manner in which the Capital Accounts are maintained; *provided, however*, that any such change in the manner of maintaining the Capital Accounts shall not alter materially the economic arrangement among the Members unless all adversely affected Members consent to the change.

Section 3.5    <u>Allocation of Net Income and Net Loss</u>.  (a) Except as otherwise provided in Section 3.5 hereof, Net Income and Loss shall be allocated pro rata in accordance with each vested Series A Preferred Unit holders Capital Account balance.

(b)    The Members agree to be bound by the provisions of this ARTICLE III in reporting their shares of Company Net Income and Loss for tax purposes.

3

App. 0354

(c)    The cost of performance of any special service required by any member shall be allocated and charged to and borne by such Member.  Any Member allocated and charged a particular cost or expense shall be entitled to such deductions or credits as a re-attributable to such cost or expense in computing such Member's taxable income or tax liability to the exclusion of any other Member.

ARTICLE IV

DISTRIBUTIONS

Section 4.1    Distributions.  No other distributions of any cash or assets of the Company shall be made, except as (a) required by Section 4.2, (b) as permitted under paragraph 2 under Series A Preferred Units on Exhibit A, or (c) as required in connection with the dissolution of the Company.

Section 4.2    Tax Distributions.  The Board shall promptly declare and make cash distributions pursuant hereto to the Members to allow the federal and state income tax attributable to the Company's taxable income that is passed through the Company to the Members to be paid by such Member (a "*Tax Distribution*").  To satisfy this requirement, the Company shall pay to each Member on or before April 14 of each Fiscal Year, an amount at least equal to the product of (a) the sum of the Company's positive taxable income attributed to that Member during the prior Fiscal year multiplied by (b) the sum of the highest federal and state individual income tax rates imposed on any Member in effect that prior Fiscal Year.

ARTICLE V

MANAGEMENT OF THE COMPANY

Section 5.1    General.  The Company shall be managed by a Board of Directors (the "*Board*"), which shall at all times consist of six members, consisting of the following individuals:

> R. Joseph Dougherty
> Patrick Boyce
> John Honis
> William L. Britain
> Amit Walia
> Ted Dameris

The Board shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company.  The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement.  Each member of the Board shall serve until such member shall cease to hold Series A Preferred Units or until such member's death, resignation or removal from by Board by the unanimous affirmative vote of the remaining Board members.  Any vacancies on the Board shall be filled by holder(s) of Series A Preferred Units

4

elected by a majority of the remaining members of the Board, or if no such majority decision can be reached, by the holder(s) of the greatest number of Series A Preferred Units who are not then currently a member of the Board and who are willing to serve on the Board, or if no Series A Preferred Units remain outstanding, as determined by a majority of the remaining members of the Board.

Section 5.2    Delegation of Powers of the Board.    (a) Subject to Section 5.2(b) and ARTICLE XI hereof, the Board shall have the exclusive and complete authority, acting without the consent or approval of, or notice to, the Member and in the Board's sole and absolute discretion, to operate the Company and its business and to make all determinations or elections or to consent to any matter otherwise described in this Agreement. Neither the Member nor any other unitholder shall have the authority to remove any member of the Board.

(b)    Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company shall not, and shall not have power or authority and shall not be authorized to, and the Board shall not, and shall not have power or authority and shall not be authorized to cause the Company to, take any of the following actions without the prior affirmative vote or written consent of at least 75% of the members of the Board:

(i)    dissolve, wind-up or liquidate, in whole or in part, or cause or consent to the dissolution, winding up or liquidation, in whole or in part, of the Company;

(ii)    be a party to any merger or consolidation or sell, transfer, assign, convey or lease any asset of the Company, or cause or consent to any merger or consolidation or sale, transfer, assignment, conveyance or lease of any assets of the Company;

(iii)    directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity, or cause the Company to directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity;

(iv)    amend, alter, change or repeal any of the provisions of this Agreement;

(v)    incur or assume any indebtedness or obligations except for liabilities under Section 3.3, or cause the Company, to incur or assume any indebtedness or obligations except for liabilities under Section 3.3; or

(vi)    take any Bankruptcy Action with respect to the Company, or take, cause or consent to any Bankruptcy Action with respect to the Company.

Section 5.3    Officers.    The Board may appoint individuals with or without such titles as it may elect, including the titles of President, Vice President, Treasurer, and Secretary, to act on

5

behalf of the Company with such power and authority as the Board may delegate in writing to any such persons.

Section 5.4    Powers of the Board.  The Board shall have the sole right, power and authority, in the management of the business and affairs of the Company, to do or cause to be done any and all acts deemed by the Board to be necessary or appropriate to effectuate the business, purposes and objectives of the Company at the expense of the Company, including but not limited to the execution of all documents or instruments in all matters necessary, desirable, convenient or incidental to the purpose of the Company or the making of investments of Company funds.

Section 5.5    Reliance by Third Parties.  Any person or entity dealing with the Company may rely on a certificate signed by the Board as to:

(a)    the identity of the Board;

(b)    the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Board or are in any matter germane to the affairs of the Company;

(c)    the persons who or entities which are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(d)    any act or failure to act by the Company or as to any other matter whatsoever involving the Company.

Section 5.6    Tax Reporting.  The Board shall endeavor to cause to be prepared after the end of each taxable year of the Company and filed, on or before their respective due dates (as the same may be extended), all federal and state income tax returns of the Company for such taxable year and shall take all action as may be necessary to permit the Company's regular accountants to prepare and timely file such returns.  Form, 1065 (Schedule K-1) shall be sent to the Member and each holder of Series A Preferred Units after the end of each taxable year reflecting such member's or holders pro rata share of income, loss, credit and deductions for such taxable year.

Section 5.7    Tax Election.  Any elections required or permitted to be made by the Company under the Code shall be made by the Board in such manner as the Board shall determine.  In the event of an audit of the Company by the Internal Revenue Service, the Board shall act as the "tax matters partner" pursuant to Section 6231(a)(7) of the Code, and such tax matters partner shall comply with all of his obligations as such under the Code and the regulations promulgated thereunder.  During such time as the Company has one Member, it intends to be treated as a "branch" of such Member for U.S. federal income tax purposes, and during such time as the Company has more than one member, it intends to be treated as a partnership for federal income tax purposes, and the Board shall make any such elections necessary for such purposes and neither the Member nor any holder of Series A Preferred Units shall do anything inconsistent with such characterization.

6

App. 0357

ARTICLE VI

DISSOLUTION

The Company shall be dissolved, and shall terminate and wind up its affairs, upon the first to occur of the following:

      (a)     the determination by the Board to dissolve the Company; or

      (b)     the entry of a decree of judicial dissolution pursuant to Section 18.802 of the Act.

ARTICLE VII

GOVERNING LAW AND JURISDICTION

This Agreement, including its existence, validity, construction and operating effect, and the rights of each of the parties hereto, shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

ARTICLE VIII

INDEMNIFICATION

Section 8.1    Indemnification and Liability.    (a) To the maximum extent permitted by applicable law, no member of the Board, no officer of the Company nor the Member shall be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, or (iii) for losses due to any such mistakes, action or inaction.

      (b)     Except as may be restricted by applicable law, no member of the Board, no officer of the Company nor the Member shall be liable for and the Company shall indemnify each such person and/or the Member against, and agrees to hold each such person and/or the Member harmless from, all liabilities and claims (including reasonable attorney's fees and expenses in defending against such liabilities and claims) against each such person and/or the Member, arising from each such person's and/or the Member's performance of its duties in conformance with the terms of this Agreement.

      (c)     The Board, any officers and/or the Member may consult with legal counsel or accountants selected by the Board and/or the Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

7

App. 0358

ARTICLE IX

ASSIGNMENT OF INTERESTS

No interest in the Company, whether Common Units, Preferred Units or otherwise, may be assigned without the prior written consent of the Board, provided, however, that vested Series A Preferred Units may be assigned as set forth on Exhibit A.

ARTICLE X

WINDING UP AND DISTRIBUTION OF ASSETS

Section 10.1    Winding Up.  If the Company is dissolved, the Board shall wind up the affairs of the Company.

Section 10.2    Distribution of Assets.  Upon the winding up of the Company, subject to the provisions of the Act, the Board shall pay or make reasonable provision to pay all claims and obligations of the Company, including all costs and expenses of the liquidation and all contingent, conditional or unmatured claims and obligations that are known to the Board but for which the identity of the claimant is unknown.  If there are sufficient assets, such claims and obligations shall be paid in full and any such provision shall be made in full.  If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available therefor.  Any remaining cash and other assets shall be distributed to the holders of any Series A Preferred Units outstanding.

ARTICLE XI

SEPARATENESS AND OPERATING PROCEDURES

Section 11.1    Separateness; Operating Procedures.  Until the date on which no Series A Preferred Units remain outstanding, the Company represents warrants and covenants as follows:

(a)    The purpose for which the Company is organized shall be and remain limited solely to (i) directly owning and holding assets to be contributed by the Member and to distribute the proceeds of such assets from time to time to certain employees of the Member in order to create a retention initiative for such employees (the "*Retention Assets*"), (ii) distribute the proceeds of the Retention Assets in accordance with the terms of the Series A Preferred Units of the Company, and (iii) transacting any and all lawful business for which a limited liability company may be organized under Delaware law that is incident, necessary and appropriate to accomplish the foregoing.

(b)    The Company will maintain all of its books, records, and bank accounts separate from those of any affiliate.  The Company's assets will not be listed as assets on the financial statement of any other entity. The Company's assets will not be listed as assets on the financial statement of any other entity; provided, however, that its assets may be included in a consolidated financial statement of its parent if inclusion on such consolidated financial statement is required to comply with the requirements of GAAP, provided that such consolidated

8

App. 0359

financial statements shall contain a footnote to the effect that the Company's assets are owned by it and that they are being included on the financial statement of its parent solely to comply with the requirements of GAAP. The Company will file its own tax returns and will not file a consolidated federal income tax return with any other entity unless required to do so by applicable law or regulation.

(c)    The Company will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any of its affiliates), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, and shall maintain and utilize separate stationery, invoices and checks.

(d)    The Company shall maintain its bank accounts separate from any other person or entity other than a successor in interest and will not commingle its funds and other assets with those of any of its affiliates, other than any successor in interest, or any other person, and will not participate in a cash management system with any such party.

(e)    The Company will not guarantee or become obligated for the debts of any other entity or person or pledge its assets for the benefit of any such entity or person and does not and will not hold itself out as being responsible for the debts or obligations of any other person, or hold out its credit as available to satisfy the obligations of any other person or entity.

(f)    The Company shall allocate fairly and reasonably any overhead expenses that are shared with an affiliate, including paying for office space and services performed by any employee of an affiliate.

(g)    The Company shall hold regular meetings, as appropriate, to conduct its business, and has done or caused to be done and will do all things necessary to observe all customary organizational and operational formalities and to preserve its existence.

(h)    The Company shall pay its own liabilities and expenses out of its own funds drawn on its own, or any successor-in-interest's, bank account.

ARTICLE XII

DISPUTE RESOLUTION; CONFIDENTIALITY

Section 12.1    Dispute Resolution. In the event any Member or holder of units of the Company, including, without limitation, Series A Preferred Units (any such member or holder, a "**Disputing Party**"), commences litigation or, solely with respect to persons who have not executed a separation agreement in favor of the Initial Member unless such action constitutes a breach of such separation agreement, otherwise initiates any dispute or makes any claim, or takes any action that results in any third party making a claim, in each case related to the Company, or the management or operation thereof or the assets held thereby (each, a "**Dispute**") (i) against the Company, any Member thereof, any officer or director or other agent or representative or equity holder thereof (each, a "**Company Party**"), or (ii) that in any way does or could adversely impact any of the assets held by the Company, then with the consent of 75% of the Board, all pending and future distributions to the Disputing Party shall be immediately suspended and held in escrow by the Company (the "**Dispute Escrow**") until the final, non-appealable resolution of the

9

Dispute, it being understood that the expiration of any applicable statute of limitations (including any applicable tolling periods with respect thereto) shall constitute such a resolution (any such resolution, a "*Dispute Resolution Date*"). The full balance of the Dispute Escrow shall be distributed to the Disputing Party promptly following the Dispute Resolution Date, net of the sum of (A) the full costs and expenses incurred by any Company Party in connection with such Dispute, including without limitation, costs and expenses of legal counsel, unless a court of competent jurisdiction has ruled in favor of Disputing Party in a final non-appealable judgment, and (B) any diminution in value to the assets held by the Company resulting from or in connection with such Dispute, as determined by the Board in its sole discretion. Any amount deducted from a Disputing Party's distribution pursuant to the preceding sentence shall be reallocated pro rata to the other Series A Preferred Unit Holders based on their respective holdings of Series A Preferred Units.

Section 12.2  Confidentiality. All matters and information regarding the Company and the assets held thereby are strictly confidential (all such information, "*Confidential Information*"). No holder of units of the Company, including, without limitation, the Series A Preferred Units, shall be permitted to disclose or to use for any purpose any Confidential Information, except as (i) required by law or (ii) as directed and authorized in writing by the Company. In the event any unit holder violates the provisions of this Section 12.2 as determined by 75% of the Board, then the dispute resolution provisions of Section 12.1 hereof shall be deemed to apply as if the violating holder was a "Disputing Party" thereunder pending the Company's resolution of such violation, including, without limitation, the netting provisions under Section 12.1 with respect to the costs, expenses and diminution resulting from such violation.

## ARTICLE XIII

## DEFINITIONS

As used herein, the following terms shall have the indicated definitions.

"*Act*" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., as may be amended from time to time.

"*Agreement*" means this Limited Liability Company Agreement, as may be amended from time to time.

"*Bankruptcy Action*" means, with respect to any entity:

(a)    Filing or consenting to the filing of any bankruptcy, insolvency or reorganization case or proceeding with respect to such entity;

(b)    Instituting any proceedings with respect to such entity under any applicable insolvency law or otherwise seeking any relief under any laws relating to the relief from debts or the protection of debtors generally;

10

App. 0361

(c)      Seeking or consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such entity or a substantial portion of its properties;

(d)      Making any assignment for the benefit of such entity's creditors;

(e)      Taking any action in furtherance of any of the foregoing; or

(f)      Admitting in writing the inability of such entity to pay its debts generally as they become due.

"*Capital Contribution*" means the contribution by the Member to capital of the Company.

"*Certificate of Formation*" means the Certificate of Formation of the Company as filed with the Delaware Secretary of State on June 23, 2009, as the same may be amended from time to time.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Company*" means Highland Employee Retention Assets LLC, a Delaware limited liability company.

"*Initial Member*" means Highland Capital Management, L.P., a Delaware limited partnership, the holder of the Common Units of the Company.

"*Members*" means the Initial Member and each holder of vested Series A Preferred Units.

"*Net Income*" or "*Net Loss*" means, for any fiscal year of the Company, the taxable income or loss of the Company for such year, as well as any other taxable income or loss (as computed for federal income tax purposes), with the following adjustments: (i) expenditures of the Company that are neither deductible for federal income tax purposes nor allowable as additions to the basis of Company property (or that are so treated pursuant to Section 1.704-1(b)(2)(iv) of the Treasury Regulations) shall be subtracted from such taxable income or loss; and (ii) there shall not be taken into account any items specially allocated pursuant to Section 3.5.

"*Treasury Regulations*" means the Treasury Regulations promulgated under the Code.

*[SIGNATURE PAGE FOLLOWS]*

11

App. 0362

Case 3:24-cv-00498-K    Document 133-1    Filed 02/14/25    Page 364 of 467    PageID 6910

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement the day and year first above written.

INITIAL MEMBER:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By:_____
Name:_____
Title:_____


COMPANY:

HIGHLAND EMPLOYEE RETENTION ASSETS LLC, by each of the undersigned directors thereof:

_____
R. JOSEPH DOUGHERTY

_____
JOHN HONIS

_____
PATRICK BOYCE

_____
WILLIAM L. BRITAIN

_____
AMIT WALIA

_____
TED DAMERIS

App. 0363

## Exhibit A

### Rights of Common Units and Series A Preferred Units

**I.    COMMON UNITS**

    **1.    General.**

        1.1    Authorized/Issued Units.  The number of authorized Common Units shall consist of 100 Common Units, all of which shall be issued to Highland Capital Management, L.P.

        1.2    Transfer. The Common Units shall be non-transferrable

    **2.    Dividend Rights.**  No dividends shall be paid on any Common Units so long as any Series A Preferred Units remain outstanding.

    **3.    Rights on Liquidation.**  The Common Units shall have a residual right to any assets available on liquidation, dissolution and winding up of the affairs of the Company following satisfaction of all creditor claims solely in the event no Series A Preferred Units remain outstanding.

    **4.    Voting Rights.**  Each holder of shares of Common Units shall not be entitled to vote.

    **5.    No Other Rights.**  No other rights shall be vested in the holders of the Common Units except as expressly provided in the Agreement.

**II.    SERIES A PREFERRED UNITS**

    **1.    General.**

        1.1    Authorized/Issued Units.  The number of authorized Series A Preferred Units shall consist of 10,000 Series A Preferred Units.  The Company shall issue (or reissue, in the case of forfeited units) Series A Preferred Units to such persons and in such amounts designated by the Member, provided that (i) each such person shall be an employee of the Member at the time of issuance, and (ii) each such recipient shall not hold greater than a 10% beneficial interest in the Member at the time of issuance, and (iii) the aggregate number of such issued units shall not exceed the number of authorized Series A Preferred Units provided above. No holder of any Class A Preferred Units of the Company shall have any preemptive right to purchase units sold or issued by the Company except to the extent that such a right may from time to time be set forth in a written agreement between the Company and a unitholder.

        1.2    Vesting.  Each Series A Preferred Unit issued shall be deemed a *"Restricted Series A Preferred Unit"* until such unit or units vest in accordance with this Section 1.2 or Section 1.3 below.  The Restricted Series A Preferred Units shall vest and become non-forfeitable on May 15, 2011.  The period commencing on the date of issuance and ending on the date the Restricted Series A Preferred Units vest is referred to as the *"Restricted Unit Period"* as

A-1

to those Restricted Series A Preferred Units.  For purposes of this Exhibit and the attached Agreement, references to the Series A Preferred Units shall be deemed to include all such units, whether or not restricted, unless the context expressly provides otherwise.  Notwithstanding anything contained herein to the contrary, the Company may provide for vesting terms different than those set forth herein if expressly set forth in the terms of any award letter or agreement pursuant to which Series A Preferred Units are issued or granted.

1.3    Change in Control. If a Change in Control occurs, any Restricted Series A Preferred Units, to the extent then outstanding and not vested, shall become fully vested and non-forfeitable as of the date of such Change in Control.  For purposes of this Agreement, "*Change in Control*" shall mean any change in "beneficial ownership" (as defined in Rule 13d-3 under the Exchange Act of 1934, as amended) of at least a majority of the voting securities of the general partner of the Member.

1.4    Termination of Employment. In the event of the termination of any Series A Preferred Holder's employment or service with the Member or affiliate thereof, as applicable, for any reason prior to the lapsing of the restrictions in accordance with Section 1.2 above with respect to any of the Restricted Series A Preferred Units granted hereunder, the entire unvested portion of the Restricted Series A Preferred Units held by such person shall be automatically forfeited as of the date of termination. In the event of any forfeiture, such forfeited units will cease to remain outstanding unless reissued pursuant to Section 1.1 above.  Neither the holder nor any of such holder's successors, heirs, assigns or personal representatives shall have any rights or interests in any Restricted Series A Preferred Units that are so forfeited.

1.5    Transfer.  No Restricted Series A Preferred Units nor any interest therein, may be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of, except by will or the laws of descent and distribution, during the Restricted Unit Period. Any attempt to dispose of any Restricted Series A Preferred Units in contravention of the above restriction shall be null and void and without effect.

2.    **Dividend Rights.**  The Board may elect from time to time to make distributions, in cash or in kind, to the holders of the Series A Preferred Units, provided that (i) all such distributions shall be paid pro rata to each holder of Series A Preferred Units, and (ii) the Company shall provide to the Series A Holders at least 60 days advance written notice of any proposed in-kind distribution and each such holder shall be given the opportunity to forfeit, in whole or in part, its right to receive all or any portion of the assets proposed to be distributed in kind.

3.    **Rights on Liquidation.**  The Series A Preferred Units shall have no rights with respect to rights on liquidation, dissolution and winding up of the affairs of the Company, other than with respect to (i) payment of accrued and unpaid dividends through the date of liquidation or dissolution, and (ii) distribution of all other cash and assets of the Company remaining following such liquidation or dissolution.

App. 0365

**4.** **Voting Rights.** No holder of shares of Series A Preferred Units shall be entitled to vote.

**5.** **Miscellaneous.**

5.1 **Information Rights.** The Company will deliver to each holder of Series A Preferred Units quarterly reports that include (i) such holder's percentage interest in the outstanding Series A Preferred Units, (ii) a current listing of the Company's assets and the fair market values thereof, and (iii) the change in value of such assets since the last such report.

5.2 **No Right to Continued Employment.** Nothing in this Agreement shall confer upon any holder of Series A Preferred Units any right to continue in the employ of the Member nor of any affiliate thereof, or shall interfere with or restrict in any way the right of the Member or any such affiliate, which is hereby expressly reserved, to remove, terminate or discharge the holder at any time for any reason whatsoever, with or without cause and with or without advance notice.

A-3

App. 0366

## Thomas Uebler

| | |
|---|---|
| **From:** | Tyler, Annette |
| **Sent:** | Friday, January 11, 2013 9:21 PM |
| **To:** | 'legal-invoices@hcmlp.com' |
| **Cc:** | Lane Britain; Ted Dameris; 'Thomas Surgent' |
| **Subject:** | Retainer Request |
| **Attachments:** | HERA invoice.pdf |

Please see attached.

