**Thomas Uebler**

| | |
|---|---|
| **From:** | Hough, Steven C. |
| **Sent:** | Monday, January 14, 2013 8:03 PM |
| **To:** | 'TDameris@hcmlp.com' |
| **Cc:** | 'TSurgent@hcmlp.com'; Abrams, Kevin |
| **Subject:** | RE: HERA |
| **Attachments:** | HERA (1st) Amendment (Walia-related) to Second Amended Restated LLC Agreement (00236187-5).DOC; 1st Am Blackline WSComparison_00236187-00236187.doc; HERA (2d) Amendment (indemnification) to Second Amended Restated LLC Agreement (00236453-2).DOC; 2d Am Blackline WSComparison_00236453-00236453.doc; HERA Member Consent (2d) (indemnification) (00236456-2).DOC; 2d Am Member Consent Blackline WSComparison_00236456-00236456.doc; HERA (3d) Amendment (amendment) to Second Amended Restated LLC Agreement (00236454-2).DOC; 3d Am Blackline WSComparison_00236454-00236454.doc; HERA - Written Consent (3d) Approving Transfer and Amendment Amendment (00236464-2).DOC; 3d Am Board Consent Blackline WSComparison_00236464-00236464.doc; HERA Member Consent (3d) (transfer and amendment) (00236465-2).DOC; 3d Am Member Consent Blackline WSComparison_00236465-00236465.doc |

Ted:

Consistent with our telephone conversations earlier today, attached are revised drafts of the amendment papers for the proposed HERA buyout and blacklines comparing these documents to the versions that I circulated on Friday night.

Sincerely,

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294
E-Mail: Hough@AbramsBayliss.com
* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Hough, Steven C.
**Sent:** Friday, January 11, 2013 11:24 PM
**To:** 'TSurgent@hcmlp.com'; 'TDameris@hcmlp.com'
**Cc:** Abrams, Kevin
**Subject:** RE: HERA

Gentlemen:

1

**EXHIBIT**

**42**

App. 0467

Our comments on the proposed HERA buyout papers are reflected in the attached documents. Please let us know if you have any questions or would like to discuss further.

Sincerely,

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294
E-Mail: Hough@AbramsBayliss.com
* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

```
-----Original Message-----
From: Abrams, Kevin
Sent: Friday, January 11, 2013 1:03 PM
To: 'TDameris@hcmlp.com'
Cc: 'TSurgent@hcmlp.com'; Hough, Steven C.
Subject: Re: HERA
```

Fyi--we are shooting to circulate our markups by later today. We see that certain steps are different than what we expected and we will let you know if we need a call to clarify anything. We are trying to use the structure in the papers that we received as much as possible.

Kevin G. Abrams
Abrams & Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, DE 19807
Main:  302-778-1000
Direct:  302-778-1002
Facsimile:  302-778-1001
Cell:  302-547-8000
E-Mail:  abrams@abramsbayliss.com<mailto:abrams@abramsbayliss.com>

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

App. 0468

```
----- Original Message -----
From: Ted Dameris <TDameris@hcmlp.com>
To: Abrams, Kevin
Cc: Thomas Surgent <TSurgent@hcmlp.com>
Sent: Thu Jan 10 23:06:47 2013
Subject: Re: HERA

Perfect.  Thx.


On Jan 10, 2013, at 9:42 PM, "Abrams, Kevin" <abrams@AbramsBayliss.com> wrote:

> We are trying to get comments to you by late tomorrow afternoon. I will have a better
idea in the morning and will give you a status report.
>
> Kevin G. Abrams
> Abrams & Bayliss LLP
> 20 Montchanin Road
> Suite 200
> Wilmington, DE  19807
> Main:  302-778-1000
> Direct:  302-778-1002
> Facsimile:  302-778-1001
> Cell:  302-547-8000
> E-Mail:  abrams@abramsbayliss.com<mailto:abrams@abramsbayliss.com>
>
> The information contained in this transmission is confidential, proprietary or
privileged, may be subject to protection under the law, and is transmitted for the sole
use of the intended recipient(s).  Any review, dissemination, copying or use of this
communication by or to anyone other than the intended recipient(s), without our express
permission, is unauthorized.  If you are not the intended recipient, or the employee or
agent responsible to deliver it to the intended recipient, please notify us immediately
by telephone or return e-mail and delete or destroy this communication immediately.  To
ensure compliance with requirements imposed by the IRS under Circular 230, we inform you
that any U.S. federal tax advice contained in this communication (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose
of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or
recommending to another party any transaction or matter addressed herein.
>
>
>
>
> ----- Original Message -----
> From: Ted Dameris <TDameris@hcmlp.com>
> To: Abrams, Kevin
> Cc: Thomas Surgent <TSurgent@hcmlp.com>
> Sent: Thu Jan 10 22:23:20 2013
> Subject: HERA
>
>
> Do you have an estimate on a timeframe to get back to us after your review of the
documents?
>
> Dondero wants to get an estimate on timing so that he can prepare the necessary funds.
>
>
> _____
>
```

3

App. 0469

> DISCLAIMER- This email is intended for the recipient(s) only and should not be copied
or reproduced without explicit permission. The material provided herein is for
informational purposes only and does not constitute an offer or commitment, a
solicitation of an offer, or any advice or recommendation, to enter into or conclude any
transaction. It may contain confidential, proprietary or legally privileged information.
If you receive this message in error, please immediately delete it.
>
>

4

App. 0470

A&B Comments 1/14/13 on DRAFT 1/09/13

**AMENDMENT**
**TO**
**SECOND AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THIS AMENDMENT (this "*Amendment*") to the Second Amended and Restated Limited Liability Company Agreement of HIGHLAND EMPLOYEE RETENTION ASSETS LLC (the "*Company*") dated as of February 16, 2012 (the "*Company Agreement*") is entered into as of January __, 2013 (the "*Effective Date*") by and among the members of the board of directors of the Company (the "*Board*"). All capitalized terms used but not defined in this Amendment and defined in the Company Agreement shall have the meanings ascribed to them in the Company Agreement.

WHEREAS, the Company desires to amend Section 5.1 of the Company Agreement;

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the Company requires the affirmative vote or written consent of at least 75% of the members of the Board in order to amend, alter, change or repeal any of the provisions of the Company Agreement.

NOW, THEREFORE, the Company amends the Company Agreement as follows as of the Effective Date:

1.      Section 5.1 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.1    General. The Company shall be managed by a Board of Directors (the "*Board*"), which shall at all times consist of five members, consisting of the following individuals:

> Patrick Boyce
> John Honis
> William L. Britain
> Ted Dameris
> Scott Ellington

The Board shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company. The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement. Each member of the Board shall serve until such member shall cease to hold Series A Preferred Units or until such member's death, resignation or removal from ~~by~~the Board by the unanimous affirmative vote of the remaining Board members. Any vacancies on the Board shall be filled by holder(s) of Series A Preferred Units elected by a majority of the

{A&B-00236187-}

remaining members of the Board, or if no such majority decision can be reached, by the holder(s) of the greatest number of Series A Preferred Units who are not then currently a member of the Board and who are willing to serve on the Board, or if no Series A Preferred Units remain outstanding, as determined by a majority of the remaining members of the Board.

2.      This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original, facsimile or scanned signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed document.  All such fully executed original, facsimile or scanned counterparts will collectively constitute a single document.

3.      Except as modified hereby, the Company Agreement shall remain in full effect and the Amendment shall be binding upon the Company and its successors and assigns.  If any inconsistency exists or arises between the terms of the Amendment and the terms of the Company Agreement, the Amendment shall prevail.


*[Signature page follows]*

App. 0472

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first set forth above.

**DIRECTORS**:

_____
Patrick Boyce


_____
John Honis


_____
William L. Britain


_____
Ted Dameris


_____
Scott Ellington

{A&B-00236187-}

App. 0473

Document comparison by Workshare Professional on Monday, January 14, 2013
7:23:33 PM

| Input: | |
|---|---|
| Document 1 ID | file://F:\wdox\clients\729\00\~VER\4\00236187.DOC |
| Description | 00236187 |
| Document 2 ID | file://F:\wdox\clients\729\00\00236187.DOC |
| Description | 00236187 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 2 |
| Deletions | 1 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 3 |

App. 0474

A&B Comments 1/14/13 on DRAFT 1/09/13

**SECOND AMENDMENT
TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THIS SECOND AMENDMENT (this "*Amendment*") to the Second Amended and Restated Limited Liability Company Agreement of HIGHLAND EMPLOYEE RETENTION ASSETS LLC (the "*Company*") dated as of February 16, 2012 (the "*Company Agreement*"), as amended, is entered into as of January __, 2013 (the "*Effective Date*") by and among the members of the board of directors of the Company (the "*Board*"). All capitalized terms used but not defined in this Amendment and defined in the Company Agreement shall have the meanings ascribed to them in the Company Agreement.

WHEREAS, the Company desires to amend Article VIII of the Company Agreement;

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the Company requires the affirmative vote or written consent of at least 75% of the members of the Board in order to amend, alter, change or repeal any of the provisions of the Company Agreement;

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the Company adopting the within Amendment.

NOW, THEREFORE, the Company amends the Company Agreement as follows as of the Effective Date:

1.    Article VIII of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

ARTICLE VIII

INDEMNIFICATION

Section 8.1    Indemnification and Liability. (a) To the maximum extent permitted by applicable law, no current or future member of the Board, no current or future officer of the Company nor the Initial Member (each an "Indemnitee") shall be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, (iii) for breach of fiduciary duty owed to the Company and/or its members or (iv) for losses due to any such mistake, action or inaction, or breach of fiduciary duty.

(b)    To the fullest extent permitted by applicable law as the same exists or may hereafter be amended, the Company shall indemnify and hold harmless, and advance expenses including attorneys' fees, to an Indemnitee against all liabilities and claims against each such person arising from such person's performance of his duties in conformance with the terms of this Agreement. Notwithstanding the preceding sentence, the Company shall be required to indemnify, or advance expenses to, an Indemnitee in

{A&B-00236453-}

App. 0475

connection with a proceeding (or part thereof) commenced by such Indemnitee only if the commencement of such proceeding (or part thereof) by the Indemnitee was authorized by the Board.

(c)   An Indemnitee may consult with legal counsel or accountants selected by the Board and/or the Initial Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

(d)   The rights conferred upon Indemnitees in this Article VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a member of the Board, an officer of the Company or the Initial Member and shall inure to the benefit of the Indemnitee's heirs, executors, administrators and successors.  Any amendment, alteration or repeal of this Article VIII that adversely affects any right of an Indemnitee or its successors shall be prospective only and shall not limit or eliminate any such right with respect to any liability or claim involving any occurrence or any alleged occurrence of any action or omission that took place prior to such amendment or repeal.

2.   This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original, facsimile or scanned signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed document.  All such fully executed original, facsimile or scanned counterparts will collectively constitute a single document.

3.   Except as modified hereby, the Company Agreement shall remain in full effect and the Amendment shall be binding upon the Company and its successors and assigns.  If any inconsistency exists or arises between the terms of the Amendment and the terms of the Company Agreement, the Amendment shall prevail.

*[Signature page follows]*

{A&B-00236187-}                                        2

App. 0477

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first set forth above.

**<u>DIRECTORS</u>:**

_____
Patrick Boyce

_____
John Honis

_____
William L. Britain

_____
Ted Dameris

_____
Scott Ellington

{A&B-00236453-}

Document comparison by Workshare Professional on Monday, January 14, 2013 7:28:25 PM

| Input: | |
|---|---|
| Document 1 ID | file://F:\wdox\clients\729\00\~VER\1\00236453.DOC |
| Description | 00236453 |
| Document 2 ID | file://F:\wdox\clients\729\00\00236453.DOC |
| Description | 00236453 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 6 |
| Deletions | 0 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 6 |

App. 0478

**WRITTEN CONSENT
OF HOLDER OF SERIES A PREFERRED UNITS
OF
HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THE UNDERSIGNED holder of Series A Preferred Units of Highland Employee Retention Assets LLC hereby consents to and ratifies the below amendment to the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the "*Company Agreement*"), as amended:

Article VIII of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

ARTICLE VIII

INDEMNIFICATION

Section 8.1    Indemnification and Liability.    (a) To the maximum extent permitted by applicable law, no current or future member of the Board, no current or future officer of the Company nor the Initial Member (each an "Indemnitee") shall be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, (iii) for breach of fiduciary duty owed to the Company and/or its members or (iv) for losses due to any such mistake, action or inaction, or breach of fiduciary duty.

(b)    To the fullest extent permitted by applicable law as the same exists or may hereafter be amended, the Company shall indemnify and hold harmless, and advance expenses including attorneys' fees, to an Indemnitee against all liabilities and claims against each such person arising from such person's performance of his duties in conformance with the terms of this Agreement. Notwithstanding the preceding sentence, the Company shall be required to indemnify, or advance expenses to, an Indemnitee in connection with a proceeding (or part thereof) commenced by such Indemnitee only if the commencement of such proceeding (or part thereof) by the Indemnitee was authorized by the Board.

(c)    An Indemnitee may consult with legal counsel or accountants selected by the Board and/or the Initial Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

{A&B-00236456-}

(d)     The rights conferred upon Indemnitees in this Article VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a member of the Board, an officer of the Company or the Initial Member and shall inure to the benefit of the Indemnitee's heirs, executors, administrators and successors.  Any amendment, alteration or repeal of this Article VIII that adversely affects any right of an Indemnitee or its successors shall be prospective only and shall not limit or eliminate any such right with respect to any liability or claim involving any occurrence or any alleged occurrence of any action or omission that took place prior to such amendment or repeal.

IN WITNESS WHEREOF, the undersigned has executed this Consent to be effective as of the date set forth below.

HOLDER OF SERIES A PREFERRED UNITS:

Name:_____

By:_____

Number of Series A Preferred Units Held:_____

Dated:_____

{A&B-00236456-}

App. 0480

Document comparison by Workshare Professional on Monday, January 14, 2013
7:36:24 PM

| Input: | |
|---|---|
| Document 1 ID | file://F:\wdox\clients\729\00\~VER\1\00236456.DOC |
| Description | 00236456 |
| Document 2 ID | file://F:\wdox\clients\729\00\00236456.DOC |
| Description | 00236456 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 5 |
| Deletions | 0 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 5 |

App. 0481

A&B Comments 1/14/13 on DRAFT 1/09/13

**THIRD AMENDMENT**
**TO**
**SECOND AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THIS THIRD AMENDMENT (this "*Amendment*") to the Second Amended and Restated Limited Liability Company Agreement of HIGHLAND EMPLOYEE RETENTION ASSETS LLC (the "*Company*") dated as of February 16, 2012 (the "*Company Agreement*"), as amended, is entered into as of January __, 2013 (the "*Effective Date*") by and among the members of the board of directors of the Company (the "*Board*"). All capitalized terms used but not defined in this Amendment and defined in the Company Agreement shall have the meanings ascribed to them in the Company Agreement.

WHEREAS, the Company desires to amend ~~Section~~Sections 5.1 and 5.2 of the Company Agreement;

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the Company requires the affirmative vote or written consent of at least 75% of the members of the Board in order to amend, alter, change or repeal any of the provisions of the Company Agreement;

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the Company adopting the within Amendment;

WHEREAS, the holders of a majority-in-interest of the Company's Series A Preferred Units have accepted [BUYER'S] Offer to Purchase dated [January ___, 2013].

NOW, THEREFORE, the Company amends the Company Agreement as follows as of the Effective Date:

1.    Section 5.1 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.1    General. The Company shall be managed by a Board of Directors (the "*Board*"), which shall at all times consist of five members, consisting of the following individuals:

Patrick Boyce
John Honis
William L. Britain
Ted Dameris
Scott Ellington

The Board shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to

{A&B-00236454-}

App. 0482

bind the Company.  The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement.  Each member of the Board shall serve until such member's death, resignation or removal from the Board by the unanimous affirmative vote of the remaining Board members.  Any vacancies on the Board shall be filled by majority vote of the remaining members of the Board, or if no such majority decision can be reached, as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

2.    1. Section 5.2 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.2    Delegation of Powers of the Board.  (a) Subject to Sections 5.2(b) and 5.2(c) and ARTICLE XI hereof, the Board shall have the exclusive and complete authority, acting without the consent or approval of, or notice to, the Member and in the Board's sole and absolute discretion, to operate the Company and its business and to make all determinations or elections or to consent to any matter otherwise described in this Agreement.  Neither the Member nor any other unitholder shall have the authority to remove any member of the Board.