Thank you.


Annette B. Tyler
Assistant to Kevin G. Abrams
Abrams &Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, Delaware  19807
Direct:  302-778-1012
Facsimile:  302-778-1001
E-Mail:  tyler@abramsbayliss.com


The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

EXHIBIT

30

App. 0367

# ABRAMS & BAYLISS LLP
## 20 Montchanin Road, Suite 200
## Wilmington, DE  19807
## Main: 302-778-1000
## Fax: 302-778-1001

STATEMENT DATE: January 11, 2013
STATEMENT NO. 11092R
ACCOUNT NO. 729.00

## HIGHLAND EMPLOYEE RETENTION ASSETS
c/o Highland Capital Management, L.P.
300 Crescent Court – Suite 700
Dallas, Texas  75201

ATTENTION:   Thomas Surgent, Chief Compliance
             Officer and Deputy General Counsel

Re:     Retainer Request

**TOTAL AMOUNT DUE:** ...............................................................................**$ 100,000.00**

KGA/abt

## WIRING INSTRUCTIONS

### ABRAMS & BAYLISS LLP
ESCROW A/C No. 2910 5995
M&T BANK
ABA No. 031100092

{A&B-00236452-}

App. 0368

**mbobo@mwblawyer.com**

| | |
|---|---|
| **From:** | Hough, Steven C. |
| **Sent:** | Friday, January 11, 2013 10:24 PM |
| **To:** | 'TSurgent@hcmlp.com'; 'TDameris@hcmlp.com' |
| **Cc:** | Abrams, Kevin |
| **Subject:** | RE: HERA |
| **Attachments:** | HERA - Written Consent Removing Dougherty and Appointing Ellington (00236185-3).DOC; HERA - Written Consent Removing Walia and Approving Amendment (00236186-3).DOC; HERA Amendment (Walia-related) to Second Amended Restated LLC Agreement (00236187-4).DOC; HERA - Written Consent Approving Indemnification Amendment (00236462).DOC; HERA Member Consent (indemnification) (00236456).DOC; HERA Amendment (indemnification) to Second Amended Restated LLC Agreement (00236453).DOC; HERA - Written Consent Approving Transfer and Amendment Amendment (00236464).DOC; HERA Member Consent (transfer and amendment) (00236465).DOC; HERA Amendment (amendment) to Second Amended Restated LLC Agreement (00236454).DOC; HERA Offer to Purchase (00236188-3).DOCX; HERA Transfer Agreement (00236189-3).DOC |

Gentlemen:

Our comments on the proposed HERA buyout papers are reflected in the attached documents.  Please let us know if you have any questions or would like to discuss further.

Sincerely,

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294
E-Mail: Hough@AbramsBayliss.com
* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

```
-----Original Message-----
From: Abrams, Kevin
Sent: Friday, January 11, 2013 1:03 PM
To: 'TDameris@hcmlp.com'
Cc: 'TSurgent@hcmlp.com'; Hough, Steven C.
Subject: Re: HERA

Fyi--we are shooting to circulate our markups by later today. We see that certain steps
are different than what we expected and we will let you know if we need a call to clarify
```

1

EXHIBIT

31

App. 0369

anything. We are trying to use the structure in the papers that we received as much as possible.

Kevin G. Abrams
Abrams & Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, DE  19807
Main:  302-778-1000
Direct:  302-778-1002
Facsimile:  302-778-1001
Cell:  302-547-8000
E-Mail:  abrams@abramsbayliss.com<mailto:abrams@abramsbayliss.com>

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.


----- Original Message -----
From: Ted Dameris <TDameris@hcmlp.com>
To: Abrams, Kevin
Cc: Thomas Surgent <TSurgent@hcmlp.com>
Sent: Thu Jan 10 23:06:47 2013
Subject: Re: HERA

Perfect.  Thx.


On Jan 10, 2013, at 9:42 PM, "Abrams, Kevin" <abrams@AbramsBayliss.com> wrote:

> We are trying to get comments to you by late tomorrow afternoon. I will have a better idea in the morning and will give you a status report.
>
> Kevin G. Abrams
> Abrams & Bayliss LLP
> 20 Montchanin Road
> Suite 200
> Wilmington, DE  19807
> Main:  302-778-1000
> Direct:  302-778-1002
> Facsimile:  302-778-1001
> Cell:  302-547-8000
> E-Mail:  abrams@abramsbayliss.com<mailto:abrams@abramsbayliss.com>
>
> The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or

2

App. 0370

agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.
>
>
>
>
> ----- Original Message -----
> From: Ted Dameris <TDameris@hcmlp.com>
> To: Abrams, Kevin
> Cc: Thomas Surgent <TSurgent@hcmlp.com>
> Sent: Thu Jan 10 22:23:20 2013
> Subject: HERA
>
>
> Do you have an estimate on a timeframe to get back to us after your review of the documents?
>
> Dondero wants to get an estimate on timing so that he can prepare the necessary funds.
>
>
> _____
>
> DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.
>
>

3

App. 0371

**Thomas Uebler**

| | |
|---|---|
| **From:** | Abrams, Kevin |
| **Sent:** | Thursday, January 17, 2013 2:55 PM |
| **To:** | Hough, Steven C. |
| **Subject:** | Re: Buyout [HERA] |

Ok

Kevin G. Abrams
Abrams & Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, DE 19807
Main: 302-778-1000
Direct: 302-778-1002
Facsimile: 302-778-1001
Cell: 302-547-8000
E-Mail: abrams@abramsbayliss.com<mailto:abrams@abramsbayliss.com>

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From**: Hough, Steven C.
**To**: Abrams, Kevin
**Sent**: Thu Jan 17 14:38:38 2013
**Subject**: Buyout [HERA]

Kevin:

Thomas Surgent called.  Highland has a major transaction launching soon that it does not want to be held up with negative publicity if Patrick Daugherty decides to sue; accordingly, Jim Dondero would like to delay sending the buyout offer to non-employees with HERA interests until February 1.  Thus, the buyout offer would go to current employees tomorrow, while Dondero would wait two weeks to make the buyout offer to the others.

Any problem with this? Based on our call last night, I reiterated the concern that Patrick Daugherty might find out in the interim (which Surgent was not concerned about) and recommended that the offer be open for the same amount of time for each set of holders (so that the later-notified non-employees do not receive less time to decide—i.e., a less favorable offer term—than the employees to decide whether to accept the buyout offer).

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294

1

**EXHIBIT**

**32**

exhibitsticker.com

App. 0372

E-Mail: Hough@AbramsBayliss.com
\* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

App. 0373

## AGREEMENT

This Agreement ("*Agreement*") is entered into by and among R. JOSEPH DOUGHERTY ("*Seller*") and Highland Capital Management, L.P. ("*Purchaser*"). Each of Seller and Purchaser are individually referred to as a "*Party*" and together, collectively referred to as the "*Parties*."

WHEREAS, Seller holds 1,294.79 units (the "*Interests*") of the Series A Preferred Units of Highland Employee Retention Assets LLC, a Delaware limited liability company ("*HERA*"; and

WHEREAS, Seller desires to transfer the Interests and all of its rights, claims and interests related to or arising from the Interests and settle and release any and all claims that Seller may have with respect to HERA, Purchaser and their respective affiliates and the Interests.

NOW, THEREFORE AND IN CONSIDERATION of the mutual covenants contained herein, and other good and valuable consideration, the parties intending to be legally bound hereby agree as follows:

1. <u>Transfer of Interests</u>. Subject to the terms and conditions set forth in this Agreement, Seller hereby sells, transfers, assigns, sets over and otherwise conveys to Purchaser, and Purchaser hereby purchases and takes from Seller, all right, title, duties, obligations and interest (whether now owned or hereafter acquired or arising and wherever located) of Seller in, to and under the Interests.

2. <u>Representations and Warranties of Seller</u>. Seller hereby represents and warrants as follows:

(a) It has all requisite power, authority and capacity, corporate, limited partnership or otherwise, to execute, deliver and perform under this Agreement. Its execution, delivery and performance of this Agreement have been duly authorized by all necessary action. This Agreement has been duly executed and delivered by Seller. This Agreement is a legal, valid and binding agreement of such party, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer or conveyance or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity.

(b) Seller's Interests are owned of record and beneficially by Seller, free and clear of any obligation, lien, claim, pledge, security interest, liability, charge, contingency or other encumbrance or claim of any nature. Seller has not assigned, pledged or otherwise in any manner whatsoever sold or transferred either by instrument in writing or otherwise, any right, title, interest or claim which it has or may have in HERA or the Interests or any matters arising out of, related thereto, or in connection therewith.

**EXHIBIT**

**33**

App. 0374

(c)    Seller has had access to all information as it deems necessary and appropriate in connection with its decision to enter into this Agreement. Seller believes the Payment Amount represents fair value for the Interests.

(d)    None of HERA, Purchaser or any of their respective Board members or any of their respective affiliates has recommended or induced Seller to enter into this Agreement.

3.    <u>Representations and Warranties of Purchaser</u>. Purchaser hereby represents and warrants as follows:

Purchaser has all requisite power, authority and capacity, corporate, individual or otherwise, to execute, deliver and perform under this Agreement. The execution, delivery and performance by Purchaser of this Agreement has been duly authorized by all necessary action. This Agreement has been duly executed and delivered by Purchaser. This Agreement is a legal, valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer or conveyance or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity. Purchaser has had access to all information as it deems necessary and appropriate in connection with its decision to enter into this Agreement. None of HERA or any of its Board members or any of their respective affiliates has recommended or induced Purchaser to enter into this Agreement. Purchaser further represents that Purchaser intends to make substantially similar or better offers to purchase Series A Units from existing HERA owners.

4.    <u>Payment</u>. The purchase price for the Interests is $1,446,415.56, payable in immediately available funds upon the execution hereof (the "*Payment Amount*") according to the following wiring instructions:

TRANSFERS TO LITTLER MENDELSON STATE BAR TRUST ACCOUNT

Bank Name:    Union Bank
400 California Street
San Francisco, CA 94104
Tel: (800) 898-6466

Account Name:    Littler Mendelson, P.C.
California State Trust
Account Number:    7007200883
ABA Routing No:    122000496
Swift Code:    BOFCUS33MPK
Contact Person:    Janet Hui
Telephone No:    (415) 399-8465
Fax No:    (415) 399-8490

Required Information:

Page 2

App. 0375

Sender's  Entity Name:          Highland Capital Management, L.P.
Contact Person:                 Frank Waterhouse, CFO
Contact Phone #:                (972) 628-4100
Client/Matter Reference #:      070655.1000

5.     Waiver and Release. Except for claims or situations excluded below, Seller does hereby and for its predecessors, successors, assigns and affiliates and for all other persons or entities claiming by, through or under any of them, hereby fully, irrevocably and forever RELEASE, ACQUIT AND FOREVER DISCHARGE HERA, Purchaser and their respective predecessors, successors, assigns, affiliates, subsidiaries, and all their respective past, present and future officers, directors, board members, agents, representatives and employees (the  "Released Parties"), of and from any and all claims, liabilities, actions, causes of action, demands, rights, damages, costs, loss of service, expense and compensation whatsoever, from the beginning of time through the date of this Agreement, related to, or arising from, HERA and/or Purchaser or their respective affiliates, the activities in connection therewith, the Interests or Seller's or Purchaser's investment therein, and any acts and omissions relating to the management of HERA and/or Purchaser or their respective affiliates, whether or not in contract, in equity, in tort or otherwise, whether pursuant to any rule, regulation, law or otherwise, whether direct or indirect, whether known or unknown, and whether fixed, accrued, contingent or otherwise, which Seller ever had or, now has, except (i) for claims against Purchaser for breach of this Agreement, or (ii) in cases or situations when any of the Released Parties have sued or made claims against Seller.  In cases or situations when any of the Released Parties sue or make claims against Seller, Seller retains the right to assert as counterclaims, crossclaims or affirmative defenses any claims, causes of action, or rights that might otherwise be covered by this paragraph.  Seller acknowledges that there are or may be claims, disputes, obligations, rights, damages, injury, or causes of action which may arise out of facts existing or actions taken by the Parties as of the date of this Agreement but which are as yet unknown and which may not be known until some period in the future.  The Parties agree that the above release does not include claims for indemnification that Seller may have against any of the Released Parties related to his service as director of HERA.

6.     HERA Indemnification.  Purchaser agrees that if any action is taken to eliminate or impair the provisions of Article VIII of the Second Amended and Restated Operating Agreement of HERA dated February 16, 2012 as they apply for the benefit of Seller in his capacity as a former director of HERA, Purchaser promises to provide the same indemnification rights in favor of Seller as provided in Article VIII of the SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC entered into on February 16, 2012.

7.     Covenant Not to Sue.  Except as provided in Paragraph 5, Seller acknowledges and agrees that all disputes between the parties and the claims released herein have been fully and finally settled to its complete satisfaction, leaving no disputes, controversies, claims or grievances of any kind of between the Parties in relation to the claims released herein; therefore, Seller covenants and agrees that it will not again raise, participate in, assist, or in any way pursue any claims which are being released and discharged in this Agreement in any forum of any kind, including, without limitation, the federal, state or

Page 3

App. 0376

local courts, or federal, state or local agencies or offices of any kind, be they administrative, regulatory, judicial, quasi-judicial, or otherwise.

8.     Confidentiality.  Except for the disclosure required under Section 9 below, Seller covenants and agrees that the terms and conditions of this Agreement are to be held strictly confidential by him and not revealed to any other person or entity, unless in response to the lawful process of any judicial or governmental authority or as otherwise required by law, with the exception of his spouse, advisors, attorneys, auditors, other professional or financial advisors, insurers and parent company affiliates who need to know the information and who have been advised of the confidential nature of such information.

9.     Freedom of Choice.  Each signatory to this Agreement agrees it has been entered into freely and without duress after having consulted with the attorneys and/or professionals of his/her choice. This Agreement, or any portion thereof, shall not be construed against the Party who initially prepared it, but shall be construed as if all Parties jointly prepared each and every part thereof, and any uncertainty or ambiguity shall not be interpreted to the detriment of any Party on such basis.

10.     Miscellaneous.  The Parties acknowledge that they are represented by counsel, and fully understand their rights and obligations under the Agreement.  The Parties acknowledge and agree that each of HERA and the other parties and persons released herein are intended third party beneficiaries of this Agreement, and agree to deliver to HERA a copy of this Agreement promptly following the execution thereof.  Further, the Parties declare they have completely read this Agreement, and they enter into the Agreement freely, voluntarily and without coercion or duress.  Seller understands that Purchaser is relying upon the representations made by Seller in this Agreement, and Seller knowingly waives (i) any claim that this settlement was induced by any misrepresentation or nondisclosure, and (ii) any right to rescind or avoid this settlement based upon presently existing facts, known or unknown.

11.     Applicable Law.  It is also understood and agreed that this Agreement shall be governed by and construed in accordance with Texas law, without regard to its conflict of laws rules.

12.     Severability.  In case any provision of this Agreement shall be held invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

13.     No Admission of Liability.  By entering into this Agreement, the Parties do not admit any liability on the part of any Party.

14.     Modification of Agreement.  It is expressly understood and agreed that this Agreement may not be altered, amended, waived, modified, or otherwise changed in any respect or particular whatsoever, except in writing, which writing must be signed by authorized representatives of each Party. The Parties further acknowledge and agree that they will make no claims at any time or place that this Agreement has been orally supplemented, modified, or altered in any respect whatsoever.

15.     Further Assurances.  Seller agrees that from time to time, it will promptly execute and deliver all further instruments and documents, and take any and all further action, that Purchaser may reasonably request, in order to fully transfer the Interests purchased hereunder.

App. 0377

16.    Execution of Agreement. It is understood and agreed that this Agreement may be executed in any number of identical counterparts, each of which shall be deemed original for all purposes.

17.    Arbitration. In the event there is an unresolved legal dispute between the parties and/or any of the Released Parties that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Parties might pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service. The arbitrator(s) shall be duly licensed to practice law in the State of Texas. The discovery process shall be conducted pursuant to the Texas Rules of Civil Procedure. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's employment dispute resolution rules or other mutually agreeable, arbitration service rules. As necessary Purchaser will pay any up-front arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. Purchaser will not have the exclusive right to select the arbitrator(s) or the number utilized. Rather, the preceding sentences selections, if not mandated by law or rule, will be mutually agreed upon and in instances where more than one arbitrator is to be selected, and it is an odd number of arbitrators, one arbitrator will be selected by a mutually agreed upon independent third party and Purchaser and Seller will each select one-half of the remaining. In situations where there is an even number of arbitrators, Purchaser and Seller will each select half. In the event only one arbitrator is to be selected, Purchaser and Seller must mutually agree on the selection of that arbitrator. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each Party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the Parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on the date appearing next to each Party's signature and this Agreement shall be effective on the date the last signature has been signed upon this Agreement.

SELLER:

R. JOSEPH DOUGHERTY

Dated: 1/17/13

PURCHASER:

HIGHLAND CAPITAL MANAGEMENT, L.P.
By: Strand Advisors, Inc., its general partner

By:_____
Name:
Title:

Date:_____

Firmwide:117642276.2 070655.1000

App. 0379

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on the date appearing next to each Party's signature and this Agreement shall be effective on the date the last signature has been signed upon this Agreement.

SELLER:

_____

R. JOSEPH DOUGHERTY

Dated:_____

PURCHASER:

HIGHLAND CAPITAL MANAGEMENT, L.P.
By: Strand Advisors, Inc., its general partner

By:_____
Name:        James D. Dondero
Title:          President

Date:    01/17/2013

Firmwide:117642276.2 070655.1000

App. 0380

**mbobo@mwblawyer.com**

| | |
|---|---|
| **From:** | Tyler, Annette |
| **Sent:** | Monday, February 4, 2013 8:31 PM |
| **To:** | 'Thomas Surgent' |
| **Cc:** | Ted Dameris |
| **Subject:** | HERA |
| **Attachments:** | 2-4-13 HERA letter and invoices.pdf |

Please see attached.


Annette B. Tyler
Assistant to Kevin G. Abrams
Abrams & Bayliss LLP
(302) 778-1012

EXHIBIT

34

1

App. 0381

**ABRAMS & BAYLISS LLP**
20 MONTCHANIN ROAD, SUITE 200
WILMINGTON, DE 19807
MAIN: 302-778-1000
FAX: 302-778-1001

KEVIN G. ABRAMS

DIRECT DIAL NUMBER
302-778-1002
ABRAMS@ABRAMSBAYLISS.COM

February 4, 2013

Highland Employee Retention Assets, LLC
c/o Thomas J. Surgent, Esq.
Highland Capital Management, L.P.
300 Crescent Court - Suite 700
Dallas, Texas 75201

      Re:    HERA—Daugherty Litigation

Dear Tom:

      This letter constitutes a reminder regarding our unpaid invoices for services rendered to Highland Employee Retention Assets, LLC in connection with the Daugherty Litigation and related matters.

      I have enclosed copies of Invoice No. 11050 dated January 9, 2013 in the amount of $8,167.98 and Invoice No. 11092 dated January 11, 2013 in the amount of $100,000.00. Per your request, the foregoing invoices were submitted to a "legal-invoices" email address at Highland on January 9 and January 11; however, payment has not been received. If you find our enclosed bills to be in order, we would appreciate anything you can do to ensure that we receive prompt payment.

      As always, we appreciate the opportunity to represent Highland Capital Management and we hope that you will not hesitate to give us a call in the event we can provide any additional assistance.

                        Sincerely yours,

                        /s/ Kevin G. Abrams

                        Kevin G. Abrams

KGA/abt
Enclosures
cc:    Ted Dameris (by email with enclosures)

{A&B-00238722-1}

App. 0382

# ABRAMS & BAYLISS LLP

20 MONTCHANIN ROAD
SUITE 200
WILMINGTON, DE 19807
302-778-1000

TAX ID No. 56-2528254

HIGHLAND EMPLOYEE RETENTION ASSETS
c/o Highland Capital Mgmt, L.P.
300 Crescent Court - Suite 700
Dallas, TX  75201

| | |
|---|---|
| Invoice Date: | January 11, 2013 |
| Invoice No. | 11092 |
| Account No. | 729.00 |
| Page: | 1 |

Attn:    Thomas Surgent, Esq.

Re:  Daugherty Litigation

## Activities

| | | | Hours | |
|---|---|---|---|---|
| 01/11/2013 | KGA | RETAINER REQUEST | | 100,000.00 |
| | | For Current Services Rendered | | 100,000.00 |
| | | Total Current Work | | 100,000.00 |
| | | **TOTAL AMOUNT DUE:** | | $100,000.00 |

(

**WIRING INSTRUCTIONS:**

ABRAMS & BAYLISS LLP OPERATING ACCOUNT
Account No. 2910 3917

M&T Bank
ABA No. 031100092

App. 0383

# ABRAMS & BAYLISS LLP

20 MONTCHANIN ROAD
SUITE 200
WILMINGTON, DE 19807
302-778-1000

TAX ID NO. 56-2528254

HIGHLAND EMPLOYEE RETENTION ASSETS
c/o Highland Capital Mgmt, L.P.
300 Crescent Court - Suite 700
Dallas, TX 75201

| | |
|---|---|
| Invoice Date: | January 9, 2013 |
| Invoice No. | 11050 |
| Account No. | 729.00 |
| Page: | 1 |

Attn:  Thomas Surgent, Esq.