(b)    Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company shall not, and shall not have power or authority and shall not be authorized to, and the Board shall not, and shall not have power or authority and shall not be authorized to cause the Company to, take any of the following actions without the prior affirmative vote or written consent of at least 75% of the members of the Board:

(i)    dissolve, wind-up or liquidate, in whole or in part, or cause or consent to the dissolution, winding up or liquidation, in whole or in part, of the Company;

(ii)    be a party to any merger or consolidation or sell, transfer, assign, convey or lease any asset of the Company, or cause or consent to any merger or consolidation or sale, transfer, assignment, conveyance or lease of any assets of the Company;

(iii)    directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity, or cause the Company to directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity;

(iv)    incur or assume any indebtedness or obligations except for liabilities under Section 3.3, or cause the Company, to incur or assume any indebtedness or obligations except for liabilities under Section 3.3; or

{A&B-00236187-}    2

(v)    take any Bankruptcy Action with respect to the Company, or take, cause or consent to any Bankruptcy Action with respect to the Company.

(c)    Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company may amend, alter, change or repeal any of the provisions of this Agreement (including, without limitation, the last sentence of Section 5.2(a) hereof) only upon either the prior affirmative vote or written consent of at least 75% of the members of the Board or as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

3.    2. This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original, facsimile or scanned signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed document. All such fully executed original, facsimile or scanned counterparts will collectively constitute a single document.

4.    3. Except as modified hereby, the Company Agreement shall remain in full effect and the Amendment shall be binding upon the Company and its successors and assigns. If any inconsistency exists or arises between the terms of the Amendment and the terms of the Company Agreement, the Amendment shall prevail.

*[Signature page follows]*

App. 0484

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first set forth above.

**<u>DIRECTORS</u>:**

_____
Patrick Boyce

_____
John Honis

_____
William L. Britain

_____
Ted Dameris

_____
Scott Ellington

{A&B-00236454-}

App. 0485

Document comparison by Workshare Professional on Monday, January 14, 2013
7:46:33 PM

| Input: | |
|---|---|
| Document 1 ID | file://F:\wdox\clients\729\00\~VER\1\00236454.DOC |
| Description | 00236454 |
| Document 2 ID | file://F:\wdox\clients\729\00\00236454.DOC |
| Description | 00236454 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 14 |
| Deletions | 4 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 18 |

App. 0486

**WRITTEN CONSENT**
**OF BOARD OF DIRECTORS**
**OF**
**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

Effective as of January ___, 2013

THE UNDERSIGNED members of the board of directors (the "*Board*") of Highland Employee Retention Assets LLC, a Delaware limited liability company (the "*Company*"), acting pursuant to the Delaware Limited Liability Company Act and the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the "*Company Agreement*"), as amended, do hereby adopt the following resolutions by written consent:

WHEREAS, the Company desires to amend SectionSections 5.1 and 5.2 of the Company Agreement in the form previously reviewed by the undersigned (the "*Amendment*");

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the affirmative vote or written consent of at least 75% of the members of the Board is required in order to amend, alter, change or repeal any of the provisions of the Company Agreement;

WHEREAS, pursuant to Article IX of the Company Agreement, the prior written consent of the Board is required to assign Series A Preferred Units of the Company;

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the Company adopting the Amendment;

WHEREAS, the holders of a majority-in-interest of the Company's Series A Preferred Units have accepted [BUYER'S] Offer to Purchase dated [January ___, 2013] (the "*Offer*");

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the assignment of Series A Preferred Units of the Company to [BUYER] pursuant to the Offer to Purchase dated [January ___, 2013] (the "*Assignment*").

NOW, THEREFORE, BE IT

RESOLVED, that, subject to and conditioned upon a majority-in-interest of the Company's Series A Preferred Units having consented to and ratified the Amendment and having accepted the Offer, the Board approves the proposed Amendment;

RESOLVED FURTHER, that, subject to and conditioned upon a majority-in-interest of the Company's Series A Preferred Units having consented to and ratified the Assignment and having accepted the Offer, the Board approves the Assignment;

RESOLVED FURTHER, that the Company's directors be, and they hereby are, authorized, empowered and directed for, in the Company's name and behalf, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other

{A&B-00236464-}

App. 0487

agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions; and that all acts and deeds of the directors and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the Company's acts and deeds;

RESOLVED FURTHER, that this authorization shall remain in effect until further written notice from the Company.

*[Signature Page to Follow]*

App. 0488

IN WITNESS WHEREOF, the undersigned have executed this Consent to be effective as of the date first set forth above.

**<u>DIRECTORS</u>:**

_____
Patrick Boyce


_____
John Honis


_____
William L. Britain


_____
Ted Dameris


_____
Scott Ellington

{A&B-00236464-}

App. 0489

Document comparison by Workshare Professional on Monday, January 14, 2013
7:49:28 PM

| Input: | |
|---|---|
| Document 1 ID | file://F:\wdox\clients\729\00\~VER\1\00236464.DOC |
| Description | 00236464 |
| Document 2 ID | file://F:\wdox\clients\729\00\00236464.DOC |
| Description | 00236464 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 1 |
| Deletions | 1 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 2 |

App. 0490

**WRITTEN CONSENT**
**OF HOLDER OF SERIES A PREFERRED UNITS**
**OF**
**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THE UNDERSIGNED holder of Series A Preferred Units of Highland Employee Retention Assets LLC hereby consents to and ratifies the below amendment to the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the "*Company Agreement*"), as amended:

> Section 5.1 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:
>
> Section 5.1    General.    The Company shall be managed by a Board of Directors (the "*Board*"), which shall at all times consist of five members, consisting of the following individuals:
>
> > Patrick Boyce
> > John Honis
> > William L. Britain
> > Ted Dameris
> > Scott Ellington
>
> The Board shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company. The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement. Each member of the Board shall serve until such member's death, resignation or removal from the Board by the unanimous affirmative vote of the remaining Board members. Any vacancies on the Board shall be filled by majority vote of the remaining members of the Board, or if no such majority decision can be reached, as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

> Section 5.2 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:
>
> Section 5.2    Delegation of Powers of the Board.    (a) Subject to Sections 5.2(b) and 5.2(c) and ARTICLE XI hereof, the Board shall have the exclusive and complete authority, acting without the consent or approval of, or notice to, the Member and in

{A&B-00236465-}

App. 0491

the Board's sole and absolute discretion, to operate the Company and its business and to make all determinations or elections or to consent to any matter otherwise described in this Agreement. Neither the Member nor any other unitholder shall have the authority to remove any member of the Board.

(b)    Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company shall not, and shall not have power or authority and shall not be authorized to, and the Board shall not, and shall not have power or authority and shall not be authorized to cause the Company to, take any of the following actions without the prior affirmative vote or written consent of at least 75% of the members of the Board:

(i)    dissolve, wind-up or liquidate, in whole or in part, or cause or consent to the dissolution, winding up or liquidation, in whole or in part, of the Company;

(ii)    be a party to any merger or consolidation or sell, transfer, assign, convey or lease any asset of the Company, or cause or consent to any merger or consolidation or sale, transfer, assignment, conveyance or lease of any assets of the Company;

(iii)    directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity, or cause the Company to directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity;

(iv)    incur or assume any indebtedness or obligations except for liabilities under Section 3.3, or cause the Company, to incur or assume any indebtedness or obligations except for liabilities under Section 3.3; or

(v)    take any Bankruptcy Action with respect to the Company, or take, cause or consent to any Bankruptcy Action with respect to the Company.

(c)    Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the

App. 0492

Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company may amend, alter, change or repeal any of the provisions of this Agreement (including, without limitation, the last sentence of Section 5.2(a) hereof) only upon either the prior affirmative vote or written consent of at least 75% of the members of the Board or as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

THE UNDERSIGNED further consents to and ratifies the Board's approval of the assignment of Series A Preferred Units of the Company to [BUYER] pursuant to the Offer to Purchase dated [January ___, 2013].

IN WITNESS WHEREOF, the undersigned has executed this Consent to be effective as of the date set forth below.

<div style="margin-left: 40%;">

HOLDER OF SERIES A PREFERRED UNITS:

Name:_____

By:_____

Number of Series A Preferred Units Held:_____

Dated:_____

</div>

{A&B-00236465-}

Document comparison by Workshare Professional on Monday, January 14, 2013
7:57:06 PM

| Input: | |
|---|---|
| Document 1 ID | file://F:\wdox\clients\729\00\~VER\1\00236465.DOC |
| Description | 00236465 |
| Document 2 ID | file://F:\wdox\clients\729\00\00236465.DOC |
| Description | 00236465 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 9 |
| Deletions | 0 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 9 |

App. 0494

**WRITTEN CONSENT**
**OF BOARD OF DIRECTORS**
**OF**
**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

Effective as of January __, 2013

THE UNDERSIGNED members of the board of directors (the "*Board*") of Highland Employee Retention Assets LLC, a Delaware limited liability company (the "*Company*"), acting pursuant to the Delaware Limited Liability Company Act and the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the "*Company Agreement*"), as amended, do hereby adopt the following resolutions by written consent:

WHEREAS, the Company desires to amend Sections 5.1 and 5.2 of the Company Agreement in the form previously reviewed by the undersigned (the "*Amendment*");

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the affirmative vote or written consent of at least 75% of the members of the Board is required in order to amend, alter, change or repeal any of the provisions of the Company Agreement;

WHEREAS, pursuant to Article IX of the Company Agreement, the prior written consent of the Board is required to assign Series A Preferred Units of the Company;

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the Company adopting the Amendment;

WHEREAS, the holders of a majority-in-interest of the Company's Series A Preferred Units have accepted [BUYER'S] Offer to Purchase dated [January ___, 2013] (the "*Offer*");

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the assignment of Series A Preferred Units of the Company to [BUYER] pursuant to the Offer to Purchase dated [January ___, 2013] (the "*Assignment*").

NOW, THEREFORE, BE IT

RESOLVED, that, subject to and conditioned upon a majority-in-interest of the Company's Series A Preferred Units having consented to and ratified the Amendment and having accepted the Offer, the Board approves the proposed Amendment;

RESOLVED FURTHER, that, subject to and conditioned upon a majority-in-interest of the Company's Series A Preferred Units having consented to and ratified the Assignment and having accepted the Offer, the Board approves the Assignment;

RESOLVED FURTHER, that the Company's directors be, and they hereby are, authorized, empowered and directed for, in the Company's name and behalf, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other

{A&B-00236464-}

App. 0495

agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions; and that all acts and deeds of the directors and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the Company's acts and deeds;

RESOLVED FURTHER, that this authorization shall remain in effect until further written notice from the Company.

*[Signature Page to Follow]*

.

2

IN WITNESS WHEREOF, the undersigned have executed this Consent to be effective as of the date first set forth above.

**DIRECTORS:**

_____
Patrick Boyce

_____
John Honis

_____
William L. Britain

_____
Ted Dameris

_____
Scott Ellington

{A&B-00236464-}

App. 0497

A&B Comments 1/14/13 on DRAFT 1/09/13

**AMENDMENT
TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THIS AMENDMENT (this "*Amendment*") to the Second Amended and Restated Limited Liability Company Agreement of HIGHLAND EMPLOYEE RETENTION ASSETS LLC (the "*Company*") dated as of February 16, 2012 (the "*Company Agreement*") is entered into as of January __, 2013 (the "*Effective Date*") by and among the members of the board of directors of the Company (the "*Board*"). All capitalized terms used but not defined in this Amendment and defined in the Company Agreement shall have the meanings ascribed to them in the Company Agreement.

WHEREAS, the Company desires to amend Section 5.1 of the Company Agreement;

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the Company requires the affirmative vote or written consent of at least 75% of the members of the Board in order to amend, alter, change or repeal any of the provisions of the Company Agreement.

NOW, THEREFORE, the Company amends the Company Agreement as follows as of the Effective Date:

1.      Section 5.1 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.1    General. The Company shall be managed by a Board of Directors (the "*Board*"), which shall at all times consist of five members, consisting of the following individuals:

Patrick Boyce
John Honis
William L. Britain
Ted Dameris
Scott Ellington

The Board shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company. The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement. Each member of the Board shall serve until such member shall cease to hold Series A Preferred Units or until such member's death, resignation or removal from the Board by the unanimous affirmative vote of the remaining Board members. Any vacancies on the Board shall be filled by holder(s) of Series A Preferred Units elected by a majority of the

{A&B-00236187-}

App. 0498

remaining members of the Board, or if no such majority decision can be reached, by the holder(s) of the greatest number of Series A Preferred Units who are not then currently a member of the Board and who are willing to serve on the Board, or if no Series A Preferred Units remain outstanding, as determined by a majority of the remaining members of the Board.

2.    This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original, facsimile or scanned signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed document.  All such fully executed original, facsimile or scanned counterparts will collectively constitute a single document.

3.    Except as modified hereby, the Company Agreement shall remain in full effect and the Amendment shall be binding upon the Company and its successors and assigns.  If any inconsistency exists or arises between the terms of the Amendment and the terms of the Company Agreement, the Amendment shall prevail.

*[Signature page follows]*

{A&B-00236187-}                              2

App. 0499

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first set forth above.

**<u>DIRECTORS</u>:**

_____
Patrick Boyce


_____
John Honis


_____
William L. Britain


_____
Ted Dameris


_____
Scott Ellington

{A&B-00236187-}

App. 0500

Case 3:24-cv-00498-K    Document 133-2    Filed 02/14/25    Page 35 of 93    PageID 7048

A&B Comments 1/14/13 on DRAFT 1/09/13

**SECOND AMENDMENT
TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THIS SECOND AMENDMENT (this "*Amendment*") to the Second Amended and Restated Limited Liability Company Agreement of HIGHLAND EMPLOYEE RETENTION ASSETS LLC (the "*Company*") dated as of February 16, 2012 (the "*Company Agreement*"), as amended, is entered into as of January __, 2013 (the "*Effective Date*") by and among the members of the board of directors of the Company (the "*Board*"). All capitalized terms used but not defined in this Amendment and defined in the Company Agreement shall have the meanings ascribed to them in the Company Agreement.

WHEREAS, the Company desires to amend Article VIII of the Company Agreement;

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the Company requires the affirmative vote or written consent of at least 75% of the members of the Board in order to amend, alter, change or repeal any of the provisions of the Company Agreement;

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the Company adopting the within Amendment.

NOW, THEREFORE, the Company amends the Company Agreement as follows as of the Effective Date:

1.      Article VIII of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

ARTICLE VIII

INDEMNIFICATION

Section 8.1      Indemnification and Liability.  (a) To the maximum extent permitted by applicable law, no current or future member of the Board, no current or future officer of the Company nor the Initial Member (each an "Indemnitee") shall be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, (iii) for breach of fiduciary duty owed to the Company and/or its members or (iv) for losses due to any such mistake, action or inaction, or breach of fiduciary duty.

(b)      To the fullest extent permitted by applicable law as the same exists or may hereafter be amended, the Company shall indemnify and hold harmless, and advance expenses including attorneys' fees, to an Indemnitee against all liabilities and claims against each such person arising from such person's performance of his duties in conformance with the terms of this Agreement. Notwithstanding the preceding sentence, the Company shall be required to indemnify, or advance expenses to, an Indemnitee in

{A&B-00236453-}

App. 0501

connection with a proceeding (or part thereof) commenced by such Indemnitee only if the commencement of such proceeding (or part thereof) by the Indemnitee was authorized by the Board.

(c)    An Indemnitee may consult with legal counsel or accountants selected by the Board and/or the Initial Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

(d)    The rights conferred upon Indemnitees in this Article VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a member of the Board, an officer of the Company or the Initial Member and shall inure to the benefit of the Indemnitee's heirs, executors, administrators and successors.  Any amendment, alteration or repeal of this Article VIII that adversely affects any right of an Indemnitee or its successors shall be prospective only and shall not limit or eliminate any such right with respect to any liability or claim involving any occurrence or any alleged occurrence of any action or omission that took place prior to such amendment or repeal.

2.    This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original, facsimile or scanned signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed document.  All such fully executed original, facsimile or scanned counterparts will collectively constitute a single document.

3.    Except as modified hereby, the Company Agreement shall remain in full effect and the Amendment shall be binding upon the Company and its successors and assigns.  If any inconsistency exists or arises between the terms of the Amendment and the terms of the Company Agreement, the Amendment shall prevail.

*[Signature page follows]*

{A&B-00236187-}                              2

App. 0502

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first set forth above.

**<u>DIRECTORS</u>**:

_____

Patrick Boyce

_____

John Honis

_____

William L. Britain

_____

Ted Dameris

_____

Scott Ellington

{A&B-00236453-}

App. 0503

A&B Comments 1/14/13 on DRAFT 1/09/13

**THIRD AMENDMENT
TO
SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THIS THIRD AMENDMENT (this "*Amendment*") to the Second Amended and Restated Limited Liability Company Agreement of HIGHLAND EMPLOYEE RETENTION ASSETS LLC (the "*Company*") dated as of February 16, 2012 (the "*Company Agreement*"), as amended, is entered into as of January __, 2013 (the "*Effective Date*") by and among the members of the board of directors of the Company (the "*Board*"). All capitalized terms used but not defined in this Amendment and defined in the Company Agreement shall have the meanings ascribed to them in the Company Agreement.