Re:  Daugherty Litigation

## Activities

| | | | Hours | |
|---|---|---|---|---|
| 12/06/2012 | KGA | Messages with board members | 0.10 | 79.50 |
| | SCH | Emails re disqualification and settlement | 0.20 | 89.00 |
| 12/07/2012 | SCH | Emails re settlement | 0.10 | 44.50 |
| | KGA | Messages with clients re settlement negotiations | 0.10 | 79.50 |
| 12/09/2012 | SCH | Emails re board meetings and settlement | 0.20 | 89.00 |
| 12/10/2012 | SCH | Emails re settlement proposals; review order re motions to disqualify | 0.20 | 89.00 |
| | KGA | Messages with directors re settlement issues | 0.10 | 79.50 |
| 12/12/2012 | SCH | Email re settlement proposals | 0.10 | 44.50 |
| | KGA | Review settlement term sheet | 0.10 | 79.50 |
| 12/22/2012 | SCH | Emails re HERA LLC agreement | 0.20 | 89.00 |
| | KGA | Review client questions re board voting procedures and Dondero buyout offer; review HERA operating agreement; prepare talking points re responses to client questions | 1.00 | 795.00 |
| 12/23/2012 | SCH | Review LLC agreement; conference call with HERA directors re LLC agreement; draft memo re LLC agreement and Dondero proposal | 1.70 | 756.50 |
| | KGA | Review and analyze client questions re board procedures and Dondero buyout offer; review HERA operating agreement; prepare advice to directors re board procedures and Dondero offer; teleconference with directors | 1.50 | 1,192.50 |
| 12/24/2012 | KGA | Review LLC operating agreement and analyze client questions re Dondero buyout offer; revise advice memo to clients re board reconstitution and Dondero buyout | 0.70 | 556.50 |
| | SCH | Analyze indemnification issues and LLC agreement; draft memo re LLC agreement amendments | 2.10 | 934.50 |
| 12/25/2012 | SCH | Emails re HERA LLC agreement and Dondero buyout | 0.10 | 44.50 |

App. 0384

HIGHLAND EMPLOYEE RETENTION ASSETS

Re:  Daugherty Litigation

| | Invoice Date: | January 9, 2013 |
| --- | --- | --- |
| | Invoice No. | 11050 |
| | Account No. | 729.00 |
| | Page: | 2 |

| Date | | Description | Hours | |
| --- | --- | --- | --- | --- |
| 12/26/2012 | KGA | Analyze client questions re Dondero taking board control; review LLC agreement; revise advice messages to client; follow up messages with Dameris re Dondero buyout proposal | 0.60 | 477.00 |
| | SCH | Analyze potential amendments to HERA LLC agreement; emails re HERA LLC agreement; legal research re indemnification and amendments to LLC agreements; draft message to Dameris re electing and replacing directors, amendment to LLC agreements and indemnification; draft messages to Dameris re HERA LLC agreement amendments | 2.70 | 1,201.50 |
| 12/29/2012 | SCH | Legal research re indemnification; draft message to Dameris re HERA LLC agreement and Dondero buyout proposal | 2.10 | 934.50 |
| 12/30/2012 | KGA | Revise advice memo to Dameris re director indemnification issues | 0.20 | 159.00 |
| | SCH | Draft memo re HERA LLC agreement amendments; emails re HERA LLC agreement amendments | 0.60 | 267.00 |
| | | For Current Services Rendered | 14.70 | 8,081.50 |

## Expenses

| | |
| --- | --- |
| Photocopying | 7.50 |
| Total Expenses | 7.50 |

## Advances

| | |
| --- | --- |
| Online Legal Research | 78.98 |
| Total Advances | 78.98 |
| Total Current Work | 8,167.98 |

| | |
| --- | --- |
| **TOTAL AMOUNT DUE:** | $8,167.98 |

**WIRING INSTRUCTIONS:**

ABRAMS & BAYLISS LLP OPERATING ACCOUNT
Account No. 2910 3917

M&T Bank
ABA No. 031100092

App. 0385

**Thomas Uebler**

| | |
|---|---|
| **From:** | Tyler, Annette |
| **Sent:** | Tuesday, March 5, 2013 5:38 PM |
| **To:** | 'legal-invoices@hcmlp.com' |
| **Cc:** | 'Thomas Surgent' |
| **Subject:** | Daugherty Litigation |
| **Attachments:** | 20130305172813646.pdf |

Attached is our invoice for services rendered duringFebruary 2013.

Thank you,
Annette

Annette B. Tyler
Assistant to Kevin G. Abrams
Abrams &Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, Delaware  19807
Direct:  302-778-1012
Facsimile:  302-778-1001
E-Mail:  tyler@abramsbayliss.com

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s).  Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately.  To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**EXHIBIT**

**35**

App. 0386

# ABRAMS & BAYLISS LLP

20 Montchanin Road
Suite 200
Wilmington, DE 19807
302-778-1000

Tax ID No. 56-2528254

| | |
|---|---|
| HIGHLAND EMPLOYEE RETENTION ASSETS | Invoice Date:    March 5, 2013 |
| c/o Highland Capital Mgmt, L.P. | Invoice No.    11386 |
| 300 Crescent Court - Suite 700 | Account No.    729.00 |
| Dallas, TX  75201 | Page:  1 |

Attn:    Thomas Surgent, Esq.

Re:  Daugherty Litigation

## Activities

| Date | Atty | Description | Hours | Amount |
|---|---|---|---|---|
| 01/02/2013 | KGA | Analyze Dondero positions and Dameris questions re buyout proposal | 0.30 | 250.50 |
| | SCH | Communication with Dameris re buyout proposal; emails re HERA board actions | 0.20 | 89.00 |
| 01/03/2013 | SCH | Review Dameris questions; review memos and LLC agreement; legal research re Dameris questions; emails re HERA call; discussion with Abrams re buyout structure; draft memo re buyout approaches | 4.20 | 1,869.00 |
| | KGA | Analyze Dameris questions re Dondero transaction; analyze board succession, unit transfer and LLC agreement amendment questions; prepare outline to address Dameris questions | 1.00 | 835.00 |
| 01/04/2013 | KGA | Analyze steps required by Board and Dondero to complete units sales and HERA governance changes; strategy call with clients; draft and revise step transaction list | 2.40 | 2,004.00 |
| | SCH | Prepare for conference call; conference call with Dameris, Sargent and Abrams; revise memo re buyout approaches; draft and revise memo re buyout steps; analyze buyout steps | 4.70 | 2,091.50 |
| 01/09/2013 | KGA | Review and prepare comments on Dondero transaction documents; related messages with working group | 1.00 | 835.00 |
| 01/10/2013 | KGA | Review and revise Dondero transaction documents | 0.30 | 250.50 |
| | SCH | Communication with Highland re LLC agreement; review and comment on buyout documents; legal research re fiduciary duties; discussion with Bayliss, Farrell and Shindel re precedent offer and transfer documents; review precedent offer and transfer documents | 6.30 | 2,803.50 |
| 01/11/2013 | KGA | Review and revise Dondero transaction documents; related messages with working group; review, analyze and prepare comments on Dondero transaction documents; teleconfernece with client represnetatives re Dondero transaction documents; further attention to revising Dondero-related documents | 1.50 | 1,252.50 |
| | SCH | Communication with Abrams re HERA documents; review and comment on | | |

App. 0387

HIGHLAND EMPLOYEE RETENTION ASSETS

Re: Daugherty Litigation

| | Invoice Date: | March 5, 2013 |
|---|---|---|
| | Invoice No. | 11386 |
| | Account No. | 729.00 |
| | | Page: 2 |

| Date | | Description | Hours | |
|---|---|---|---|---|
| | | LLC amendments and buyout documents; draft memo re buyout documents; review HERA documents; emails re HERA documents; conference call with Dameris and Surgent re HERA documents | 11.90 | 5,295.50 |
| 01/14/2013 | SCH | Call with Surgent and Dameris re buyout documents; discussion with Abrams re buyout documents; discussion with Dameris re release; draft and revise buyout amendment documents; communication with Dameris and Surgent re buyout amendment documents | 2.50 | 1,112.50 |
| 01/15/2013 | SCH | Email re HERA buyout documents; review HERA buyout documents; review HERA buyout blacklines; draft memo re HERA buyout blacklines | 0.80 | 356.00 |
| 01/16/2013 | SCH | Emails re HERA call; review HERA comments on buyout documents; draft and revise buyout document provision; communications with Surgent re buyout document provision | 2.90 | 1,290.50 |
| | KGA | Review Buyer and working group comments on Dondero transaction documents; review client comments on Dondero deal document;s related messages with working group; teleconference with working group re Dondero transaction documents | 2.10 | 1,753.50 |
| 01/17/2013 | SCH | Discussion with Surgent and analyze buyout timing issues | 0.30 | 133.50 |
| | KGA | Address changes to transaction documents; related messages with working group; address client questions re Dondero transaction | 0.90 | 751.50 |
| 01/18/2013 | SCH | Communication with Surgent re index; review index; discussion with Surgent re buyout; analyze buyout issues | 0.50 | 222.50 |
| 01/23/2013 | SCH | Discussion with Surgent re buyout and HERA; analyze buyout and HERA issues | 0.70 | 311.50 |
| | KGA | Status report from client re buyout timetable | 0.10 | 83.50 |
| 01/24/2013 | KGA | Review and prepare comments on new LLC agreement, expense agreement and offset resolutions | 0.50 | 417.50 |
| 01/25/2013 | SCH | Review and comment on HERA documents | 5.30 | 2,358.50 |
| | KGA | Address changes to HERA operating agreement and board resolution re expense allocation | 0.90 | 751.50 |
| 01/27/2013 | SCH | Prepare for conference call; emails re conference call; conference call with Surgent re HERA corporate documents | 0.80 | 356.00 |
| | KGA | Revise comments on Dondero-proposed amendments to operating agreement; prepare and conduct teleconference with Surgent re operation agreement amendments | 0.90 | 751.50 |
| 01/28/2013 | SCH | Review revised LLC agreement draft; comment on revised LLC agreement draft; discussion with Surgent re corporate documents and buyout status; draft memo re Surgent questions and corporate documents; analyze Surgent questions and corporate documents; discussion with Surgent re questions and corporate documents; draft memo re Surgent call; communication with Surgent re HERA amendments | 5.90 | 2,625.50 |
| | KGA | Review changes to Dondero transaction documents | 0.40 | 334.00 |

App. 0388

HIGHLAND EMPLOYEE RETENTION ASSETS

Re:  Daugherty Litigation

Invoice Date:  March 5, 2013
Invoice No.  11386
Account No.  729.00
Page:  3

| Date | Atty | Description | Hours | |
|------|------|-------------|-------|---|
| 01/29/2013 | SCH | Conference call with Surgent re buyout developments; review LLC agreement drafts; discussion with Surgent re LLC agreement and buyout documents; analyze Surgent questions; discussion with Abrams re Surgent questions; discussion with Surgent re questions | 1.50 | 667.50 |
| | KGA | Review changes to operating agreement; prepare outline for strategy call with client; call with client re Dondero risk tolerance in new offer and operating agreement amendments; address client questions re second-steps buyout offer | 1.00 | 835.00 |
| 02/05/2013 | SCH | Discussion with Surgent re buyout developments; analyze client's buyout questions; discussion with Surgent re disclosures to selling members | 0.60 | 267.00 |
| | KGA | Address client questions re possible requests for additional disclosures re Dondero offer | 0.20 | 167.00 |
| 02/06/2013 | SCH | Review new disclosure statement; discussion with Surgent re new disclosure statement; draft memo re statement; review and prepare comments re revised statement; email re revised statement | 0.90 | 400.50 |
| | KGA | Address Daugherty financial position and disclosure statement | 0.10 | 83.50 |
| 02/07/2013 | SCH | Review books and records letter; draft memo re books and records letter; draft memo re books and records response; communication with Surgent re demand letter; emails re Daugherty letters | 1.90 | 845.50 |
| | KGA | Address Daugherty books and records demand and formulate objections and response timetable; messages re Daugherty books and records demand | 0.30 | 250.50 |
| 02/08/2013 | SCH | Discussion with Surgent re books and records response; legal research re books and records demand; review precedent books and records responses; draft memo re books and records demand; draft and revise letter re books and records demand | 3.70 | 1,646.50 |
| 02/11/2013 | KGA | Review responses to Daugherty books and records demand | 0.10 | 83.50 |
| | SCH | Communication with Surgent re books and records response; review Daugherty letter; communication with Surgent re buyout offer acceptance; draft and revise books and records response; draft memo re books and records response | 2.20 | 979.00 |
| 02/12/2013 | KGA | Messages re timetable and contents of books and records response to Daugherty; address client questions re changes to Dondero offer terms; address Rourke questions re Dondero offer terms | 0.50 | 417.50 |
| | SCH | Communication with Surgent re Daugherty letter; review Daugherty letter; emails re books and records; communication with Surgent re books and records response; legal research re deadline; draft memo re deadline; communication with Surgent re buyout question; review transfer agreement, offer to purchase; draft memo re buyout question; review revised transfer agreement; legal research re third-party beneficiaries; draft memo re revised transfer agreement | 3.10 | 1,379.50 |
| 02/13/2013 | KGA | Address offer changes requested by Rourke; related messages with working group; messages re 220 response letter to Daugherty | 0.30 | 250.50 |
| | SCH | Communication with Surgent re buyout question; draft memo re buyout question; legal research re third-party beneficiaries and cooperation; | | |

App. 0389

HIGHLAND EMPLOYEE RETENTION ASSETS

Re:  Daugherty Litigation

| | Invoice Date: | March 5, 2013 |
|---|---|---|
| | Invoice No. | 11386 |
| | Account No. | 729.00 |
| | | Page:  4 |

| | Hours | |
|---|---|---|
| discussion with Surgent re buyout question and transfer agreement; communication with Daugherty and Surgent re books and records demand | 2.00 | 890.00 |
| For Current Services Rendered | 77.70 | 40,348.50 |

#### Expenses

| | |
|---|---|
| Telephone Charges | 239.87 |
| Photocopying | 9.45 |
| Total Expenses | 249.32 |

#### Advances

| | |
|---|---|
| Online Legal Research | 173.90 |
| Total Advances | 173.90 |

| | |
|---|---|
| Total Current Work | 40,771.72 |

#### Payments

| | |
|---|---|
| Total Payments for 03/05/2013 | -40,771.72 |

| | |
|---|---|
| **TOTAL AMOUNT DUE:** | **$0.00** |

WIRING INSTRUCTIONS:

ABRAMS & BAYLISS LLP OPERATING ACCOUNT
Account No. 2910 3917

M&T Bank
ABA No. 031100092

App. 0390

## Page 1

NO. 12-04005

HIGHLAND CAPITAL MANAGEMENT, L.P., AND CORNERSTONE HEALTHCARE GROUP HOLDING, INC. ) ) ) ) )

Plaintiff and Counter-Defendant )

VS. )

PATRICK DAUGHERTY, )

Defendant and Counter-Plaintiff )

VS. )

SIERRA VERDE, LLC, HIGHLAND EMPLOYEE RETENTION ASSETS LLC, JAMES DONDERO, PATRICK BOYCE, AND WILLIAM BRITAIN, )

Third-Party Defendants. )

IN THE DISTRICT COURT OF

DALLAS COUNTY, TEXAS

68TH JUDICIAL DISTRICT

———————

VIDEOTAPED ORAL DEPOSITION OF
WILLIAM LANE BRITAIN
JUNE 11, 2013

———————

CAUTION - THE FOLLOWING TRANSCRIPT
CONTAINS EXCERPTS DESIGNATED
"ATTORNEYS' EYES ONLY"

## Page 2

ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM LANE BRITAIN, produced as a witness at the instance of the Defendant and Counter-Plaintiff Patrick Daugherty, taken in the above-styled and -numbered cause on the 11th day of June, 2013, from 9:17 A.M. to 6:12 P.M., before Michelle C. Folks, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of JAMS, 8401 N. Central Expressway, Suite 610, Dallas, Texas, pursuant to the agreements as stated on the record and/or the Texas Rules of Civil Procedure.

## Page 3

ATTORNEYS OF RECORD

APPEARANCES:

MR. MARC D. KATZ
MR. JASON R. REGAS
   ANDREWS KURTH, LLP
   1717 MAIN STREET, SUITE 3700
   DALLAS, TEXAS 75201
   (214) 659-4722
   COUNSEL FOR THE PLAINTIFFS HIGHLAND CAPITAL
   MANAGEMENT, L.P., CORNERSTONE HEALTHCARE GROUP
   HOLDING, INC., AND THIRD-PARTY DEFENDANTS
   JAMES DONDERO AND SIERRA VERDE

MS. RUTH ANN DANIELS
MS RACHEL CROCKETT
   LOOPER REED & MCGRAW, P C
   1601 ELM STREET, SUITE 4600
   DALLAS, TEXAS 75201
   (214) 954-4136
   COUNSEL FOR THE DEFENDANT AND
   COUNTER-PLAINTIFF PATRICK DAUGHERTY

MR. SCOTT ELLINGTON
   ATTORNEY AT LAW
   3100 INDEPENDENCE PARKWAY, SUITE 311
   PLANO, TEXAS 75075
   (972) 419-2584
   GENERAL FOR HIGHLAND CAPITAL MANAGEMENT, L.P

MR. MARK L JOHANSEN
   GRUBER HURST JOHANSEN HAIL SHANK
   1445 ROSS AVENUE, SUITE 2500
   DALLAS, TEXAS 75202-2711
   (214) 855-6800
   COUNSEL FOR THE THIRD-PARTY DEFENDANTS
   PATRICK BOYCE, WILLIAM L. BRITAIN AND
   HIGHLAND EMPLOYEE RETENTION ASSETS LLC

ALSO PRESENT:

   MR. BILLY GONZALEZ, VIDEOGRAPHER
   MR. PATRICK DAUGHERTY

## Page 4

INDEX

ATTORNEYS OF RECORD . . . . . . . . . . . . . . . 03
AGREEMENTS . . . . . . . . . . . . . . . . . . . 05
EXAMINATION BY MS. DANIELS. . . . . . . . . . . . 05
SIGNATURE AND CORRIGENDA PAGE . . . . . . . . . .296
CERTIFICATION PAGE . . . . . . . . . . . . . . .297

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 21 | E-mail from John Honis to Lane Britain and others dated 1/17/12 Regarding Draft Crusader Presentation (Plaintiffs 0765739 - 0765740) | 196 |
| 22 | E-mail from Brian Collins to Lane Britain dated 5/16/12 Regarding Pat D (HERA 0002395) | 227 |
| 23 | E-mail chain between Lane Britain, Joe Dougherty and Brian Collins dated 7/21/11 Regarding HERA/Vessel Cash Distributions (HERA 0005130 - 0005128) | 270 |
| 24 | E-mail chain between Lane Britain, Joe Dougherty and Brian Collins dated 7/21/11 Regarding HERA/Vessel Cash Distributions (HERA 0005143 - 0005144) | 279 |

"ATTORNEYS' EYES ONLY" DESIGNATIONS

| | | |
|---|---|---|
| 1 | Pages 114 - 128 | |
| 2 | Pages 135 - 137 | |
| 3 | Pages 191 - 204 | |
| 4 | Pages 253 - 263 | |

1 (Pages 1 to 4)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)

**EXHIBIT**

**36**

2a5a2bf6-8490-4b24-aed3-4af7e7455a9d

App. 0391

Page 5

PROCEEDING

THE VIDEOGRAPHER: Going on the record Tuesday, June 11th, 2013. The time is approximately 9:17 A.M. Will the reporter please swear in the witness.

(Whereupon the witness was sworn.)

MR. KATZ: We agree that objection for one party is good for all parties?

MS. DANIELS: Sure. Taken pursuant to the Texas Rules of Civil Procedure. We're also using contiguous numbers on the deposition exhibits. We are at Number 21.

WILLIAM LANE BRITAIN, having been first duly sworn, testified as follows:

EXAMINATION

BY MS. DANIELS (9:18 A.M.):

Q. State your full name for the record, sir.

A. William Lane Britain.

Q. Mr. Britain, have you given a deposition before?

A. Once.

Q. Under what circumstances?

A. Another court case.

Q. I'm sorry?

A. Another court case.

Page 6

Q. What kind of case?

A. It was litigation.

Q. Who were the parties?

A. Highland was involved. I don't know who all the other parties were.

Q. Did you testify on behalf of Highland?

A. I don't know the answer to that.

Q. What was the subject matter of the litigation?

MR. KATZ: Objection, form.

A. I don't really know.

THE WITNESS: What's that?

MR. KATZ: You can answer.

A. I don't know what the subject matter of the litigation was.

Q. What did you testify about, sir?

A. About what I did at Highland.

Q. Excuse me?

A. What I did at Highland, what my job was.

Q. What did you understand to be the issues involved in the lawsuit that you testified in, Mr. Britain?

A. Something regarding a real estate transaction.

Q. How recent was the deposition?

A. I don't remember.

Q. This year?

Page 7

A. I don't even know. I don't think so. I think it was last year.

Q. Okay. Well, we're now in June of 2013. Do you recall whether or not your testimony was given in 2013?

MR. KATZ: Objection, form.

A. As I said before, I do not remember if it was this year or last year.

Q. Who was your counsel?

A. I don't remember. I know one of the Highland internal lawyers was there, but I don't remember who the counsel was.

Q. You understand that we are here today in a deposition in a case involving claims that Highland has made against Pat Daugherty and that Pat Daugherty in exchange has made against Highland?

MR. KATZ: Objection, form.

A. And myself and Patrick Boyce and a number of other people.

Q. Correct.

A. Yes, ma'am, I do.

Q. You -- you read the pleadings in that case?

MR. KATZ: Objection, form.

A. Not recently.

Q. You understand what the claims are against you?

A. I think so. I don't know if I fully do, but

Page 8

yes.

Q. What do you understand them to be?

A. Something to do with HERA.

Q. Anything else that you understand about it with respect to your involvement in the lawsuit?

MR. KATZ: And I'm going to instruct the witness not to disclose any information that the witness got from either inside or outside counsel.