WHEREAS, the Company desires to amend Sections 5.1 and 5.2 of the Company Agreement;

WHEREAS, pursuant to Section 5.2(b)(iv) of the Company Agreement, the Company requires the affirmative vote or written consent of at least 75% of the members of the Board in order to amend, alter, change or repeal any of the provisions of the Company Agreement;

WHEREAS, a majority-in-interest of the Company's Series A Preferred Units have consented to and ratified the Company adopting the within Amendment;

WHEREAS, the holders of a majority-in-interest of the Company's Series A Preferred Units have accepted [BUYER'S] Offer to Purchase dated [January ___, 2013].

NOW, THEREFORE, the Company amends the Company Agreement as follows as of the Effective Date:

1.    Section 5.1 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.1    General.  The Company shall be managed by a Board of Directors (the "*Board*"), which shall at all times consist of five members, consisting of the following individuals:

Patrick Boyce
John Honis
William L. Britain
Ted Dameris
Scott Ellington

The Board shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to

{A&B-00236454-}

App. 0504

bind the Company. The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement. Each member of the Board shall serve until such member's death, resignation or removal from the Board by the unanimous affirmative vote of the remaining Board members. Any vacancies on the Board shall be filled by majority vote of the remaining members of the Board, or if no such majority decision can be reached, as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

2.    Section 5.2 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.2    Delegation of Powers of the Board. (a) Subject to Sections 5.2(b) and 5.2(c) and ARTICLE XI hereof, the Board shall have the exclusive and complete authority, acting without the consent or approval of, or notice to, the Member and in the Board's sole and absolute discretion, to operate the Company and its business and to make all determinations or elections or to consent to any matter otherwise described in this Agreement. Neither the Member nor any other unitholder shall have the authority to remove any member of the Board.

(b)    Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company shall not, and shall not have power or authority and shall not be authorized to, and the Board shall not, and shall not have power or authority and shall not be authorized to cause the Company to, take any of the following actions without the prior affirmative vote or written consent of at least 75% of the members of the Board:

(i)    dissolve, wind-up or liquidate, in whole or in part, or cause or consent to the dissolution, winding up or liquidation, in whole or in part, of the Company;

(ii)    be a party to any merger or consolidation or sell, transfer, assign, convey or lease any asset of the Company, or cause or consent to any merger or consolidation or sale, transfer, assignment, conveyance or lease of any assets of the Company;

(iii)    directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity, or cause the Company to directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity;

(iv)    incur or assume any indebtedness or obligations except for liabilities under Section 3.3, or cause the Company, to incur or assume any indebtedness or obligations except for liabilities under Section 3.3; or

(v)     take any Bankruptcy Action with respect to the Company, or take, cause or consent to any Bankruptcy Action with respect to the Company.

(c)     Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company may amend, alter, change or repeal any of the provisions of this Agreement (including, without limitation, the last sentence of Section 5.2(a) hereof) only upon either the prior affirmative vote or written consent of at least 75% of the members of the Board or as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

3.     This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original, facsimile or scanned signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed document. All such fully executed original, facsimile or scanned counterparts will collectively constitute a single document.

4.     Except as modified hereby, the Company Agreement shall remain in full effect and the Amendment shall be binding upon the Company and its successors and assigns. If any inconsistency exists or arises between the terms of the Amendment and the terms of the Company Agreement, the Amendment shall prevail.

*[Signature page follows]*

{A&B-00236187-}                          3

App. 0506

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first set forth above.

**<u>DIRECTORS</u>:**

_____
Patrick Boyce

_____
John Honis

_____
William L. Britain

_____
Ted Dameris

_____
Scott Ellington

{A&B-00236454-}

App. 0507

**WRITTEN CONSENT
OF HOLDER OF SERIES A PREFERRED UNITS
OF
HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THE UNDERSIGNED holder of Series A Preferred Units of Highland Employee Retention Assets LLC hereby consents to and ratifies the below amendment to the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the "*Company Agreement*"), as amended:

Article VIII of the Company Agreement is hereby amended
and replaced in its entirety to read as follows:

ARTICLE VIII

INDEMNIFICATION

Section 8.1    Indemnification and Liability.    (a) To the maximum extent permitted by applicable law, no current or future member of the Board, no current or future officer of the Company nor the Initial Member (each an "Indemnitee") shall be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, (iii) for breach of fiduciary duty owed to the Company and/or its members or (iv) for losses due to any such mistake, action or inaction, or breach of fiduciary duty.

(b)    To the fullest extent permitted by applicable law as the same exists or may hereafter be amended, the Company shall indemnify and hold harmless, and advance expenses including attorneys' fees, to an Indemnitee against all liabilities and claims against each such person arising from such person's performance of his duties in conformance with the terms of this Agreement. Notwithstanding the preceding sentence, the Company shall be required to indemnify, or advance expenses to, an Indemnitee in connection with a proceeding (or part thereof) commenced by such Indemnitee only if the commencement of such proceeding (or part thereof) by the Indemnitee was authorized by the Board.

(c)    An Indemnitee may consult with legal counsel or accountants selected by the Board and/or the Initial Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

{A&B-00236456-}

App. 0508

(d)    The rights conferred upon Indemnitees in this Article VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a member of the Board, an officer of the Company or the Initial Member and shall inure to the benefit of the Indemnitee's heirs, executors, administrators and successors.  Any amendment, alteration or repeal of this Article VIII that adversely affects any right of an Indemnitee or its successors shall be prospective only and shall not limit or eliminate any such right with respect to any liability or claim involving any occurrence or any alleged occurrence of any action or omission that took place prior to such amendment or repeal.

IN WITNESS WHEREOF, the undersigned has executed this Consent to be effective as of the date set forth below.

<u>HOLDER OF SERIES A PREFERRED UNITS:</u>

Name:_____

By:_____

Number of Series A Preferred Units Held:_____

Dated:_____

{A&B-00236456-}

App. 0509

**WRITTEN CONSENT**
**OF HOLDER OF SERIES A PREFERRED UNITS**
**OF**
**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THE UNDERSIGNED holder of Series A Preferred Units of Highland Employee Retention Assets LLC hereby consents to and ratifies the below amendment to the Second Amended and Restated Limited Liability Company Agreement of the Company dated February 16, 2012 (the "*Company Agreement*"), as amended:

Section 5.1 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.1     General.   The Company shall be managed by a Board of Directors (the "*Board*"), which shall at all times consist of five members, consisting of the following individuals:

Patrick Boyce
John Honis
William L. Britain
Ted Dameris
Scott Ellington

The Board shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company. The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement. Each member of the Board shall serve until such member's death, resignation or removal from the Board by the unanimous affirmative vote of the remaining Board members. Any vacancies on the Board shall be filled by majority vote of the remaining members of the Board, or if no such majority decision can be reached, as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

Section 5.2 of the Company Agreement is hereby amended and replaced in its entirety to read as follows:

Section 5.2     Delegation of Powers of the Board.
(a) Subject to Sections 5.2(b) and 5.2(c) and ARTICLE XI hereof, the Board shall have the exclusive and complete authority, acting without the consent or approval of, or notice to, the Member and in

{A&B-00236465-}

App. 0510

the Board's sole and absolute discretion, to operate the Company and its business and to make all determinations or elections or to consent to any matter otherwise described in this Agreement. Neither the Member nor any other unitholder shall have the authority to remove any member of the Board.

(b)      Notwithstanding  any  other  provision  of  this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company shall not, and shall not have power or authority and shall not be authorized to, and the Board shall not, and shall not have power or authority and shall not be authorized to cause the Company to, take any of the following actions without the prior affirmative vote or written consent of at least 75% of the members of the Board:

(i)      dissolve, wind-up or liquidate, in whole or in part, or cause or consent to the dissolution, winding up or liquidation, in whole or in part, of the Company;

(ii)      be a party to any merger or consolidation or sell, transfer, assign, convey or lease any asset of the Company, or cause or consent to any merger or consolidation or sale, transfer, assignment, conveyance or lease of any assets of the Company;

(iii)      directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity, or cause the Company to directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity;

(iv)      incur  or  assume  any  indebtedness  or obligations except for liabilities under Section 3.3, or cause the Company, to incur or assume any indebtedness or obligations except for liabilities under Section 3.3; or

(v)      take any Bankruptcy Action with respect to the Company, or take, cause or consent to any Bankruptcy Action with respect to the Company.

(c)      Notwithstanding  any  other  provision  of  this Agreement or any provision of law that otherwise so empowers the

{A&B-00236465-}

App. 0511

Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company may amend, alter, change or repeal any of the provisions of this Agreement (including, without limitation, the last sentence of Section 5.2(a) hereof) only upon either the prior affirmative vote or written consent of at least 75% of the members of the Board or as determined by the Member(s) holding a majority-in-interest of the Series A Preferred Units.

THE UNDERSIGNED further consents to and ratifies the Board's approval of the assignment of Series A Preferred Units of the Company to [BUYER] pursuant to the Offer to Purchase dated [January ___, 2013].

IN WITNESS WHEREOF, the undersigned has executed this Consent to be effective as of the date set forth below.

HOLDER OF SERIES A PREFERRED UNITS:

Name:_____

By:_____

Number of Series A Preferred Units Held:_____

Dated:_____

{A&B-00236465-}

App. 0512

### Page 1

NO. 12-04005

HIGHLAND CAPITAL ) IN THE DISTRICT COURT OF
MANAGEMENT, L.P., AND )
CORNERSTONE HEALTHCARE )
GROUP HOLDING, INC. )
)
Plaintiff and )
Counter-Defendant )
)
VS. )
)
PATRICK DAUGHERTY, )
)
Defendant and )
Counter-Plaintiff ) DALLAS COUNTY, TEXAS
)
VS. )
)
SIERRA VERDE, LLC, )
HIGHLAND EMPLOYEE )
RETENTION ASSETS LLC, )
JAMES DONDERO, PATRICK )
BOYCE, AND WILLIAM BRITAIN, )
)
Third-Party Defendants. ) 68TH JUDICIAL DISTRICT

—————

VIDEOTAPED ORAL DEPOSITION OF
MARK OKADA
OCTOBER 15, 2013

—————

CAUTION - THE FOLLOWING TRANSCRIPT
IS CONFIDENTIAL AND CONTAINS
EXCERPTS DESIGNATED
"ATTORNEYS' EYES ONLY"

### Page 2

ORAL AND VIDEOTAPED DEPOSITION OF MARK OKADA, produced as a witness at the instance of the Defendant and Counter-Plaintiff, taken in the above-styled and -numbered cause on the 15th day of October, 2013, from 9:03 A.M. to 3:40 P.M., before Michelle C. Folks, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of JAMS, 8401 N. Central Expressway, Suite 610, Dallas, Texas, pursuant to the agreements as stated on the record and/or the Texas Rules of Civil Procedure.

### Page 3

ATTORNEYS OF RECORD

APPEARANCES:

MR. MARC D. KATZ
ANDREWS KURTH, LLP
1717 MAIN STREET, SUITE 3700
DALLAS, TEXAS 75201
(214) 659-4722
COUNSEL FOR THE PLAINTIFFS HIGHLAND CAPITAL
MANAGEMENT, L.P., CORNERSTONE HEALTHCARE GROUP
HOLDING, INC., AND THIRD-PARTY DEFENDANTS
JAMES DONDERO AND SIERRA VERDE

MS. RUTH ANN DANIELS
LOOPER REED & MCGRAW, P.C.
1601 ELM STREET, SUITE 4600
DALLAS, TEXAS 75201
(214) 954-4136
COUNSEL FOR THE DEFENDANT AND
COUNTER-PLAINTIFF PATRICK DAUGHERTY

MR. JONATHAN CHILDERS
MR. MICHAEL HURST
GRUBER HURST JOHANSEN HAIL SHANK
1445 ROSS AVENUE, SUITE 2500
DALLAS, TEXAS 75202-2711
(214) 855-6800
COUNSEL FOR THE THIRD-PARTY DEFENDANTS
PATRICK BOYCE, WILLIAM L. BRITAIN AND
HIGHLAND EMPLOYEE RETENTION ASSETS LLC

ALSO PRESENT:
MR. ERIC GIRARD
HIGHLAND CAPITAL MANAGEMENT, L.P.
300 CRESCENT COURT, SUITE 700
DALLAS, TEXAS 75201
(972) 628-4130
IN-HOUSE COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P.
HONORABLE JEFF KAPLAN
MR. PATRICK DAUGHERTY
MR. STEVE RAYNES, VIDEOGRAPHER

### Page 4

INDEX

ATTORNEYS OF RECORD . . . . . . . . . . . . . . . 03
AGREEMENTS . . . . . . . . . . . . . . . . . . . . 05
EXAMINATION BY MS. DANIELS. . . . . . . . . . . . 05
SIGNATURE AND CORRIGENDA PAGE . . . . . . . . . .213
CERTIFICATION PAGE . . . . . . . . . . . . . . .215

"ATTORNEYS' EYES ONLY" DESIGNATIONS

1    Pages 27 - 41
2    Pages 111 - 138
3    Pages 143 - 145
4    Pages 207 - 208

1 (Pages 1 to 4)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)

EXHIBIT

43

28616f5d-5a6e-4609-927e-b32a62cdffc9

App. 0513

**Page 193**

A. That the transaction was unwound.

Q. Who unwound it?

MR. KATZ: Objection, form.

A. Highland.

Q. And who at Highland unwound it?

A. I don't know.

Q. What happened to the assets in Sierra Verde when it was unwound?

MR. KATZ: Objection, form.

MR. CHILDERS: Same.

A. I don't know.

Q. None of that was ever brought to the compliance committee either before or after?

MR. KATZ: Objection, form; asked and answered. You can answer it one more time.

A. Not that I know of.

Q. Were you off the compliance committee at that point?

A. No.

Q. Is that when the compliance committee was morphed into a different format?

MR. KATZ: Objection, form.

A. No.

Q. Was the morphing of the Highland compliance committee related at all to the Sierra Verde transaction?

**Page 194**

A. No.

Q. What do you know about the Highland Employee Retention Asset Fund?

A. That is a deferred compensation mechanism that was set up to provide deferred compensation for some of our employees.

Q. What was your involvement in it?

MR. KATZ: Bless you.

MR. CHILDERS: Thank you.

A. I had very little involvement in it.

Q. What was your involvement in it?

A. I wasn't involved in it.

Q. I thought you said you had very little involvement in it.

A. Yeah. So I know about it. It's part of the firm that I co-founded, but I'm -- I'm not involved in -- I wasn't involved in the details or the structure or the management or the -- or any -- any of the -- the formation of -- of that transaction.

Q. What do you know about Highland's involvement in purchasing HERA units from participants in HERA?

MR. KATZ: Objection, form.

MR. CHILDERS: Same.

A. I -- I think that that happened. I believe that happened.

**Page 195**

Q. Well, you own 25 percent of Highland. And in your capacity as an owner of a fourth of that company, what do you know about its purchase of the HERA units held by HERA participants?

MR. KATZ: Objection, form.

MR. CHILDERS: Objection, form.

MR. KATZ: And I want to instruct you not to disclose information you've learned from counsel.

MR. CHILDERS: Same instruction.

MR. KATZ: Other than that, you can answer.

A. I believe the firm bought some of the interest back.

Q. How much of the interest in HERA did the firm buy back, sir?

A. I don't know.

Q. Why did Highland buy back the HERA interests?

A. I don't know.

MR. CHILDERS: Objection, form.

Q. (By Ms. Daniels) What was the motivation in your company purchasing back HERA units?

MR. KATZ: Objection, form.

MR. CHILDERS: Same objection.

A. I do not know.

Q. What was the benefit to your company in

**Page 196**

purchasing back HERA units?

MR. KATZ: Objection, form.

MR. CHILDERS: Objection, form.

A. I don't know.

Q. Who made the determination that Highland was going to make an offer to purchase HERA units?

MR. KATZ: Objection, form.

A. I don't know.

Q. Were you involved in that decision?

MR. KATZ: Objection, form.

A. No.

Q. Was Jim Dondero?

MR. KATZ: Objection, form.

MR. CHILDERS: Objection, form.

A. I believe so.

Q. Who made the decision to purchase back the HERA units at a discounted value?

MR. CHILDERS: Objection, form.

MR. KATZ: Same objection.

A. I do not know.

Q. Were you involved in that decision?

A. No, I was not.

Q. Was Mr. Dondero?

MR. KATZ: Objection, form.

MR. CHILDERS: Same objection.

49 (Pages 193 to 196)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)                    28616f5d-5a6e-4609-927e-b32a62cdffc9

Page 217

CERTIFIED to by me this 23rd day of October, 2013.



MICHELLE C. FOLKS
Texas CSR No. 3192
Date of Expiration: 12/31/13
FOLKS & ASSOCIATES, INC.
P.O. BOX 851168
MESQUITE, TEXAS 75185-1168
Phone: (214) 320-9823
Fax: (972) 226-4574
Firm Number: 2

Page 218

FURTHER CERTIFICATION UNDER RULE 203 T.R.C.P.