A. I can't answer that because everything I've been told about the claims against me are from my lawyer.

Q. All right. Well, did you -- can you read?

MR. JOHANSEN: Objection, form.

Q. (By Ms. Daniels) I mean, you read it yourself.

MR. KATZ: Objection, form.

Q. (By Ms. Daniels) Right?

MR. KATZ: Objection, form.

A. Yes, ma'am.

Q. You ever read legal documents in connection with what you do for a living, sir?

A. Not litigation very much. Mainly other documents, yes, ma'am.

Q. Just based on your understanding, a layman's understanding --

A. Uh-huh.

Q. -- of reading a piece of paper and having some

2 (Pages 5 to 8)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)                    2a5a2bf6-8490-4b24-aed3-4af7e7455a9d

App. 0392

Page 85

Daugherty had said that?

A. Which thing? That he would try --

Q. That he would ruin you with the Safety Kleen board.

A. Patrick Boyce, he told me that.

Q. Anybody else tell you they heard him say that?

A. No, ma'am.

Q. And then what you're telling me is that with respect to that statement that Mr. Daugherty supposedly made to Mr. Boyce, that you learned that he did in fact talk to people on the Safety Kleen board?

A. Yes, ma'am.

Q. Tell me what you learned about that.

A. I don't remember the specifics but just that, you know, Pat didn't have good things to say about you, along those lines.

Q. What did he say?

A. I don't know. I didn't push it. I didn't really care.

Q. Who told you that Pat didn't have any good things to say about you?

A. One of the two, and I can't remember whether it was Bill Raine or Phil -- gosh, I can't ever pronounce his last name. I can get it for you later and spell it for you if you want it, but it was one of those two

Page 86

individuals.

Q. You say Bill Raine?

A. I think that's his name.

Q. And Phil somebody?

A. Yeah. Yes, ma'am. It starts with an R. I can -- I can't tell you how to pronounce it.

Q. And are those two separate occasions where you heard from Bill and Phil --

A. No, I can't remember which one I heard from.

Q. Oh, just one of them?

A. I believe so, if I remember right. It was a long time ago.

Q. Well, a long time ago, it was, what, sometime in 2012, last year?

A. No, ma'am. It was fall of 2011, I believe. That's, yeah, fall of 2011.

Q. Is it Phil Raygorodetsky?

A. You know, I couldn't -- I would have to -- I could get on my Blackberry and tell you what it says --

MR. DAUGHERTY: Raygorodetsky.

MS. DANIELS: Raygorodetsky?

A. I couldn't -- I honestly, I can't tell you what his last name is.

Q. Is that close?

A. I couldn't -- I'm not going to speculate. Like

Page 87

I said, I can get the name for you at a break if you'd like me to.

Q. And whether it was from Bill or from Phil, who are both on the Safety Kleen board, the message that you received from them was that Mr. Daugherty didn't have good things to say about you?

A. From one of them. And I said I don't remember which one.

Q. Anything more specific than that?

A. No, ma'am. And I didn't press. I didn't really care. I figured I'd be on the board and I'd -- they would form their own opinion of me. I don't -- I don't know that they put a lot of -- they really cared what he had to say either but --

Q. Did they indicate to you that they didn't care?

A. No, I based that on their actions and comments as I was on the board about Pat's tenure on the board.

Q. Okay. Well, let's go over that. So as you're on the Safety Kleen board beginning in late 2011 and -- and what, through the present, right?

A. No, ma'am. We sold that business. The sale closed December 28th of 2012. So I resigned from the board concurrent with the close of that sale.

Q. Okay. You're right. You're right. Safety Kleen was sold.

Page 88

A. Yes, ma'am.

Q. So you were on that board a little over a year?

A. Yes, ma'am.

Q. Okay. So during the time that you were on the board of Safety Kleen, did you hear any of the board members of Safety Kleen make comments about Pat Daugherty?

A. Yes, ma'am.

Q. What did you hear? What do you recall hearing?

A. I couldn't remember which one, but one of them called him the extortionist.

Q. Who was that?

A. As I said, I can't remember. You know, it was -- it was a decent size board. I remember comments like, it's refreshing to have you here, not Pat. Things along the lines of you actually show up prepared. Nothing -- nothing flattering.

Q. Never heard a single compliment about Pat Daugherty once you joined the Safety Kleen board from any of its board members?

A. Oh, Ron Haddock always had a soft place in his heart for Pat for sure.

Q. What do you mean by that?

A. I don't remember him ever saying anything nice, but I don't remember him ever saying anything derogatory.

22 (Pages 85 to 88)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)    2a5a2bf6-8490-4b24-aed3-4af7e7455a9d

App. 0393

Page 217

A. Certainly.

Q. Was there anyone that you're aware of that got an offer that chose not to accept it?

A. I -- I don't know.

Q. I just asked you was there anyone that you're aware of.

A. Like I said, I don't know.

Q. Well, see, that's one of those questions -- it's kind of funny. That's one of those questions that either you're aware of someone that got the offer and didn't accept it or you're not aware of anyone that got the offer and didn't accept it.

MR. JOHANSEN: Objection, form. Or you don't know.

Q. (By Ms. Daniels) Well, you do know. You either know if you're aware of someone or you know if you're not aware of someone.

A. I'm not aware of anyone.

Q. There you go. Okay. So the answer is no.

MR. JOHANSEN: Objection, form.

Q. (By Ms. Daniels) Not aware. Now, why did you accept the offer?

A. I thought it was a fair offer for the -- for what it was.

Q. And what was fair about that offer? Because I

Page 218

-- I know you're good at analyzing apparently what's fair and what isn't. What was fair about that offer?

MR. JOHANSEN: Object to side-bar.

A. I thought it was a fair value for the assets in HERA.

Q. What assets were in HERA at that time?

A. To my recollection some cash and some interest in RCP.

Q. Okay. And how much cash was in HERA?

A. I -- I don't remember that number.

Q. Well, certainly you made it your business to know, didn't you, when you were evaluating the fairness of that offer?

MR. JOHANSEN: Objection, form.

A. I'm sure I knew at the point, but I can't tell you right now how much cash was in there.

Q. Memory fails you on that?

MR. JOHANSEN: Objection, form.

A. I really don't know how to answer that question.

Q. Well, I mean, were you accepting a 25 percent -- or I think it was 25.1 percent of cash? Was it fair to discount you 25.1 percent of the cash in HERA?

MR. JOHANSEN: Objection, form.

A. I looked at it as a holistic offer and made a

Page 219

decision.

Q. Holistic?

A. Right.

Q. What does that mean?

A. Holistic meaning the offer as a whole, not as the parts.

Q. So you take into consideration that the cash part of HERA wasn't being discounted but instead the nonliquidated portions of HERA were discounted?

MR. JOHANSEN: Objection, form.

A. That's how I made my personal decision.

Q. And in fact, then that would make the nonliquidated portions of HERA discounted over 25 percent, wouldn't it?

A. That's -- that's math, yes, ma'am.

Q. Who bought the shares?

A. I believe Highland Capital Management bought them.

Q. Who owns Highland Capital Management?

A. Jim and Mark -- Jim Dondero and Mark Okada.

Q. So Mr. Dondero, he pretty much owns everything, doesn't he?

MR. KATZ: Objection, form.

A. I don't know what you mean by that.

Q. Well, I mean, Mr. Dondero made the decision to

Page 220

purchase -- well, he made this fair offer, as you've described it, right?

MR. KATZ: Objection, form.

Q. (By Ms. Daniels) An offer so fair you couldn't refuse it, right?

MR. KATZ: Objection, form.

A. I couldn't speculate on what you mean by that.

Q. Well, you felt like it was so fair there was no reason to refuse it, right?

MR. JOHANSEN: Objection, form.

A. I took the offer.

Q. Right. Would you still have a job at Highland if you hadn't taken the offer, sir?

MR. JOHANSEN: Objection, form.

MR. KATZ: Objection, form.

A. I believe I would.

Q. Did you feel threatened or coerced to take that offer?

A. No.

Q. When did you get your money?

A. Soon after I accepted the offer.

Q. Did you talk to any -- any of the other board members of HERA about the offer --

MR. KATZ: Objection.

Q. (By Ms. Daniels) -- in reviewing and analyzing

55 (Pages 217 to 220)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)          2a5a2bf6-8490-4b24-aed3-4af7e7455a9d

App. 0394

Page 221

it for it's fairness?

MR. KATZ: Objection, form.

A. I don't remember doing that.

Q. So now Mr. Dondero owns your shares in HERA?

MR. KATZ: Objection, form.

MR. JOHANSEN: Objection, form.

A. I have no idea what's happened to them since then.

Q. Oh, you don't know if he took them and turned -- turned it around and flipped them to somebody else?

MR. JOHANSEN: Objection, form.

MR. KATZ: Objection, form.

A. I don't keep track of that.

Q. You curious?

A. Not really.

Q. You do anything else to review or analyze the value of the offer made to you other than just taking a look at it and deciding it was fair?

A. I mean, I looked at the offer. I knew the underlying assets. I made the decision.

Q. Tell me what you did to analyze the offer in light of the underlying assets.

A. I looked at the value placed on the assets and knew in my, you know -- obviously I had an idea what I thought they were worth and made a decision.

Page 222

Q. Who had put the value on the assets?

A. The person that made the offer.

Q. So Mr. Dondero?

A. Well, let me make sure I understand. What do you mean, who had put the -- who had decided what to offer for the assets?

Q. No, sir. You said, I looked at this value that had been put on the assets of HERA and decided to take the offer.

A. I'm sorry. I probably wasn't clear. I looked at the value that was offered for my shares of HERA and decided to take the offer.

Q. Did you at any point undertake to value the underlying assets of HERA in order to determine whether or not the price was fair as you've stated?

A. As part of my personal assets, I had an idea of what I thought that part of my assets were worth. So I -- you know, it wasn't a hard decision.

Q. What assets did HERA have in it at the time the offer was made besides cash?

A. As I said, it had some interest in Restoration Capital Partners I, the private equity fund.

Q. Any -- any other interests?

A. Not that I'm aware of.

Q. And Restoration holds what investments?

Page 223

A. I don't know all of them.

Q. Tell me the ones you do know.

A. It used to own Safety Kleen. It holds Cornerstone. Let's see. What else? There's a building, a paper company. I can't remember the name of it. And I don't remember what else at that point it held.

Q. Did you put a value on Cornerstone or research what the value was of Cornerstone in determining that the offer to purchase HERA was fair?

A. I'm sure I had my own idea of what Cornerstone was worth at the time.

Q. What -- what value did you use?

A. I don't remember.

Q. Did you make any notes or spreadsheets or anything in writing in which you did this analysis?

A. Not that I recall.

Q. Did you do it all in your head?

MR. JOHANSEN: Objection, form.

A. I don't remember.

Q. When Safety Kleen was sold, was a banker hired to evaluate the value of -- of the offer in Safety Kleen?

MR. KATZ: Objection, form.

A. I don't understand the question.

Q. Well, when -- when you were on the board and Safety Kleen was sold, did you hire any experts or

Page 224

professionals to evaluate the offer to determine whether or not it was fair or good value for shares of Safety Kleen?

MR. KATZ: Objection, form.

A. We hired bankers to represent us in the sale process.

Q. Did you hire any expert related to an analysis of the valuation of Safety Kleen as compared to the offer that had been made?

A. I don't recall if that was ever -- if that was done or not as part of their services.

Q. Well, would that be something that you think would be appropriate to do?

MR. KATZ: Objection, form.

A. In this situation, no. You had the major shareholders on the board, and they decide the value they accept.

Q. And in the HERA situation, did you retain or confer with any valuation experts to determine if the HERA offer was fair?

A. No.

Q. Why not?

A. I didn't feel that I needed to.

Q. Because you thought you knew enough? You had the expertise to value whether or not the offer was fair?

56 (Pages 221 to 224)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)                    2a5a2bf6-8490-4b24-aed3-4af7e7455a9d

App. 0395

**Page 257**

Q. And did you receive any management fee or any other type of monetary award associated with the ultimate sale of Safety Kleen?

A. From Safety Kleen?

Q. Any source related to the sale.

A. You'll have to reask your question.

Q. Sure. Did you receive any kind of monetary -- monetary award from any source related to the sale of Safety Kleen?

MR. KATZ: Objection, form.

A. I did not receive anything more from Safety Kleen and I didn't receive anything from Highland explicitly for the sale of the business.

Q. Or any Highland related entities?

A. We got paid an annual bonus.

Q. Was your bonus based upon the net profit made in the sale of Safety Kleen to Highland?

MR. KATZ: Objection, form.

A. I have no idea.

Q. You don't know how they come up with your bonus either?

MR. KATZ: Objection, form.

A. I don't.

Q. Did you get a good bonus --

MR. JOHANSEN: Objection, form.

**Page 258**

Q. -- after the sale of Safety Kleen at any time?

MR. KATZ: Objection, form.

A. I don't -- what do you mean by "good"?

Q. Well, did you consider it good, sir, whatever good means in your language?

MR. JOHANSEN: Objection, form.

MR. KATZ: You can answer in English.

A. I got what I got. I don't know.

Q. Well, were you satisfied with it?

A. It was fine.

Q. And ultimately after reviewing the bids that had been solicited for the company, the board of directors voted to sell Safety Kleen to who?

A. Clean Harbors.

Q. And as you say, you did that after hundreds and hundreds of hours of work?

MR. KATZ: Objection, form.

A. That's my estimate. I don't have a specific number for you.

Q. See, what I'm confused about is that was your responsibility as a board member of HERA different than your responsibility as a board member of Safety Kleen?

MR. JOHANSEN: Objection, form.

A. I don't follow your question.

Q. Well, I guess we could contrast. For example,

**Page 259**

in HERA when a purchase officer [sic] -- offer was presented by Highland Capital Management, were there any investment bankers who ran an auction process to determine if it was a fair price?

MR. KATZ: Objection, form.

A. No.

Q. Did you spend hundreds and hundreds of hours evaluating the information of comparators to determine if it was a fair price?

MR. KATZ: Objection, form.

A. No, 'cause I -- I only had to make a decision for myself. Whereas in Safety Kleen, the board made a decision for everyone.

Q. Well, weren't you on the board of HERA?

A. Again, I -- the offer was made as to the shareholders directly. The two entities work very differently.

Q. So you -- you didn't have any responsibilities as a board member of HERA to determine if the price was fair for all the shareholders?

MR. JOHANSEN: Objection, form.

A. No, I didn't have a responsibility to determine that because the offer, every shareholder was able to make their own mind up.

Q. Didn't you have more information as a member of

**Page 260**

the board of directors --

MR. KATZ: Objection, form.

Q. (By Ms. Daniels) -- than the other members of HERA?

MR. KATZ: Objection, form.

A. I don't believe so, no.

Q. Bottom line is you didn't do anything --

MR. JOHANSEN: Objection, form.

Q. (By Ms. Daniels) -- except -- except within minutes of getting the offer.

MR. KATZ: Objection, form.

A. Repeat your question.

Q. You didn't do anything when you got the HERA offer except -- except say where do I sign.

MR. JOHANSEN: Objection, form.

Q. (By Ms. Daniels) Right?

A. I don't believe I asked where I sign.

Q. Oh, you probably knew that. You didn't do anything when you got the HERA offer except sign.

MR. JOHANSEN: Objection, form.

A. As I said before, I reviewed the offer. I determined that for me personally it was a fair offer and I accepted the offer.

Q. You know, when HERA was involved in the sale of the Sugarland project, did you engage in a process of due

65 (Pages 257 to 260)

Electronically signed by Michelle Folks (501-307-451-0219)

2a5a2bf6-8490-4b24-aed3-4af7e7455a9d

App. 0396

Page 273

A. It would reduce the number of shares; that's correct.

Q. So Mr. Dougherty, Joe Dougherty responds and says I would say no as others who have left and are still in the plan like everyone else. If we can't treat everyone the same, we shouldn't do it for a small group. And then what was your response to him? Read that.

MR. KATZ: Objection, form.

A. It would not be a favor. I was thinking about offering a purchase at the recent tax -- excuse me -- the recent tax valuation so a big discount.

Q. Basically you were promoting the idea of offering to purchase the shares of Colvin, Nam, and Schrembi at about a 40 percent discount to what you actually knew the real value of those shares to be, weren't you, Mr. Britain?

MR. JOHANSEN: Objection, form.

A. I was offering to provide liquidity to -- well, I can't force anyone to sell anything. I was offering to sell -- not sell -- to help make an offer to purchase shares -- purchase shares, and it would have been at a discount to the current mark. They would have been aware of the current valuation and would have made a decision whether to sell or not.

Q. Who would have made them aware of the current

Page 274

valuation?

A. That would have been part of the offer.

Q. Would that have been part of your obligation as a member of the board?

MR. JOHANSEN: Objection, form.

A. Certainly.

Q. Fiduciary obligation?

MR. JOHANSEN: Objection, form.

A. Certainly.

Q. And so you would have said in an offer letter, look, we know your shares are worth X but we're agreeing to purchase them back for Y?

MR. JOHANSEN: Objection, form.

A. That wouldn't have been the way I would have -- I would have been a little more formal. Here's the valuation as it currently stands. We're willing to make you an offer at Y; do you want to sell?

Q. And why would that have been something that they would have wanted to do?

MR. JOHANSEN: Objection, form.

MR. KATZ: Objection, form.

A. I would have no idea if they wanted to do it.

Q. But literally this was you making about a what, 40 percent off -- 40 percent decrease in value?

MR. JOHANSEN: Objection, form.

Page 275

A. I have -- I don't remember.

Q. Does that sound fair to you?

MR. JOHANSEN: Objection, form.

A. Things change hands every day and it's up to the buyer, the buyer and seller to come up with a price. They didn't have to accept the offer. There was no harm if they wouldn't have accepted this offer that never happened, so I think that's fair.

Q. It's the same thing that happened to you ultimately, wasn't it? I mean, you got a 40 percent discount basically against your value in HERA, didn't you?

A. I got a 40 percent discount against the assets and a zero percent discount against the cash if you want to cut it up that way. Yes, ma'am.

Q. Yeah, and that's the way I'm cutting it up. That's what happened to you, wasn't it?

A. That's the offer I chose to accept.

Q. And that's the offer you as a board member allowed to be made to every other interest holder in HERA, didn't you?

MR. KATZ: Objection, form.

A. I don't know. You said "allowed." I don't know that I had any power to stop it. But that was the offer that was made.

Page 276

Q. Well, you know, you said -- before we took our little break you said that you didn't have any duty as a board member to drive that offer and that value that was offered for HERA up past what it was. It basically -- it was what it was. Isn't that basically what your position is?

MR. KATZ: Objection, form.

Q. (By Ms. Daniels) I mean, in other words, you had no responsibility or obligation as a HERA board member to do anything about that offer made in January of 2013 except to individually decide whether to accept or reject it; is that your position?

MR. KATZ: Objection, form.

A. As advised by counsel that was our position.

Q. I asked you what you your position was, sir.

MR. JOHANSEN: Objection, form.

A. I'm telling you -- I'm telling you my position was to seek Kevin Abrams to tell us what our responsibilities were, and that's what he -- I'm not an expert in Delaware law.

Q. That is amazing how that answer has changed from when we discussed it earlier today. Earlier today you told me you evaluated it and made a decision, actually I think within about a couple minutes, but whatever, to accept the offer. Has your testimony

69 (Pages 273 to 276)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)                                    2a5a2bf6-8490-4b24-aed3-4af7e7455a9d

App. 0397

Page 293

A. I don't -- I probably don't get the point of your question. We were sued as board members of HERA so.

Q. Okay. So the invoices that -- that came to HERA for legal fees, were there separate invoices that were generated for work on behalf of you individually --

MR. KATZ: Objection, form.

Q. (By Ms. Daniels) -- by the law firm?

A. I don't remember.

Q. Was there -- was there an invoice that was generated that was specific to expenses in the defense of Patrick Boyce?

MR. JOHANSEN: Objection, form.

A. I don't remember.

Q. That's what I'm asking. Was the one bill to HERA a bill that covered the costs and expenses associated with your defense as well?

MR. JOHANSEN: Objection, form.

Q. (By Ms. Daniels) As you understood it.

A. It was my understanding that the lawyers hired by HERA, for example Marc's firm, were defending Patrick Boyce and I because we were sued as members of HERA and the -- and the entity owed us indemnification because of that lawsuit.

Q. Okay. Do you have any direct knowledge or information related to HERA's board of directors being

Page 294

involved in analyzing, formulating, or reviewing Highland's offer to purchase any of Highland employees' interest in HERA?

MR. JOHANSEN: Objection, form.

A. I don't recall that, no.

Q. Do you have any direct knowledge or information of any person who was involved in analyzing, formulating, or reviewing Highland's offer to purchase the interest of any Highland employee in HERA?

A. No.

Q. Do you know why there was a difference in timing between the offers that were made to purchase HERA interests from current Highland employees versus former Highland employees?

MR. KATZ: Objection, form.

A. I don't know.

Q. Do you know of anything that the Highland -- that HERA's board of directors did to assure that the offer price for the HERA shares was fair and adequate?

MR. JOHANSEN: Objection, form.

A. I think that's the same question you've asked me before. And, no, we looked at the offers that were made to the shareholders, not to the board.

Q. So you don't know of anything the board did to look at those offers as a board.

Page 295

A. That's correct.

Q. In its role as a board, okay, to determine if the offers were fair and adequate while you were on the board.

MR. KATZ: Objection, form.

A. I would -- no, I don't know of anything.

Q. Do you know if the HERA fund still exists as you sit here today?

A. I don't know.

Q. Do you know how it is owned if it does exist?

A. I don't know how it's owned.

Q. Do you know if there's been any recent valuation in the shares of HERA?

A. I don't know.

Q. Have you seen any documentation that reflects the current value assigned to HERA shares?

A. I have not.

MS. DANIELS: At this time we'll pass the witness.