The original deposition was/was not returned to the deposition officer on the      day of      , 2013;

If returned, the attached Corrigenda and Signature page(s) contain any changes and the reasons therefor;

If returned, the original deposition was delivered to MS. RUTH ANN DANIELS, Custodial Attorney;

That $      is the deposition officer's charges to the Defendant/Counter-Plaintiff Patrick Daugherty for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

CERTIFIED to by me this      day of      , 2013.

MICHELLE C. FOLKS
Texas CSR No. 3192
Date of Expiration: 12/31/12
FOLKS & ASSOCIATES, INC.
P.O. BOX 851168
MESQUITE, TEXAS 75185-1168
Phone: (214) 320-9823
Fax: (972) 226-4574
Firm Number: 2

55 (Pages 217 to 218)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)                                        28616f5d-5a6e-4609-927e-b32a62cdffc9

## Thomas Uebler

| | |
|---|---|
| **From:** | Thomas Surgent <TSurgent@hcmlp.com> |
| **Sent:** | Tuesday, January 15, 2013 11:52 AM |
| **To:** | Paul Lackey (pbl@lhlaw.net); Michael Aigen (mpa@lhlaw.net); Patrick Boyce; Lane Britain; Ted Dameris; Scott Ellington; Katz, Marc (MarcKatz@andrewskurth.com) |
| **Cc:** | Hough, Steven C. |
| **Subject:** | HERA docs for review |
| **Attachments:** | HERA (1st) Amendment (Walia-related) to Second Amended Restated LLC Agreement (00236187-5).doc; HERA (2d) Amendment (indemnification) to Second Amended Restated LLC Agreement (00236453-2).doc; HERA Member Consent (2d) (indemnification) (00236456-2).doc; HERA (3d) Amendment (amendment) to Second Amended Restated LLC Agreement (00236454-2).doc; HERA - Written Consent (3d) Approving Transfer and Amendment Amendment (00236464-2).doc; HERA Member Consent (3d) (transfer and amendment) (00236465-2).doc; PRIVILEGED Offer to Purchase (1-15-2013).docx; HERA Transfer Agreement (00236189-3).doc; HERA - Written Consent Removing Dougherty and Appointing Ellington (00236185-3).doc; HERA - Written Consent Removing Walia and Approving Amendment (00236186-3).doc; HERA - Written Consent Approving Indemnification Amendment (00236462).doc |

| | |
|---|---|
| **Importance:** | High |

Attached are revised versions of all the HERA docs for review, which incorporate Delaware counsel comments. Paul/Michael: I will call you to discuss the form of release contained in the transfer agreement to determine what final tweaks are necessary to cover the issue previously discussed. Marc: I will call you to explain.

Otherwise the docs should be done other than filling in blanks.

Plan is to get this closed this week, so we need to finalize quickly.

THOMAS SURGENT | CHIEF COMPLIANCE OFFICER & DEPUTY GENERAL COUNSEL



HIGHLAND CAPITAL
MANAGEMENT, LP

300 Crescent Court | Suite 700 | Dallas, Texas 75201
Office: 972.419-6205 | Fax: 972.628.4147
tsurgent@hcmlp.com | www.hcmlp.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

**EXHIBIT**

**44**

App. 0516

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

# Offer to Purchase
## Statement
January ___, 2013

To the holders (each a "Seller") of Series A Preferred Units of Highland Employee Retention Assets, LLC ("**HERA**"):

_____ ("**Purchaser**") invites you, on the terms and subject to the conditions set forth in this Offer to Purchase, which we refer to herein as this "Statement," to sell all of your Series A Preferred Units of HERA ("**Interests**"), which we refer to herein as the "**Offer**".

Interests tendered for purchase will be purchased, on the terms and subject to the conditions set forth in this Statement for a cash purchase price determined as follows:

- ____% of the [December 31, 2012] estimated value of your Interests as reflected on the statement previously provided to Seller by HERA (the "**Unadjusted Purchase Price**"), LESS

- the Adjustment Amount, if any.

As used herein the "**Adjustment Amount**" shall be equal to the total of the full costs and expenses (including costs and expenses of legal counsel) of HERA or any of its members, officers, directors, agents, representatives, or equity holders (each, a "HERA Party"), plus any diminution in value of HERA's assets, incurred in connection with any litigation, dispute, or claim commenced by any Seller (or any action taken by Seller that results in any third party making a claim) against a HERA Party or that does or could impact adversely any of HERA's assets, or Seller's disclosure of matters and information regarding HERA and its assets (except as required by law or directed and authorized in writing by HERA), all of the foregoing to be determined in Purchaser's sole discretion.

**The Offer is subject to a minimum tender condition, which we may elect to waive as discussed in Section 5 of "Description of the Offer". Additionally, we reserve the right, in our sole discretion, to amend the terms of the Offer.**

**To tender your Interests pursuant to the Offer you must follow the procedures described in this Statement.**

**We have not authorized any person to make any recommendation on our behalf as to whether you should tender or refrain from tendering your Interests in the Offer. We have not authorized any person to give any information or to make any representation on our behalf in connection with the Offer other than those contained in this Offer or in the related Transfer Agreement. If given or made, any recommendation, information or representation must not be relied upon as having been authorized by us.**

> **Commented [A1]:** Consider clarifying what statement is being referred to (date? title?).

> **Commented [A2]:** We should restate Article XII's key provisions in the Offer instead of cross-referencing the Operating Agreement because Article XII requires the consent of 75% of the Board and contemplates funds being placed into a Dispute Escrow and reallocated pro rata to other Series A Preferred Unit holders.

App. 0517

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

**THE OFFER WILL EXPIRE AT 5:00 P.M., DALLAS TIME, ON JANUARY \_\_\_, 2013, UNLESS THE OFFER IS EXTENDED. WE MAY EXTEND THE OFFER PERIOD AT ANY TIME.**

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

**Summary Term Sheet**

*We are providing this summary term sheet for your convenience. It highlights material information in this Offer, but you should realize that it does not describe all of the details of the Offer to the same extent that they are described in the body of this Offer. We urge you to read the entire Statement because it contains the full details of the Offer.*

**Who will be the purchaser of Interests in the Offer?**

- The Purchaser is _____ (the "***Purchaser***").

**What will be the purchase price for Interests tendered in the Offer?**

- Subject to the terms and conditions set forth in this Statement, Interests that are tendered will be purchased at a cash purchase price determined as follows:
  - ____% of the [December 31, 2012] estimated value of Seller's Interests as reflected on the statement previously provided to Seller by HERA (the "***Unadjusted Purchase Price***"), LESS
  - the Adjustment Amount, if any.

As used herein the "***Adjustment Amount***" shall be equal to the total of the full costs and expenses (including costs and expenses of legal counsel) of HERA or any of its members, officers, directors, agents, representatives, or equity holders (each, a "HERA Party"), plus any diminution in value of HERA's assets, incurred in connection with any litigation, dispute, or claim commenced by any Seller (or any action taken by Seller that results in any third party making a claim) against a HERA Party or that does or could impact adversely any of HERA's assets, or Seller's disclosure of matters and information regarding HERA and its assets (except as required by law or directed and authorized in writing by HERA), all of the foregoing to be determined in Purchaser's sole discretion.

**How can I determine what my purchase price would be in the Offer?**

- At your request, a statement can be provided to you that calculates the anticipated purchase price for your Interests.

**What will be the form of the purchase price in the Offer?**

- If your Interests are purchased in the Offer, you will be paid the purchase price in cash, less any applicable withholding taxes and without interest.

**What amount of Interests will be purchased in the Offer?**

- Subject to the terms and conditions set forth in this Statement, the Purchaser is offering to purchase all Interests in the Offer.

**Is the Offer subject to a financing condition?**

- No.

**What are the primary conditions to the Offer?**

- The Offer is subject to receipt of tenders for the Offer from the holders of at least a majority-in-interest of the Series A Preferred Units of HERA.

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

**Will the terms of the HERA Operating Agreement be amended following the Offer?**

- If the Purchase is completed, Purchaser will become the holder of at least a majority-in-interest of the Series A Preferred Units of HERA and will be able to amend HERA's Operating Agreement without obtaining approval from HERA's Board or other holders of Series A Preferred Units of HERA. Purchaser reserves the right to amend the terms of the Operating Agreement in the event the Purchase is completed.

**How long do I have to decide whether to tender my Interests in the Offer? Can the Offer be extended past the initial expiration date?**

- You may tender your Interests pursuant to the Offer until the Offer expires. Currently, the Offer is scheduled to expire at 5:00 p.m., Dallas time, on January ___, 2013.
- We can extend the Offer past this scheduled expiration date in our sole discretion. If we choose to do so, you will be able to tender your Interests until 5:00 p.m., Dallas time, on the day selected as the new expiration date.

**Can the terms of the Offer be amended?**

- We reserve the right in our sole discretion to amend the Offer in any respect.

**How do I tender my Interests?**

- To tender your Interests, you must complete the actions described under Section 2 of "Description of the Offer."

**How and when will I be paid if I tender my Interests for Purchase?**

- If your Interests are purchased pursuant to the Offer, you will be paid the applicable purchase price, in cash, without interest, promptly upon receipt of tenders from the holders of at least a majority-in-interest of the Series A Preferred Units of HERA and the acceptance of the Interests for payment. [There may be tax consequences to receiving this payment. See "Certain Tax Consequences," below.]

**Once I have tendered my Interests in the Offer, can I withdraw my tender?**

- No, unless the Offer expires or is terminated.

**What are the tax consequences if I tender my Interest?**

- The transaction will be treated as a sale of a partnership interest for those members who tender their units. You should consult your personal tax advisor for the specific tax consequences resulting from the sale. In general, gain or loss will be recognized to the extent the sales price of the partnership interest exceeds a member's tax basis in his partnership interest. Given the nature of the underlying assets held by HERA, it is anticipated that the vast majority of that gain or loss would be long term capital gain or loss.

**How do I calculate the basis in my partnership interest?**

- You should consult your tax advisor for your actual tax basis. However, in general a member's tax basis in his partnership interest should equal the discounted value of the HERA property included on his 2011 W-2 (this amount was reflected as a contribution on your 2011 K-1), plus or minus any taxable income/(loss) reported to him on his 2011, 2012 and 2013

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

K-1s from HERA, less any cash distributions received from the partnership after 5/15/11. Please note that the capital balances reflected on the 2011 K-1 reflect those tax basis capital balances as of 12/31/11 according to the partnerships records.

**Will I still be allocated income /(loss) from HERA for 2012 & 2013 and owe tax on that income as well?**

- Yes, a tendering member will still receive a 2012 and 2013 K-1 and be subject to tax on the income reflected on those K-1s in addition to any gain / loss on sale of the partnership interest. However, as mentioned above the K-1 income / loss does adjust the basis in their partnership interest. A unitized estimate of the 2012 taxable income expected to be reported on the 2012 HERA K-1s is available upon request. That template also includes the unitized cash distribution paid by the partnership in 2012. Those amounts are very rough and subject to change. The 2013 K-1 for a tendering member will only reflect their share of income from HERA through the date they sell their partnership interest. No estimate for 2013 is currently available.

**How will the transaction affect non-tendering members from a tax perspective?**

- Non-tendering members will continue to receive K-1s reflecting their share of taxable income related to a full year of HERA activity in 2013. However, depending on the percentage of units tendered, HERA may be required to file two partnership tax returns for 2013. One for the 1-1-13 to 1-xx-13 period and a second return for the period beginning 1-xx-13 and ending on 12/31/13. If this is the case a non-tendering member will receive two K-1s related to the 2013 calendar year. Both would need to be included in their 2013 tax return. From a tax perspective, there should not be any other significant impact of the transaction to a non-tendering member.

**[Whom can I talk to if I have questions about the Offer?]**

App. 0521

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

**Background of the Offer.**

Purchaser believes that there are many Interest holders that would prefer to receive immediate liquidity with respect to their Interests rather than wait for distributions to occur over time.

As a result, the primary purpose of the Offer is to provide Interest holders that desire the opportunity to receive immediate liquidity with respect to their Interests to sell their Interests.

**Certain Effects of the Offer.**

The Offer is conditional on a minimum tender of a majority-in-interest of the Interests. In the event this condition is satisfied and the Purchase is completed, the Purchaser will be able to amend the terms of HERA's Operating Agreement in its sole and absolute discretion. See Section 7 of "Description of the Offer" for a more detailed description of certain effects of the Offer and related transactions on Non-Electing Holders (as hereinafter defined).

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

**Description of the Offer**

**1.      The Election; Amount of Interests to be Purchased or Exchanged.**

On the terms and subject to the conditions of this Offer, holders of Interests can elect whether or not they wish to sell their Interests.

Interests tendered for purchase will be purchased, on the terms and subject to the conditions set forth in this Statement for a cash price determined as follows:

- ____% of the [December 31, 2012] estimated value of Seller's Interests as reflected on the statement previously provided to Seller by HERA (the "*Unadjusted Purchase Price*"), LESS

- the Adjustment Amount, if any.

As used herein the "*Adjustment Amount*" shall be equal to the total of the full costs and expenses (including costs and expenses of legal counsel) of HERA or any of its members, officers, directors, agents, representatives, or equity holders (each, a "HERA Party"), plus any diminution in value of HERA's assets, incurred in connection with any litigation, dispute, or claim commenced by any Seller (or any action taken by Seller that results in any third party making a claim) against a HERA Party or that does or could impact adversely any of HERA's assets, or Seller's disclosure of matters and information regarding HERA and its assets (except as required by law or directed and authorized in writing by HERA), all of the foregoing to be determined in Purchaser's sole discretion.

A holder that does not tender its Interests for purchase is referred to herein as a "*Non-Electing Holder*." See Section 7 for a description of certain effects of the Offer and related transactions on Non-Electing Holders.

Interests properly tendered for purchase will be purchased at the applicable purchase price upon the terms and conditions of the Offer. See Section 4 for a more detailed description of the terms of our Offer.

**The Offer is subject to the tender for purchase of at least a majority-in-interest of the aggregate Interests. See Section 5.**

**2.      Procedures for Tendering.**

For Interests to be properly tendered for purchase, we must receive before or on the expiration date a properly completed and executed Transfer Agreement, the form of which is attached as Appendix A, together with all documents contemplated thereby.

For purposes of the Offer, the term "expiration date" means 5:00 p.m., Dallas time, on January ___, 2013, unless and until we in our sole discretion extend the period of time during which the offer will remain open. If extended by us, the term "expiration date" will refer to the latest time and date at which the offer, as extended, will expire. See Section 9 for a description of our right to extend, delay, terminate or amend the Offer.

To be validly tendered all required documents must be received by us at the following address prior to the expiration date:

Highland Capital Management, L.P.

App. 0523

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

300 Crescent Court, Suite 700
Dallas, TX 75201
Attention: Thomas Surgent

**The method of delivery of all documents is at your election and risk. If you decide to make delivery by mail, we recommend you use registered mail with return receipt requested, properly insured. In all cases, sufficient time should be allowed to ensure timely delivery.**

We will determine, in our sole discretion, all questions as to the validity, form, eligibility, including time of receipt, and acceptance of any tender of Interests. Our determination will be final and binding on all parties. We reserve the absolute right to reject any or all tenders we determine not to be in proper form or the acceptance of which we determine may be unlawful. We also reserve the absolute right to waive any of the conditions of the Offer and any defect or irregularity in the tender of any particular Interests or any particular Interest holder. No tender will be deemed to be properly made until all defects or irregularities have been cured by the tendering holder or waived by us. We assume no duty or obligation to provide you with any notice of any defects or irregularities in any tender. Our interpretation of the terms of and conditions to the Offer will be final and binding. By tendering Interests to us, you agree to accept all decisions we make concerning these matters and waive any right you might otherwise have to challenge those decisions.

To tender your Interests you will be required to complete, execute and deliver a Transfer Agreement. Among other things, the Transfer Agreement requires you to make certain representations and warranties, including with respect to your ownership of the tendered Interest; to release any and all claims that you may have against HERA, Highland, and certain parties associated with them; and to agree to take such further actions as may be necessary to effect the transfer of your Interests pursuant to the Offer.

A tender of shares for purchase under the procedures described herein will constitute your acceptance of the terms and conditions of the applicable Offer.

Our acceptance for purchase of an Interest tendered pursuant to the Offer will constitute a binding agreement between you and us upon the terms and conditions of such Offer described in this Statement and related documents.

3.      **Withdrawal Rights; Change in Election.**

Interests tendered in the Offer may not be withdrawn at any time before the expiration date. After the expiration date, unless we have already accepted your tendered Interests for payment, you may withdraw your Interests at any time after 5:00 p.m., Dallas time, on January ___, 2013. Except as otherwise provided in the preceding sentence, tenders of Interests for purchase pursuant to this Offer are irrevocable and may not be withdrawn.

For a withdrawal to be effective, we must receive a notice of withdrawal in written form on a timely basis. The notice of withdrawal must specify the name of the person who tendered the Interests to be withdrawn, identify the Interests to be withdrawn and the name of the registered holder.