MR. JOHANSEN: We will reserve our questions.

MR. KATZ: As will we.

THE VIDEOGRAPHER: Off the record, 6:12 P.M.

(Deposition concluded, 6:12 P.M.)

Page 296

CORRIGENDA AND SIGNATURE

PAGE    LINE    CORRECTION              REASON

I, WILLIAM LANE BRITAIN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

WILLIAM LANE BRITAIN

STATE OF
COUNTY OF
BEFORE ME,          , on this day personally appeared WILLIAM LANE BRITAIN, known to me (or proved to me under oath or through
(description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purpose and consideration therein expressed.
GIVEN UNDER my hand and seal of office this          day of          , 2013.

Notary Public in and for the
State of

74 (Pages 293 to 296)

Electronically signed by Michelle Folks (501-307-451-0219)        2a5a2bf6-8490-4b24-aed3-4af7e7455a9d

App. 0398

Page 297

12-04005

HIGHLAND CAPITAL ) IN THE DISTRICT COURT OF
MANAGEMENT, L.P., AND )
CORNERSTONE HEALTHCARE )
GROUP HOLDING, INC. )
 )
Plaintiff and )
Counter-Defendant )
 )
VS. )
 )
PATRICK DAUGHERTY, )
 )
Defendant and )
Counter-Plaintiff ) DALLAS COUNTY, TEXAS
 )
VS. )
 )
SIERRA VERDE, LLC, )
HIGHLAND EMPLOYEE )
RETENTION ASSETS LLC, )
JAMES DONDERO, PATRICK )
BOYCE, AND WILLIAM BRITAIN, )
 )
Third-Party Defendants. ) 68TH JUDICIAL DISTRICT

------------------
REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
WILLIAM LANE BRITAIN
JUNE 11, 2013
------------------

I, Michelle C. Folks, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, WILLIAM LANE BRITAIN, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on the 19th day of June, 2013, to the witness or to the attorney

Page 298

me by the 9th day of June, 2013;

That pursuant to the information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record and the amount of time used by each party at the deposition:

MR. MARC D. KATZ
MR. JASON R. REGAS
  ANDREWS KURTH, LLP
  1717 MAIN STREET, SUITE 3700
  DALLAS, TEXAS 75201
  (214) 659-4722
  COUNSEL FOR THE PLAINTIFFS HIGHLAND CAPITAL
  MANAGEMENT, L.P., CORNERSTONE HEALTHCARE GROUP
  HOLDING, INC., AND THIRD-PARTY DEFENDANTS
  JAMES DONDERO AND SIERRA VERDE
  TOTAL TIME USED: NONE
MS. RUTH ANN DANIELS
MS. RACHEL CROCKETT
  LOOPER REED & MCGRAW, P.C.
  1601 ELM STREET, SUITE 4600
  DALLAS, TEXAS 75201
  (214) 954-4136
  COUNSEL FOR THE DEFENDANT AND
  COUNTER-PLAINTIFF PATRICK DAUGHERTY
  TOTAL TIME USED: 5 HOURS, 38 MINUTES

MR. SCOTT ELLINGTON
  ATTORNEY AT LAW
  3100 INDEPENDENCE PARKWAY, SUITE 311
  PLANO, TEXAS 75075
  (972) 419-2584
  GENERAL FOR HIGHLAND CAPITAL MANAGEMENT, L.P.
  TOTAL TIME USED: NONE

MR. MARK L. JOHANSEN
  GRUBER HURST JOHANSEN HAIL SHANK
  1445 ROSS AVENUE, SUITE 2500
  DALLAS, TEXAS 75202-2711
  (214) 855-6800
  COUNSEL FOR THE THIRD-PARTY DEFENDANTS
  PATRICK BOYCE, WILLIAM L. BRITAIN AND
  HIGHLAND EMPLOYEE RETENTION ASSETS LLC
  TOTAL TIME USED: NONE

Page 299

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of the T.R.C.P. will be certified to after they have occurred.

CERTIFIED to by me this 19th day of June, 2013.

Michelle C. Folks

MICHELLE C. FOLKS
Texas CSR No. 3192
Date of Expiration: 12/31/13
FOLKS & ASSOCIATES, INC.
P.O. BOX 851168
MESQUITE, TEXAS 75185-1168
Phone: (214) 320-9823
Fax: (972) 226-4574
Firm Number: 2

Page 300

FURTHER CERTIFICATION UNDER RULE 203 T.R.C.P.

The original deposition was/was not returned to the deposition officer on the     day of        , 2013;

If returned, the attached Corrigenda and Signature page(s) contain any changes and the reasons therefor;

If returned, the original deposition was delivered to MS. RUTH ANN DANIELS, Custodial Attorney;

That $     is the deposition officer's charges to Defendant and Counter-Plaintiff Patrick Daugherty for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

CERTIFIED to by me this     day of        , 2013.

MICHELLE C. FOLKS
Texas CSR No. 3192
Date of Expiration: 12/31/13
FOLKS & ASSOCIATES, INC.
P.O. BOX 851168
MESQUITE, TEXAS 75185-1168
Phone: (214) 320-9823
Fax: (972) 226-4574
Firm Number: 2

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)                    2a5a2bf6-8490-4b24-aed3-4af7e7455a9d

App. 0399

## Page 1

NO. 12-04005

HIGHLAND CAPITAL ) IN THE DISTRICT COURT OF
MANAGEMENT, L.P., AND )
CORNERSTONE HEALTHCARE )
GROUP HOLDING, INC. )
)
Plaintiff and )
Counter-Defendant )
)
VS. )
)
PATRICK DAUGHERTY, )
)
Defendant and )
Counter-Plaintiff ) DALLAS COUNTY, TEXAS
)
VS. )
)
SIERRA VERDE, LLC, )
HIGHLAND EMPLOYEE )
RETENTION ASSETS LLC, )
JAMES DONDERO, PATRICK )
BOYCE, AND WILLIAM BRITAIN, )
)
Third-Party Defendants. ) 68TH JUDICIAL DISTRICT

-----------------

VIDEOTAPED ORAL DEPOSITION OF
PATRICK BOYCE
JUNE 5, 2013

-----------------

CAUTION - THE FOLLOWING TRANSCRIPT
CONTAINS EXCERPTS DESIGNATED
"ATTORNEYS' EYES ONLY"

## Page 2

ORAL AND VIDEOTAPED DEPOSITION OF PATRICK BOYCE, produced as a witness at the instance of the Defendant and Counter-Plaintiff Patrick Daugherty, taken in the above-styled and -numbered cause on the 5th day of June, 2013, from 10:12 a.m. to 6:00 p.m., before Michelle C. Folks, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of JAMS, 8401 N. Central Expressway, Suite 610, Dallas, Texas, pursuant to the agreements as stated on the record and/or the Texas Rules of Civil Procedure.

## Page 3

ATTORNEYS OF RECORD

APPEARANCES:

MR. MARC D. KATZ
MR. JASON R. REGAS
    ANDREWS KURTH, LLP
    1717 MAIN STREET, SUITE 3700
    DALLAS, TEXAS 75201
    (214) 659-4722
    COUNSEL FOR THE PLAINTIFFS HIGHLAND CAPITAL
    MANAGEMENT, L.P., CORNERSTONE HEALTHCARE GROUP
    HOLDING, INC., AND THIRD-PARTY DEFENDANTS
    JAMES DONDERO AND SIERRA VERDE

MS. RUTH ANN DANIELS
MS. RACHEL CROCKETT
    LOOPER REED & MCGRAW, P.C.
    1601 ELM STREET, SUITE 4600
    DALLAS, TEXAS 75201
    (214) 954-4136
    COUNSEL FOR THE DEFENDANT AND
    COUNTER-PLAINTIFF PATRICK DAUGHERTY

MR. ISAAC LEVENTON
    HIGHLAND CAPITAL MANAGEMENT, L.P.
    300 CRESCENT COURT, SUITE 700
    DALLAS, TEXAS 75201
    (972) 628-4130
    IN-HOUSE COUNSEL FOR HIGHLAND CAPITAL
    MANAGEMENT, L.P.

MR. MARK L. JOHANSEN
    GRUBER HURST JOHANSEN HAIL SHANK
    1445 ROSS AVENUE, SUITE 2500
    DALLAS, TEXAS 75202-2711
    (214) 855-6800
    COUNSEL FOR THE THIRD-PARTY DEFENDANTS
    PATRICK BOYCE, WILLIAM L. BRITAIN AND
    HIGHLAND EMPLOYEE RETENTION ASSETS LLC

## Page 4

MR. SCOTT ELLINGTON
    ATTORNEY AT LAW
    3100 INDEPENDENCE PARKWAY, SUITE 311
    PLANO, TEXAS 75075
    (972) 419-2584
    GENERAL COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT

ALSO PRESENT:
    HONORABLE JUDGE JEFF KAPLAN
    MR. STEVE RAYNES, VIDEOGRAPHER
    MR. CARL MOORE, CORPORATE REPRESENTATIVE FOR
    SIERRA VERDE

    MR. PATRICK DAUGHERTY

1 (Pages 1 to 4)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)

**EXHIBIT**

**37**

8bc852b0-c563-46df-9cbc-9d0b763835b1

App. 0400

Page 5

INDEX

ATTORNEYS OF RECORD . . . . . . . . . . . . . . . 02
EXAMINATION BY MS. DANIELS. . . . . . . . . . . 13
SIGNATURE AND CORRIGENDA PAGE . . . . . . . . .317
CERTIFICATION PAGE . . . . . . . . . . . . . . .318

EXHIBITS

NUMBER   DESCRIPTION                    PAGE

1    Patrick Daugherty's Compensation and
     Benefits Statement
     (HERA 0004220 - 0004222)      76

2    E-mail from Brian Collins to Patrick
     Boyce dated 8/19/11 Regarding Pat D
     Data Request (HERA 0002391 - 0002392)  96

3    Limited Liability Company Agreement of
     Sierra Verde, LLC
     (Daugherty 002004 - 0002015)      103

4    Sierra Verde, LLC Action by Written
     Consent of the Members
     (Daugherty 001150 - 001153)      140

5    Limited Liability Company Agreement of
     Highland Employee Retention Assets LLC
     (HERA 0000019 - 0000030)      246

6    Current Vessel Allocations as of
     9/30/2010 (Daugherty 001013 - 001015) 254

7    Second Amended and Restated Limited
     Liability Company Agreement of Highland
     Employee Retention Assets LLC
     (Plaintiffs 000104 - 000124)      259

8    Offer to Purchase Statement dated
     January 31, 2013 for Highland Employee
     Retention Assets LLC
     (Daugherty 002626 - 002640)      278

Page 6

9    Highland Capital Management, LP Vessel
     Award Purchase Officer Calculation
     Statement for Patrick Daugherty
     (HERA 0000065)      289

     "ATTORNEYS' EYES ONLY" DESIGNATIONS

1    Pages 68 - 72
2    Pages 179 - 185
3    Pages 223 - 229
4    Pages 239 - 244
5    Pages 286 - 289

Page 7

PROCEEDINGS

THE VIDEOGRAPHER: We're going on the record Wednesday, June 5th, 2013. The time is approximately 10:05 a.m. Will the court reporter please swear in the witness.

MS. CROCKETT: Your Honor, before we begin with the deposition, I want it to be on the record, but we have an objection to the attendance of Carl Moore. They have two other corporate representatives here. Carl Moore is going to be a witness in this case, is going to be deposed next week. And we would like to sequester him from observing the testimony of other witnesses. We think that two corporate representatives is more than sufficient. We've looked at the case law and we believe the case law is in our favor on this. Courts have frequently upheld not allowing multiple corporate representatives. We're willing to allow both in-house counsel to stay since they are not going to be witnesses in this case. Since Carl Moore is going to be a witness in this case, we think it's inappropriate for him to stay.

MS. DANIELS: Another witness.

MS. CROCKETT: And Tim Lawler also here, the same goes -- the same thing for Tim Lawler. He's

Page 8

going to be deposed on Friday, and we think it's inappropriate for him to be here in this case. We think that they have corporate representatives already available. And we received no notice of either of these witnesses going to be present today pursuant to the Texas Rules of Civil Procedure 199.5.

MR. KATZ: Your Honor, corporate representatives do not have to provide notice that they are going to be in attendance. Mr. Moore is here as representative of Sierra Verde. Mr. Lawler is here as a representative of Highland Capital. Mr. Leventon and Mr. Ellington are in-house counsel. They are counsel for Highland and they are entitled to be here as counsel for Highland.

THE COURT: So -- and I'm sorry. Who is Mr. Moore?

MR. KATZ: He's to your right.

THE COURT: Mr. Moore is a representative for which party?

MR. KATZ: Sierra Verde.

THE COURT: Okay.

MR. KATZ: And Mr. Lawler is the representative for Highland Capital.

THE COURT: Okay. Mr. Moore is employed by Sierra Verde?

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)                 8bc852b0-c563-46df-9cbc-9d0b763835b1

App. 0401

Page 277

facts and consult with counsel.

Q. When did you first receive an offer for the Highland entity to purchase your shares in HERA?

A. I don't remember. Sometime in the first quarter of 2013.

Q. Isn't it true that it was in the first week of January of 2013, sir?

MR. KATZ: Objection, form.

A. I -- I -- I continue to not recall.

Q. Wasn't there a directive to Highland employees by mid-January that you sign off on the offer and take it or you get fired?

A. I -- I've never heard that language.

Q. Nobody said that to you?

A. No one said that to me.

Q. Did anybody say anything similar to that to you in which the same message was delivered; that is, you don't have any choice but to take our offer to purchase your HERA stock?

MR. KATZ: Objection, form.

A. Jim Dondero told me I didn't have to sell.

Q. What was the form of your offer of purchase, sir?

A. I don't recall.

Q. Letter? E-mail? Word of mouth?

Page 278

A. I don't recall.

Q. What was the offer language?

MR. JOHANSEN: Objection, form.

A. I don't recall.

MS. DANIELS: Would you mark that, please.

(Exhibit No. 8 was marked.)

Q. (By Ms. Daniels) I'm going to hand you what's been marked as Boyce Number 7 -- 8, sorry. Boyce 8. Ask you to take a look at that document. Have you seen this before?

A. Not this particular document but I think something like it.

Q. Well, does this document, sir, refresh your recollection about the nature or the terms of the offer to purchase you were given with respect to HERA?

A. I don't know that this document refreshes it, but I'm pretty aware of at least the rough nature of the terms.

Q. Did the offer that you received, was it written like this and called offer to purchase statement?

A. My best recollection is yes.

Q. And in looking at this one, can you tell which of its terms were different?

A. The terms look identical. I think maybe the date was different. Based on what you told me before.

Page 279

I'm just assuming what you tell me is the truth. I don't -- I don't think you can tell me not the truth. You said I got it in the first week of January. If that's indeed true, I would think the date on mine would be different than the date on this one.

Q. Does this identify who the purchaser is?

A. It does.

Q. Highland Capital Management LP.

A. And I don't know if that was the final purchaser or not.

Q. What do you mean? Between the offer and the actual purchase there was another entity that came in?

A. I don't know.

MR. KATZ: Objection, form.

A. I don't know.

Q. Do you have any reason to believe that the ultimate purchaser wasn't Highland Capital Management LP from anything you've seen or heard?

MR. KATZ: Objection, form.

A. I just don't know if it was a final one or not. I have reason to believe, yes. We would often -- when I was CFO it wouldn't -- we weren't quite sure which entity would do the purchasing, and so we put Highland as a placeholder. And generally the counter party doesn't care; they just want their money.

Page 280

Q. As we sit here today do you know what Highland entity owns the HERA preferred units that were purchased from its current and former employees in January of 2013?

A. I don't. I -- I just wasn't that involved in this entire offer.

Q. Do you know if those preferred shares that were purchased by the Highland entity have been sold or transferred?

A. I have no idea.

Q. And based upon the terms of this offer, sir, did you consider that you had a choice in tendering your interest --

MR. JOHANSEN: Objection, form.

Q. (By Ms. Daniels) -- in HERA for sale?

MR. JOHANSEN: Objection, form.

A. Yes, I always felt that I had a choice.

Q. Well, did you read at the top of the third page of this offer statement that if the purchase is completed, the purchaser -- and again the purchaser at this point is defined as Highland Capital Management -- will become the holder of at least the majority in interest of a series A preferred unit, would be able to amend HERA's operating agreement without obtaining approval from HERA's board or other holders of the series A preferred units. Did you read that?

70 (Pages 277 to 280)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)    8bc852b0-c563-46df-9cbc-9d0b763835b1

App. 0402

Page 281

A. I'm sure I did at the time. Yeah, the -- what -- what I think is important to understand about my position is that Jim didn't know who would take it, who wouldn't take it. He was just making an offer to people. And without me, he didn't have the majority. So my -- my ownership units allowed -- I had a choice what I wanted to do. And I didn't abuse that privilege or anything. I was treated the same as everyone else.

Q. So in being treated the same as everyone else, sir, was your unit price discounted by 25 percent?

A. No, it was discounted by more than that. I think it was 25.1.

Q. Did you understand to be the discount that that's what everybody got on their unit price?

A. That's what I -- I was told the same offer. The genesis for this is that, based on what I know, that Joe Dougherty left it, call it in the summer of maybe June, June 2012. And at that point in time Joe said he would resign from the board. He told me that he would resign from the board. Joe decided not to resign from the board, and there were ongoing conversations in which I was not involved in terms of -- what we call doing a cleanup of all his Highland affiliated interest. And at some point in time whoever was working with Joe was going back and forth in terms of a buyout. I was aware of that

Page 282

on the side. I was not involved in any form or fashion. And then at some point in time that morphed into a buy offer for everybody. And I was told about it I believe at approximately the same time that everybody else was told about it.

Q. Didn't you attempt to negotiate in order to reduce the discount that was applied to your offer?

A. No. That's nothing more than a joke.

Q. What, the ability to be able to discount anything with Mr. Dondero?

A. No, that I would -- that I would ever do that. No, I didn't attempt to negotiate anything. You -- you did it in an accusatory term in didn't you do that. No. That can only be a joke you're saying. I did not.

Q. Why wouldn't you have attempted to negotiate that, sir, as a smart businessman, assuming that as you've just told us you had a controlling interest that was particularly important in Highland, the purchaser, getting a majority of the stock?

MR. JOHANSEN: Objection, form.

A. That's just not ever how I've inter -- interacted with any of my employers.

Q. So you wouldn't consider that to be a savvy business negotiation?

MR. JOHANSEN: Objection, form.

Page 283

A. I don't. Everybody is different. For me it wasn't what I wanted to do. Other people may have chosen differently and been perfectly justified. It's not something that I chose to do.

Q. Do you know of a single holder of HERA stock that didn't sell its stock back to Highland Capital in accordance with this offer?

A. I'm not aware of the way the offer went.

Q. I just asked you if you know of anybody that didn't sell.

A. And my answer is, is I don't know. I don't know a yes or a no. I don't know.

Q. Do you believe that the discounted price per unit that was offered by Highland Capital Management to purchase the shares that you guys held in HERA was a fair value?

MR. JOHANSEN: Objection, form.

A. I believe that it was something that I was willing to accept.

Q. Do you believe it was a fair value was my question.

MR. JOHANSEN: Objection, form.

A. I don't know what "fair value" means.

Q. Do you believe as a member of HERA that you had a duty to demand that a fair value be paid for the stock?

Page 284

A. I believe I had to exercise my business judgment in deciding to -- to -- as a member of the board to -- I guess for the buyout offer I don't think I voted on this, but I can't recall. I just used my business judgment if I thought the offer was acceptable to me.

Q. Well, in looking at whether the offer was acceptable, did you look at what Cornerstone was marked at, at the time?

A. I -- I looked at the holistic number. I know what my number was on the sheet distributed by Brian Collins. I mentioned earlier I thought approximately 1.3, 1.4 and my offer was -- call it 1,000 and -- $1,060,000 roughly. And so I was -- I was -- I was having to make a decision if I wanted to sell or not.

Q. Was your offer a million sixty after the 25.1 percent discount was applied?

A. I -- I was applied the discount. So when I said approximately a million sixty, it was -- it was in that ballpark.

Q. And again, do you have any understanding for what justified a 25 percent discount?

A. No.

Q. I mean, if -- if the mark for the Cornerstone stock at the time was well in excess of 2,000, right?

A. I don't remember where it was at that point in

71 (Pages 281 to 284)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)    8bc852b0-c563-46df-9cbc-9d0b763835b1

App. 0403

Page 285

time.

Q. Well, you just testified that you'd done projections in which the projected value --

MR. DAUGHERTY: Hold on. Hold on. I'm going to walk out.

(Mr. Daugherty leaves the room.)

MR. KATZ: We're going to -- we're going to designate counsel's statement as attorneys' eyes only statement.

(The following testimony is designated "attorneys' eyes only" to Page 290.)

Page 286

Q. (By Ms. Daniels) You'd projected the future value of Cornerstone at over 8,000, hadn't you?

A. As one possibility out of a thousand.

Q. Sure. And the mark for the MGM Studio stock, which was held indirectly in the HERA fund was about what, $38 a share at the time of the offer?

A. I -- I just flat out don't remember where the individual marks were.

Q. And that stock is marked at over $50 today, isn't it?

A. I don't know where it is today.

MR. KATZ: Also designate counsel's other statements as attorneys' eyes only.

Q. (By Ms. Daniels) Did you know that HERA at the time it made this offer was cash heavy, having -- having just benefited from the sale of the Safety Kleen stock and had a cash injection into HERA of over half a million dollars?