We will determine, in our sole discretion, all questions as to the form and validity, including time of receipt, of notices of withdrawal. Our determination shall be final and binding on all parties.

App. 0524

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

We assume no duty or obligation to provide you with any notice of any defects or irregularities in any notice of withdrawal.

**4.      Purchase of Interests and Payment of Purchase Price.**

Upon the terms and subject to the conditions of the Offer, we will accept for payment and pay for, and thereby purchase, Interests validly tendered for purchase and not properly withdrawn.

For purposes of the Offer, we will be deemed to have accepted for payment, and therefore purchased, Interests that are properly tendered for purchase and not properly withdrawn only when, as and if we accept such Interests for payment.

Upon the terms and subject to the conditions of the Offer, after the expiration date, we will purchase and pay for Interests accepted for payment under the Offer, provided that we reserve the right to accept and/or pay for any tendered Interest prior to the expiration date. Our intention is to commence payment for the tendered Interests upon receipt of tendered Interests for a majority-in-interest of Series A Preferred Units. In all cases, payment for Interests tendered and accepted for payment pursuant to the Offer will be made only after our timely receipt of a properly completed and duly executed Transfer Agreement and the documents described in the Transfer Agreement.

**Under no circumstances will we pay interest on the purchase price, regardless of any delay in making payment.** In addition, the Offer is subject to the conditions set forth below.

**5.      Conditions of the Offer.**

We will not be required to accept for payment, purchase or pay for any Interests tendered for purchase, and we may terminate or amend the Offer or postpone the acceptance of Interests tendered, if at any time on or after the date hereof and prior to acceptance of tendered Interests we have not received tenders accepting the Offer from holders of at least a majority-in-interest of the Series A Preferred Units of HERA.

No assurance can be given that this condition will be satisfied.

The condition listed above is for our sole benefit and we may assert this condition regardless of the circumstances (including our action or inaction) that give rise to the condition and we may, in our sole discretion, waive the condition listed above, before the expiration date. Our failure at any time to exercise any of the foregoing rights shall not be deemed a waiver of any of these rights, and each of these rights shall be deemed an ongoing right that may be asserted by us at any time prior to the expiration of the Offer.

**6.      Certain Effects of the Offer on Non-Electing Holders.**

Non-Electing Holders will have no assurance as to the ultimate value that will be received by HERA in respect of its assets (many of which are highly illiquid), nor the timing of any distributions by HERA to any Non-Electing Holders following completion of the Purchase contemplated herein. In addition, in the event the Purchase is completed, Purchaser will be able to amend the terms of the Operating Agreement in its discretion without the consent of any Non-Electing Holder.

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

7.    **Certain Tax Consequences.**

The transaction will be treated as a sale of a partnership interest for those members who tender their units. You should consult your personal tax advisor for the specific tax consequences resulting from the sale. In general, gain or loss will be recognized to the extent the sales price of the partnership interest exceeds a member's tax basis in his partnership interest. Given the nature of the underlying assets held by HERA, it is anticipated that the vast majority of that gain or loss would be long term capital gain or loss.

- **How do I calculate the basis in my partnership interest?**

You should consult your tax advisor for your actual tax basis. However, in general a member's tax basis in his partnership interest should equal the discounted value of the HERA property included on his 2011 W-2 (this amount was reflected as a contribution on your 2011 K-1), plus or minus any taxable income/(loss) reported to him on his 2011, 2012 and 2013 K-1s from HERA, less any cash distributions received from the partnership after 5/15/11. Please note that the capital balances reflected on the 2011 K-1 reflect those tax basis capital balances as of 12/31/11 according to the partnerships records.

- **Will I still be allocated income /(loss) from HERA for 2012 & 2013 and owe tax on that income as well?**

Yes, a tendering member will still receive a 2012 and 2013 K-1 and be subject to tax on the income reflected on those K-1s in addition to any gain / loss on sale of the partnership interest. However, as mentioned above the K-1 income / loss does adjust the basis in their partnership interest. A unitized estimate of the 2012 taxable income expected to be reported on the 2012 HERA K-1s is available upon request. That template also includes the unitized cash distribution paid by the partnership in 2012. Those amounts are very rough and subject to change. The 2013 K-1 for a tendering member will only reflect their share of income from HERA through the date they sell their partnership interest. No estimate for 2013 is currently available.

- **How will the transaction affect non-tendering members from a tax perspective?**

Non-tendering members will continue to receive K-1s reflecting their share of taxable income related to a full year of HERA activity in 2013. However, depending on the percentage of units tendered, HERA may be required to file two partnership tax returns for 2013. One for the 1-1-13 to 1-xx-13 period and a second return for the period beginning 1-xx-13 and ending on 12/31/13. If this is the case a non-tendering member will receive two K-1s related to the 2013 calendar year. Both would need to be included in their 2013 tax return. From a tax perspective, there should not be any other significant impact of the transaction to a non-tendering member.

8.    **Extension of the Offer; Termination; Amendment.**

We reserve the right, in our sole discretion, at any time and from time to time, and regardless of whether or not any of the events set forth in Section 5 occur, to extend the period of time during which the Offer is open and thereby delay acceptance of Interests for purchase or exchange by giving notice of such extension. We also reserve the right, in our sole discretion, to terminate the Offer and not accept for payment or pay for any Interests not already accepted for payment upon

PRIVILEGED AND CONFIDENTIAL
DRAFT: 1/15/2013

the occurrence of any of the conditions specified in Section 5 by giving notice of such termination.

We also reserve the right, in our sole discretion, and regardless of whether any of the events set forth in Section 5 occur or are deemed by us to have occurred, to amend the Offer in any respect.

9.    **Miscellaneous.**

**We have not authorized any person to make any recommendation on our behalf regarding whether you should tender or refrain from tendering your Interests in the Offer. We have not authorized any person to provide any information or make any representation in connection with the Offer, other than those contained in this Statement.**

Any questions or requests for assistance may be directed to us as follows:

[Contact Person[s] and Number(s)]

> **Commented [A3]:** We should ask Purchaser to obtain and disclose to the HERA Series A Preferred Unit holders a fairness opinion supporting the financial fairness of this Offer.

App. 0527

## Thomas Uebler

| | |
|---|---|
| **From:** | Helen Kim <HKim@hcmlp.com> |
| **Sent:** | Thursday, January 10, 2013 8:19 AM |
| **To:** | Hough, Steven C. |
| **Cc:** | Abrams, Kevin; Thomas Surgent |
| **Subject:** | RE: DRAFT HERA DOCS |
| **Attachments:** | HERA Second Amended Restated LLC Agreement (Current).doc |

Mr. Hough,

Per your request to Thomas, attached please find a Word version of the requested HERA agreement.

Best regards,

_____

HELEN KIM | PARALEGAL



300 CRESCENT COURT | SUITE 700 | DALLAS, TEXAS 75201
O: 972.419.2513 | F: 972.628.4147
HKim@hcmlp.com | www.hcmlp.com

**From:** Thomas Surgent
**Sent:** Wednesday, January 09, 2013 7:21 PM
**To:** Helen Kim
**Subject:** FW: DRAFT HERA DOCS

Can you get this to him in the morning

**From:** Hough, Steven C. [mailto:Hough@AbramsBayliss.com]
**Sent:** Wednesday, January 09, 2013 5:12 PM
**To:** Thomas Surgent
**Cc:** Abrams, Kevin
**Subject:** RE: DRAFT HERA DOCS

Thomas:

To facilitate our review of these documents, could you please send us a copy of HERA's operative February 16, 2012, Second Amended and Restated Limited Liability Company Agreement in Microsoft Word DOC format? We previously received this document only as a scanned Adobe PDF.

Sincerely,

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294

EXHIBIT

45

1

App. 0528

E-Mail: Hough@AbramsBayliss.com
* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Abrams, Kevin
**Sent:** Wednesday, January 09, 2013 1:45 PM
**To:** 'TSurgent@hcmlp.com'
**Cc:** Hough, Steven C.
**Subject:** Re: DRAFT HERA DOCS

Thanks for the drafts. We will start reviewing today.

Kevin G. Abrams
Abrams & Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, DE 19807
Main: 302-778-1000
Direct: 302-778-1002
Facsimile: 302-778-1001
Cell: 302-547-8000
E-Mail: abrams@abramsbayliss.com<mailto:abrams@abramsbayliss.com>

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

/

**From:** Thomas Surgent <TSurgent@hcmlp.com>
**To:** 'Paul Lackey (pbl@lhlaw.net)' <pbl@lhlaw.net>; 'Michael Aigen (mpa@lhlaw.net)' <mpa@lhlaw.net>; Lane Britain <LBritain@hcmlp.com>; Patrick Boyce <PBoyce@hcmlp.com>; John Honis <JHonis@hcmlp.com>; Scott Ellington <SEllington@hcmlp.com>; Abrams, Kevin
**Cc:** Ted Dameris <TDameris@hcmlp.com>
**Sent:** Wed Jan 09 13:41:15 2013
**Subject:** DRAFT HERA DOCS

Attached for your review are drafts of the proposed HERA docs (in chronological order):

1. Dougherty resignation
2. Resolution accepting resignation and appointing Ellington
3. Resolution removing Walia and approving amendment
4. Form of Amendment to HERA operating agreement

2

App. 0529

5. Offer to Purchase HERA interests
6. Form of Transfer Agreement
7. Form of Amended and Restated LLC Agreement (post all transactions)

Please let me know if you have any comments.

**THOMAS SURGENT | CHIEF COMPLIANCE OFFICER &**
**DEPUTY GENERAL COUNSEL**



300 Crescent Court | Suite 700 | Dallas, Texas 75201
Office: 972.419-6205          |          Fax: 972.628.4147
tsurgent@hcmlp.com       |       www.hcmlp.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction It may contain confidential, proprietary or legally privileged information If you receive this message in error please immediately delete it

3

App. 0530

## Page 1

NO. 12-04005

HIGHLAND CAPITAL ) IN THE DISTRICT COURT OF
MANAGEMENT, L.P., AND )
CORNERSTONE HEALTHCARE )
GROUP HOLDING, INC. )

  Plaintiff and )
  Counter-Defendant )

VS. )
  )
PATRICK DAUGHERTY, )
  )
  Defendant and )
  Counter-Plaintiff ) DALLAS COUNTY, TEXAS
  )
VS. )
  )
SIERRA VERDE, LLC, )
HIGHLAND EMPLOYEE )
RETENTION ASSETS LLC, )
JAMES DONDERO, PATRICK )
BOYCE, AND WILLIAM BRITAIN, )
  )
  Third-Party Defendants. ) 68TH JUDICIAL DISTRICT

VIDEOTAPED ORAL DEPOSITION OF
WILLIAM CARL MOORE, JR.
(APPEARING AS CORPORATE REPRESENTATIVE
FOR HIGHLAND EMPLOYEE RETENTION ASSETS L.L.C.)
SEPTEMBER 24, 2013

## Page 2

ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM CARL MOORE, JR. produced as a witness at the instance of the Defendant, taken in the above-styled and -numbered cause on the 24th day of September, 2013, from 9:10 A.M to 5:12 P.M., before Michelle C. Folks, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of JAMS, 8401 N. Central Expressway, Suite 610, Dallas, Texas, pursuant to the agreements as stated on the record and/or the Texas Rules of Civil Procedure.

## Page 3

ATTORNEYS OF RECORD

APPEARANCES:

MR. MARC D. KATZ
  ANDREWS KURTH, LLP
  1717 MAIN STREET, SUITE 3700
  DALLAS, TEXAS 75201
  (214) 659-4722
  COUNSEL FOR THE PLAINTIFFS HIGHLAND CAPITAL
  MANAGEMENT, L.P., CORNERSTONE HEALTHCARE GROUP
  HOLDING, INC., AND THIRD-PARTY DEFENDANTS
  JAMES DONDERO AND SIERRA VERDE

MR. WILLIAM B. CHANEY
MS RUTH ANN DANIELS
  LOOPER REED & MCGRAW, P C
  1601 ELM STREET, SUITE 4600
  DALLAS, TEXAS 75201
  (214) 954-4136
  COUNSEL FOR THE DEFENDANT AND
  COUNTER-PLAINTIFF PATRICK DAUGHERTY

MS. SHONN BROWN
MR. MICHAEL P. HURST
  GRUBER HURST JOHANSEN HAIL SHANK
  1445 ROSS AVENUE, SUITE 2500
  DALLAS, TEXAS 75202-2711
  (214) 855-6800
  COUNSEL FOR THE THIRD-PARTY DEFENDANTS
  PATRICK BOYCE, WILLIAM L. BRITAIN AND
  HIGHLAND EMPLOYEE RETENTION ASSETS LLC

MR. ISAAC LEVENTON
  HIGHLAND CAPITAL MANAGEMENT, L.P
  300 CRESCENT COURT, SUITE 700
  DALLAS, TEXAS 75201
  (972) 628-4130
  IN-HOUSE COUNSEL FOR HIGHLAND CAPITAL
  MANAGEMENT, L.P

ALSO PRESENT

HONORABLE JUDGE JEFF KAPLAN
MR. PATRICK DAUGHERTY
MR. STEVE RAYNES, VIDEOGRAPHER

## Page 4

INDEX

ATTORNEYS OF RECORD . . . . . . . . . . . . . . . 03
AGREEMENTS . . . . . . . . . . . . . . . . . . . 07
EXAMINATION BY MR. CHANEY . . . . . . . . . . . 08
SIGNATURE AND CORRIGENDA PAGE . . . . . . . . . .242
CERTIFICATION PAGE . . . . . . . . . . . . . . .244

EXHIBITS

| Number | Description | Page |
|---|---|---|
| 65 | Daugherty's Notice of Oral Deposition Of HERA's Corporate Representative | 10 |
| 66 | Daugherty's Amended Notice of Oral Deposition of HERA's Corporate Representative | 10 |
| 67 | Affidavit of Carl Moore with Attachments | 11 |
| 68 | Delaware Certification of Formation of Highland Employee Retention Assets LLC (HERA 0006133 - 0006134) | 22 |
| 69 | Written Consent of Board of Directors of Highland Employee Retention Assets LLC Dated 2/16/12 (HERA 0007680 - 0007687) | 27 |
| 70 | Amendment to Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets LLC Dated 1/17/13 (HERA 0007648 - 0007654) | 39 |
| 71 | Second Amendment to Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets LLC dated 1/17/13 (HERA 0007655 - 0007660) | 40 |
| 72 | Third Amendment to Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets LLC dated 1/18/13 | |

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)

EXHIBIT

46

74867727-1b30-4191-902d-5cffb000db24

App. 0531

**Page 5**

73  Patrick Boyce's Resignation Letter from Board of Directors of Highland Employee Retention Assets LLC dated 1/19/13 (HERA 0007687)    43

74  Lane Britain's Resignation Letter from Board of Directors of Highland Employee Retention Assets LLC dated 1/19/13 (HERA 0007688)    43

75  Third Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets LLC dated 2/1/13 (HERA 0007669 - 0007679)    45

76  Written Consent of Manager of Highland Employee Retention Assets LLC dated 2/1/13 (HERA 0007689 - 0007691)    87

77  Expense Allocation Agreement dated 2/1/13 (HERA 0007692 - 0007694)    90

78  Chart entitled Highland Employee Retention Assets, LLC Article V. Management of the Company    93

79  Patrick Daugherty's Highland Employee Retention Assets LLC Series A Preferred Units Award Agreement dated 11/5/09 (HERA 0000066 - 0000070)    107

80  Document entitled Article II, Business Purpose and Term of Company, Section 2.1    126

81  Document entitled Article XI, Separateness And Operating Procedures    129

82  Document entitled Article II, Business, Purpose, and Terms of Company, Section 2.3    133

83  Document entitled Article III, Membership Units; Capital Contribution, Section 3.1    139

84  Document entitled Article IX, Assignment of Interest    142

85  E-mail to Jim Dondero from Ted Dameris dated 12/26/12, Subject: Buyout

**Page 6**

86  E-mail to Ted Dameris from Brian Collins dated 12/11/12, Subject: Privileged and Confidential: 11/30/12 HERA Estimated Values (HERA 0007736 - 0007737)    148

87  Affidavit of William Lane Britain dated 8/14/13    157

88  Affidavit of Brian Collins, with attachments, dated 8/15/13    224

89  E-mail to Clint Gilchrist from Helen Kim dated 4/11/12, Subject: HCMLP-HERA Assignment (HERA 0005959 - 0005969)    227

90  E-mail to Frank Waterhouse from Kristin Hendrix dated 5/15/12, Subject: HERA Asset Listing (HERA 0003998)    229

91  E-mail to Clint Gilchrist from Brian Collins dated 10/5/09, Subject: Employee Vessel Structure Final 10052009.docx (HERA 0007707- 0007714)    230

92  E-mails between Brian Collins and Paul Kauffman dated 9/27/12, Subject: Vessel Managing Committee and Reallocation (HERA 0005769)    232

93  Highland Employee Retention Assets LLC's Objections to Daugherty's Amended Notice of Oral Deposition of Corporate Representative    241

**Page 7**

PROCEEDINGS

(Exhibit Nos. 65 and 66 were marked.)