A. Are you asking me to opine on what "cash heavy" means or if it had over a half million dollars from Safety Kleen?

Q. Did you know that HERA had a bunch of cash in it at this time?

A. I don't know how much a bunch of cash is. I'm sorry.

Page 287

Q. Did you consider that HERA was -- had a lot of cash in it at the time this offer was made?

MR. JOHANSEN: Objection, form.

A. I considered that there was cash in HERA, and I considered that the cash was not discounted as part of my business judgment.

Q. Well, I was going to say it would be kind of silly, this 25 percent discount, if cash is sitting there, wouldn't it?

A. Not if you're a finance person.

Q. Well, was -- you said as part of your consideration you look at whether or not the cash sitting in HERA actually had been discounted, right?

A. I did.

Q. All right. Did you consider then that the cash sitting in HERA at the time of your offer was discounted by 25.1 percent or not?

A. I considered everything. I just -- I didn't consider it silly to put a discount on cash if you don't have access to it. If you have a -- an account with cash and you don't have the ability to control the distribution of it on an individual basis, which I didn't, it makes sense if somebody offers you access to that cash potentially. And everyone makes their own decision. But I think the use of the word "silly" in my

Page 288

professional opinion is incorrect.

Q. Do you know how much cash was in HERA at the time of the offer?

A. No.

Q. Do you know whether or not the cash in HERA was discounted?

A. I do know that the offer did not discount the cash. I -- I do know that when they gave me my calculation of how their value came up for me, it showed the cash balance and it showed zero discount related to the cash.

Q. Were you involved in generating the offers or in seeing the paperwork with respect to the offers to purchase HERA provided to any other participant?

A. Not to my recollection.

Q. Did you see the HERA offer to Pat Daugherty?

MR. KATZ: Objection, form.

A. No.

Q. Were you aware that the HERA offer to Pat Daugherty was zeroed out to have zero value?

A. I never saw. I was never part of any conversation with anyone around Pat. That was made by -- decision made by a person or persons other than me.

Q. Who was involved in calculating the terms of the offers and in preparing the calculation statements?

72 (Pages 285 to 288)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)                                              8bc852b0-c563-46df-9cbc-9d0b763835b1

App. 0404

Page 297

Q. You weren't involved in that decision or analysis?

A. I didn't make the offer.

Q. You weren't involved in the decision related to make -- related to making the offer to current Highland employees before former employees were offered?

MR. JOHANSEN: Objection, form.

A. I mean, any conversations we would have had around any of that would have been privileged. But I don't -- I don't recall and I didn't make any decision around -- around the timing at all.

Q. Were you involved in privileged conversations, and I'm assuming you mean conversations with inside or outside counsel, related to the terms of the offer and the timing of the offer?

A. Related to the timing of the offer, yes.

Q. And who was involved in those conversations?

A. Outside counsel from Delaware.

Q. Any other board members para?

A. It's going to be the same answer as before. I just -- I can't remember who was on the phone. Ted Dameris was involved.

Q. And what's Ted Dameris's role?

A. He's a member -- excuse me. He's a member and a member of the board of directors or was at least. I

Page 298

don't know if he still is or not.

Q. I believe you told me you don't recall who made the offer to you or the circumstances under which that offer was made.

A. That's correct.

Q. Although once I did show you the offer document you remember seeing something similar to that?

A. Yes, that -- that's right. Similar. I think you asked me was it e-mail or handed to me and I still don't know if -- how I got it.

Q. What is Pat Daugherty's current ownership percentage in the HERA fund, if you know?

A. I don't know.

Q. Do you know if the units in HERA have been evaluated since the beginning of 2013 as far as what their value is?

A. I don't know.

Q. You ever involved, sir, in communications with anyone in the press related to Patrick Daugherty?

A. Have I ever spoken to a member of the press about Pat Daugherty?

Q. Yes, sir.

A. I don't recall speaking to anyone in the press about Pat Daugherty.

Q. And by "press" I'm talking about anybody at

Page 299

Bloomberg, anybody from the Wall Street Journal.

A. Correct.

Q. Whether you provided a statement or been interviewed or any type of communication with folks at those -- at those publications or any other publications.

A. My current recollection is that I've been on the phone when they've been on the phone, but I didn't -- I don't recall having any dialogue with them.

Q. And who was there?

A. Tim Lawler.

Q. Who was on the phone from the press?

A. I don't recall.

Q. Who was present besides Lawler?

A. On a -- on a different phone call, the different one from that one -- and Lawler may have been on this other one, too. I remember Mark Okada.

Q. Any other occasions where you've been present in the room, on the phone, or within hearing distance of anybody at Highland talking to anyone from the press?

A. About Pat, right?

Q. Yes, sir.

A. I've done my own interviews that haven't had anything to do with Pat. I can remember those two conversations. There may have been more, but at this point in time all I can remember is being -- you know,

Page 300

being in the room when the conversations were -- were occurring.

Q. What do you remember about the conversation that you heard Lawler having?

A. I just -- I flat out -- I mean, it was something around the lawsuit. I don't remember what. They wanted a statement from us.

Q. Who wanted a statement from you?

A. Whoever the press was.

Q. Do you remember Lawler going into specific details about claims in the lawsuit?

A. I don't.

Q. Do you remember anything at all that Lawler provided?

A. I don't.

Q. With respect to Okada what do you recall?

A. I'm sorry?

Q. With respect to Mr. Okada.

A. Oh, what do I recall. Okay. I remember he was trying to get the -- the press called and said they were going to publish something, and Mark was telling them that it wasn't news; that these are just rehashed allegations and so please don't release whatever article you're planning to release.

Q. Was Mr. Ellington present at any of these phone

75 (Pages 297 to 300)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)    8bc852b0-c563-46df-9cbc-9d0b763835b1

App. 0405

Page 317

CORRIGENDA AND SIGNATURE

PAGE    LINE    CORRECTION    REASON

I, PATRICK BOYCE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

PATRICK BOYCE

STATE OF
COUNTY OF
BEFORE ME,            , on this day personally appeared PATRICK BOYCE, known to me (or proved to me under oath or through

(description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purpose and consideration therein expressed. GIVEN UNDER my hand and seal of office this      day of            , 2013.

Notary Public in and for the
State of

Page 318

NO. 12-04005
HIGHLAND CAPITAL          ) IN THE DISTRICT COURT OF
MANAGEMENT, L.P., AND     )
CORNERSTONE HEALTHCARE    )
GROUP HOLDING, INC.       )
                          )
    Plaintiff and         )
    Counter-Defendant     )
                          )
VS.                       )
                          )
PATRICK DAUGHERTY,        )
                          )
    Defendant and         )
    Counter-Plaintiff     ) DALLAS COUNTY, TEXAS
                          )
VS.                       )
                          )
SIERRA VERDE, LLC,        )
HIGHLAND EMPLOYEE         )
RETENTION ASSETS LLC,     )
JAMES DONDERO, PATRICK    )
BOYCE, AND WILLIAM BRITAIN, )
                          )
    Third-Party Defendants. ) 68TH JUDICIAL DISTRICT

---------------------
REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
PATRICK BOYCE
JUNE 5, 2013
---------------------

I, Michelle C. Folks, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, PATRICK BOYCE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on the 18th day of June, 2013, to the witness or to the attorney for the witness for examination, signature and return to me by the 8th day of July, 2013;

Page 319

deposition officer at the time said testimony was taken, the following includes counsel for all parties of record and the amount of time used by each party at the deposition:

MR. MARC D. KATZ
MR. JASON R. REGAS
    ANDREWS KURTH, LLP
    1717 MAIN STREET, SUITE 3700
    DALLAS, TEXAS 75201
    (214) 659-4722
    COUNSEL FOR THE PLAINTIFFS HIGHLAND CAPITAL
    MANAGEMENT, L.P., CORNERSTONE HEALTHCARE GROUP
    HOLDING, INC., AND THIRD-PARTY DEFENDANTS
    JAMES DONDERO AND SIERRA VERDE
    TOTAL TIME USED: NONE

MS. RUTH ANN DANIELS
MS. RACHEL CROCKETT
    LOOPER REED & MCGRAW, P.C.
    1601 ELM STREET, SUITE 4600
    DALLAS, TEXAS 75201
    (214) 954-4136
    COUNSEL FOR THE DEFENDANT AND
    COUNTER-PLAINTIFF PATRICK DAUGHERTY
    TOTAL TIME USED: 6 HOURS, 9 MINUTES

MR. ISAAC LEVENTON
    HIGHLAND CAPITAL MANAGEMENT, L.P.
    300 CRESCENT COURT, SUITE 700
    DALLAS, TEXAS 75201
    (972) 628-4130
    IN-HOUSE COUNSEL FOR HIGHLAND CAPITAL
    MANAGEMENT, L.P.
    TOTAL TIME USED: NONE

MR. MARK L. JOHANSEN
    GRUBER HURST JOHANSEN HAIL SHANK
    1445 ROSS AVENUE, SUITE 2500
    DALLAS, TEXAS 75202-2711
    (214) 855-6800
    COUNSEL FOR THE THIRD-PARTY DEFENDANTS
    PATRICK BOYCE, WILLIAM L. BRITAIN AND
    HIGHLAND EMPLOYEE RETENTION ASSETS LLC
    TOTAL TIME USED: NONE

Page 320

MR. SCOTT ELLINGTON
    ATTORNEY AT LAW
    3100 INDEPENDENCE PARKWAY, SUITE 311
    PLANO, TEXAS 75075
    (972) 419-2584
    GENERAL COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT
    TOTAL TIME USED: NONE

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of the T.R.C.P. will be certified to after they have occurred.

CERTIFIED to by me this 17th day of June, 2013.



Michelle C. Folks
Texas CSR No. 3192
Date of Expiration: 12/31/13
FOLKS & ASSOCIATES, INC.
P.O. BOX 851168
MESQUITE, TEXAS 75185-1168
Phone: (214) 320-9823
Fax: (972) 226-4574
Firm Number: 2

80 (Pages 317 to 320)

Electronically signed by Michelle Folks (501-307-451-0219)      8bc852b0-c563-46df-9cbc-9d0b763835b1

App. 0406

Page 321

FURTHER CERTIFICATION UNDER RULE 203 T.R.C.P.

The original deposition was/was not returned to the deposition officer on the      day of            , 2011;

If returned, the attached Corrigenda and Signature page(s) contain any changes and the reasons therefor;

If returned, the original deposition was delivered to MS. RUTH ANN DANIELS, Custodial Attorney;

That $      is the deposition officer's charges to the Defendant and Counter-Plaintiff Patrick Daugherty for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

CERTIFIED to by me this      day of      , 2013.

MICHELLE C. FOLKS
Texas CSR No. 3192
Date of Expiration: 12/31/13
FOLKS & ASSOCIATES, INC.
P.O. BOX 851168
MESQUITE, TEXAS 75185-1168
Phone: (214) 320-9823
Fax: (972) 226-4574
Firm Number: 2

81 (Page 321)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)　　　　8bc852b0-c563-46df-9cbc-9d0b763835b1

App. 0407

1

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/17/2014*

REPORTER'S RECORD
VOLUME 11 OF 41 VOLUMES
TRIAL COURT CAUSE NO. 12-04005
COURT OF APPEALS CAUSE NO. 05-14-01215-CV

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, ) L.P. AND CORNERSTONE ) HEALTHCARE GROUP HOLDING, ) INC. ) ) | IN THE DISTRICT COURT OF |
| vs. ) ) | DALLAS COUNTY, TEXAS |
| PATRICK DAUGHERTY ) ) | |
| vs. ) ) | |
| SIERRA VERDE, LLC, HIGHLAND ) EMPLOYEE RETENTION ASSETS ) LLC, JAMES DONDERO, PATRICK ) BOYCE AND WILLIAM L. ) BRITAIN ) | 68TH JUDICIAL DISTRICT |

_____

**TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS**

_____

On the 17th day of January, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Martin Hoffman, Judge Presiding, held in Dallas County, Texas.

Proceedings reported by computerized stenotype machine.

LANETTA WILLIAMS, CSR, RPR, CRR

EXHIBIT

38

App. 0408

2

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/17/2014*

**APPEARANCES**

Marc D. Katz
SBOT NO. 007911002
William J. Moore
SBOT NO. 24051075
Isabel Andrade Crosby
SBOT NO. 24050226
John Regas
SBOT NO. 24056189
Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone:  214-659-4400
Attorneys for Highland Capital Management, L.P.,
Cornerstone Healthcare Group Holding, Inc., James
Dondero and Sierra Verde, LLC

Ruth Ann Daniels
SBOT NO. 15109200
William B. Chaney
SBOT NO. 04108500
Rachel M. Crockett
SBOT NO. 24076221
Andrew K. York
SBOT NO. 24051554
Gray Reed & McGraw, P.C.
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  214-954-4135
Attorneys for Patrick Daugherty

Michael K. Hurst
SBOT NO. 10316310
A. Shonn Brown
SBOT NO. 24007164
Gruber Hurst Johansen Hail Shank, LLP
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202-2711
Telephone:  214-855-6800
Attorneys for Highland Employee Retention Assets LLC,
Patrick Boyce and Williams L. Britain

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0409

3

*TRIAL ON THE MERITS - AFTERNOON PROCEEDINGS*
*1/17/2014*

VOLUME 11

TRIAL ON THE MERITS - AFTERNOON PROCEEDINGS

1/17/2014

|  | Direct | Cross | V.Dire | PAGE VOL. |
|---|---|---|---|
| Thomas Surgent | | | |
| By Mr. Chaney | | 6 v11 | |
| By Mr. Katz | 80 v11 | | |
| By Ms. Brown | | 86 v11 | |
| By Mr. Chaney | | 95 v11 | |
| | | | |
| Lane Britain | Direct | Cross | V.Dire |
| By Mr. Katz | 98 v11 | | |
| By Ms. Hurst | | 103 v11 | |

Reporter's Certificate .........................117  11

LANETTA WILLIAMS, CSR, RPR, CRR

4

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/17/2014*

### ALPHABETICAL INDEX OF WITNESSES

|  | Direct | Cross | V.Dire |
|---|---|---|---|
| Britain, Lane | 98 v11 | 103 v11 | |
| Surgent, Thomas | 80 v11 | 6 v11 | |
| | | 86 v11 | |
| | | 95 v11 | |

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0411

5

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/17/2014*

**INDEX OF EXHIBITS**

Use is indicated as follows:
J – Jury        R – Record Only        D – Demonstrative

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED | USE |
|---------|-------------|---------|----------|-----|
| D-37 | 10/26/09 Assignment Agreement Between HERA and Highland | 18 v11 | 18 v11 | J |
| P-70 | Staffing Agreement Between Highland and Sierra Verde | 52 v11 | 52 v11 | J |
| D-73 | Third Amended and Restated Limited Liability Company Agreement of HERA | 13 v11 | 13 v11 | J |
| D-79 | 4/30/13 Assignment Agreement Between HCM and HERA | 24 v11 | 24 v11 | J |
| D-80 | 12/13/13 Escrow Agreement Between HCM and Abrams & Balyiss, LLP | 28 v11 | 28 v11 | J |
| D-191 | Agreement of Limited Partnership of Highland Restoration Capital Partners, LP | 70 v11 | 70 v11 | J |

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0412

6

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/17/2014*

**A F T E R N O O N   P R O C E E D I N G S**

*(Open court jury present)*

THE COURT:  All right, guys, ready to proceed?

THE JUROR:  Yes.

THE COURT:  Let's get going.

**CROSS-EXAMINATION (CONTINUED)**

BY MR. CHANEY

Q.   Mr. Surgent, before lunch you recall we were discussing the term adjustment amount as found in the offer to purchase that was sent to Pat.

A.   Yes.

Q.   You recall those discussions?

A.   Yes, I do.

Q.   And we were trying to parse through the language before the break.

A.   Yes.

Q.   Okay.  Now, I just -- the point that I want to make is the adjustment amount is an amount to be deducted from the value of the interest, right?

A.   No.  It's an amount to be applied in arriving at the offered purchase price.  It doesn't impact at all the value of the interest itself.

Q.   You started with the net asset value, right?

A.   Correct.  Correct.

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0413

114

*TRIAL ON THE MERITS - AFTERNOON PROCEEDINGS*
*1/17/2014*

Q.   And at the time that you left the board in January of 2013, what had been done with his units?

A.   He was still the largest owner of units in HERA.

Q.   Did anybody do anything as a result of 12.1 or otherwise with his units, when I say anybody, anybody on the HERA board or otherwise?

A.   Never, 12.1 was never utilized.

Q.   Okay.  I'm going to just ask you a couple of questions about the offer to purchase.  And this offer to purchase was made by Highland; is that right?

A.   That's correct.

Q.   Did you have any involvement whatsoever in deciding to make an offer to purchase for Highland?

A.   I -- no -- I had -- I took no part in it.  I had nothing to do with it.

Q.   What about Patrick Boyce, did he?

A.   No.

Q.   Did you direct, as it's been alleged, the offer to purchase?

A.   No.  I did not direct anything.

Q.   Do you direct Jim Dondero to do anything?

A.   I do not.

Q.   He's your boss, isn't he?

A.   He is.  I do not direct him to do anything.

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0414

115

*TRIAL ON THE MERITS - AFTERNOON PROCEEDINGS*
*1/17/2014*

Q.   I understand.  I understand.

A.   And I'm not going to.

Q.   That is smart.

So this offer to purchase, did you ever have a conversation with Mr. Dondero where he said, gosh, you know, Lane and Patrick, you guys better -- you know, you better do something with this offer to purchase or I'm going to fire you?

A.   That -- and -- that conversation didn't happen or any conversation like that didn't happen.  We didn't talk -- I never talked to him about it.

Q.   Did you ever e-mail with Jim Dondero about the offer to purchase that Highland was going to make to the HERA interest owners?

A.   No e-mails either.

Q.   No conversations, no e-mails whatsoever?

A.   That's correct, either conversations nor e-mails.

Q.   So why did Pat Daugherty sue you?

A.   Again, because he had decided he wanted to ruin my career, or because he was mad about Sierra Verde, me blowing the whistle on Sierra Verde. That's what I -- all I can figure.

MR. HURST:  Your Honor, this would be a good stopping point to start back up on Tuesday if we're

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0415

116

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/17/2014*

going to quit here in just a second anyway, with your Honor's permission, of course.

*THE COURT:* Okay.  That's fine.  We'll go ahead and break for the -- let's go ahead and step down.

All right, guys, we'll see you guys on Tuesday.  At what time?

*THE JUROR:* 9 o'clock.

*THE COURT:* Nine in the morning.  All right.  See you at nine in the morning.

*(Proceedings concluded)*

LANETTA WILLIAMS, CSR, RPR, CRR

117

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/17/2014*

STATE OF TEXAS

COUNTY OF DALLAS


    I, Lanetta Williams, Official Court Reporter in and
for the County Court at Law No. 2 of Dallas, State of
Texas, do hereby certify that the above and foregoing
contains a true and correct transcription of all
portions of evidence and other proceedings requested in
writing by counsel for the parties to be included in
this volume of the Reporter's Record in the above-styled
and numbered cause, all of which occurred in open court
or in chambers and were reported by me.

    I further certify that this Reporter's Record of the
proceedings truly and correctly reflects the exhibits,
if any, offered by the respective parties.

    I further certify that the total cost for the
preparation of this Reporter's Record is $_____ and
was paid by Defendant.

                              /s/ Lanetta Williams

                              Lanetta Williams, CSR, RPR, CRR
                              Texas CSR 6216
                              Official Court Reporter
                              County Court at Law No. 2
                              Dallas County, Texas
                              600 Commerce Street, 5th Floor
                              Suite 555D
                              Dallas, Texas 75202
                              Telephone:  214-653-7497
                              Expiration:  12/31/2016


LANETTA WILLIAMS, CSR, RPR, CRR

App. 0417

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY     1
TRIAL ON THE MERITS - 01-21-14

**REPORTER'S RECORD**
**VOLUME 12 OF 41 VOLUMES**
**CAUSE NO. 05-14-01215-CV**
**FORMERLY CAUSE NO:  12-04005-C**

| | | |
|---|---|---|
| **HIGHLAND CAPITAL** | § | **IN THE DISTRICT COURT** |
| **MANAGEMENT, L.P., AND** | § | |
| **CORNERSTONE HEALTHCARE** | § | |
| **GROUP HOLDING, INC.,** | § | |
| Plaintiffs and Counter-Defendants, | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **PATRICK DAUGHERTY,** | § | |
| Defendant and Counter-Plaintiff, | § | **68TH JUDICIAL DISTRICT** |
| | § | |
| **VS.** | § | |
| | § | |
| **SIERRA VERDE, LLC, HIGHLAND** | § | |
| **EMPLOYEE RENTENTION ASSETS LLC,** | § | |
| **JAMES DONDERO, PATRICK BOYCE** | § | |
| **AND WILLIAM L. BRITAIN,** | § | |
| Third-Party Defendants. | § | **OF DALLAS COUNTY, TEXAS** |

_____

**TRIAL ON THE MERITS**

_____

ON THE **21ST DAY OF JANUARY, 2014,** the following proceedings came on to be heard in the presence of the jury, in the above-entitled and numbered cause; and the following proceedings were had before the HONORABLE MARTIN HOFFMAN, Judge of the 68th Judicial District Court in Dallas, Dallas County, Texas:

Proceedings reported by Computerized Stenotype Machine.

ANTIONETTE REAGOR, OFFICIAL COURT REPORTER
68TH JUDICIAL DISTRICT COURT - 600 Commerce Street
Dallas, Texas  75202
(214) 653-7158

**EXHIBIT**

**39**

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY    2
TRIAL ON THE MERITS - 01-21-14

**A P P E A R A N C E S:**

**COUNSEL FOR PLAINTIFFS:**

Mr. Marc Katz
ANDREWS KURTH, LLP
1717 Main Street
Suite 3700
Dallas, Texas 75201
(214) 783-7636


     -AND-


**COUNSEL FOR DEFENDANTS HERA, PATRICK BOYCE AND WILLIAM BRITAIN:**

GRUBER HURST JOHANSEN HAIL SHANK

Mr. Michael Hurst
Ms. Shonn Brown
1445 Ross Avenue
Suite 2500
Dallas, Texas 75202
(214) 855-6800

     -AND-


**COUNSEL FOR DEFENDANT PATRICK DAUGHERTY**

LOOPER REED & MCGRAW, P.C.