VIDEOGRAPHER: We're going on the record Tuesday, September 24th, 2013. The time is approximately 9:10 A.M. Will the court reporter please swear in the witness.

(Whereupon the witness was sworn.)

MR. CHANEY: Taken according to the rules.

MS. BROWN: According to the rules is good with us.

MR. KATZ: As with us.

MR. CHANEY: Has that your -- been your normal protocol?

MS. BROWN: I believe so.

MR. KATZ: The only agreement we'd had in depos in the past is that an objection for one party is good for all parties.

MR. CHANEY: Given that this is a corporate rep, I don't know that that will work --

MR. KATZ: Okay.

MR. CHANEY: -- in this situation. Anything else?

WILLIAM CARL MOORE, JR., having been first duly sworn, testified as follows:

**Page 8**

EXAMINATION

BY MR. CHANEY (9:11 A.M.):

Q. Please state your name.

A. William Carl Moore, Junior.

Q. Mr. Moore, where do you live?

A. Dallas.

Q. What's your address in Dallas?

A. 3713 Wentwood Drive.

Q. And as I recall, you have been deposed in this case before; is that correct?

A. I have. Yes.

Q. And you understand that today you have been designated to appear on behalf of an entity known as Highland Employee Retention Assets LLC?

A. Yes.

Q. And you understand that that's a different type of deposition than when you appeared and testified individually?

A. Yes, I do.

Q. Okay. And you're here to speak on behalf of and bind that entity to your testimony; do you understand that?

MR. KATZ: Objection, form.

MS. BROWN: Objection, form.

A. I understand --

2 (Pages 5 to 8)

FOLKS & ASSOCIATES (214) 320-9823

Page 65

A. I don't know exactly.

Q. Mr. Dondero didn't say?

A. He did not.

Q. Now, the second general topic regarding this issue that you spoke to Mr. Dondero about you characterized as the terms.

A. Uh-huh.

Q. What did he say about the terms?

MS. BROWN: Objection, form.

MR. KATZ: Same objection.

A. What he -- what he told me about the terms was very general in nature. Most of what I know about the terms come from the offer letter itself. But the general feedback I received from Jim about the offer was Highland looked at the various assets. There was a discount that Highland felt was appropriate for certain parts of the assets, specifically the RCP component. The other element is, is they're making an offer on the same terms to everyone so people don't necessarily have to accept. So you can -- that's another thing I talked to him about. Highland could bid whatever it wanted to and the various participants were -- it was their own decision as to whether to participate or not.

Q. Now, you were -- let me interrupt one second. You -- were you done with your answer?

Page 66

A. No.

Q. Okay. Let me interrupt and then finish.

A. Let's come back.

Q. You referred to RCP. What do you mean by that?

A. I should have been more specific. One of the assets that was contained in HERA was a fund called Restoration Capital Partners.

Q. Okay. Now can you complete your answer?

A. Sorry for the abbreviation. But then the offer that he made to everyone, also from Highland's perspective it was reasonable to contain an adjustment amount. We'll probably get into the specifics of that when we look at the offer later. But from Highland's perspective it was reasonable to include an adjustment amount for litigation costs in connection with just, you know, litigation itself or disclosure of confidential information or everything that was contained in the ultimate offer letter. He didn't go into a whole lot of detail about that, but he did mention it.

Q. Okay.

A. As being reasonable.

Q. And we'll examine that later.

A. Sure.

Q. Timing. What did he say about the third topic you identified, timing?

Page 67

A. The timing was he -- there were a number of -- I don't know when all of the offers were made. What I do know is that the offers were made to the HERA participants who were existing employees of Highland on or around January 18th. As a matter of fact, I think it was January 18th exactly. Some of the offers to the non-employees occurred later. For example, I read in an affidavit I believe Pat's was on January 31st. I could be wrong. So the question -- my question was why -- why the two different time -- was there a different time frame and why -- why did Highland go to its own employees before it went to the employees outside. The answer to that was just one of logistics. The offer itself by its terms was conditioned on getting a minority -- a majority, rather, in interest. So you know the participants who are employees are there within your own four walls, so you might as well float it with them to see if you have enough interest before you go bother people who are ex-employees.

Q. Is that all he said about timing?

A. That's right. That's all he said.

Q. If you would turn to Volume 1 of the exhibits.

A. Which tab?

Q. Tab 8.

A. I'm there.

Page 68

Q. Is that the offer to purchase that you -- in -- in the form that you've discussed with Mr. Dondero?

MR. KATZ: Objection, form.

A. I think so. But let me look at it for one minute. Yes, this appears to be a form of offer. Not a copy of one that was given to anybody, but it looks like the form and the structure.

Q. And it's dated January 31, 2013. Do you see that --

MR. KATZ: Objection, form.

A. Right.

Q. -- up at the top?

A. That is what it says, yes.

Q. And was this the form of the offer to purchase that was submitted to the employees within the four walls earlier in January that you discussed?

MR. KATZ: Objection.

MS. BROWN: Objection, form.

MR. KATZ: Objection, form.

A. I don't know exactly. It looks very similar, but I don't know if this was the exact form.

Q. All right. We'll come back to that. Did you discuss in preparation for today's deposition with anyone else matters related to topic four, the offers of Highland to purchase any individual or entity's interest

17 (Pages 65 to 68)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)    74867727-1b30-4191-902d-5cffb000db24

App. 0533

Page 197

are maintained?

MS. BROWN: Objection, form.

A. No, I don't.

Q. Do you know who the custodian of records for HERA's books and records is?

MS. BROWN: Objection, form.

A. No.

Q. You're not.

MS. BROWN: Objection, form.

A. I'm not.

Q. Directing your attention to your affidavit, Exhibit 67.

A. Yes.

Q. You made the statements in Paragraph 16 of Exhibit 67 without being the custodian of records of HERA; is that correct?

MS. BROWN: Objection, form.

MR. KATZ: Objection, form.

A. Yes.

Q. And what is --

A. I'm not sure that's --

Q. -- your personal knowledge --

MS. BROWN: He was -- are you still --

A. No, I was -- the answer to the question is yes.

Q. What is your personal knowledge to be able to

Page 198

state -- to make the statements referenced in Exhibit -- pardon me -- Paragraph 16 of your affidavit?

MS. BROWN: Objection, form.

A. Gathering, reviewing the documents, making sure they at least on the faces of them are what they purport to be, and I followed up with Isaac Leventon who confirmed with me that they were true and correct copies.

Q. Prior -- directing your attention to topic 15 of the amended notice, Exhibit 66, inquires as to the most recent value of the underlying assets of HERA according to Highland's monthly mark for reporting purposes.

A. Yes.

Q. Now if I understand correctly, you would say that that's zero because there are no assets. Is that correct?

MS. BROWN: Objection, form.

MR. KATZ: Objection, form.

A. That is correct.

Q. Immediately prior to the transfer of the assets what was that value?

MS. BROWN: Objection, form.

MR. KATZ: Objection, form.

A. I still don't know 'cause I don't know when the transfer took place.

Page 199

Q. Topic 16 asks for the most recent valuation of Highland Restoration Capital Partners Fund for reporting purposes. Do you know that?

A. I do.

Q. What is it?

A. Approximately 292 million.

Q. As in -- that's effective as of when?

A. I believe it's the end of August.

Q. 2013?

A. Yes, sir.

Q. Do you know how much of that is in cash?

A. I don't.

Q. Topic 17 asks what HERA's current ownership percentage of the Highland Restoration Capital Partners Fund is. I assume based on your testimony that's zero; is that correct?

MS. BROWN: Objection, form.

MR. KATZ: Objection, form.

A. That's correct.

Q. But immediately prior to the transfer of assets what was HERA's percentage of ownership in Restoration Capital Partners Fund?

MS. BROWN: Objection, form.

A. Approximately 3.28 percent.

Q. And what do you base that on?

Page 200

A. Having inquired into Highland's books and records through Isaac -- Isaac helped run the number down.

Q. And do you know if that amount -- that percentage varied at any point in time during HERA's corporate existence?

A. I'm not aware that it did until the asset transfer.

Q. So with reference to topic 18, HERA's ownership percentage of Highland's Restoration Capital Partners Fund as of December 31, 2012, would be 3.28 percent.

A. That's correct.

Q. Paragraph 19 inquires as to any analysis relating to the future performance of Restoration Capital Partners Fund and its holdings such as the path to two times or two X analysis. Do you see that?

A. That's right.

Q. What is your understanding regarding that analysis?

MR. KATZ: Objection, form.

A. As I understand it, to parse through this, HERA never did such an analysis. The path to two times -- there's nothing called that per se. It's more colloquial, I suppose. But the concept that this referred to is -- a fund like Restoration, for example, a

50 (Pages 197 to 200)

Electronically signed by Michelle Folks (501-307-451-0219)                    74867727-1b30-4191-902d-5cffb000db24

App. 0534

Page 209

in Highland Capital and then perhaps some other people or holders. So it provides -- there's a couple of things it provides for. One -- I'm not sure why this is -- it takes out the automatic -- it takes out the feature by which board members were automatically removed from the board upon the sale of their -- or transfer of their Series A preferred units. And the other thing that it does is it adds down in -- it's section two but it amends Section 5.2, the LLC agreement down in C. The original provision provided that any amendment to the LLC agreement required 70 -- affirmative vote of 75 percent of the members of the board. This adds the provision that the LLC agreement can be amended by members holding a majority in interest in the Series A preferred units. Essentially to reflect the fact that you're going to have a minority stockholder -- minority -- majority stockholder going forward.

Q. Do you know in the transactions that occurred on or about January 18, 2013, what percent of the Series A units Highland acquired?

MS. BROWN: Objection, form.

MR. KATZ: Objection, form.

A. At the end of the day it's the inverse of what Pat's interest is. It's a little less than 91 percent.

MR. KATZ: Objection --

Page 210

Q. (By Mr. Chaney) So in the transactions that occurred on or about January 18, 2013, Highland acquired approximately 91 percent?

A. No, I don't know how many --

MS. BROWN: Objection, form.

A. I don't know how many people --

Q. Or 81 percent.

A. Yeah, I messed the math up. I don't know how many -- I don't know how many shares or units were bought on that day. I just know how many were bought in the aggregate at the end of the exercise.

Q. What were the terms of the escrow? On what -- on what condition -- scratch that.

On what condition would the escrow be released to allow implementation of Exhibit 72?

MR. KATZ: Objection, form.

MS. BROWN: Objection, form.

A. Well, the way it was explained to me is there's no -- there's no formal mechanism for the release of that escrow or holding of this document. But the way it was explained to me is that once a majority had actually accepted the offer from Highland, then this amendment would be released.

Q. Okay. And who explained that to you?

A. Isaac.

Page 211

Q. Now, Section 1 amends and replaces Section 5.1 of the HERA company agreement, correct?

A. That's right.

Q. And in doing so it creates a board of five members consisting of Messrs. Boyce, Honis, Britain, Dameris, and Ellington, correct?

A. That's correct.

Q. And I believe you said this was to provide a transition after the sale occurred, correct?

MS. BROWN: Objection, form.

A. That actually wasn't the part that I was referring to when I made that statement.

Q. Okay. What part were you referring to?

A. In the bottom in 5.2 -- well, it's Section 2 of the amendment, mainly Section 5.2 of the LLC agreement, specifically C that talks --

Q. I'm sorry. Go ahead.

A. I'm sorry. Anyway, it talks about the added provision where if you have a member holding a majority in interest in the Series A preferred units, that member can amend the LLC document. That's what I was talking about in terms of continuity. And I guess in Section 5.1 relates to that as well because although the board resigned the next day, I don't know whether they had determined they were going to actually resign the next

Page 212

day in advance. But there was that provision in there that says once you tender or sell your shares, you're no longer a board member. It removes that mechanic.

Q. Okay. That provision did not exist in earlier versions of the agreement, correct?

A. Which provision, the one in 5.2 or 5.1?

Q. The automatic removal from the board upon selling units.

MS. BROWN: Objection, form.

A. Well, it did. It was --

Q. I believe that's what you corrected in Paragraphs -- Paragraphs 9 and 10 of your affidavit, correct?

MS. BROWN: Objection, form.

A. That's right. It all relates to the same concept. So before if someone had sold their shares, they would go off the board. That provision was taken out of 5.1 of the LLC agreement. And so therefore as a technical matter, for example, if you relate it back to the affidavit, Boyce and Britain were technically on the board until the 19th when they resigned. That's the correction after we figured out the timing.

Q. Okay. Topics 24 and 25, who were the persons involved in the February 1, 2013, amendment, Exhibit 75 as I recall?

53 (Pages 209 to 212)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)                    74867727-1b30-4191-902d-5cffb000db24

App. 0535

**Page 221**

damages from Daugherty's claims in this litigation for compensation related to the HERA and proportion of potential damages for Daugherty's claims in this litigation for compensation related to Highland. Do you see that?

A. I do.

Q. I believe, at least I think I understand from your earlier testimony, that that was Mr. Dondero. But I just need you to confirm that. Is that correct?

MS. BROWN: Objection, form.

MR. KATZ: Objection, form. Counsel can you --

MR. CHANEY: I'm asking him if my understanding is correct.

Q. (By Mr. Chaney) Is it Mr. Dondero that is responsive to item 32?

MS. BROWN: Objection, form.

MR. KATZ: Objection, form.

A. Jim working with -- Jim Dondero working with legal.

Q. And who in the legal group?

A. I don't know exactly.

Q. How do you know that he worked with the legal group on that issue?

A. Because I heard about the --

**Page 222**

MR. KATZ: Object to the form.

MS. BROWN: Object to the form.

MR. KATZ: You can answer the question but don't disclose the substance of any communications with counsel.

A. I heard that he was working -- I'm assuming that he worked with the legal group because I heard about the allocation or the assessment of damages, rather, through Isaac. But I do know that Jim was the person that made that decision.

Q. Okay. And again, with respect to topic 33, what was your understanding regarding the methodology used in calculating the proportion of potential damages?

MR. KATZ: Objection, form.

MS. BROWN: Objection, form.

MR. KATZ: Instruct the witness not to answer if your understanding comes from legal counsel.

MS. BROWN: Same instruction on behalf of HERA.

A. Well, it's a -- it was an allocation of what the potential damages were, the claims against HERA versus claims against Highland. What I understand is, is that the claim against HERA was potentially the non-offset value of Pat's interest, which was 2.7 or 2.8 million dollars, versus an LTIP award or some award,

**Page 223**

long-term incentive plan at Highland that was like $200,000. And so if you do the math, that's how you wind up 93.4 versus .6.

Q. So it's based upon the amount at stake in zeroing Pat's interest out compared with the value of the LTIP?

MR. KATZ: Objection, form.

MS. BROWN: Objection, form.

A. The zeroing Pat's interest out is the part that I disagree with because it -- it was against gross amounts, potential damages from the onset of the suit.

Q. Gross amount is as opposed to what net amount?

A. Well, the net amount would be zero. I think that's where you were going. I don't want to put words in your mouth but --

Q. So the gross amount of what Pat had at stake as a result of the zeroing out of his interest compared with the amount that Highland would owe under the LTIP.

MS. BROWN: Objection, form.

MR. KATZ: Objection, form.

A. Now I understand. You may have said the very same thing, but I'm -- I'm with you. Yes. That's true.

Q. That I'm correct.

A. Yes.

Q. On behalf of HERA have you reviewed any of the

**Page 224**

damage expert reports or disclosures in this case?

MS. BROWN: Objection, form.

A. No.

(Exhibit No. 88 was marked.)

Q. (By Mr. Chaney) Let me show you what's been marked as Exhibit 88, the affidavit of Mr. Brian Collins, and direct your attention to topic 37.

A. Yes.

Q. Did you review this affidavit in preparation for your testimony today?

A. Yes, I did.

Q. And is Exhibit 1 to Mr. Collin's affidavit --

A. Mine have highlights on it. May be your copy. I didn't mean to interrupt.

Q. Pardon me?

A. The one you gave me has highlights on it. It may be your copy that you're looking for.

Q. Oh.

MR. KATZ: Counsel, I think ours do as well. Do you care? Do you want them back?

MR. CHANEY: Yeah, give them back to me.

MS. BROWN: Mine does not have highlights so.

MR. KATZ: We're fine.