Ms. Ruth Ann Daniels
Ms. Rachel M. Crockett
Mr. William Chaney
Mr. Drew York
1601 Elm Street
Suite 4600
Dallas, Texas 75201
(214) 954-4135

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0419

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY    3
TRIAL ON THE MERITS - 01-21-14

**INDEX**

**(JANUARY 21, 2014)**

**PAGE**

Appearances . . . . . . . . . . . . . . . . . . . . . . . .    02

Exhibit Index . . . . . . . . . . . . . . . . . . . . . .    04

Proceedings . . . . . . . . . . . . . . . . . . . . .    05

Reporter's Certificate . . . . . . . . . . . . . . . . .    93

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Lane Britain | -- | 08 | -- | -- |
|  | -- | 28 | -- | -- |

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0420

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY    4
TRIAL ON THE MERITS - 01-21-14

## EXHIBIT INDEX

| DEFENDANT'S | DESCRIPTION | PAGE OFFD/AMTD |
|---|---|---|
| No. 42 | Email fr Britain 7-21-11 | 59/59 |
| No. 71 | Offer to Purchase Statement | 79/79 |

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0421

**PROCEEDINGS**

**(JANUARY 21, 2015)**

(Open court.  All parties present.

Proceedings began outside the

presence of the jury at 9:06 a.m.)

THE COURT:  I understand you have something you wanted to put on the record.

MR. YORK:  Yes, Your Honor.  The first thing is Lanette, your afternoon court reporter, indicated after we finished on Friday that we used Highland's Exhibit 23 and it hasn't been offered and admitted into evidence.  So I think we need to take care of that real quick.

The second thing relates to Mr. Katz's redirect of Mr. Surgent at the end of the day on Friday.  And I have copies of the excerpts of the transcript.  As you may recall --

THE COURT:  I have 23 as admitted already.

MR. YORK:  Okay.  Well --

THE COURT:  I have it as admitted.

Do you have it as admitted?

THE COURT REPORTER:  I can check real quickly.

THE COURT:  Highland -- if it wasn't, it is admitted.

MS. BROWN:  I think it may have been

App. 0422

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY  23
TRIAL ON THE MERITS - 01-21-14

A.    Those are false.

Q.    Did Jim have any influence or direction over you with regard to the Second Amendment?

A.    No, he did not.

Q.    Did anybody other than what you testified about here a little while ago, relying upon legal counsel, have any influence on you with respect to your duties as a fiduciary in passing the Second Amendment?

A.    No, they did not.

Q.    All right.  I'm going to fast forward a little bit to the Offer to Purchase.

Were you offered to purchase -- did somebody offer to purchase your interest and your assets with HERA?

A.    Say that one more time?

Q.    Did somebody offer to purchase your assets in HERA?

A.    My units.

Q.    Your units, yes?

A.    Yes.

Q.    Okay.  And your units, your share of the assets, correct?

A.    Yes.

Q.    Okay.  And who was that?

A.    Highland Capital.

Q.    What was your involvement in the decision of

ANTIONETTE REAGOR, C.S.R.  (214) 653-7158

App. 0423

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY   24
TRIAL ON THE MERITS - 01-21-14

Highland Capital to make an offer to purchase your units in HERA?

A.   I had no involvement.

Q.   None at all?

A.   None.

Q.   Well, you're being sued by Mr. Daugherty that you directed the Offer to Purchase.  Is that a true statement?

A.   That I'm being sued for it, or that I did it?

Q.   That's a good clarification.  Thank you.  What a good question.

Is it true that you directed the Offer of Purchase that you've been sued for?

A.   No, I did not.  I had nothing to do with it.

Q.   Do you still own your units in HERA?

A.   No, I sold them.

Q.   Why did you sell your units in HERA?

A.   You know, I was presented with an offer.  I reviewed the offer.  I looked at it.  I thought it was a fair price for what I owned, and I sold them.

Q.   And can you tell the jury what it is that you specifically considered with respect to the structure of the offer?

A.   Sure.  The offer was -- you saw the thing that Pat put up on the -- that his lawyers put up there.  There are

App. 0424

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY    25
TRIAL ON THE MERITS - 01-21-14

two sets of assets.  There was cash, which there was no discount offered for, and there were some -- these ill-liquid real estate, at that point really just private equity fund interest that HERA held.  And we were offered a 40 percent discount to the net asset value, so to the -- what they were worth in a perfect scenario.  And in thinking about the offer, I said, all right, give me 100 cents on the dollar for the cash.  That seems fair.

On the liquid assets, I have no idea.  HERA had no control over when these got sold.  We had to just wait for money to come to us.  I didn't know when cash would come.  So I got a -- a bird in the hand was better, and I took the offer.  I thought it was a very fair -- very fair offer.

Q.    Lane, did you consider anything else besides that analysis that you just went through in deciding whether or not to accept the offer to purchase?

A.    Well, you know, it also -- Pat was suing HERA.  HERA was spending a lot of money on legal fees, and I was afraid that that might, you know, maybe use up all the cash, maybe use up some of the value of those assets.  So the fact that I got, you know, fair payment for the cash and, you know, a fair discount, I thought it was a fair offer and I took it.

Q.    Jim Dondero.  Mr. Dondero has been in this courtroom throughout the entire trial, did he talk to you

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY  26
TRIAL ON THE MERITS - 01-21-14

about the Offer to Purchase before the offer was made?

A.    We never talked about it.

Q.    You never talked about it before, during, or after?

A.    No.

Q.    Did you feel coerced to take the offer?

A.    Absolutely not.

Q.    Did you feel like somehow you would lose your job if you did not accept the Offer to Purchase?

A.    No, quite the opposite.  We were told we would get an offer; take it, don't take it, it doesn't matter.  But the offer is there.

Q.    Well, if you didn't work for Highland -- in other words, if you were like one of the former employees who was also made the offer, would you have still taken it?

A.    Yes.

Q.    So this is in, I think you said January of 2013, is that right?

A.    That's right.

Q.    After you sold your shares, your units, if you will, in HERA and you sold it to Highland, what involvement in HERA did you have after that?

A.    I resigned from the board and I had no involvement.

Q.    So you resigned from the board January of 2013,

App. 0426

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY  27
TRIAL ON THE MERITS - 01-21-14

correct?

A.    Yes, as I was required to do under the documents because I no longer owned any units.

Q.    Were you involved in any way in anybody else's Offer to Purchase?

A.    No, I wasn't.

Q.    And I believe opposing counsel put up on the board yesterday in one of the exhibits that -- yesterday, Friday, whenever it was that we were in the courtroom -- that Mr. Daugherty was given an Offer to Purchase and Calculation Statement, I think on or about January 31st or February 1st of 2013, were you still an interest holder in HERA at that time?

A.    I was not.

Q.    Were you off the board of HERA at that time?

A.    I was no longer on the board.

Q.    Did you --

A.    And I had no involvement in that.

Q.    So just to summarize.  True or false, you were directed -- you directed or participated in the directing of the Offer to Purchase by Highland to Pat Daugherty?

A.    Absolutely false.

        MR. HURST:  Pass the witness, Your Honor.

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0427

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY   72
TRIAL ON THE MERITS - 01-21-14

A.    I have no idea.

Q.    If you'd turn to the third page of this document.

A.    Okay.

Q.    The first item listed is, *Will The Terms of the HERA Operating Agreement Be Amended Following The Offer.* Do you see that?

A.    I do.

Q.    And then it states:   *If the purchase is complete, purchaser will become a holder of at least a majority in interest of the Series A Preferred Units of HERA and will be able to amend HERA's operating agreement without obtaining approval from HERA's board or other holders of Series A Preferred Units of HERA.  Purchaser reserves the right to amend the terms of the operating agreement in the event the purchase is completed.*

Do you see that?

A.    I do.

Q.    So this offer to purchase warned that if they obtained a majority, they could amend the agreement at any time without any notice to unit holders or approval from HERA's board, is that correct?

A.    That's what it says.

Q.    In fact, long before this offer to purchase was sent out, Dondero had specific discussions with HERA board members about the buyout and about how he could obtain a

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY  73
TRIAL ON THE MERITS - 01-21-14

majority in interest and control the entity, isn't that correct?

A.   No, it's not.

Q.   You testified earlier that the Offer to Purchase everyone's HERA units except for Pat Daugherty's was applied a 40 percent discount, is that correct?

A.   A 40 percent discount on the non-cash assets.  I think that's -- I don't know if that's exactly the right number, but it's roughly the right number.  Maybe I got my decimal right.

Q.   If you'll take a look at Defendants Exhibit 72?

A.   Where do I find that?

Q.   In the green notebooks.

A.   Can I put this one up?  Are we done with this?

Q.   We may go back to it, but we're done with it for right now.  It's up to you if you want to.

A.   Just trying to make sure.  Sorry, which one did you say?

Q.   Green notebook Defendant's Exhibit 72.

A.   72.  All right.

THE COURT:  Has it been pre-admitted?

MS. CROCKETT:  Yes, Your Honor.

Q.   (By Ms. Crockett)  If you'll look at the second page?

A.   Okay.

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY  92
TRIAL ON THE MERITS - 01-21-14

You guys approach.

(Off-the-record bench conference.)

THE COURT:  All right.  I'm going to instruct the jury to disregard what the witness just said. I have worked with these law firms in the past, I've never had a technology issue.  The technology was coordinated by this side of the courtroom, so if there's an issue with the technology, which there is right now, it's not the attorneys for the other side that are creating this issue. So I'm going to again instruct you to disregard what the witness said.

And I don't think there's anything nefarious going on, sometimes technology doesn't work.  But to blame the other side for that I don't think is appropriate.

So let's go ahead and go forward.

MS. CROCKETT:  I apologize, Your Honor.  I guess when we were back there they've disconnected the wiring altogether.  So I think we're going to have to continue after the lunch break.

THE COURT:  Let's go ahead and break for lunch.

(Recess was taken at 11:53 a.m.)

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0430

HIGHLAND CAPITAL MANAGEMENT, LLC. VS. PATRICK DAUGHERTY   93
TRIAL ON THE MERITS - 01-21-14

STATE OF TEXAS          *

COUNTY OF DALLAS       *

     I, ANTIONETTE REAGOR, Official Court Reporter in and for the 68th Judicial District Court, of Dallas County, Texas, do hereby certify that the above and foregoing pages contain a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     I further certify that the total cost for the preparation of this Reporter's Record is $1,116.00 and was paid by counsel for Plaintiff.

     Witness my hand this the 21st day of January, 2014.


                              /S/
                              _____
                              Antionette Reagor, Texas CSR # 6416
                              68th Judicial District Court
                              George S. Allen Courts Building
                              600 Commerce Street - 5th Floor
                              Dallas, Texas  75202
                              Certificate Number: 6416
                              Certification Expires:  12-31-15


ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0431

1

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/16/2014*

```
                        REPORTER'S RECORD
                    VOLUME 9 OF 41 VOLUMES
                  TRIAL COURT CAUSE NO. 12-04005
                COURT OF APPEALS CAUSE NO. 05-14-01215-CV


HIGHLAND CAPITAL MANAGEMENT, ) IN THE DISTRICT COURT OF
L.P. AND CORNERSTONE         )
HEALTHCARE GROUP HOLDING,     )
INC.                          )
                              )
vs.                           ) DALLAS COUNTY, TEXAS
                              )
PATRICK DAUGHERTY             )
                              )
vs.                           )
                              )
SIERRA VERDE, LLC, HIGHLAND   )
EMPLOYEE RETENTION ASSETS     )
LLC, JAMES DONDERO, PATRICK   )
BOYCE AND WILLIAM L.          )
BRITAIN                       ) 68TH JUDICIAL DISTRICT
```

---

**TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS**

---

On the 16th day of January, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Martin Hoffman, Judge Presiding, held in Dallas County, Texas.

Proceedings reported by computerized stenotype machine.

LANETTA WILLIAMS, CSR, RPR, CRR

EXHIBIT

40

exhibitsticker.com

App. 0432

2

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/16/2014*

**APPEARANCES**

Marc D. Katz
SBOT NO. 007911002
William J. Moore
SBOT NO. 24051075
Isabel Andrade Crosby
SBOT NO. 24050226
John Regas
SBOT NO. 24056189
Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone:  214-659-4400
Attorneys for Highland Capital Management, L.P.,
Cornerstone Healthcare Group Holding, Inc., James
Dondero and Sierra Verde, LLC

Ruth Ann Daniels
SBOT NO. 15109200
William B. Chaney
SBOT NO. 04108500
Rachel M. Crockett
SBOT NO. 24076221
Andrew K. York
SBOT NO. 24051554
Gray Reed & McGraw, P.C.
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  214-954-4135
Attorneys for Patrick Daugherty

Michael K. Hurst
SBOT NO. 10316310
A. Shonn Brown
SBOT NO. 24007164
Gruber Hurst Johansen Hail Shank, LLP
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202-2711
Telephone:  214-855-6800
Attorneys for Highland Employee Retention Assets LLC,
Patrick Boyce and Williams L. Britain

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0433

3

*TRIAL ON THE MERITS - AFTERNOON PROCEEDINGS*
*1/16/2014*

VOLUME 9

TRIAL ON THE MERITS - AFTERNOON PROCEEDINGS

1/16/2014

|  | Direct | Cross | PAGE VOL.<br>V.Dire |
|---|---|---|---|
| Thomas Surgent | | | |
| By Mr. Katz | 20 v9 | | |
| By Mr. Chaney | | | 73 v9 |
| By Mr. Katz | 75 v9 | | |
| By Ms. Brown | | 101 v9 | |

Reporter's Certificate .........................134    9

LANETTA WILLIAMS, CSR, RPR, CRR

4

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/16/2014*

**ALPHABETICAL INDEX OF WITNESSES**

|  | Direct | Cross | V.Dire |
|---|---|---|---|
| Surgent, Thomas | 20 v9 | 101 v9 | 73 v9 |
|  | 75 v9 |  |  |

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0435

5

*TRIAL ON THE MERITS - AFTERNOON PROCEEDINGS*
*1/16/2014*

**INDEX OF EXHIBITS**

Use is indicated as follows:

J - Jury      R - Record Only      D - Demonstrative

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED | USE |
|---------|-------------|---------|----------|-----|
| J-1 | Juror Question | 57 v9 | | |
| J-2 | Juror Question | 57 v9 | | |
| P-6 | Employee Handbook | 70 v9 | | |
| P-9 | Employee Handbook Acknowledgment Form | 72 v9 | 78 v9 | J |
| P-13 | Annual Certification & Conflicts of Interest Disclosure | 84 v9 | 85 v9 | J |
| P-14 | Annual Certification & Conflicts of Interest Disclosure | 84 v9 | 85 v9 | J |
| P-16 | Highland Compliance Manual | 38 v9 | 39 v9 | J |
| P-17 | Compliance Training Presentation | 42 v9 | 43 v9 | J |
| P-18 | Yearly Compliance Training Sign-In Sheet | 43 v9 | 43 v9 | J |
| P-19 | Code of Ethics | 81 v9 | 82 v9 | J |

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0436

6

*TRIAL ON THE MERITS - AFTERNOON PROCEEDINGS*
*1/16/2014*

**A F T E R N O O N   P R O C E E D I N G S**

*(Open court jury not present)*

*THE COURT:* All right. I understand there's an issue that we need to bring up before the jury gets in. What's the issue?

*MR. MOORE:* Yes, Your Honor. The other day when we had --

*THE REPORTER:* I'm sorry. I'm sorry. Are you Mr. Katz?

*MR. MOORE:* No, I'm sorry. I'm William Moore.

*THE COURT:* One of Mr. Katz's colleagues.

Go ahead.

*MR. MOORE:* When Mr. Katz presented the motion for temporary and permanent sealing order to you, I think you had denied it but requested that we look to see if there were any cases addressing similar situations.

*THE COURT:* Sure.

*MR. MOORE:* Believe it or not, we actually found a pretty similar situation.

*THE COURT:* Okay. Let me see it.

*MR. MOORE:* Yes, sir. May I?

*THE COURT:* Just so it's clear on the record, one other thing. The parties and I have

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0437

104

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/16/2014*

MS. BROWN:  Okay.

BY MS. BROWN

Q.   All right.  Let me ask this question Mr. Surgent.  At the time of the sale -- you know what, were you involved in the offer to purchase that Highland made to the unit holders?

A.   Yes, I was.

Q.   Was Pat Daugherty one of those unit holders?

A.   Yes.

Q.   And this jury has also heard and we'll talk about in detail Section 12.1 of the HERA LLC agreement, correct?

A.   Yes.

Q.   Now, was Section 12.1 of HERA, is that the same thing as the Highland offer to purchase?

A.   No, they're different.

Q.   Two separate things?

A.   Separate.

Q.   Was HERA involved in making the offer to purchase to Pat Daugherty?

A.   No, it was not.

Q.   Was Patrick Boyce or Lane Britain involved in making the offer to purchase?

A.   No, they were not.

Q.   And you understand that -- I'll represent to

LANETTA WILLIAMS, CSR, RPR, CRR

105
*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/16/2014*

you that the allegations that Mr. Daugherty has made against my client is that they directed Highland's offer to purchase to the unit holders. Will you take that representation?

A.    That representation is not correct.

Q.    So were Lane Britain or Patrick Boyce involved in directing the offer to purchase that Highland made to HERA?

A.    Absolutely not.

Q.    All right. So I want to take a little step back with you.

We talked with HERA and I want the jury to hear from somebody with knowledge about it. Were you involved in setting up HERA, the company?

A.    Yes, I was.

MS. BROWN:    If we could pull up, please, the demonstrative, What is HERA.

BY MS. BROWN

Q.    Mr. Surgent, you're an attorney, right?

A.    Yes, I am.

Q.    You're not a trial lawyer like myself, correct?

A.    No, I am not.

Q.    You set up companies and you provide compliance information?

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0439

110

*TRIAL ON THE MERITS - AFTERNOON PROCEEDINGS*
*1/16/2014*

Q.    Never.  Was Jim Dondero involved in managing the affairs of HERA?

A.    No.

Q.    Now, you talked about the board governing. Did the board also make distributions to the individual unit holders?

A.    Yes.

Q.    Who actually made a determination when those distributions would be made?

A.    It was left up to the discretion of the board. And the board was -- had their full discretion to decide if and when to make distributions when there was available cash in the entity to distribute it to the owners, assuming they had vested.

MS. BROWN:  If we could pull up HERA's Exhibit No. 5, please.

BY MS. BROWN

Q.    Is HERA's Exhibit No. 5 -- can you see that on the screen okay?

A.    Yes, I can.

MS. BROWN:  Your Honor, I'm actually going to approach the witness, also, and take the blue notebooks.  We have our documents in them.

THE COURT:  Okay.

MS. BROWN:  And we have a copy for

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0440

130

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/16/2014*

directors taking any action on behalf of HERA?

A.   No.

Q.   Was the board authorized to make amendments to the LLC agreement?

A.   Yes, they were.

Q.   And as they made amendments, such as Exhibit 7 that we just looked at, are you aware of anything that was improper about the way in which they went about adding the language in Section 12.1 to that document?

A.   No, I'm not.

Q.   You're familiar with the offer to purchase, right?

A.   Yes, I am.

Q.   And I need to come back to the flip chart, if you will. So we talked about the fact that Section 12.1 and the offer to purchase aren't the same thing. But it may be helpful for me to draw this out.

So HERA added Section 12.1, correct?

A.   Yes.

Q.   Of the LLC agreement?

A.   Yes.

Q.   Who was the offer to purchase from?

A.   Highland Capital Management.

Q.   And you're aware that my clients are no longer on the board of directors of HERA, correct?

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0441

131

*TRIAL ON THE MERITS – AFTERNOON PROCEEDINGS*
*1/16/2014*

A.    Yes.

Q.    And were they on the board of directors of HERA when Highland actually made the offer to purchase to the unit holders?

A.    Yes.

Q.    Were they involved in the offer to purchase to the unit holders?

A.    No, they were not.

Q.    Were they in any way -- were you involved in the offer to purchase?

A.    Yes, I was.

Q.    On behalf of whom?

A.    On behalf of both HERA and Highland.

Q.    Okay.  And in that role, did you have any discussions, communications, conversations, seek advice from, talk to Lane Britain or Patrick Boyce about Highland's decision to make an offer to purchase to any of the unit holders?

A.    Beyond them receiving the offer as unit holders, not that I recall.

Q.    What is the offer to purchase?

A.    The offer to purchase was an offer made by Highland to purchase the interest of all the Series 8 unit holders.

Q.    Did ever unit holder of Highland actually

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0442

133

*TRIAL ON THE MERITS - AFTERNOON PROCEEDINGS*
*1/16/2014*

Highland?

    *A.*   Correct.

        *MS. BROWN:*  Pass the witness, your Honor.

        *THE COURT:*  Okay.  This is a good time to stop.  We're going to go ahead and break for today and we'll reconvene tomorrow at 9 a.m.  See you guys tomorrow morning.

        *(Proceedings concluded)*

LANETTA WILLIAMS, CSR, RPR, CRR

App. 0443

134

*TRIAL ON THE MERITS - AFTERNOON PROCEEDINGS*
*1/16/2014*

STATE OF TEXAS

COUNTY OF DALLAS


     I, Lanetta Williams, Official Court Reporter in and for the County Court at Law No. 2 of Dallas, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid by <u>Defendant</u>.