Q. (By Mr. Chaney) Exhibit 1 to Mr. Collins'

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)    74867727-1b30-4191-902d-5cffb000db24

App. 0536

Page 245

return to me by the 28th day of October, 2013;

That pursuant to the information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record and the amount of time used by each party at the deposition:

MR. MARC D. KATZ
ANDREWS KURTH, LLP
1717 MAIN STREET, SUITE 3700
DALLAS, TEXAS 75201
(214) 659-4722
COUNSEL FOR THE PLAINTIFFS HIGHLAND CAPITAL
MANAGEMENT, L.P., CORNERSTONE HEALTHCARE GROUP
HOLDING, INC., AND THIRD-PARTY DEFENDANTS
JAMES DONDERO AND SIERRA VERDE
TOTAL TIME USED: NONE

MR. WILLIAM B. CHANEY
MS. RUTH ANN DANIELS
LOOPER REED & MCGRAW, P.C.
1601 ELM STREET, SUITE 4600
DALLAS, TEXAS 75201
(214) 954-4136
COUNSEL FOR THE DEFENDANT AND
COUNTER-PLAINTIFF PATRICK DAUGHERTY
TOTAL TIME USED: 6 HOURS, 9 MINUTES

MS. SHONN BROWN
MR. MICHAEL HURST
GRUBER HURST JOHANSEN HAIL SHANK
1445 ROSS AVENUE, SUITE 2500
DALLAS, TEXAS 75202-2711
(214) 855-6800
COUNSEL FOR THE THIRD-PARTY DEFENDANTS
PATRICK BOYCE, WILLIAM L. BRITAIN AND
HIGHLAND EMPLOYEE RETENTION ASSETS LLC
TOTAL TIME USED: NONE

MR. ISAAC LEVENTON
HIGHLAND CAPITAL MANAGEMENT, L.P.
300 CRESCENT COURT, SUITE 700
DALLAS, TEXAS 75201
(972) 628-4130
IN-HOUSE COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P.
TOTAL TIME USED: NONE

Page 246

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of the T.R.C.P. will be certified to after they have occurred.

CERTIFIED to by me this 6th day of October, 2013.

*Michelle C. Folks*

MICHELLE C. FOLKS
Texas CSR No. 3192
Date of Expiration: 12/31/13
FOLKS & ASSOCIATES, INC.
P.O. BOX 851168
MESQUITE, TEXAS 75185-1168
Phone: (214) 320-9823
Fax: (972) 226-4574
Firm Number: 2

Page 247

FURTHER CERTIFICATION UNDER RULE 203 T.R.C.P.

The original deposition was/was not returned to the deposition officer on the    day of    , 2013;

If returned, the attached Corrigenda and Signature page(s) contain any changes and the reasons therefor;

If returned, the original deposition was delivered to MR. WILLIAM B. CHANEY, custodial Attorney;

That $    is the deposition officer's charges to the Defendant and Counter-Plaintiff Patrick Daugherty for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

CERTIFIED to by me this    day of    , 2013.

MICHELLE C. FOLKS
Texas CSR No. 3192
Date of Expiration: 12/31/13
FOLKS & ASSOCIATES, INC.
P.O. BOX 851168
MESQUITE, TEXAS 751585-1168
Phone: (214) 320-9823
Fax: (972) 285-1613
Firm Number: 2

62 (Pages 245 to 247)

FOLKS & ASSOCIATES (214) 320-9823

Electronically signed by Michelle Folks (501-307-451-0219)    74867727-1b30-4191-902d-5cffb000db24

App. 0537

**Thomas Uebler**

| | |
|---|---|
| **From:** | Hough, Steven C. |
| **Sent:** | Friday, January 18, 2013 3:41 PM |
| **To:** | Abrams, Kevin |
| **Subject:** | Buyout Update [HERA] |

Thomas Surgent called and told me that the HERA buyout documents were executed this morning, with close to 60% accepting. As we discussed, Highland is going to wait two weeks to extend the offer to HERA's non-employee members.

Thomas explained that the documents related to Joe Dougherty's separate buyout, Amit Walia's removal, and the indemnification amendment were dated January 17. The amendment permitting Dondero to make further amendments, the various member consents, the offer to purchase, and the transfer agreements were dated January 18. Thomas will date the outgoing board's resignations January 19 so that there is no doubt that their resignations occurred only after the transactions were effected.

Thomas added that he was very happy with us all in connection with our work on this project.

Steven C. Hough*
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
Telephone: (302) 778-1004
Facsimile: (302) 261-0294
E-Mail: Hough@AbramsBayliss.com
* Admitted in New York, but not admitted in Delaware

The information contained in this transmission is confidential, proprietary or privileged, may be subject to protection under the law, and is transmitted for the sole use of the intended recipient(s). Any review, dissemination, copying or use of this communication by or to anyone other than the intended recipient(s), without our express permission, is unauthorized. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please notify us immediately by telephone or return e-mail and delete or destroy this communication immediately. To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**EXHIBIT**

**47**

App. 0538

**SECOND AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "*Agreement*") is entered into as of this 16th day of February, 2012 by Highland Employee Retention Assets LLC, a Delaware limited liability company (the "*Company*"), and Highland Capital Management, L.P., a Delaware limited partnership (the "*Initial Member*"), as the sole initial member of the Company and the members of the Board of the Company set forth on the signature pages hereof.

WHEREAS, the original Limited Liability Company Agreement of the Company was entered into on October 26, 2009 (the "*Original Agreement*");

WHEREAS, the Original Agreement was amended and restated effective May 13, 2011 (as amended, the "*Restated Agreement*")

WHEREAS, at least 75% of the Board of Directors of the Company has recommended certain amendments to the Restated Agreement;

WHEREAS, in order to incorporate such amendments and restate the Restated Agreement, the parties hereto hereby approve the further amendment and restatement of the Restated Agreement on the terms set forth herein;

NOW THEREFORE, the Restated Agreement of the Company is hereby further amended and restated in its entirety as follows:

## ARTICLE I

## NAME AND PLACE OF BUSINESS

The name of the Company is Highland Employee Retention Assets LLC. Its registered office in the State of Delaware is 1209 Orange Street, Wilmington, Delaware 19801, in the County of New Castle. The name of its registered agent at such address is The Corporation Trust Company. Its principal place of business is 13455 Noel Road, Suite 800, Dallas, TX 75240 or such other place or places as the Board of Directors may hereafter determine.

## ARTICLE II

## BUSINESS, PURPOSE, AND TERM OF COMPANY

Section 2.1    Purposes. The purpose of the Company shall be to receive and hold assets to be contributed by the Initial Member and to distribute the proceeds of such assets from time to time to certain employees of the Initial Member (or of affiliates of the Initial Member, as applicable) as the Board may from time to time determine in order to create a retention initiative

**EXHIBIT**

**48**

App. 0539

for such employees and to engage in such other lawful purposes and activities in connection with the foregoing.

Section 2.2    Term of Company. The term of the Company shall commence on the date the Certificate of Formation is filed with the Delaware Secretary of State in accordance with the provisions of the Act and shall continue on a perpetual basis unless dissolved pursuant to ARTICLE VI of this Agreement.

Section 2.3    Powers of the Company. In addition to the purpose set forth in Section 2.1 above and subject to Section 5.2, the Company shall have the power:

(a)    to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(b)    to acquire, by purchase, mortgage, lease, contribution of property or otherwise, and to own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(c)    to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with the Initial Member or any person or other entity that directly or indirectly controls, is controlled by, or is under common control with the Initial Member, or any agent of the Company necessary to, in connection with, convenient to, or incidental to, the accomplishment of the purpose of the Company;

(d)    to lend or borrow money and to invest its funds, in each case as necessary to, convenient to, or incidental to, the accomplishment of the purpose of the Company;

(e)    to sue and be sued;

(f)    to appoint employees and fix their compensation; and

(g)    to indemnify any officer, director, employee, agent or holder of Series A Preferred Units of the Company.

ARTICLE III

MEMBERSHIP UNITS; CAPITAL CONTRIBUTIONS

Section 3.1    Membership Units. The capital interests in the Company shall consist of (a) Common Units and (b) Series A Preferred Units, each having the respective rights set forth on Exhibit A, attached. No holder of Series A Preferred Units shall be deemed a member of the Company until such units vest in accordance with Exhibit A, thereafter, such vested holders together with the Initial Member shall be members of the Company (collectively, the "*Members*").

2

App. 0540

Section 3.2    <u>Capital Contribution by Members</u>.  Capital Contributions shall be made, in cash or in kind, from time to time as the Board shall determine.

Section 3.3    <u>Tax Contributions</u>.  To the extent the Company does not possess sufficient available cash to fund the current tax obligations of the Company, the Initial Member shall fund to the Company the full amount of such deficiency in the form of either (a) one or more capital contributions or (b) one or more loans at the then prevailing prime rate maintained by the Company's primary banking institution.

Section 3.4    <u>Capital Accounts</u>.    (a) The Company shall establish and maintain a separate Capital Account for each Member in accordance with Section 704 of the Code and the Treasury Regulations promulgated thereunder, including Treasury Regulations §1.704-a(b) (each such Capital Account, a "*Capital Account*").  The Capital Account maintained for each member shall be equal to:

(i)    the capital contributions made by such member to the Company, if any; *increased by*

(ii)    the aggregate amount of Net Income and other items of income and gain allocated to such Member pursuant to this ARTICLE III; *decreased by*

(iii)    the aggregate amount of distributions made by the Company to such Member; *decreased by*

(iv)    the aggregate amount of Net Loss and other items of deduction, expenditure and loss allocated to such member pursuant to this ARTICLE III.

(b)    The maintenance of Capital Accounts pursuant to this ARTICLE III is intended to comply with the requirements of Section 704 of the Code and the Treasury Regulations promulgated thereunder, and the provisions of this Agreement regarding the maintenance of Capital Accounts shall be interpreted and applied consistently therewith.  If, in the opinion of the Board, the manner in which the Capital Accounts are to be maintained pursuant to this ARTICLE III should be modified in order to comply with the requirements of Section 704 of the Code and the Treasury Regulations promulgated thereunder, then, notwithstanding anything to the contrary contained in this ARTICLE III, the Board may change the manner in which the Capital Accounts are maintained, and the Board shall have the right, upon delivery of written notice to each other Member and without obtaining the consent of any member, to amend this Agreement to reflect any such change in the manner in which the Capital Accounts are maintained; *provided, however*, that any such change in the manner of maintaining the Capital Accounts shall not alter materially the economic arrangement among the Members unless all adversely affected Members consent to the change.

Section 3.5    <u>Allocation of Net Income and Net Loss</u>.  (a) Except as otherwise provided in Section 3.5 hereof, Net Income and Loss shall be allocated pro rata in accordance with each vested Series A Preferred Unit holders Capital Account balance.

(b)    The Members agree to be bound by the provisions of this ARTICLE III in reporting their shares of Company Net Income and Loss for tax purposes.

3

App. 0541

(c)    The cost of performance of any special service required by any member shall be allocated and charged to and borne by such Member. Any Member allocated and charged a particular cost or expense shall be entitled to such deductions or credits as a re-attributable to such cost or expense in computing such Member's taxable income or tax liability to the exclusion of any other Member.

## ARTICLE IV

## DISTRIBUTIONS

Section 4.1    Distributions. No other distributions of any cash or assets of the Company shall be made, except as (a) required by Section 4.2, (b) as permitted under paragraph 2 under Series A Preferred Units on Exhibit A, or (c) as required in connection with the dissolution of the Company.

Section 4.2    Tax Distributions. The Board shall promptly declare and make cash distributions pursuant hereto to the Members to allow the federal and state income tax attributable to the Company's taxable income that is passed through the Company to the Members to be paid by such Member (a "*Tax Distribution*"). To satisfy this requirement, the Company shall pay to each Member on or before April 14 of each Fiscal Year, an amount at least equal to the product of (a) the sum of the Company's positive taxable income attributed to that Member during the prior Fiscal year multiplied by (b) the sum of the highest federal and state individual income tax rates imposed on any Member in effect that prior Fiscal Year.

## ARTICLE V

## MANAGEMENT OF THE COMPANY

Section 5.1    General. The Company shall be managed by a Board of Directors (the "*Board*"), which shall at all times consist of six members, consisting of the following individuals:

> R. Joseph Dougherty
> Patrick Boyce
> John Honis
> William L. Britain
> Amit Walia
> Ted Dameris

The Board shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company. The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement. Each member of the Board shall serve until such member shall cease to hold Series A Preferred Units or until such member's death, resignation or removal from by Board by the unanimous affirmative vote of the remaining Board members. Any vacancies on the Board shall be filled by holder(s) of Series A Preferred Units

4

App. 0542

elected by a majority of the remaining members of the Board, or if no such majority decision can be reached, by the holder(s) of the greatest number of Series A Preferred Units who are not then currently a member of the Board and who are willing to serve on the Board, or if no Series A Preferred Units remain outstanding, as determined by a majority of the remaining members of the Board.

Section 5.2    Delegation of Powers of the Board.    (a) Subject to Section 5.2(b) and ARTICLE XI hereof, the Board shall have the exclusive and complete authority, acting without the consent or approval of, or notice to, the Member and in the Board's sole and absolute discretion, to operate the Company and its business and to make all determinations or elections or to consent to any matter otherwise described in this Agreement. Neither the Member nor any other unitholder shall have the authority to remove any member of the Board.

(b)    Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company shall not, and shall not have power or authority and shall not be authorized to, and the Board shall not, and shall not have power or authority and shall not be authorized to cause the Company to, take any of the following actions without the prior affirmative vote or written consent of at least 75% of the members of the Board:

(i)    dissolve, wind-up or liquidate, in whole or in part, or cause or consent to the dissolution, winding up or liquidation, in whole or in part, of the Company;

(ii)    be a party to any merger or consolidation or sell, transfer, assign, convey or lease any asset of the Company, or cause or consent to any merger or consolidation or sale, transfer, assignment, conveyance or lease of any assets of the Company;

(iii)    directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity, or cause the Company to directly or indirectly purchase or otherwise acquire (other than via a contribution from the Member) all or substantially all of the assets, or any equity interest of any class, of any legal entity;

(iv)    amend, alter, change or repeal any of the provisions of this Agreement;

(v)    incur or assume any indebtedness or obligations except for liabilities under Section 3.3, or cause the Company, to incur or assume any indebtedness or obligations except for liabilities under Section 3.3; or

(vi)    take any Bankruptcy Action with respect to the Company, or take, cause or consent to any Bankruptcy Action with respect to the Company.

Section 5.3    Officers.    The Board may appoint individuals with or without such titles as it may elect, including the titles of President, Vice President, Treasurer, and Secretary, to act on

5

App. 0543

behalf of the Company with such power and authority as the Board may delegate in writing to any such persons.

Section 5.4    Powers of the Board.  The Board shall have the sole right, power and authority, in the management of the business and affairs of the Company, to do or cause to be done any and all acts deemed by the Board to be necessary or appropriate to effectuate the business, purposes and objectives of the Company at the expense of the Company, including but not limited to the execution of all documents or instruments in all matters necessary, desirable, convenient or incidental to the purpose of the Company or the making of investments of Company funds.

Section 5.5    Reliance by Third Parties.  Any person or entity dealing with the Company may rely on a certificate signed by the Board as to:

(a)    the identity of the Board;

(b)    the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Board or are in any matter germane to the affairs of the Company;

(c)    the persons who or entities which are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(d)    any act or failure to act by the Company or as to any other matter whatsoever involving the Company.

Section 5.6    Tax Reporting.  The Board shall endeavor to cause to be prepared after the end of each taxable year of the Company and filed, on or before their respective due dates (as the same may be extended), all federal and state income tax returns of the Company for such taxable year and shall take all action as may be necessary to permit the Company's regular accountants to prepare and timely file such returns.  Form, 1065 (Schedule K-1) shall be sent to the Member and each holder of Series A Preferred Units after the end of each taxable year reflecting such member's or holders pro rata share of income, loss, credit and deductions for such taxable year.

Section 5.7    Tax Election.  Any elections required or permitted to be made by the Company under the Code shall be made by the Board in such manner as the Board shall determine.  In the event of an audit of the Company by the Internal Revenue Service, the Board shall act as the "tax matters partner" pursuant to Section 6231(a)(7) of the Code, and such tax matters partner shall comply with all of his obligations as such under the Code and the regulations promulgated thereunder.  During such time as the Company has one Member, it intends to be treated as a "branch" of such Member for U.S. federal income tax purposes, and during such time as the Company has more than one member, it intends to be treated as a partnership for federal income tax purposes, and the Board shall make any such elections necessary for such purposes and neither the Member nor any holder of Series A Preferred Units shall do anything inconsistent with such characterization.

6

## ARTICLE VI

### DISSOLUTION

The Company shall be dissolved, and shall terminate and wind up its affairs, upon the first to occur of the following:

        (a)      the determination by the Board to dissolve the Company; or

        (b)      the entry of a decree of judicial dissolution pursuant to Section 18.802 of the Act.

## ARTICLE VII

### GOVERNING LAW AND JURISDICTION

This Agreement, including its existence, validity, construction and operating effect, and the rights of each of the parties hereto, shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

## ARTICLE VIII

### INDEMNIFICATION

Section 8.1    Indemnification and Liability.  (a) To the maximum extent permitted by applicable law, no member of the Board, no officer of the Company nor the Member shall be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, or (iii) for losses due to any such mistakes, action or inaction.