                              /s/ Lanetta Williams
                              _____

                              Lanetta Williams, CSR, RPR, CRR
                              Texas CSR 6216
                              Official Court Reporter
                              County Court at Law No. 2
                              Dallas County, Texas
                              600 Commerce Street, 5th Floor
                              Suite 555D
                              Dallas, Texas 75202
                              Telephone:  214-653-7497
                              Expiration:  12/31/2016


LANETTA WILLIAMS, CSR, RPR, CRR

App. 0444

**REPORTER'S RECORD**
**VOLUME 10 OF 41 VOLUMES**
**CAUSE NO. 05-14-01215-CV**
**FORMERLY CAUSE NO:  12-04005-C**

| | | |
|---|---|---|
| **HIGHLAND CAPITAL** | § | **IN THE DISTRICT COURT** |
| **MANAGEMENT, L.P., AND** | § | |
| **CORNERSTONE HEALTHCARE** | § | |
| **GROUP HOLDING, INC.,** | § | |
| Plaintiffs and Counter-Defendants, | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **PATRICK DAUGHERTY,** | § | |
| Defendant and Counter-Plaintiff, | § | **68TH JUDICIAL DISTRICT** |
| | § | |
| **VS.** | § | |
| | § | |
| **SIERRA VERDE, LLC, HIGHLAND** | § | |
| **EMPLOYEE RENTENTION ASSETS LLC,** | § | |
| **JAMES DONDERO, PATRICK BOYCE** | § | |
| **AND WILLIAM L. BRITAIN,** | § | |
| Third-Party Defendants. | § | **OF DALLAS COUNTY, TEXAS** |

---

**TRIAL ON THE MERITS**

---

ON THE **17TH DAY OF JANUARY, 2014,** the following proceedings came on to be heard in the presence of the jury, in the above-entitled and numbered cause; and the following proceedings were had before the HONORABLE MARTIN HOFFMAN, Judge of the 68th Judicial District Court in Dallas, Dallas County, Texas:

Proceedings reported by Computerized Stenotype Machine.

ANTIONETTE REAGOR, OFFICIAL COURT REPORTER
68TH JUDICIAL DISTRICT COURT - 600 Commerce Street
Dallas, Texas  75202
(214) 653-7158

**EXHIBIT**

**41**

App. 0445

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY    2
TRIAL ON THE MERITS - 01-17-14

**A P P E A R A N C E S:**


**COUNSEL FOR PLAINTIFFS:**

Mr. Marc Katz
ANDREWS KURTH, LLP
1717 Main Street
Suite 3700
Dallas, Texas 75201
(214) 783-7636


        -AND-


**COUNSEL FOR DEFENDANTS HERA, PATRICK BOYCE AND WILLIAM BRITAIN:**

GRUBER HURST JOHANSEN HAIL SHANK

Mr. Michael Hurst
Ms. Shonn Brown
1445 Ross Avenue
Suite 2500
Dallas, Texas 75202
(214) 855-6800

        -AND-


**COUNSEL FOR DEFENDANT PATRICK DAUGHERTY**

LOOPER REED & MCGRAW, P.C.

Ms. Ruth Ann Daniels
Ms. Rachel M. Crockett
Mr. William Chaney
Mr. Drew York
1601 Elm Street
Suite 4600
Dallas, Texas 75201
(214) 954-4135


ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0446

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY    3
TRIAL ON THE MERITS - 01-17-14

**INDEX**

**(JANUARY 17, 2014)**

|                                | | **PAGE** |
|--------------------------------|---|---|
| Appearances . . . . . . . . . . . . . . . . . . . . . . . . | | 02 |
| Proceedings . . . . . . . . . . . . . . . . . . . . . . . . | | 05 |
| Reporter's Certificate . . . . . . . . . . . . . . . . . . | | 89 |

| **PLAINTIFF'S WITNESSES:** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| Mark Surgent | -- | 05 | --- | --- |
|  | -- | 30 | --- | --- |

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0447

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY    4
TRIAL ON THE MERITS - 01-17-14

## EXHIBIT INDEX

| PLAINTIFF'S | DESCRIPTION | PAGE OFFD/AMTD |
|---|---|---|
| No. 95 | First Cease & Desist Ltr | 08/08 |
| No. 98 | Second Cease & Desist Ltr | 13/13 |
| No. 48 | Summary/Institutional Prive Fund | 17/17 |
| No. 151 | Email String | 19/19 |
| No. 155 | Confidential Bus Comm | 21/21 |
| No. 148 | Highland Email Re Priv Fund | 23/23 |
| No. 149 | Highland Email Re Priv Fund | 24/24 |

| DEFENDANT'S | DESCRIPTION | PAGE OFFD/AMTD |
|---|---|---|
| No. 107 | Ltr Dated 1-26-12 | 66/67 |

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0448

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY    5
TRIAL ON THE MERITS - 01-17-14

**PROCEEDINGS**

**(JANUARY 17, 2014)**

(Open court.  All parties present.

Jury entering courtroom at 9:12 a.m.)

THE COURT:  Good morning.  Please be seated.

We are going to go until 4:30 today.  The traffic out of downtown Dallas is awful.  I encourage you as soon as we let you out, go to your cars, get out of here because by 5 o'clock traffic gets to a standstill around here, so you want to get out of here.

We're going to take a 10:30 break, then lunch break, then afternoon break.  Are we taking enough breaks for you guys?

(Jury simultaneously responds yes.)

THE COURT:  All right, guys, ready to get started?

Sir, you're still under oath.

Let's proceed.

MR. KATZ:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. KATZ:**

Q.    Mr. Surgent, I know we spent a fair amount of time yesterday talking about the various confidentiality policies at Highland.  Have you ever been told by anybody at Highland that those confidentiality provisions are not

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0449

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  46
TRIAL ON THE MERITS - 01-17-14

THE COURT:  What number are you looking for?

Q.    (By Mr. Chaney)  Pardon me.  Have you looked at them?

A.    Should I be looking at 5 and 61?

Q.    The Third-party Defendant's exhibits in the blue binders.  That's the original HERA Agreement and the Restated HERA Agreement?

A.    Bear with me.

THE COURT:  That has already been admitted.

A.    They appear to be substantially similar.  They may be identical -- actually, they're not identical because some of the numbering is different, but they may be.  I'd have to read in detail line by line.

Q.    (By Mr. Chaney)  And when you say the numbering, you mean maybe the formatting and its presentation may be a little different but the substance is the same?

A.    It appears to be so.

Q.    Right.  And if we take a look at Section 11.1 of Exhibit 61, the May amended -- May 2011 Amended and Restated Agreement.

A.    Yes.

Q.    It states that, "Until the date on which no Series A Preferred Units remain outstanding, the company" -- and the company is HERA, right?

A.    Yes.

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0450

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY   47
TRIAL ON THE MERITS - 01-17-14

Q.   "-- represents, warrants, and covenants as follows." And then it continues onto the next page. "The purpose" -- under (a) -- "The purpose for which the company is organized shall be and remain limited solely to, one, directly owning and holding assets to be contributed by the member." And the member in this case is Highland, right?

A.   Correct.

Q.   "And to distribute the proceeds of such assets from time to time to certain employees of the member in order to create a retention incentive for such employees." Now, those employees are the Series A Preferred Unit holders, right?

A.   That's correct.

Q.    "Two, distribute the proceeds of the retention assets." Those are the proceeds that were just discussed, right?

A.   Correct.

Q.   "In accordance with the terms of Series A Preferred Units of the company." Those terms are set forth in Exhibit A to both the agreements, right?

A.   Yes.

Q.   And transacting any unlawful business for which a limited liability company may be organized under Delaware law as incident (sic), necessary and appropriate to accomplish those two things under one and two, right?

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0451

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  48
TRIAL ON THE MERITS - 01-17-14

A.    Yes.

Q.    And you drafted these agreements, right?

A.    I participated in their drafting, yes.

Q.    Now, if you also take a look at the May 15 amended agreement, Exhibit 61, it established a board of seven members, is that correct?  That's Section 5.1.

A.    Yes.

Q.    And those board -- those board members were Patrick Daugherty, Joseph Dougherty, Paul Kauffman, Patrick Boyce, John Honis, William Britain, and Amit Walia, right?

A.    Yes.

Q.    Now, we talked earlier that in February 2012, HERA amended its limited liability company again, right?

A.    Correct.

Q.    And you participated in the drafting of that amendment, correct?

A.    Yes, I did.

Q.    And you testified regarding some of the circumstances surrounding that amendment being enacted in February 2012, is that correct?

A.    Yes, I did.

Q.    And that Second Amendment that we've referred to is Third-party Defendant's Exhibit 7 in the blue binder, is that correct?  No, you need to get another volume.  Sorry.  It's pre-admitted.

ANTIONETTE REAGOR, C.S.R.  (214) 653-7158

App. 0452

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  49
TRIAL ON THE MERITS - 01-17-14

MS. BROWN:  Your Honor, can I approach the witness and help him find it?

A.    Here we go.  It's throwing me off because it's black on the inside.  I'm sorry.

Q.    (By Mr. Chaney)  That's exhibit -- Third-party Defendant's Exhibit 7 is the Second Amended Restated Limited Liability Company Agreement of Highland Employee Retention Assets, LLC, correct?

A.    Yes.

Q.    And that's what we've talked about during this trial known as the Second Amendment?

A.    Yes.

Q.    And just to make certain, it was dated February 16, 2012, right?

A.    Yes.

Q.    But that was not the only action that HERA took on February 16, 2012, was it?

A.    I don't recall.

Q.    Well, if you take a look in the green binders -- and sorry we're moving around.  A lot of paper in the case.

A.    Which number?

Q.    Go to the green binders Tab 51.  Pre-admitted Defense Exhibit 51.

A.    Okay.

Q.    Now, that's a document entitled, Written Consent

App. 0453

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  50
TRIAL ON THE MERITS - 01-17-14

of the Board of Directors of Highland Employee Retention Assets, LLC.  That is dated February 16, 2012, right?

A.    Yes.

Q.    And did you participate in drafting that written consent?

A.    Yes.

Q.    And now that written consent did a couple of things.  First, it recognized that Mr. Kauffman, who was on the board in that list that we talked about a minute ago, had resigned from the board and the board members that entered into this written consent wanted to accept that resignation and appoint a Mr. Ted Dameris to fill the vacancy, correct?

A.    Correct.

Q.    But the other thing that the board -- that the board members that signed this written consent wanted to do was to remove Patrick Daugherty from the board, right?

A.    Correct.

Q.    And under this agreement they purported to do that?

A.    Correct.

Q.    When I say agreement, a written consent?

A.    Correct.

Q.    That's a document, they didn't -- that wasn't a meeting.  That's not minutes of a meeting, that's just a

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0454

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  51
TRIAL ON THE MERITS - 01-17-14

signed written consent that was put in front of him to sign?

A.   Correct.

Q.   And Mr. Daugherty, Pat, wasn't told on February 16 that the board was meeting or taking these actions, was he?

A.   I don't recall.

Q.   He was a member of the board prior to that, and he wasn't told that the board was going to be taking that action before it happened, was he?

A.   I don't know.

Q.   You seem to know a lot about what the board was doing, you don't know that?

A.   I don't recall.

Q.   And then if we take a look at the Second Amendment, if you take a look at the signature page on the Second Amendment, Pat's not listed, isn't even provided a signature block to say whether he agreed or disagreed with the Second Amendment, was he?

A.   He was removed at that time, so no.

Q.   Right.  The prior exhibit we looked at, the same day removed him and then they entered into the Second Amendment, right?

A.   Correct.

Q.   And he wasn't given an opportunity to participate in the document that removed him, or in the Second

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0455

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  52
TRIAL ON THE MERITS - 01-17-14

Amendment?

A.   He didn't sign the Second Amendment.  I don't recall whether or not he was notified of the board action.

Q.   In fact, he wasn't, was he?

A.   I don't recall.

MR. CHANEY:  Your Honor, this might be a good place to take a break.

THE COURT:  We had talked about I have a phone conference at 10:30 so this is a good time.

We'll go ahead and take our morning break and reconvene in ten minutes.  Probably more than ten minutes.

(Recess was taken from 10:29 to 10:46 a.m.)

THE COURT:  All right.  Guys.  Ready to get started.  Sir, you okay?

THE WITNESS:  Yes.

THE COURT:  Let's proceed.

Q.   (By Mr. Chaney)  Mr. Surgent, just to kind of recap.  We've traced through the HERA Company Agreements starting with the formation of HERA in 2009 and have come up to February of 2012, right?

A.   Yes.

Q.   And what we've looked at is that HERA, being a limited liability company, is governed by these LLC agreements, right?

A.   Correct.

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0456

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  53
TRIAL ON THE MERITS - 01-17-14

Q.    And those agreements set forth what type of units there are, who the members are, what the powers of the various people are, and how the company is supposed to operate, right?

A.    Yes.

Q.    And the Original Agreement was amended in May, just about the time that the original unit holders vested --

A.    Yes.

Q.    -- right?  And that was in May of 2011?

A.    Correct.

Q.    And then we've come up to February of 2012 in which the document that we've talked about in this case, the Second Amendment was entered into, right?

A.    Yes.

Q.    And as we talked about just before the break, that amendment was adopted on February 16, 2012, right?

A.    Yes.

Q.    And immediately before that amendment was adopted, all the board members of HERA other than Pat signed a written consent removing Pat from the board?

A.    Correct.

Q.    And then they entered into the Second Amendment?

A.    Correct.

Q.    And Pat did not participate, wasn't given the

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0457

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  54
TRIAL ON THE MERITS - 01-17-14

opportunity to participate in the decision whether to remove him from the board, was he?

A.    It wasn't required under the document, so no.

Q.    Whether it was required or not, he wasn't given the opportunity, was he?

A.    Not that I recall.

Q.    And he wasn't given the opportunity to be heard on whether the Second Amendment should be adopted?

A.    Not that I recall.

Q.    And then you didn't tell Mr. Daugherty -- you didn't tell Pat after it happened on February 16 what had happened, did you?

A.    I don't recall when he was notified.

Q.    Well, in fact, take a look at Exhibit -- Defendant's 52 in the green binders.  That's a letter from you to Mr. Ribman, Pat's lawyer, right?

A.    Yes.

Q.    And in that letter --

MR. CHANEY:  And Your Honor, this is a pre-admitted exhibit.

THE COURT:  Okay.

Q.    (By Mr. Chaney)  In that letter you state that you enclose both clean and black lined versions of the revised HERA (sic) Agreement, right?

A.    Correct.

Q.    Now, for the jury, what does black line mean?

A.    It's when you show the changes that were made by either underlining additions or striking through things that were deleted from the document so that it makes it clear what the changes are from one version to the next.

Q.    And when we talk about one version to the next, it's a black line showing the changes in the Second Amendment, as compared to the First Amendment, the one that was entered into in May of 2011, right?

A.    Yes.

Q.    Now, this packet of materials that you sent Mr. Ribman, Pat's lawyer, did not include the written consent that removed Pat from the board, did it?

A.    I don't recall.  I'll flip through it.

Q.    Take a look at it.  Tell me if it does.

A.    It does so -- it notifies him that if the -- the current composition of the board -- it says it was amended to reflect the current composition of the board.  So Pat would have clearly saw that he was no longer on the board.

Q.    And you're referring to the second page?

A.    Yes.

Q.    Which is a March 1, 2012 notice from HERA to the holders of the Series A Preferred Units?

A.    Correct.

Q.    Okay.  Now, but my question was this packet of

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  56
TRIAL ON THE MERITS - 01-17-14

documents did not include the written consent, Exhibit 51, that we looked at earlier?

A.    That would be the company's confidential information.  He was removed from the board.  He's notified by letting him know what the current composition of the board is.

Q.    He's still a member of the company, right?

A.    Yes.

Q.    In fact, there are other members of the company?

A.    Yes.

Q.    And you're saying that documents regarding what the board does are confidential from Pat and the other members of the company?

A.    They would have to have a business purpose under Delaware law to request those documents.

Q.    Pat doesn't have a business purpose to know and see the document by which he was removed from the board?

A.    He may.  I haven't talked to the analysis.

Q.    Bottom line is, you didn't provide the document to him?

A.    It doesn't appear to be attached.

Q.    Okay.  And the actions were taken on February 16, 2012, weren't they?

A.    That's correct.

Q.    Over two weeks later, you're sending notice?

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0460

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  74
TRIAL ON THE MERITS - 01-17-14

A.    Yes.

Q.    And it's an amended agreement for the governance of HERA, right?

A.    Yes.

Q.    And it's the third agreement that existed for the governance of HERA?

A.    I believe that's correct.

Q.    Okay.  We talked about the original one, the First Amended Restated, and now the second, right?

A.    Yes.

Q.    Now Article IX, read that into the record, if you would?

A.    Assignment of Interests?

Q.    Yes.

A.    "No interest in the company, whether Common Units, Preferred Units, or otherwise, may be assigned without the prior written consent of the board, provided however, that vested Series A accrued Units may be assigned as set forth on Exhibit A."

Q.    Okay.  And Exhibit A -- back up one second.  And this Article IX consistently appeared in the Original Agreement, in the Amendment in May of 2011, and still appeared in the Second Amendment?

A.    I believe so.

Q.    Okay.  And Exhibit A we talked about earlier in

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0461

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  76
TRIAL ON THE MERITS - 01-17-14

ownership share in the company known as HERA?

A.   That's correct.

Q.   And I believe that in connection with those offers to purchase units from the HERA Series A Preferred unit holders, you did some work as the lawyer both for HERA and Highland?

A.   That's correct.

Q.   And that offer -- those offers were made to the people who were unit holders at the time, whether they were current employees of Highland or former employees, right?

A.   Yes.  Although I believe that it was made in two stages initially to the -- to the employees that were still at the firm and then subsequently to the former employees.

Q.   Well, let's focus on that timing, the two stages. The current employees received their offers from Highland on or about January 18 of 2013, the year that just passed, right?

A.   That sounds right.

Q.   And the former employees such as Pat didn't receive their offers until the end of January, some two weeks later?

A.   I believe that's correct.

Q.   Now, I believe you said that the HERA board did not have any involvement in the offers to purchase the HERA

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  77
TRIAL ON THE MERITS - 01-17-14

units made by Highland, correct?

A.    Correct.  I believe that's correct.

Q.    And that applied to the current employees who received their offers on or about January 18, and the former employees who received their offers on or about January 30 or 31, right?

A.    Yes.

Q.    And so what you're saying is that the HERA board did not meet or consider whether to approve under Article IX of the Second Amendment that we just looked at.

MS. BROWN:  Objection, Your Honor.  Can we approach, please?

THE COURT:  Okay.

(Off-the-record bench conference.)

THE COURT:  All right.  Let's get going.

Q.    (By Mr. Chaney)  Let me try to -- before we took our break -- let me try to regroup where I was.

Now, you had said that the HERA board was not involved in the offer to purchase made by Highland, right?

A.    Correct.

Q.    And that included the fact that the HERA board did not meet or consider whether to approve any transfers of units?

MS. BROWN:  Objection, Your Honor.  We need to approach.

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0463

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  78
TRIAL ON THE MERITS - 01-17-14

Are you done?

MR. CHANEY:  I'm sorry.  I was --

THE COURT:  Why don't you rephrase the question.

Q.   (By Mr. Chaney)  The HERA board did not meet or consider under Article IX, Second Amendment, whether to approve any transfer of interest by unit holders to Highland?

MS. BROWN:  Objection, Your Honor.  We need to approach.  And relevance.

THE COURT:  I'm going to overrule that objection.  I understand what your objection is going to be, Ms. Brown.  I'm going to overrule that objection.

A.   I don't believe that approval would have been necessary under Article IX.

Q.   (By Mr. Chaney)  I'm not asking your opinion as to whether you thought it was appropriate.  I'm asking the board did not meet or consider under Article IX whether to approve the transfer of unit holders' interest to Highland.

MS. BROWN:  Objection, asked and answered.

THE COURT:  He didn't answer it the first time.  So the objection's overruled.

You need to answer, sir.

A.   It wasn't required, so I don't believe they did it.

App. 0464

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  88
TRIAL ON THE MERITS - 01-17-14

purchaser and HERA or any of their members and other people.

A.    Correct.

Q.    That would include Mr. Dondero?

A.    Correct.

Q.    That would include Mr. Boyce?

A.    Correct.

Q.    That would include Mr. Britain?

A.    Correct.

Q.    And then it goes on and says, "Or that has impacted, does impact, or could impact adversely any relevant party's assets."  So it has, does, or could affect the assets of any of those people then the adjustment amount can be applied, right?

A.    Correct.

THE COURT:  Why don't we do this.  Lunch is back in the jury room.  So we're going to go ahead and take a break and we'll reconvene at 1 o'clock.

(Recess was taken at 11:55 a.m.)

ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0465

HIGHLAND CAPITAL MANAGEMENT, L.P. VS. PATRICK DAUGHERTY  89
TRIAL ON THE MERITS - 01-17-14

STATE OF TEXAS          *

COUNTY OF DALLAS        *

I, ANTIONETTE REAGOR, Official Court Reporter in and for the 68th Judicial District Court, of Dallas County, Texas, do hereby certify that the above and foregoing pages contain a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $1,068.00 and was paid by counsel for Plaintiff.

Witness my hand this the 17th day of January, 2014.


                              /S/
                    _____
                    Antionette Reagor, Texas CSR # 6416
                    68th Judicial District Court
                    George S. Allen Courts Building
                    600 Commerce Street - 5th Floor
                    Dallas, Texas  75202
                    Certificate Number: 6416
                    Certification Expires:  12-31-15


ANTIONETTE REAGOR, C.S.R. (214) 653-7158

App. 0466