        (b)      Except as may be restricted by applicable law, no member of the Board, no officer of the Company nor the Member shall be liable for and the Company shall indemnify each such person and/or the Member against, and agrees to hold each such person and/or the Member harmless from, all liabilities and claims (including reasonable attorney's fees and expenses in defending against such liabilities and claims) against each such person and/or the Member, arising from each such person's and/or the Member's performance of its duties in conformance with the terms of this Agreement.

        (c)      The Board, any officers and/or the Member may consult with legal counsel or accountants selected by the Board and/or the Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

7

App. 0545

# ARTICLE IX

## ASSIGNMENT OF INTERESTS

No interest in the Company, whether Common Units, Preferred Units or otherwise, may be assigned without the prior written consent of the Board, provided, however, that vested Series A Preferred Units may be assigned as set forth on Exhibit A.

# ARTICLE X

## WINDING UP AND DISTRIBUTION OF ASSETS

Section 10.1    Winding Up.  If the Company is dissolved, the Board shall wind up the affairs of the Company.

Section 10.2    Distribution of Assets.  Upon the winding up of the Company, subject to the provisions of the Act, the Board shall pay or make reasonable provision to pay all claims and obligations of the Company, including all costs and expenses of the liquidation and all contingent, conditional or unmatured claims and obligations that are known to the Board but for which the identity of the claimant is unknown.  If there are sufficient assets, such claims and obligations shall be paid in full and any such provision shall be made in full.  If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available therefor.  Any remaining cash and other assets shall be distributed to the holders of any Series A Preferred Units outstanding.

# ARTICLE XI

## SEPARATENESS AND OPERATING PROCEDURES

Section 11.1    Separateness; Operating Procedures.  Until the date on which no Series A Preferred Units remain outstanding, the Company represents warrants and covenants as follows:

(a)    The purpose for which the Company is organized shall be and remain limited solely to (i) directly owning and holding assets to be contributed by the Member and to distribute the proceeds of such assets from time to time to certain employees of the Member in order to create a retention initiative for such employees (the "*Retention Assets*"), (ii) distribute the proceeds of the Retention Assets in accordance with the terms of the Series A Preferred Units of the Company, and (iii) transacting any and all lawful business for which a limited liability company may be organized under Delaware law that is incident, necessary and appropriate to accomplish the foregoing.

(b)    The Company will maintain all of its books, records, and bank accounts separate from those of any affiliate.  The Company's assets will not be listed as assets on the financial statement of any other entity. The Company's assets will not be listed as assets on the financial statement of any other entity; provided, however, that its assets may be included in a consolidated financial statement of its parent if inclusion on such consolidated financial statement is required to comply with the requirements of GAAP, provided that such consolidated

8

financial statements shall contain a footnote to the effect that the Company's assets are owned by it and that they are being included on the financial statement of its parent solely to comply with the requirements of GAAP. The Company will file its own tax returns and will not file a consolidated federal income tax return with any other entity unless required to do so by applicable law or regulation.

(c)    The Company will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any of its affiliates), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, and shall maintain and utilize separate stationery, invoices and checks.

(d)    The Company shall maintain its bank accounts separate from any other person or entity other than a successor in interest and will not commingle its funds and other assets with those of any of its affiliates, other than any successor in interest, or any other person, and will not participate in a cash management system with any such party.

(e)    The Company will not guarantee or become obligated for the debts of any other entity or person or pledge its assets for the benefit of any such entity or person and does not and will not hold itself out as being responsible for the debts or obligations of any other person, or hold out its credit as available to satisfy the obligations of any other person or entity.

(f)    The Company shall allocate fairly and reasonably any overhead expenses that are shared with an affiliate, including paying for office space and services performed by any employee of an affiliate.

(g)    The Company shall hold regular meetings, as appropriate, to conduct its business, and has done or caused to be done and will do all things necessary to observe all customary organizational and operational formalities and to preserve its existence.

(h)    The Company shall pay its own liabilities and expenses out of its own funds drawn on its own, or any successor-in-interest's, bank account.

<div align="center">ARTICLE XII</div>

<div align="center">DISPUTE RESOLUTION; CONFIDENTIALITY</div>

Section 12.1    Dispute Resolution. In the event any Member or holder of units of the Company, including, without limitation, Series A Preferred Units (any such member or holder, a "**Disputing Party**"), commences litigation or, solely with respect to persons who have not executed a separation agreement in favor of the Initial Member unless such action constitutes a breach of such separation agreement, otherwise initiates any dispute or makes any claim, or takes any action that results in any third party making a claim, in each case related to the Company, or the management or operation thereof or the assets held thereby (each, a "**Dispute**") (i) against the Company, any Member thereof, any officer or director or other agent or representative or equity holder thereof (each, a "**Company Party**"), or (ii) that in any way does or could adversely impact any of the assets held by the Company, then with the consent of 75% of the Board, all pending and future distributions to the Disputing Party shall be immediately suspended and held in escrow by the Company (the "**Dispute Escrow**") until the final, non-appealable resolution of the

<div align="center">9</div>

Dispute, it being understood that the expiration of any applicable statute of limitations (including any applicable tolling periods with respect thereto) shall constitute such a resolution (any such resolution, a *"Dispute Resolution Date"*). The full balance of the Dispute Escrow shall be distributed to the Disputing Party promptly following the Dispute Resolution Date, net of the sum of (A) the full costs and expenses incurred by any Company Party in connection with such Dispute, including without limitation, costs and expenses of legal counsel, unless a court of competent jurisdiction has ruled in favor of Disputing Party in a final non-appealable judgment, and (B) any diminution in value to the assets held by the Company resulting from or in connection with such Dispute, as determined by the Board in its sole discretion. Any amount deducted from a Disputing Party's distribution pursuant to the preceding sentence shall be reallocated pro rata to the other Series A Preferred Unit Holders based on their respective holdings of Series A Preferred Units.

Section 12.2    Confidentiality. All matters and information regarding the Company and the assets held thereby are strictly confidential (all such information, *"Confidential Information"*). No holder of units of the Company, including, without limitation, the Series A Preferred Units, shall be permitted to disclose or to use for any purpose any Confidential Information, except as (i) required by law or (ii) as directed and authorized in writing by the Company. In the event any unit holder violates the provisions of this Section 12.2 as determined by 75% of the Board, then the dispute resolution provisions of Section 12.1 hereof shall be deemed to apply as if the violating holder was a "Disputing Party" thereunder pending the Company's resolution of such violation, including, without limitation, the netting provisions under Section 12.1 with respect to the costs, expenses and diminution resulting from such violation.

## ARTICLE XIII

## DEFINITIONS

As used herein, the following terms shall have the indicated definitions.

*"Act"* means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., as may be amended from time to time.

*"Agreement"* means this Limited Liability Company Agreement, as may be amended from time to time.

*"Bankruptcy Action"* means, with respect to any entity:

(a)    Filing or consenting to the filing of any bankruptcy, insolvency or reorganization case or proceeding with respect to such entity;

(b)    Instituting any proceedings with respect to such entity under any applicable insolvency law or otherwise seeking any relief under any laws relating to the relief from debts or the protection of debtors generally;

10

App. 0548

(c)    Seeking or consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such entity or a substantial portion of its properties;

(d)    Making any assignment for the benefit of such entity's creditors;

(e)    Taking any action in furtherance of any of the foregoing; or

(f)    Admitting in writing the inability of such entity to pay its debts generally as they become due.

"*Capital Contribution*" means the contribution by the Member to capital of the Company.

"*Certificate of Formation*" means the Certificate of Formation of the Company as filed with the Delaware Secretary of State on June 23, 2009, as the same may be amended from time to time.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Company*" means Highland Employee Retention Assets LLC, a Delaware limited liability company.

"*Initial Member*" means Highland Capital Management, L.P., a Delaware limited partnership, the holder of the Common Units of the Company.

"*Members*" means the Initial Member and each holder of vested Series A Preferred Units.

"*Net Income*" or "*Net Loss*" means, for any fiscal year of the Company, the taxable income or loss of the Company for such year, as well as any other taxable income or loss (as computed for federal income tax purposes), with the following adjustments: (i) expenditures of the Company that are neither deductible for federal income tax purposes nor allowable as additions to the basis of Company property (or that are so treated pursuant to Section 1.704-1(b)(2)(iv) of the Treasury Regulations) shall be subtracted from such taxable income or loss; and (ii) there shall not be taken into account any items specially allocated pursuant to Section 3.5.

"*Treasury Regulations*" means the Treasury Regulations promulgated under the Code.

*[SIGNATURE PAGE FOLLOWS]*

11

App. 0549

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement the day and year first above written.

INITIAL MEMBER:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By:_____
Name:____James D. Dondero_____
Title:____President_____

COMPANY:

HIGHLAND EMPLOYEE RETENTION ASSETS
LLC, by each of the undersigned directors thereof:

_____
R. JOSEPH DOUGHERTY

_____
JOHN HONIS

_____
PATRICK BOYCE

_____
WILLIAM L. BRITAIN

_____
AMIT WALIA

_____
TED DAMERIS

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement the day and year first above written.

INITIAL MEMBER:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By:_____
Name:_____
Title:_____


COMPANY:

HIGHLAND EMPLOYEE RETENTION ASSETS
LLC, by each of the undersigned directors thereof:

_____
R. JOSEPH DOUGHERTY

_____
JOHN HONIS

_____
PATRICK BOYCE

_____
WILLIAM L. BRITAIN

_____
AMIT WALIA

_____
TED DAMERIS

App. 0551

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement the day and year first above written.

INITIAL MEMBER:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By:_____

Name:_____

Title:_____


COMPANY:

HIGHLAND EMPLOYEE RETENTION ASSETS LLC, by each of the undersigned directors thereof:

_____

R. JOSEPH DOUGHERTY

_____

JOHN HONIS

_____

PATRICK BOYCE

_____

WILLIAM L. BRITAIN

_____

AMIT WALIA

_____

TED DAMERIS

App. 0552

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement the day and year first above written.

INITIAL MEMBER:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By:_____
Name:_____
Title:_____


COMPANY:

HIGHLAND EMPLOYEE RETENTION ASSETS
LLC, by each of the undersigned directors thereof:

_____
R. JOSEPH DOUGHERTY

_____
JOHN HONIS

_____
PATRICK BOYCE

_____
WILLIAM L. BRITAIN

_____
AMIT WALIA

_____
TED DAMERIS

App. 0553

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement the day and year first above written.

INITIAL MEMBER:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By:_____

Name:_____

Title:_____


COMPANY:

HIGHLAND EMPLOYEE RETENTION ASSETS
LLC, by each of the undersigned directors thereof:

_____

R. JOSEPH DOUGHERTY

_____

JOHN HONIS

_____

PATRICK BOYCE

_____

WILLIAM L. BRITAIN

_____

AMIT WALIA

_____

TED DAMERIS

App. 0554

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement the day and year first above written.

INITIAL MEMBER:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By:_____
Name:_____
Title:_____


COMPANY:

HIGHLAND EMPLOYEE RETENTION ASSETS LLC, by each of the undersigned directors thereof:

_____
R. JOSEPH DOUGHERTY

_____
JOHN HONIS

_____
PATRICK BOYCE

_____
WILLIAM L. BRITAIN

_____
AMIT WALIA

_____
TED DAMERIS

App. 0555

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement the day and year first above written.

INITIAL MEMBER:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By:_____
Name:_____
Title:_____

COMPANY:

HIGHLAND EMPLOYEE RETENTION ASSETS LLC, by each of the undersigned directors thereof:

_____

R. JOSEPH DOUGHERTY

_____

JOHN HONIS

_____

PATRICK BOYCE

_____

WILLIAM L. BRITAIN

_____

AMIT WALIA

_____

TED DAMERIS

App. 0556

## Exhibit A

### Rights of Common Units and Series A Preferred Units

**I.    COMMON UNITS**

1.    **General.**

1.1    Authorized/Issued Units. The number of authorized Common Units shall consist of 100 Common Units, all of which shall be issued to Highland Capital Management, L.P.

1.2    Transfer. The Common Units shall be non-transferrable

2.    **Dividend Rights.** No dividends shall be paid on any Common Units so long as any Series A Preferred Units remain outstanding.

3.    **Rights on Liquidation.** The Common Units shall have a residual right to any assets available on liquidation, dissolution and winding up of the affairs of the Company following satisfaction of all creditor claims solely in the event no Series A Preferred Units remain outstanding.

4.    **Voting Rights.** Each holder of shares of Common Units shall not be entitled to vote.

5.    **No Other Rights.** No other rights shall be vested in the holders of the Common Units except as expressly provided in the Agreement.

**II.    SERIES A PREFERRED UNITS**

1.    **General.**

1.1    Authorized/Issued Units. The number of authorized Series A Preferred Units shall consist of 10,000 Series A Preferred Units. The Company shall issue (or reissue, in the case of forfeited units) Series A Preferred Units to such persons and in such amounts designated by the Member, provided that (i) each such person shall be an employee of the Member at the time of issuance, and (ii) each such recipient shall not hold greater than a 10% beneficial interest in the Member at the time of issuance, and (iii) the aggregate number of such issued units shall not exceed the number of authorized Series A Preferred Units provided above. No holder of any Class A Preferred Units of the Company shall have any preemptive right to purchase units sold or issued by the Company except to the extent that such a right may from time to time be set forth in a written agreement between the Company and a unitholder.

1.2    Vesting. Each Series A Preferred Unit issued shall be deemed a *"Restricted Series A Preferred Unit"* until such unit or units vest in accordance with this Section 1.2 or Section 1.3 below. The Restricted Series A Preferred Units shall vest and become non-forfeitable on May 15, 2011. The period commencing on the date of issuance and ending on the date the Restricted Series A Preferred Units vest is referred to as the *"Restricted Unit Period"* as

A-1

App. 0557

to those Restricted Series A Preferred Units. For purposes of this Exhibit and the attached Agreement, references to the Series A Preferred Units shall be deemed to include all such units, whether or not restricted, unless the context expressly provides otherwise. Notwithstanding anything contained herein to the contrary, the Company may provide for vesting terms different than those set forth herein if expressly set forth in the terms of any award letter or agreement pursuant to which Series A Preferred Units are issued or granted.

1.3    Change in Control. If a Change in Control occurs, any Restricted Series A Preferred Units, to the extent then outstanding and not vested, shall become fully vested and non-forfeitable as of the date of such Change in Control. For purposes of this Agreement, *"Change in Control"* shall mean any change in "beneficial ownership" (as defined in Rule 13d-3 under the Exchange Act of 1934, as amended) of at least a majority of the voting securities of the general partner of the Member.

1.4    Termination of Employment. In the event of the termination of any Series A Preferred Holder's employment or service with the Member or affiliate thereof, as applicable, for any reason prior to the lapsing of the restrictions in accordance with Section 1.2 above with respect to any of the Restricted Series A Preferred Units granted hereunder, the entire unvested portion of the Restricted Series A Preferred Units held by such person shall be automatically forfeited as of the date of termination. In the event of any forfeiture, such forfeited units will cease to remain outstanding unless reissued pursuant to Section 1.1 above. Neither the holder nor any of such holder's successors, heirs, assigns or personal representatives shall have any rights or interests in any Restricted Series A Preferred Units that are so forfeited.

1.5    Transfer. No Restricted Series A Preferred Units nor any interest therein, may be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of, except by will or the laws of descent and distribution, during the Restricted Unit Period. Any attempt to dispose of any Restricted Series A Preferred Units in contravention of the above restriction shall be null and void and without effect.

2.    **Dividend Rights.** The Board may elect from time to time to make distributions, in cash or in kind, to the holders of the Series A Preferred Units, provided that (i) all such distributions shall be paid pro rata to each holder of Series A Preferred Units, and (ii) the Company shall provide to the Series A Holders at least 60 days advance written notice of any proposed in-kind distribution and each such holder shall be given the opportunity to forfeit, in whole or in part, its right to receive all or any portion of the assets proposed to be distributed in kind.

3.    **Rights on Liquidation.** The Series A Preferred Units shall have no rights with respect to rights on liquidation, dissolution and winding up of the affairs of the Company, other than with respect to (i) payment of accrued and unpaid dividends through the date of liquidation or dissolution, and (ii) distribution of all other cash and assets of the Company remaining following such liquidation or dissolution.

A-2

**4.**    **Voting Rights.** No holder of shares of Series A Preferred Units shall be entitled to vote.

**5.**    **Miscellaneous.**

5.1    Information Rights. The Company will deliver to each holder of Series A Preferred Units quarterly reports that include (i) such holder's percentage interest in the outstanding Series A Preferred Units, (ii) a current listing of the Company's assets and the fair market values thereof, and (iii) the change in value of such assets since the last such report.

5.2    No Right to Continued Employment. Nothing in this Agreement shall confer upon any holder of Series A Preferred Units any right to continue in the employ of the Member nor of any affiliate thereof, or shall interfere with or restrict in any way the right of the Member or any such affiliate, which is hereby expressly reserved, to remove, terminate or discharge the holder at any time for any reason whatsoever, with or without cause and with or without advance notice.

A-3

App. 0559